1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF OHIO
2       WESTERN DISTRICT

3       - - - - -

4 Kimberly Hill,    :

5     Plaintiff,  :

6   vs.      : Case No. 3:17-CV-00334

7 City of Dayton Police  :
 Department, et al.,
8        :
    Defendants.
9       - - - - -

10
   DEPOSITION OF KIMBERLY ANNETTE HILL
11       - - - - -

12

13    Taken at Walton & Brown, LLP
    395 East Broad Street, Ste. 200
14     Columbus, Ohio 43215
    March 26, 2019, 10:15 a.m.
15

16

17

18

19

20

21

22

23

24

25

2

1                    A P P E A R A N C E S

2

    ON BEHALF OF THE PLAINTIFF:

3
          Walton & Brown, LLP
4         395 East Broad Street, Ste. 200
          Columbus, Ohio 43215
5         By Chanda L. Brown, Esq.

6

    ON BEHALF OF THE DEFENDANTS:

7
          City of Dayton, Ohio Department of Law
8         101 West Third Street
          Dayton, Ohio 45401
9         By Leonard J. Bazelak, Esq.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          Tuesday Morning Session

2                          March 26, 2019, 10:15 a.m.

3                          - - - - -

4              It is stipulated by counsel in

5     attendance that the deposition of Kimberly Annette

6     Hill, the Plaintiff herein, called by the

7     Defendants for cross-examination, may be taken at

8     this time by the notary pursuant to notice and

9     agreement, that said deposition may be reduced to

10    writing in stenotypy by the notary, whose note may

11    thereafter be transcribed out of the presence of

12    the witness; that proof of the official character

13    and qualification of the notary is waived.

14                          - - - - -

15

16

17

18

19

20

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department                Kimberly Annette Hill

4

```
 1              I N D E X

 2   Examination By                              Page

 3   Mr. Bazelak - Cross                           6

 4

 5   Deposition Exhibits                          Page

 6   Exhibit A - E-mail to Hill, Henderson, and
                 Dickie, 3-22-16                  76
 7
     Exhibit B - Police Major Position Description 81
 8
     Exhibit C - OCRC Charge, 5-10-16             83
 9
     Exhibit D - OCRC Charge, 5-26-16             86
10
     Exhibit E - Letter to Couch from O'Dell,
11                6-13-16                         93

12   Exhibit F - Affidavit of Shelley Dickstein  105

13   Exhibit G - Henderson Employee Action Form,
                  8-8-16                         107
14
     Exhibit H - Stiver Employee Action Form,
15                8-8-16                         107

16   Exhibit I - Letter to Hill and Bazelak from
                  Ross, 2-23-17                  109
17
     Exhibit J - Letter to Hill and Bazelak from
18                Ross, 3-16-17                  109

19   Exhibit K - Letter to Hill and Biehl from
                  Boggs, 4-27-17                 110
20
     Exhibit L - Letter to Hill and Biehl from
21                Boggs, 5-18-17                 113

22   Exhibit M - OCRC Complaint and Notice of
                  Hearing, 5-24-17               114
23
     Exhibit N - EEOC Dismissal and Notice of
24                Rights, 6-26-17                115

25
```

5

1                     I N D E X (Cont'd.)

2    Deposition Exhibits                                Page

3    Exhibit O - EEOC Notice of Right to Sue,
                 4-4-18                                 116
4
     Exhibit P - E-mail to Ecton from Hill,
5                9-8-15                                 134

6    Exhibit Q - E-mail to Booher from Johns
                 with trail, 1-7-15                     137
7
     Exhibit R - E-mail to Hill from Ecton with
8                trail, 11-2-16                         173

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

```
 1              KIMBERLY ANNETTE HILL,
 2   being first duly sworn, as hereinafter certified,
 3   deposes and says as follows:
 4   BY MR. BAZELAK:
 5   Q.        Good morning, Lieutenant Hill.
 6   A.        Good morning.
 7   Q.        I'm Len Bazelak.  We've met before.
 8   A.        Right.
 9   Q.        It's probably been a while.
10   A.        Yes, been a while.
11   Q.        But I'm in the law department for the
12   City and represent the City in the lawsuit that
13   you filed in federal court.  And I'm going to ask
14   you a series of questions today --
15   A.        Okay.
16   Q.        -- in a deposition.  Have you ever
17   given a deposition before?
18   A.        Never.
19   Q.        Okay.  I'm sure you've gone over sort
20   of the ground rules for a deposition with your
21   counsel --
22   A.        Yes.
23   Q.        -- but just a few reminders.  You have
24   to give verbal or audible answers --
25   A.        Okay.
```

7

1   Q.          -- to my questions so our court

2   reporter can take down --

3   A.          Right.

4   Q.          -- responses.  Nods of the head,

5   uh-huhs, huh-uhs, those don't translate on the

6   record.

7   A.          Right.

8   Q.          So if you can give an audible answer --

9   A.          Okay.

10  Q.          -- that would be much appreciated,

11  okay?

12  A.          Okay.

13  Q.          Secondly, if you could let me finish my

14  question before you start to give an answer, and

15  I'll extend the same courtesy to you.  I'll try to

16  let you --

17  A.          Sure.

18  Q.          -- finish your answer before I start

19  the next question.  It will make for a much

20  easier --

21  A.          Okay.

22  Q.          -- translation of the record.

23  A.          Got it.

24  Q.          All right.  If you need to take a break

25  at any time, just let your attorney know.  If you

8

```
 1   don't understand one of my questions, please let

 2   me know and I'll try to clarify it for you, okay?

 3   A.        Okay.

 4   Q.        All right.  Are you on any type

 5   of -- well, first of all, let's just start with

 6   your full name and give us your professional

 7   address.

 8   A.        Kimberly Annette Hill, 335 West Third

 9   Street, Dayton, 45402.

10   Q.        Okay.  Are you on any type of

11   medications that would impact on your ability to

12   give accurate answers here today?

13   A.        No.

14   Q.        Okay.  I'm going to ask you some

15   background questions.  I won't get into too much

16   detail, but just a few personal background

17   questions.  Have you ever been married?

18   A.        No.

19   Q.        Okay.  Do you have any children?

20   A.        No.

21   Q.        Okay.  Where were you born?

22   A.        In Dayton.

23   Q.        Okay.  Let's talk about your

24   educational background.  Where did you go to high

25   school?
```

9

```
 1   A.          Patterson Co-op High School.  It's not
 2   there anymore, but --
 3   Q.          Okay.  What year did you graduate?
 4   A.          1977.
 5   Q.          Okay.  And just take us through your
 6   educational background after high school.
 7   A.          I went to Sinclair and graduated there.
 8   I went to UD and graduated there.  And I did some
 9   work -- some graduate studies at Wright State for
10   a couple semesters.  And I'm currently attending
11   Liberty University online for a Master's degree.
12   Q.          Okay.  So Sinclair, did you go to
13   Sinclair right after high school?
14   A.          I think I went maybe a year or so
15   after.
16   Q.          Okay.  So you graduated in 1977 and you
17   think you may have started in Sinclair about 1978
18   or so?
19   A.          Somewhere around there.  It's been a
20   while.
21   Q.          All right.  And you said you graduated
22   from there.  You got an Associate's degree?
23   A.          Right.
24   Q.          All right.  What was your degree in at
25   Sinclair?
```

10

1    A.          Liberal arts, Associate's of science

2    and liberal arts.

3    Q.          All right.  And then did you graduate

4    from Sinclair with an Associate's degree, then,

5    about 1980 or so, is that correct, '81?

6    A.          It was in '85 --

7    Q.          Okay.

8    A.          -- because I did some -- I joined the

9    military in between there and did some training

10   and went through ROTC while I was at Sinclair and

11   at UD.

12   Q.          Okay.  So when did you join the

13   military?

14   A.          In -- I don't remember exactly.  I'm

15   thinking -- I went to basic training in '82, I

16   believe, 1982.

17   Q.          Okay.  So you graduated from Patterson

18   Co-op.  Shortly thereafter you started attending

19   classes at Sinclair, and then joined the military

20   during the time that you were taking classes --

21   A.          Right.

22   Q.          -- at Sinclair?

23   A.          The Army National Guard initially.

24   Q.          Okay.

25   A.          And after I got my commission, I

11

1  switched over to the Army Reserve in 1985.  But in

2  between that time I had jobs.  I worked, too,

3  so --

4  Q.          Okay.  So you were working and then you

5  ultimately got your Associate's in 1985 from

6  Sinclair?

7  A.          Right.

8  Q.          Okay.  And then you said during that

9  time you also started taking classes at UD; is

10  that right?

11  A.          Right.

12  Q.          When did you start taking classes at

13  UD?

14  A.          I don't -- I don't remember exactly,

15  because -- I don't remember exactly.  It

16  was -- they overlapped, because I would go to

17  classes at UD and then leave UD and go to a class

18  at Sinclair, so --

19  Q.          Okay.

20  A.          And it was mostly my ROTC training that

21  I did at UD initially.

22  Q.          Okay.  What type of classes did you

23  take at UD?  I mean, what was your concentration?

24  A.          General studies.  I did a lot of

25  science.  Mostly at Sinclair I did my math and

12

1    English and chemistry, and then when I went to UD,

2    I just started into just general studies type

3    things, physiology, some more chemistry.  Just I

4    had basically a couple different things going on.

5    I liked the arts and the humanities and the

6    sciences, so I put those together and I got my

7    degree in general studies, which is now called

8    interdisciplinary studies.

9    Q.          Got you.  All right.  And so when did

10   you obtain that degree from the University of

11   Dayton?

12   A.          I think it was 2006.

13   Q.          Okay.  So long period of time there.

14   So you anticipate my next question, I'm sure, and

15   that is what took you so long to get your actual

16   degree from UD, from -- you don't recall exactly

17   when you started, but seems like that was a long

18   time.

19   A.          UD's expensive.

20   Q.          Okay.  And you were working at the

21   time, correct?

22   A.          And I worked, yes.

23   Q.          And I'm going to take you through your

24   work background and your work history as well, but

25   I just kind of want to get your educational

13

1    background first.

2              So you were not a continuous student,

3    then, from the time you enrolled at UD until 2006?

4    A.         No.  Part of it was part time.  Part of

5    it I would take a semester or two off, because I

6    was paying for it, and I had student loans, too.

7    So it kind of depended on where I was monetarily.

8    Q.         Okay.  I mean, can you take me through

9    like was there a period of time there where you

10   weren't attending any school and you were just

11   working full time?

12   A.         There may have been brief periods when

13   I wasn't taking anything.  Usually I had -- always

14   took at least something, because I like to learn.

15   So I was always taking something.

16   Q.         Okay.  And that was a general studies

17   degree, then, from the University of Dayton, 2006,

18   correct?

19   A.         Right.

20   Q.         Okay.  Tell me about the Wright State

21   study, then.

22   A.         I took a couple classes in biochemistry

23   and physiology and just trying to find my niche,

24   what I wanted to do.  And that was right after UD.

25   Q.         2007-2008 time frame?  And I don't want

14

```
 1   to --

 2   A.          Could have been.

 3   Q.          Okay.

 4   A.          I'm not sure.  I don't want to -- I

 5   have the information --

 6   Q.          Okay.

 7   A.          -- but it's at home.  I would have to

 8   look it up.

 9   Q.          Did you get an actual degree from

10   Wright State?

11   A.          No, I didn't.  I just took some

12   graduate courses.

13   Q.          Okay.  All right.  And then you said

14   you're currently taking classes at Liberty

15   University.  Are those online classes?

16   A.          Online, yes.

17   Q.          Okay.  What are you taking?

18   A.          Criminal justice with a concentration

19   in public administration.  It's a Master of

20   Science.

21   Q.          Okay.  And is that the Liberty

22   University that's in Lynchburg, Virginia?

23   A.          Yes.

24   Q.          Any other formal education?  I think

25   you said something about some criminal -- other
```

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

15

1   criminal justice-type classes.

2   A.          No.

3   Q.          No?

4   A.          No criminal justice classes at all till

5   now.

6   Q.          Okay.  All right.  So no other -- we've

7   talked about all the formal education that you've

8   had?

9   A.          Uh-huh.

10  Q.          All right.  That's a yes?

11  A.          Yes.

12  Q.          Sorry.  I'll remind you.

13  A.          That's okay.

14  Q.          All right.  Let's talk about your work

15  history.  And I'm also going to go back to some of

16  your military background.

17              After 1977 when you graduated from

18  Patterson Co-op, what was your first employment?

19  A.          Oh, gosh.  While I was in high school,

20  because Patterson Co-op was a technical school and

21  we worked two weeks and went to school two weeks,

22  I worked at what was then St. Elizabeth Medical

23  Center in the medical records department.

24              And after I graduated, I think my next

25  job was at the Dayco Corporation, which doesn't

16

1    exist anymore.

2              What else did I do?  I worked for Blue

3    Cross and Blue Shield, and I don't remember the

4    years.  I don't remember which came first or -- I

5    worked for Montgomery County for a while.

6    Q.         How long did you work for the County?

7    A.         Maybe a year.

8    Q.         You remember approximately when that

9    would have been?

10   A.         It was definitely after high school,

11   and I think -- I can't remember.  It was for the

12   WIC program.

13   Q.         What's that?

14   A.         I worked for the Women, Infants and

15   Children.

16   Q.         Okay.  That's what you did for the

17   County?

18   A.         Right.  And they had different sites

19   for young mothers who were disadvantaged, and we

20   enrolled them in the program so they could get

21   food for their children, for their babies, and

22   milk and things that they needed.

23   Q.         Okay.  What did you do for Blue

24   Cross/Blue Shield, office-type job, or --

25   A.         I think I just did -- I was a

17

1   representative there; just gave benefit

2   information.

3   Q.          What do you recall next, then?

4   A.          I think that was it.  I went to school

5   full time at UD, and before I finished, I started

6   working for the police department, and I've been

7   there ever since.

8   Q.          Okay.  So your military background, you

9   said you started at UD in the Army National Guard;

10  is that right?

11  A.          Army ROTC at UD.

12  Q.          Army ROTC, yeah.

13  A.          And when I got my -- that's when I went

14  to basic training and all that.  After I got my

15  commission in '85, which is the same time I got my

16  degree from Sinclair, I switched from the Army

17  National Guard to the Army Reserves as a second

18  lieutenant.

19  Q.          Okay.  So was that the first kind of

20  law enforcement/military type --

21  A.          Yes.

22  Q.          -- job that you had was the ROTC --

23  A.          Right.

24  Q.          -- experience with UD?

25  A.          Yes.

18

1   Q.         And you don't recall exactly when that

2   was, the date, year?

3   A.         Not when I started, I don't.  I got my

4   commission in 1985 --

5   Q.         Okay.

6   A.         -- so probably two, three years before

7   that, maybe, and I went to basic training in 1982,

8   I believe, so within that two, three-year span.

9   Q.         Okay.  And then when did you start with

10  the City?

11  A.         I went to the Academy in October 1988

12  and I finished March 9th, 1989.

13  Q.         All right.  And was it after that time,

14  then, that you switched over to the Reserves?

15  A.         No.  I was already in the Reserves.

16  Q.         Already in the Reserves --

17  A.         Right.

18  Q.         -- at the time that you started with

19  the City?

20  A.         Yes.  And I can't remember how long I

21  stayed in the Reserves, but my mom got sick and I

22  had to help take care of her.  So it was kind of

23  hard to do, to work weekdays and take weekends off

24  to go to drill and take care of my mom.  It was

25  kind of hard.  So I ended up resigning my

19

1    commission, and that was maybe in '91 or '92,

2    something like that.

3    Q.        Okay.  Is your mother still living?

4    A.        No.  She died in 2000.

5    Q.        2000?  What about your father?

6    A.        He's still alive.

7    Q.        Okay.  All right.  So have we gone over

8    anything you can recall?  And I know there may

9    have been odd jobs here and there that you may

10   have done, but in terms of any significant

11   employment for any extended period of time, a few

12   months or longer, do you recall any other

13   employment other than what we've talked about?

14   A.        I think that's it --

15   Q.        Okay.

16   A.        -- pretty much.

17   Q.        All right.  And then so you graduated

18   from the Academy March 9th, 1989, with the City of

19   Dayton Police Department, correct?

20   A.        Yes.

21   Q.        All right.  Let's talk about your

22   background, then, within the police department.

23            What was your first assignment with the

24   Department?

25   A.        I was assigned to first district on

20

```
1   midnights on patrol.

2   Q.        Okay.  Did you work with somebody at

3   that time?

4   A.        I had a training officer.

5   Q.        And who was that?

6   A.        Carlene Maynes, M-a-y-n-e-s.  She's

7   retired now.

8   Q.        All right.  How long did you train with

9   her?

10  A.        I guess probably the standard six

11  months.

12  Q.        Your probationary period?

13  A.        Right.

14  Q.        Okay.  And then after your probationary

15  period you became a full police officer at that

16  time, correct?

17  A.        Right.  Yes.

18  Q.        Who was -- this, you say, was the first

19  district at that time?

20  A.        Uh-huh.

21  Q.        Who were your supervisors initially?

22  A.        Oh, gosh.  I think -- what was

23  his -- Jeff Nicholson, Sergeant Jeff Nicholson,

24  and he's still retired.

25  Q.        Okay.  Then how long did you do patrol
```

21

1    in the first district?

2    A.        At some point I went to second

3    district, because they switched us around, and I

4    went to second district on midnights.  And I don't

5    know for how long, maybe, six, eight months or so

6    or maybe a year or so.  And then I went to the

7    fifth district on midnights.

8    Q.        Do you know approximately how long you

9    were working in the first district, then, once you

10   started there?

11   A.        Maybe six months.

12   Q.        Okay.  And they all would have been

13   working for Sergeant Nicholson?

14   A.        Yes.

15   Q.        All right.  And then went over to the

16   second district.  How long were you there?

17   A.        Maybe nine months to a year or so.

18   Q.        And who was your -- who were your

19   sergeants that supervised you at that point?

20   A.        Second district?  I don't remember.

21   Q.        Okay.  And then you went to the fifth

22   district?

23   A.        Fifth district.

24   Q.        And when did that --

25   A.        That was after second district.

22

1   Q.        Okay.  So just a few years into your

2   career you were working over at the fifth

3   district, correct?

4   A.        Yes.

5   Q.        All right.  And how long were you in

6   the fifth?

7   A.        I don't know.  I can't remember.  I

8   don't know.

9   Q.        It's okay.  I mean, if you

10  can't -- can you give me an estimate as to if it's

11  months, years, many years, anything that can help?

12  A.        I was there for a while, because I went

13  from midnights to days, and so I was probably

14  there for several years.

15  Q.        Okay.  You remember who your district

16  supervisors were at that time during the stint at

17  the fifth district?

18  A.        Sergeant Maynes was my midnight

19  supervisor, and during the day I think it was Mike

20  Tussing, T-u-s-s-i-n-g, but they're all retired

21  now.

22  Q.        Okay.  Anybody else you can recall at

23  the fifth?

24  A.        No.  That's pretty much it.  And don't

25  quote me on those.  I know Sergeant Maynes was my

23

1   midnight sergeant and I think Mike Tussing was the

2   day sergeant.

3   Q.          Okay.  All right.  And during that

4   entire time, you were just -- you were having an

5   assignment as a patrol officer?

6   A.          Right.

7   Q.          Any other assignments during that time,

8   in the second or fifth district for the time that

9   you were there?

10  A.          No, I don't think so.  But I left for a

11  year or less than a year, like ten months, and

12  that was in -- maybe 2005, I think, and when I

13  came back I went to the third district.

14  Q.          Okay.  What did you leave for, then?

15  A.          I went to -- because I wanted to finish

16  school.  So I finished and got my Bachelor's

17  degree.

18  Q.          Okay.  Did you actually leave the

19  employ of the City?

20  A.          Yes.

21  Q.          And then --

22  A.          And I went full time to --

23  Q.          And you were rehired?

24  A.          Or whatever it is.  You know you can

25  come back and maintain your seniority and

24

1    everything if you come back within a year, so

2    that's what I did.  So I was gone about ten

3    months.

4    Q.        Okay.

5    A.        I did two semesters full time.

6    Q.        So there wasn't any type of break of

7    service in terms of your employment, and you kind

8    of had your job back when you were finished your

9    degree?

10   A.        Right.  Right.

11   Q.        You didn't have to go through

12   everything again?

13   A.        No, didn't have do it again.

14   Q.        Didn't have to go through training, the

15   Academy --

16   A.        No.

17   Q.        -- civil service stuff?

18   A.        No.

19   Q.        Okay.

20   A.        I think they did a background check,

21   just some general stuff --

22   Q.        Okay.

23   A.        -- but nothing like the Academy

24   training or anything.

25   Q.        All right.  And you said that was

25

1   around 2005, and you were then assigned to the

2   third district?

3   A.        Right.

4   Q.        Okay.  Again as a patrol officer?

5   A.        Right.

6   Q.        And who did you work for there?

7   A.        I don't even know.  I think Judy

8   Abshire might have been the sergeant then.  And

9   there were a couple more, but I can't remember

10  who.

11  Q.        How long were you in the third

12  district?

13  A.        I was in the third for a while.  Wait a

14  minute.  I want to say -- you know what?  I think

15  I've got some stuff mixed up, because I was

16  promoted to sergeant in '99 --

17  Q.        Okay.

18  A.        -- so that stuff had to be earlier

19  than --

20  Q.        Okay.  So you may have been in the

21  third district as a sergeant, then, when you went

22  to --

23  A.        No.  I was an officer at third

24  district.

25  Q.        Oh, okay.

26

1    A.        So all my patrol stuff was before '99.

2    And then I did go to the -- I went to recruiting,

3    too.  I did recruiting --

4    Q.        Okay.

5    A.        -- for a while, and I think that's when

6    I was promoted, because I did recruiting in, oh,

7    March of '89 through January '99.

8    Q.        Okay.  Did you go from the fifth

9    district as a patrol officer, then, to a

10   recruiting position?

11   A.        Oh, no.  Wait a minute.  I did patrol

12   in all the districts from March '89 to January of

13   '99, and then when I was promoted, I was actually

14   in the recruitment unit.  So I had made --

15   Q.        Okay.  So 1999 you were promoted to a

16   sergeant.

17   A.        Right.

18   Q.        Okay.  And you were then assigned to

19   the recruiting unit?

20   A.        No.  I was in recruiting as an officer.

21   Q.        What does that mean?

22   A.        I was assigned to the recruitment unit

23   when I was an officer --

24   Q.        Oh, okay.

25   A.        -- so that occurred before I was

27

1    promoted.

2    Q.          Okay.  What were your tasks and duties

3    and responsibilities in the recruiting unit as an

4    officer?

5    A.          We organized and attended recruitment

6    drives and went to churches to try to recruit.  We

7    did background investigations and oral review

8    board for the recruits.

9    Q.          Okay.  What division of the Department

10   was that under?

11   A.          You know, I don't know, but I want to

12   say administrative services --

13   Q.          Okay.

14   A.          -- and --

15   Q.          And who did you work for?

16   A.          That's what I'm thinking of.  It was a

17   male, a white male.  Shoot.  I can see his face,

18   but I can't think of his name offhand.

19   Q.          Okay.  If you think of it, just --

20   A.          Okay.

21   Q.          -- let me know.

22              And then you were promoted to sergeant

23   after you spent time as a patrol officer in the

24   recruiting unit, correct?

25   A.          Right.

28

1    Q.        And in order to be promoted sergeant,

2    did you have to go through a process for that,

3    civil service process?

4    A.        Yes.

5    Q.        And what did that consist of?

6    A.        I know it was a written test, and I

7    think at the time we had -- I don't know.  It may

8    have just been a written test.  And I think we may

9    have had something like an assessment center-type

10   thing for the sergeant's position.

11   Q.        When you say, "assessment center-type

12   thing," what are you --

13   A.        I think we went through some scenarios

14   and there was a written test, but that's -- I

15   can't remember.

16   Q.        So that was, to your

17   recollection - this is back a long time ago - in

18   the late Nineties, early 2000 time period?

19   A.        Right.

20   Q.        There was a civil service process to

21   promote people into the sergeant rank, which

22   consisted of not only a written test that civil

23   service administered, but also an assessment-type

24   exercise that consisted of some type of scenarios

25   that you had to address?

29

```
 1   A.          I think there may have been, but I'm
 2   not really sure.  But when we took -- I took a
 3   couple lieutenant's exams, and one of them had an
 4   assessment center with it --
 5   Q.          Okay.
 6   A.          -- definitely.
 7   Q.          Do you remember how well -- how you did
 8   on the sergeant's test, promotional exam back
 9   then?
10   A.          I was No. 6.
11   Q.          Okay.  And were you promoted after that
12   task?
13   A.          Yes.
14   Q.          The first time?
15   A.          I was in the first round of promotions.
16   Q.          So they took at least six sergeants
17   from that round of testing?
18   A.          Yes.
19   Q.          And I bet you don't recall, because you
20   can't really recall in too much detail whether
21   there was some assessment exercise, but you don't
22   recall how you would have done on that or if there
23   was a particular grade?
24   A.          I might just be thinking of the
25   lieutenant's assessment center, because we had one
```

30

1    for the lieutenant's exam.  I think it was

2    in -- the one I took in 2003.

3    Q.         Okay.  All right.  So what were you

4    assigned to do once you were promoted to sergeant?

5    A.         I went to the east patrol division and

6    I had an evening squad there.

7    Q.         All right.  And just kind of briefly

8    describe for me the different duties and

9    responsibilities now that you were promoted to

10   sergeant from a police officer/patrol officer.

11   And I know you were in the recruiting unit, so

12   those were different than your typical patrol

13   duties, but take me through what the duties and

14   responsibilities were as a sergeant.

15   A.         Primarily to hold roll call and make

16   sure that your people were there, that they had

17   the proper equipment, and when they didn't have to

18   do firearms make sure they were signed up for any

19   type of training in firearms and to respond to

20   calls for service.

21              Certain calls demanded that a

22   supervisor respond, and of course you had to

23   respond to those, or if a citizen requested a

24   supervisor, then we'd respond to those; pretty

25   basic things.  And I think my -- I had my eight to

31

1   ten people on my squad, and I think that's pretty

2   typical for most squads.

3   Q.          But you in that capacity supervised

4   officers that were under your supervision?

5   A.          Right.

6   Q.          Had to fill out reports, things like

7   that --

8   A.          Right.

9   Q.          -- regarding any type of incidents that

10  they may have?

11  A.          Exactly.  Yes.

12  Q.          And that was, again, in, what, east

13  patrol?

14  A.          That was east patrol.

15  Q.          All right.  So we switched here, around

16  that time frame, right, because it was now called

17  east patrol.  Did that used to be third district,

18  sort of?

19  A.          It used to be second district.

20  Q.          Second district?

21  A.          Right.

22  Q.          And you had worked in all the districts

23  at that point, or you had just been in first?

24  A.          I had worked all of them except

25  downtown.

32

1   Q.       Okay.

2   A.       I didn't go to downtown until I became

3   a sergeant.

4   Q.       All right.  And just kind of take us

5   through the geographic areas back then.  The first

6   district was where?

7   A.       That was north Dayton.

8   Q.       Okay.  And then the second?

9   A.       The second district is south Dayton,

10   southeast Dayton.

11   Q.       All right.  Fifth west?

12   A.       Is northwest.

13   Q.       Northwest?

14   A.       And third was southwest.

15   Q.       Southwest?  All right.  And then it

16   became kind of divided into actual geographic

17   locations like east patrol, west patrol, things

18   like that?

19   A.       Essentially they combined first and

20   second districts into the east patrol division and

21   third and fifth districts into the west patrol

22   division.  So we ended up with divisions as

23   opposed to districts.

24   Q.       And you still had a downtown --

25   A.       Right --

33

```
1    Q.        -- patrol?

2    A.        -- still had downtown.

3    Q.        Okay.  Then how long were you a

4    sergeant in the east patrol, then?

5    A.        For about ten months, I think.  Let me

6    see.  Eleven months.

7    Q.        And who was your direct supervisor when

8    you were a sergeant in east patrol?

9    A.        I'm thinking it was Pat Welsh who was

10   the lieutenant there, but he's since retired.

11   Q.        What shift were you working back then,

12   do you remember?

13   A.        We had eight shifts.  Back then I

14   worked 8 P to 6 A.

15   Q.        Okay.  All right.  How long were you a

16   sergeant, then, in east patrol?

17   A.        At that time for eleven months.

18   Q.        All right.  And then what did you do?

19   A.        Then I became an administrative aide

20   for a major who was over the community

21   policing/field services division, or blue zone,

22   because back then we had blue zone and green zone

23   and a major was over each one.  And so I became

24   the aide for the blue zone major.

25   Q.        Which major?  Who was that major?
```

34

1    A.        Jarush Jefferson.

2    Q.        Okay.  And how long were you -- did you

3    serve in that role?

4    A.        To July 2000.

5    Q.        And then where did you go?

6    A.        Then she retired and went to the

7    airport.  Then I went back to east patrol, or back

8    to second district.

9    Q.        Okay.

10   A.        And that was July of 2000, and I was

11   there until June of 2002.

12   Q.        Working for what lieutenant, if you can

13   recall?

14   A.        I think it was Chabali, I believe.

15   Q.        Okay.  Then in 2002?

16   A.        I became the administrative aide for

17   the patrol division major.  And by this time they

18   combined the blue zone and the green zone into one

19   division again.  So I was the aide for the patrol

20   division major.

21   Q.        And who was that major?

22   A.        Kenton Rainey.

23   Q.        Raney, R-a-n-e-y?

24   A.        R-a-i-n-e-y.

25   Q.        All right.  And how long were you

35

1   there?

2   A.          Till December 2003.  Actually I think

3   that should be January 2004.

4   Q.          Okay.  What did you do as an

5   administrative aide?

6   A.          Oh, gosh; handled all the day-to-day

7   things, operations of the patrol division; the

8   major's office, which included revealing

9   investigations and reports; handling the mail;

10  scheduling meetings.

11  Q.          Okay.  And then in January 2004, did

12  you take another assignment?

13  A.          I did.  I went to -- that's when I went

14  to central patrol division --

15  Q.          Okay.

16  A.          -- and I took over the traffic unit

17  there.

18  Q.          What do you mean you took it over?  You

19  were --

20  A.          I was assigned --

21  Q.          -- the sergeant in charge?

22  A.          -- as the sergeant in charge.

23  Q.          Sergeant in charge --

24  A.          Yeah.

25  Q.          -- of the traffic unit in the

36

1    central patrol district?

2    A.          Right.

3    Q.          Is that downtown?

4    A.          Right.

5    Q.          Who was your direct supervisor there?

6    A.          I want to say Matt Carper, but I'm not

7    sure.  I think there might have been somebody

8    there before him, or could have been him.

9    Q.          Okay.  And how long were you there?

10   A.          Till November -- oh, after -- at some

11   point I had to -- somebody retired or something,

12   one of the sergeants retired and I had to take

13   over the three-to-eleven shift.

14   Q.          Okay.

15   A.          Because a sergeant retired, and then I

16   went to the day shift in central.

17   Q.          Okay.  And as I recall, if you change

18   shifts you have a different supervisor, because

19   there's a day commander and a night commander.  Is

20   that how it worked, like a lieutenant that

21   you -- different lieutenant you worked for?

22   A.          I think that's how we do it now.

23   Q.          Okay.  Back then --

24   A.          We still had --

25   Q.          -- a different --

37

1  A.          -- night then, but each district didn't

2  have its own like we have now, so --

3  Q.          So who would you -- you believe you

4  still would have worked for Matt Carper --

5  A.          Probably.

6  Q.          -- at that time?

7  A.          Yes.

8  Q.          Okay.  And then how long did you serve

9  as three-to-eleven shift?

10 A.          I was in that division until November

11 of 2010 when I was promoted to lieutenant.  I have

12 a much better memory from that point on.

13 Q.          I'm sorry.  I missed that.  So say that

14 again, then?

15 A.          From January 2004 to November 2010, I

16 was -- that was downtown.

17 Q.          Okay.

18 A.          And then in 2010 I was promoted to

19 lieutenant, November 2010.

20 Q.          Okay.  Did you work for Matt Carper,

21 then, for that whole time, 2004 to 2010 time

22 period?  Were you the lieutenant over --

23 A.          I remember him being there, but I don't

24 remember if there was anybody before him.  I think

25 he may have been the only one there.  I can't

38

```
 1   remember.

 2   Q.          Okay.  And then you were promoted to

 3   lieutenant in 2010?

 4   A.          Right.

 5   Q.          All right.  Well, let's take a break at

 6   2010, and we'll move forward.  But up until 2010,

 7   did you make any type of complaints of

 8   discriminatory treatment that you believed you had

 9   received in the department?

10   A.          No.

11   Q.          And I take it you got along with all

12   the people that you worked with, whether you were

13   working alongside them or whether they were your

14   subordinates or superiors up until 2010?

15   A.          I did.  I had a couple little

16   skirmishes when I was promoted to sergeant, but

17   they just -- they worked themselves out, so

18   nothing really major.

19   Q.          Okay.  And then the promotion to

20   lieutenant, tell me about that process.  What did

21   that consist of?

22   A.          A written test.

23   Q.          And this was, again, a civil service

24   position?

25   A.          Yes.
```

39

1    Q.          So you have to go through the civil

2    service process, application --

3    A.          Right.

4    Q.          -- written test, approval by the civil

5    service board in order to be hired, correct?

6    A.          Right.  Right.

7    Q.          Background check, everything that they

8    do?

9    A.          I'm assuming.

10   Q.          For the civil service you were an

11   employee, so I don't know if they did a background

12   check for that, but the whole civil service

13   process applied to the lieutenant position.

14   A.          Right.

15   Q.          All right.  And you took a promotional

16   exam for lieutenant.  Do you remember what you

17   scored on that?

18   A.          I think I scored a -- no.  I'm not

19   sure.  It was like the low seventies, 71 point

20   something, or 70 something or something.

21   Q.          Do you remember how many positions were

22   open for lieutenant back then in 2010?

23   A.          I don't remember, but there were three

24   of us on the list, and -- I think there were like

25   20 people that took the test, but only three of us

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

40

1    passed.

2    Q.          What was a passing grade?

3    A.          70.

4    Q.          Who were the three that passed the

5    test?

6    A.          Dave Wolford, Chris Williams, and me.

7    Q.          Okay.  And what's your understanding,

8    then, in terms of in the civil service process the

9    significance of passing the test?  You're not

10   automatically put into -- promoted into a

11   lieutenant position simply because you passed the

12   test, are you?

13   A.          No.  There has to be an opening.

14   Q.          Has to be a vacancy --

15   A.          Right.

16   Q.          -- for the lieutenant position, and

17   were there -- how many vacancies back in 2010 were

18   there?

19   A.          Gosh I don't know.  But something

20   apparently came open because Chris Williams was on

21   the previous lieutenants list, and he was promoted

22   from that list, so that bumped me up to No. 2, to

23   the No. 2 slot.

24   Q.          Okay.  So you were not promoted

25   immediately after taking that lieutenant

41

1    promotional exam?

2    A.          No.

3    Q.          When were you actually promoted?  When

4    did you take the test and when were you promoted?

5    A.          I think the test may have been - let me

6    see - maybe 2008 --

7    Q.          Okay.

8    A.          -- sometime in 2008, I think.  I'm not

9    sure.

10   Q.          All right.  And then was -- is it Rick

11   Wolford?

12   A.          Dave Wolford.

13   Q.          Dave.  Sorry.  It's my handwriting.

14   It's horrible.  Dave Wolford?

15   A.          Right, W-o-l-f-o-r-d.

16   Q.          Dave Wolford, was he promoted to

17   lieutenant off that list?

18   A.          Yes.

19   Q.          Initially?

20   A.          No.  We were both promoted at the same

21   time.

22   Q.          Okay.  Can you take the test -- when

23   can you take the test?  Whenever it's offered?  I

24   mean, but when do they offer the test, you know?

25   I mean --

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

42

1  A.         Well, the lists typically expired every

2  two years, so they were good for two years.

3  Q.         All right.  So when the department

4  anticipates a need to fill a position like

5  sergeant or lieutenant, then they'll offer the

6  test, and then they'll have a list of qualified

7  candidates that they can promote from that list?

8  A.         Yes.

9  Q.         And the list stays open for two years

10 and then it expires?

11 A.         Yes.

12 Q.         And then you'd have to take a new test?

13 A.         Right.

14 Q.         Okay.  And that's how it worked for

15 sergeants and lieutenants, correct?

16 A.         Yes.

17 Q.         But not majors?

18 A.         Majors are appointed positions, so I

19 don't think they go through civil service.  I

20 don't think they do.

21 Q.         All right.  Okay.  So when was

22 your -- what was your first assignment when you

23 were ultimately promoted to lieutenant?

24 A.         I was the east patrol night watch

25 commander for about three months.

43

1   Q.          Okay.  And who did you report to?

2   Would have been a major at that time?

3   A.          Yes.  And I don't know who the major

4   was.  I can't remember who the major was.

5   Q.          Just curious:  Going back to your

6   position as an administrative aide kind of working

7   in the major's office, at that time were you

8   directly reporting to a major and not --

9   A.          Yes.

10  Q.          Okay.  So it wasn't -- you weren't

11  reporting to a separate sergeant or lieutenant?

12  A.          No.

13  Q.          You just worked for the major, correct?

14  A.          Right.

15  Q.          But here the next up in rank from

16  lieutenant is major, correct?

17  A.          Right.

18  Q.          So you would have reported to a major

19  who would have overseen and supervised your

20  assignments, correct?

21  A.          Yes.

22  Q.          But you don't recall who that was?

23  A.          I don't.  There was a lot of movement

24  during that time.  There were a lot of promotions,

25  a lot of movement around, and I can't remember.

44

1    Q.        Who did you work with, then, in terms

2    of kind of the same level as lieutenants or

3    sergeants?  Who --

4    A.        There was another watch commander --

5    Q.        Okay.

6    A.        -- and he kind of showed me the ropes,

7    told me what to do, because it was kind of weird

8    because I was used to having a group of people

9    that reported to me and I held roll call, and as a

10   watch commander you don't do any of that.

11             So one of the -- Lieutenant Bardun,

12   John Bardun.

13   Q.        John Bardun?

14   A.        Yes; kind of took me under his wing and

15   showed me around.  And we went and did -- attended

16   roll calls and responded to critical incidents and

17   things, so --

18   Q.        And he would have been the lieutenant

19   that -- he was there as a lieutenant when you came

20   in as a lieutenant?

21   A.        Right.  Right.

22   Q.        And how long had he been there as a

23   lieutenant?

24   A.        Oh, gosh.  He had been there a while.

25   Q.        In east patrol?

45

1    A.          I think he was downtown.

2    Q.          Downtown?

3    A.          I think he was, so -- but actually I

4    think at the time Bailey had -- they weren't

5    really assigned, except we may have only had one

6    or two watch commanders at the time.  We didn't

7    have them like we have them now.

8    Q.          Okay.  John Bardun, is he a white male?

9    A.          Yes.

10   Q.          All right.  And I take it, then, you

11   appreciated the fact --

12   A.          Oh, yeah.

13   Q.          -- that he kind of showed you the ropes

14   in terms of different responsibilities --

15   A.          Definitely.

16   Q.          -- you weren't used to, correct?

17   A.          Exactly.

18   Q.          And anybody else you can recall working

19   kind of closely with and from when you were first

20   appointed lieutenant in 2010 in the east patrol?

21   A.          No.  It was just him.

22   Q.          Okay.

23   A.          And after a few months then I went to

24   west patrol as the night watch commander.  I think

25   that was in February, maybe, or March.

46

1    Q.         That would have been --

2    A.         February.

3    Q.         -- 2011?

4    A.         Yes.

5    Q.         Okay.  Who did you work with?  And when

6    I ask you, "who did you work with," if you could

7    just tell me if you had other lieutenants that you

8    closely worked with or sergeants that reported to

9    you, reported to you that you recall working --

10   overseeing or supervising or the major that you

11   would have reported to during that time at west

12   patrol.

13   A.         I'm sure I did.  I don't know who it

14   would have been.

15   Q.         Okay.

16   A.         I can't remember.

17   Q.         Was lieutenant Bardun still involved at

18   that time kind of as a --

19   A.         I would just --

20   Q.         -- colleague?

21   A.         Oh, yeah.  I would just call him if I

22   needed something or had a question about

23   something.

24   Q.         Okay.

25   A.         Because I didn't stay with him long.

47

1    We just -- he was just there.  He just --

2    Q.         Okay.

3    A.         But I don't remember who the major was.

4    I don't remember who the major was in west patrol

5    until I went to the day watch commander in west

6    patrol, and that was in -- when did I go there?

7    September of 2011.  And Pat Welsh was the major

8    then.

9    Q.         Okay.  How long, then, were you in west

10   patrol?

11   A.         As the day watch commander?

12   Q.         As day watch commander.

13   A.         Until January 2013.

14   Q.         Okay.  Any issues that you can recall

15   coming up where you felt like you were being

16   treated unfairly or treated in a discriminatory

17   manner in any way based upon your race or gender

18   up until January 2013?

19   A.         I loved Lieutenant Welsh.

20   Q.         Okay.

21   A.         If he was still here, I'd probably

22   still be working for him, hopefully.

23   Q.         Okay.  So no problems with him?

24   A.         None.  None.

25   Q.         Okay.

48

1    A.          He was -- he was excellent until Carper

2    came, and that's when my problems started.

3    Q.          When did Carper go to west patrol?  He

4    was a major then in west patrol?

5    A.          He was promoted to the major after

6    Major Welsh retired --

7    Q.          Okay.

8    A.          -- and he was promoted in 2012.  I

9    don't remember exactly when in 2012.  And he was

10   okay for the first few months, because I had

11   worked for him in central.

12   Q.          Right.  We had talked about that.  For

13   kind of a long period of time you had worked for

14   now lieutenant colonel Carper.

15   A.          Right.  And I work for him now, too, as

16   a lieutenant colonel.

17   Q.          So no problems with him for all that

18   time in central, correct?

19   A.          No.

20   Q.          And then he was put in charge as a

21   major over the west patrol night shift?

22   A.          No.  He was over the whole division.

23   Q.          Over the whole division?

24   A.          The whole division, yes.

25   Q.          Okay.  So you would have directly

1    reported to him, then --

2    A.          Right.

3    Q.          -- as you were the lieutenant?

4    A.          Right.

5    Q.          Night shift, correct?

6    A.          I was day shift by then.

7    Q.          Day shift by then, or the night shift

8    before that on west patrol?

9    A.          Right.

10   Q.          All right.  So when did that occur,

11   then?

12   A.          What?

13   Q.          Carper coming over.

14   A.          Whenever he was promoted.  I think it

15   was May of 2012, I think.

16   Q.          Okay.  And tell me -- tell me what type

17   of issues you had with --

18   A.          Well, we started out okay because I had

19   worked for him before and I had liked him and I

20   thought he liked me.  But then I started noticing

21   little things, when, oh, Wendy Stiver came over to

22   be the night watch commander, and I think the two

23   of them got together and -- because she did things

24   but, you know, they were things that weren't -- at

25   the time I didn't put things together, but where

50

```
 1   today I understand exactly what was happening.

 2              I also went to training in September of

 3   2012, and that's when, you know, things started

 4   happening.

 5   Q.         Okay.  What things?

 6   A.         Well, he would give me an assignment,

 7   but -- or send it -- for example, he would send an

 8   e-mail.  It would be for me, but he would put

 9   other people there.  He would always put my name

10   last.  And I know it seems petty, but I couldn't

11   figure out if it was for me why wasn't my name

12   first.

13   Q.         You mean like an e-mail --

14   A.         On an e-mail.

15   Q.         -- distribution to who it's going to?

16   A.         I couldn't understand that.  But it

17   would be something for me to do.

18   Q.         Do you recall any examples of that --

19   A.         No.

20   Q.         -- like the subjects?

21   A.         I don't, and I'll tell you why.

22   Because I didn't know that I would ever need it,

23   so I didn't keep it.  I didn't keep it.  But they

24   were just things that made me uncomfortable, but

25   because I had a good relationship with him, I just
```

51

1    kind of blew it off and just gave him the benefit

2    of the doubt.

3    Q.          All right.  And just so I'm clear, just

4    tell me like in general the circumstance.  So it

5    would be an e-mail regarding a particular subject,

6    and who would the e-mail be going to?  Who's the

7    recipient of the e-mail?

8    A.          It would be me, Wendy, and maybe a

9    sergeant or two or something.  I don't know.  I

10   can't remember specifically.  But he would do that

11   sometimes, and not all the time.  And that's what

12   threw me off, that sometimes he would, which is

13   why I gave him the benefit of the doubt.

14   Q.          Would he send it to all of you?

15   A.          Yes.

16   Q.          Okay.  It wasn't like a cc just to you

17   and --

18   A.          No.

19   Q.          -- sent to them?  It was sent to all of

20   them --

21   A.          It was something that I --

22   Q.          -- but you were always last?

23   A.          But it was something that he needed me

24   to do.  But I'm thinking why not just send it to

25   me.  Or -- I don't care if the other people know,

52

1    but why not -- or put my name first since it's

2    something you want me to do.  So it was just

3    something that I kind of noticed and got under my

4    skin a little bit, but --

5    Q.          Anything else?

6    A.          I had a decent history with him, so I

7    didn't really pay attention to it.

8    Q.          Any other issues, then, problems, any

9    other type of treatment that you took issue with

10   or felt like was discriminatory or created a

11   hostile work environment for you back then?

12   A.          Yes.

13   Q.          Okay.  And this is -- you were put in

14   the PSB position, professional standards bureau,

15   in 2014, I recall.

16   A.          '13.

17   Q.          '13?  Okay.  So the time period I'm

18   talking about -- because we'll get to that time

19   frame, but the time period I'm talking about is

20   before you were put in PSB.

21   A.          Right.

22   Q.          And the people that you were working

23   for and with and supervising at that time, I'm

24   just trying to go through any type of problems

25   that you had, events that occurred that you found

1    offensive.

2    A.          Well, this is what I believe happened,

3    looking back on it, that Carper and Stiver somehow

4    got together and wanted me out.  And they created

5    confusion and dissension within the detectives.

6    They were confused as to who they were to report

7    to because Stiver was always meddling in the

8    detectives, with the detectives when she was a

9    night watch commander and never saw the

10   detectives --

11   Q.          What are you -- okay.

12   A.          -- and it was confusing.  So, anyway,

13   we ended up going out to -- it was a mess.  It was

14   a mess.  They were -- they were kind of fighting

15   each other and then Wendy was putting her two

16   cents in.

17              And so Carper ended up taking us all

18   out for pizza so we could just talk and get things

19   aired out away from the building, which I thought

20   was a great idea until one of them raised their

21   hand and said who do we actually report to?  Do we

22   report to you or do we report to

23   Lieutenant Stiver?  And she jumped in and said

24   something about well, it doesn't matter.  You just

25   report to, you know, whoever.

54

1    Well, you can't do that, because her

2  responsibility was as the night watch commander

3  and she never had any dealings with the

4  detectives, but she would always come in and

5  meddle and get into things.

6    And another thing that really ticked me

7  off about her, too, is I kept cameras and

8  equipment and things in my closet in my office,

9  and she went in to get something one day -- and

10  I'm very neat.  I like to have things in order.

11  And she went and got something, I can't remember

12  what it was, for a camera, and just messed my

13  closet all up, which wasn't necessary.  That did

14  tick me off, because that wasn't necessary.  Just

15  get whatever it is you need, I don't care, but

16  leave my stuff like it was.  And she would always

17  park in my park space if I wasn't there.

18    But initially I took it that

19  maybe -- because she was young and she didn't

20  really, you know, that's just how she was, and

21  once again, I gave her the benefit of the doubt.

22  But, like I said, looking back on things now and

23  knowing what role they played when I went to

24  central investigations and PSB ultimately, I see

25  how those -- back in the west patrol division,

55

1   that's when those things started, and it was just

2   a continuation in the central investigations and

3   PSB.

4   Q.        All right.  Do you have any evidence of

5   Carper and Stiver you said kind of getting

6   together and creating dissension and confusion I

7   think is the words you used?  Do you have any

8   evidence of that, that they did -- and I think

9   what you said is to ultimately try to get rid of

10  you in the division.

11  A.        Or to make things difficult --

12  Q.        Yeah.

13  A.        -- so I couldn't do my job because -- I

14  was coming off a huge success in the west patrol

15  division because the two lieutenants who were

16  there before, Chabali was a detective at the time

17  and he was in third district.  Wilhelm was the

18  lieutenant in the fifth district.  Well, they were

19  tasked with bringing the two districts together

20  into one so that we would have one west patrol

21  operations division, and they weren't able to do

22  it.  These are two seasoned, white male

23  lieutenants who weren't able to do that, and this

24  was from the Chief.

25            Well, here I came in and I'm a new

56

1    lieutenant and I was able to do it and still

2    continue with no lapse in service or anything.

3    And so I think that was -- that may be something

4    that they -- since Chabali and Carper are such

5    good friends, I think there was some talk or

6    whatever.

7           And no, I don't have proof of that.  I

8    only know what happened to me.  I know what I

9    feel.  And I don't have anything in writing.  Even

10   if there had been something in writing, I probably

11   wouldn't have kept it.  Because I never dreamed

12   that I would be sitting here today.  I didn't -- I

13   don't have anything that's tangible.

14   Q.       Yeah.  And I just want to give you a

15   fair opportunity here today to kind of go through

16   any events that you're aware of or incidents or

17   actions taken against you throughout your career

18   that you consider to be -- to have created a

19   hostile work environment for you.

20          And you've told us about this time

21   period with west patrol, and I just want to kind

22   of rehash it.  But you said that you believe

23   Carper and Stiver kind of got together and had a

24   plan to make it difficult for you.

25   A.       I do.

57

1   Q.          Okay.  But you don't have any direct

2   evidence or proof of that, correct?

3   A.          Only what I felt --

4   Q.          Okay.

5   A.          -- because there was no confusion when

6   Major Welsh and I were there.

7   Q.          Okay.  And what was the confusion?

8   Again, is this the pizza event that you're talking

9   about where people were asking who they should

10  report to?  Is that the confusion that you're

11  referring to, or --

12  A.          Well, that's the outcome.

13  Q.          Okay.

14  A.          That's what happened in the outcome.

15  Q.          And I'm still not clear on that.  What

16  did you take issue with regard to that

17  conversation at the lunch where there was an

18  airing-out session?

19  A.          Well, with the fact that she made

20  reference to who you come to, whether it be me or

21  her.  And those are not her words, but that's what

22  she meant, which is not true.  I worked in the

23  day.  They worked the same hours I worked.  She

24  was the night commander.  She should have been

25  working at night, so --

58

1   Q.        Okay.  All right.  And then you

2   mentioned sometimes that she'd park in your

3   parking space and that also she messed up your

4   closet one time, correct?

5   A.        Uh-huh.  I caught her in my office

6   sitting in my chair.  And I didn't like that,

7   because I like boundaries.

8   Q.        Do you have any evidence that

9   Wendy -- who's a white female, correct?

10  A.        Yes.

11  Q.        That she was doing any of this based

12  upon the fact that you're female?

13  A.        I think it was a competition, because I

14  was -- I was senior to her.  And she's a

15  manipulator, and if -- and everybody knows this.

16  I'm not telling you something that I wouldn't say

17  to her or that you wouldn't get from other people,

18  you know.  She does what she needs to do for

19  herself, and everybody knows, common knowledge.

20  And who better to get rid of the black girl than

21  the white male major and the white female

22  lieutenant who has less seniority than the black

23  one.

24            You're there.  You know when you're

25  loved.  You know when you're hated.  Nobody has to

59

1    come and tell me that, because you get different

2    responses from both of those different things.

3    Just because something isn't something you

4    see -- we don't see the wind, but we see evidence

5    of it.  Same thing with gravity, you can't see

6    gravity, but if I stood on the table and got to

7    the end of it, if I took another step, I would

8    fall.  I wouldn't continue to go in a horizontal

9    position.

10            So you know when things are a mess.

11   You feel it very clear.  Now, it is for me

12   because, being African-American, I deal with daily

13   microaggression, so when those microaggressions

14   occur, you know them.  Now you being white,

15   obviously you wouldn't understand that, because

16   you've never felt that.  But we do.

17   Q.       Okay.  Well, I'm just trying to get

18   anything that you can tell me about Wendy Stiver

19   or Carper during this time period that you feel

20   they did to you, took some type of action against

21   you, adverse action against you, that you feel was

22   based upon your gender or race.

23   A.       Yeah.  I feel that they felt that they

24   were entitled.  They have a sense of entitlement.

25   This is what I can do, so I'm going to do it.

60

1    Q.          And what is that based upon, that

2    feeling?

3    A.          Being white, that we're entitled

4    because we're white.

5    Q.          Okay.

6    A.          So we can do what we want to do,

7    because everybody knows that we're just two-fifths

8    of a person anyway.  We're not real people.  And

9    that's what they do is dehumanize you.

10   Q.          Have you ever heard those two

11   individuals make any type of racial or sexist-type

12   comments?

13   A.          No, and you would never -- they would

14   never do that.  They would never do that.  They're

15   too sophisticated.  Because things are covert now.

16   They would never call me a nigger, not to my face.

17   Now, they might do it at their own parties or

18   something where there's only them, but of course I

19   wouldn't hear that.  But I know by the way you

20   treat me.

21   Q.          Okay.  And that's what I'm getting at,

22   the treatment.  So have you told us everything

23   during that time frame that you took issue with

24   regarding Wendy Stiver's interactions with you,

25   Carper's interactions with you during that time

61

1   period that you feel was discriminatory or created

2   some type of hostile environment for you?

3   A.        Yes.

4   Q.        What else?  Oh, you have told us

5   everything?

6   A.        Yeah, but I can tell you that I was

7   happy when I found out I was going to go to the

8   central investigations bureau and I was going to

9   be away from Carper and Stiver.  I was elated,

10  because then I could breathe again.  I wouldn't

11  have to fight or worry about all these little

12  things that were happening that made me

13  uncomfortable.

14  Q.        What was your previous experience with

15  Wendy Stiver before that time period?

16  A.        We were friends.

17  Q.        Okay.

18  A.        I had always gotten along with her, and

19  we would eat together and talk and talk on the

20  phone and -- we were friendly when we were both

21  watch commanders.  We would meet in between the

22  east and west and just talk and, you know, she

23  would come over because we had more shootings on

24  the west side than they did on the east side, and

25  she would come over and, you know, we were

62

1    friends.

2    Q.          Okay.  Up until -- that ultimately you

3    went to PSB, but before that you went to central

4    investigations, correct?

5    A.          Right.

6    Q.          So before you went to central

7    investigations, with regard to any type of feeling

8    that you had with Carper or Stiver, did you make

9    any complaints to any of your superiors about

10   that?

11   A.          No.

12   Q.          And who would have been your superior

13   at that point?

14   A.          Carper.

15   Q.          Well, who would have been above Carper?

16   A.          I think at the time it was maybe Mark

17   Hess, I want to say.

18   Q.          Okay.  So you said that -- you started

19   talking about you were glad to get the assignment

20   in the central investigations unit, correct?

21   A.          Right.

22   Q.          All right.  How did that come about?

23   A.          According to Carper, Major Williams

24   requested me, because he was -- he was a new major

25   and he was assigned to the

63

```
 1    investigations -- administrative services bureau,

 2    and I think he was changing -- I think there was a

 3    lieutenant who wanted to leave, because he was

 4    about to retire, and he wanted to go back to the

 5    street.  So he needed a lieutenant, and he

 6    requested me is what Carper told me.  So I was

 7    glad, because I could start new.  So I looked

 8    forward to doing that.

 9    Q.        Okay.  That was a lateral move?

10    A.        Yes.

11    Q.        Okay.  And still maintained your rank

12    as a lieutenant?

13    A.        Right.

14    Q.        Just a different assignment, right?

15    A.        Right.

16    Q.        But you were working for a different

17    person at that time, and that would have been

18    Major Williams?

19    A.        Right.

20    Q.        And briefly your duties and

21    responsibilities in that position?

22    A.        Oh, under central investigations was

23    the homicide and the assault squad, the special

24    victims unit, crime stoppers, the crime scene

25    investigators.  So I had all them and sergeants
```

64

1    that were assigned there.

2              And I liked Major Williams initially,

3    but then he started to leave me out of meetings,

4    and one meeting in particular.  And, once again, I

5    never thought I would be here, so I just thought

6    that he just forgot about me inadvertently.

7              But then I was taken aback a couple

8    times when he came in my office and said Kim, they

9    tell me that you're just not all that bright.

10   Just out of the blue he would say that.  And he

11   said it three times, and after that third time,

12   you know, I just stopped and looked at him.  They

13   were on different days.  They weren't in all of

14   the same day.  And I told him, you know, Major, my

15   mom always said never underestimate anybody.  And

16   he never said it again.

17   Q.        When he said that -- more than one

18   occasion he said it to you?

19   A.        He said it three times.

20   Q.        When was the first time he said it to

21   you?

22   A.        I don't know.  I had been there maybe a

23   couple months.  I went in January 2013, so maybe

24   around February or March, and then maybe a week or

25   so later he said it again, and a couple weeks

65

1    later he said it again.

2    Q.        Did you make any complaint to anybody

3    about those statements?

4    A.        No.  But, once again, I never, you

5    know -- it stopped, and I just thought it was just

6    an isolated incident, and --

7    Q.        So it was to the extent that you said

8    something to him and it stopped, correct?

9    A.        Right.  So --

10   Q.        Did he make any type of racial or

11   sexist-type of -- use any type of racial or

12   sexist-type language?

13   A.        They don't do that, Mr. Bazelak.  They

14   don't say -- they don't do that.

15   Q.        That's fine.  But the answer to that is

16   no, correct?

17   A.        No.  That's correct.

18   Q.        Anything else with regard to

19   Major Williams other than those statements that

20   you took issue with during your time in the

21   special -- central investigations unit?

22   A.        No, but I could feel that I was not

23   comfortable with him and I was glad to leave

24   there.  And that's when I went to professional

25   standards was in September of 2013.  So I was glad

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

66

1    to be away from him.

2    Q.          Okay.  And then how did that come

3    about, you getting transferred over into the

4    professional standards bureau?

5    A.          There was a lot of movement, again,

6    because there had been promotions, and by this

7    timing Chabali had been a major and then I think

8    he was going to deputy chief, and so there was a

9    lot of promotions and movements.  So -- and they

10   hadn't had a commander in professional standards

11   for about 16 months, and they decided to -- why, I

12   don't know.  Then they decided to fill it.  So --

13   Q.          And had you before 2013 had any

14   experience in performing the roles of a

15   professional standards bureau commander?

16   A.          No, just other than what I did as a

17   lieutenant in -- because we all had some basic

18   duties that are -- that are common for a

19   lieutenant.  But the one advantage I had is that I

20   had two assignments as an administrative aide, and

21   that gave me access to -- I had to review all

22   types of investigations and things.  So -- and

23   then there was a previous professional standards

24   commander, Jerry Smith, who was married to Wanda

25   Smith.  He came over to assist sometimes, because

67

1    we had such a high volume of investigations when I

2    was in the patrol aide, and he came to assist with

3    getting some of those done and he taught me how to

4    look for things.

5    Q.          But for 16 months there was no

6    commander in the PSB, which is sort of like called

7    what people refer to -- used to refer to as

8    internal affairs --

9    A.          Right.

10   Q.          -- is that fair?

11   A.          Right.

12   Q.          So professional standards bureau,

13   they're kind of investigating officers'

14   misconduct?

15   A.          Right.

16   Q.          Either through citizen complaints or --

17   A.          Right.

18   Q.          -- other type of disciplinary

19   processes?

20   A.          Right.  Right.

21   Q.          And for 16 months or so there was no

22   commander in there, so the sergeants in that

23   division were kind of --

24   A.          They were the acting --

25   Q.          -- acting --

68

1   A.          -- bureau commanders.

2   Q.          And having to do the work, as acting,

3   the work that a commander would normally do?

4   A.          Right.

5   Q.          All right.  And who actually

6   transferred you over to the division, then?  I

7   mean, ultimately is it the Chief that does that?

8   A.          Right.

9   Q.          Did Colonel Ecton have any --

10  A.          He was a major at the time.

11  Q.          He's a retired colonel, now, right,

12  major at the time?

13  A.          Yes.

14  Q.          So did he have any role in you getting

15  that position?

16  A.          He said at some point that he did.  I

17  don't know.  The only thing I knew is that I was

18  going from central investigations to professional

19  standards.

20  Q.          Was that kind of a prestigious

21  transfer, I mean, to get into the PSB?  Is that in

22  the Department considered to be a --

23  A.          It's a coveted position.

24  Q.          -- good position?

25  A.          Yes.

69

1    Q.          And did you have discussions with then

2    Major Ecton about the position?  Do you recall any

3    specific discussions about that before you were

4    transferred?

5    A.          No, not that I can remember.  As far as

6    what?

7    Q.          About your interest in it, how he felt

8    about you going over there.

9    A.          I think the interest came from -- I

10   don't remember where this e-mail came from, but it

11   went to all the lieutenants.  I think it came from

12   Colonel Hess.  And he wanted to know the top three

13   or four assignments we wanted to do --

14   Q.          Okay.

15   A.          -- and I think we had to send them to

16   him, and professional standards was on my list.

17   Q.          Do you know who else would have been

18   interested in going over there?

19   A.          According to Colonel Ecton, there were

20   other people who were just waiting for me to leave

21   so they could take my job.  So I was -- I was

22   having to watch my back.

23   Q.          Okay.  And then who was in the PSB when

24   you were transferred over there?

25   A.          There were two sergeants that were

70

1    directly in there, Sergeant Rike and

2    Sergeant Reboulet, and then there were detectives

3    in there, too.

4    Q.        And who were they?

5    A.        Doug Hall, Scott Culham, and Howard

6    Jordan.

7    Q.        All right.  And then eventually there's

8    some different detectives --

9    A.        Right.

10   Q.        -- that worked as detectives in the

11   division under you --

12   A.        Right.

13   Q.        -- before you left, and we'll talk

14   about that.  But who were they?

15   A.        Doug Hall left because he was Carper's

16   friend.  He apparently didn't want to work under

17   me, which was fine with me.

18   Q.        How do you know that?

19   A.        Well, he said it in so many words.  I

20   knew he wanted to leave, but he had to wait

21   for -- he wanted to go to a detective section.

22   Q.        But in terms of not wanting to work

23   with you, did you hear him say that?  Did you hear

24   anyone else say that?  Was it in writing anywhere?

25   A.        They don't say, you know --

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

71

1    Q.          Okay.  I got it.

2    A.          -- I don't want to work.

3    Q.          But if you have --

4    A.          It was apparent --

5    Q.          Okay.

6    A.          -- that, you know -- Rike and Reboulet

7    had told me that.  They said they didn't think he

8    should have been there anyway, but that was

9    Carper's pick.  So he -- any time you were there

10   he was okay working under Carper, because

11   obviously Carper selected him.  He was obviously

12   okay working under the white male sergeants,

13   because he stayed there.  And it wasn't until I

14   got there that he expressed that he wanted to go

15   to a different -- go to a detective section in one

16   of the patrol divisions.  So I just deduced

17   that --

18   Q.          All right.  And we're going to get to

19   some more questions here, but do you believe that

20   he didn't want to work with you because you're an

21   African-American?

22   A.          I mean, it had to be.  I'm a black

23   female.  I can't take that away.  And Carper is a

24   white male and the sergeants are white males and

25   he's a white male.

72

1    Q.        Okay.  All right.  Who else did you

2    work with as a detective --

3    A.        I think --

4    Q.        -- as -- what detectives did

5    you -- worked for you?

6    A.        I think we replaced him with Daryl

7    Smith --

8    Q.        Okay.

9    A.        -- and Darryl's black.

10   Q.        Okay.  Who else?

11   A.        So that's good.  Then Scott Culham

12   retired and we brought in Dennis Murphy, who is a

13   white male, but he worked for me over when I was

14   in central investigations, and he was a

15   homicide --

16   Q.        Okay.

17   A.        Actually it was Daryl Smith and Murphy

18   worked for me as homicide detectives.

19   Q.        Okay.  And then there's a Gorsuch that

20   came in.

21   A.        Yes.

22   Q.        Who's that?

23   A.        And she -- she replaced -- who did she

24   replace?  Howard Jordan when he left.

25   Q.        He retired?

73

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What was her full name? |
| 3 | A. | Krista, K-r-i-s-t-a. |
| 4 | Q. | Gorsuch, G-o-r-s-u-c-h? |
| 5 | A. | Yes. |
| 6 | Q. | White female? |
| 7 | A. | Yes. |
| 8 | Q. | Howard Jordan, African-American male? |
| 9 | A. | Yes. |
| 10 | Q. | Scott Cann? |
| 11 | A. | Culham. |
| 12 | Q. | Culham, white male? |
| 13 | A. | Yes. |
| 14 | Q. | Hall, white male? |
| 15 | A. | White male. |
| 16 | Q. | Daryl Smith, black male? |
| 17 | A. | Yes. |
| 18 | Q. | And Murphy, white male? |
| 19 | A. | Yes. |
| 20 | Q. | And Rike and Reboulet, white males, |
| 21 | correct? | |
| 22 | A. | Yes. |
| 23 | Q. | All right.  Anybody else in the |
| 24 | division that you worked with or for? | |
| 25 | A. | We had a secretary, a black female |

74

1    secretary who loved Carper and Chabali.

2    Q.        Why do you say that?

3    A.        Oh, she said it.  They were the reason

4    she had her job.  And she told me -- one time I

5    was going to a meeting with Carper and she told me

6    to send him her love, so --

7    Q.        So she basically said things to you

8    that indicated that she felt she was treated

9    favorably by Carper and Chabali?

10   A.        Yes.

11   Q.        As a, what, African-American female?

12   A.        They just -- well, she wasn't

13   any -- she was a secretary.

14   Q.        Okay.

15   A.        And she did what they told her to do.

16   She would take Major Ecton's mail, because she did

17   the mail every day, and she would take his mail to

18   Chabali.  She would bypass Ecton and give it to

19   Chabali.

20             THE WITNESS:  I've got that e-mail,

21   too, as part of the packet.

22   Q.        All right.  I'm going to take you

23   through the rest of your employment history and

24   then kind of switch gears here.  Your direct

25   supervisor at PSB was who?

75

```
1    A.        Ecton.

2    Q.        Ecton during the whole time?

3    A.        Yes.

4    Q.        And then you served in the role as

5    commander of PSB until when?

6    A.        Until May of 2018.

7    Q.        And then you were transferred to a

8    different position?

9    A.        My current position.

10   Q.        Which is what?

11   A.        Inspections and audits.

12   Q.        As a?

13   A.        I'm a commander.

14   Q.        Commander?  Same rank --

15   A.        Yes.

16   Q.        -- lieutenant?

17   A.        Yes.

18   Q.        Same pay and benefits?

19   A.        Yes, although nobody works for me.  I'm

20   by myself.

21   Q.        All right.  We'll talk further about

22   that.  But we've gone through your entire career,

23   then, in terms of positions that you had within

24   the Department, correct?

25   A.        Yes.
```

76

1    Q.          At some point you became interested in

2    applying for the major position that was open in

3    the 2016 time frame, correct?

4    A.          I applied in 2012 also.

5    Q.          Okay.  What happened with that

6    application?

7    A.          We were interviewed and Carper was

8    selected for the major.

9    Q.          You're not claiming in this lawsuit any

10   type of discrimination or failure to be promoted

11   in 2012, are you?

12   A.          No, but that 2012 has some bearing on

13   the 2016.

14   Q.          Okay.  All right.  We'll circle back to

15   that.  You did apply again, though, in 2016,

16   correct?

17   A.          Yes.

18                        - - - - -

19               Thereupon, Deposition Exhibit A is

20   marked for purposes of identification.

21                        - - - - -

22   Q.          Showing you what's been marked as

23   Defendant's Exhibit A, which is e-mail from Mark

24   Ecton to you, Eric Henderson, Matthew Dickie with

25   what appears to be a job posting.

77

```
 1   A.        Uh-huh.

 2   Q.        Yes?

 3   A.        Yes.  Sorry about that.

 4   Q.        That's okay.  I'll remind you.

 5             And is this the job posting, then, for

 6   the major position in 2016?

 7   A.        Yes.

 8   Q.        And the date of that is what, the

 9   e-mail, at least, is what?

10   A.        March 22nd.

11             THE WITNESS:  This is part of your

12   packet, too.  I have the same e-mail.

13   Q.        March 22nd, 2016?

14   A.        Yes.

15   Q.        Okay.  So is this your first

16   notification, then, of the job posting that you

17   received, or at least got a little more formal

18   notice of it?

19   A.        I believe that Chief sent something out

20   when I was going through my whole packet and

21   putting stuff together.  I believe Chief sent

22   something out and then Ecton sent this one after

23   the one that the Chief sent.

24   Q.        Okay.  But, in any event, you were

25   notified that there was a posting for a major
```

78

1   position within the department, correct?

2   A.          Yes.

3   Q.          And this is an unclassified position,

4   true?

5   A.          Now, you know I get confused about

6   classified and unclassified, but I think majors

7   and the deputies are unclassified.

8   Q.          Unclassified in that they're appointed

9   by the City manager; is that your understanding?

10  A.          Okay.

11  Q.          Is that correct, your understanding?

12  A.          I don't know who appoints.

13  Q.          Okay.

14  A.          I just --

15  Q.          But this is -- the major position you

16  knew back in 2016 was not a civil service position

17  where you --

18  A.          Right.

19  Q.          -- took a test and were promoted off of

20  a --

21  A.          Right.

22  Q.          -- list, correct?  You had to go

23  through an application, resume -- submit resume

24  process, interview, and, in this particular case,

25  an assessment, right?

79

1    A.          I didn't know about -- we didn't know

2    about the assessments initially --

3    Q.          Okay.

4    A.          -- when this came out.  That wasn't

5    till later.

6    Q.          Okay.  All right.  And then what did

7    you do, then, in response to this posting?

8    A.          I didn't do anything.

9    Q.          Why not?  Were you interested in the

10   position?

11   A.          Oh, I was very interested.

12   Q.          Okay.

13   A.          Because if you look at the education

14   and experience, it says Bachelor's degree in

15   criminal justice, law enforcement or related

16   field --

17   Q.          Okay.

18   A.          -- and my degree is not in a related

19   field.  It's not in any of those, so that was

20   confusing for me.

21   Q.          Okay.  Did you discuss with anybody

22   whether or not your degree, Bachelor's degree that

23   you had in general studies would have qualified

24   you to meet the education requirement for the

25   position?

80

```
 1   A.        I happened to be in a meeting with

 2   Major Ecton and he just happened to ask me if I

 3   applied for it.  And I told him no, because I

 4   didn't meet the education requirement.  My degree

 5   didn't meet that requirement.

 6   Q.        Okay.  What did he say?

 7   A.        He didn't say anything else to me, but

 8   then after that I got an e-mail from Mr. Couch

 9   saying that it did meet the qualifications, the

10   minimum qualifications.  So -- and he gave me a

11   date that I needed to -- I think they may have

12   sent something back out --

13   Q.        Okay.

14   A.        -- and then that's when I applied.

15   Q.        Okay.  I mean, did you talk to anybody

16   else in terms of whether you could -- you met the

17   minimum education qualifications?

18   A.        No.  I mean, it was pretty clear here,

19   Bachelor's degree in criminal justice I don't

20   have, law enforcement, don't have, nothing

21   related.

22   Q.        Okay.

23   A.        Most of my classes were either science

24   or in the humanities.  I didn't have anything

25   criminal justice at all.
```

81

1    Q.          Okay.  So then it seems like basically

2    on its own the City came to you and said we hear

3    you don't believe you qualify for the position in

4    terms of the educational requirements and you do,

5    and said you can submit an application, right?

6               In other words, it wasn't you going

7    to -- you had the conversation with Ecton, but

8    other than that, you didn't go to HR or anybody to

9    say can I apply?  Do I --

10   A.          No.

11   Q.          -- meet these?

12   A.          No, I didn't.

13                         - - - - -

14              Thereupon, Deposition Exhibit B is

15   marked for purposes of identification.

16                         - - - - -

17   Q.          Okay.  Showing you what's been marked

18   as Defendant's Exhibit B.  Do you recognize that

19   document?

20   A.          Not really.  I don't think I've ever

21   seen this before.

22   Q.          It's a position description for the

23   major position, correct?

24   A.          That's what it says, title, police

25   major --

82

1    Q.        Okay.

2    A.        -- but I don't remember this being

3    attached to the e-mails or anything.

4    Q.        All right.  And, again, it's an

5    unclassified position, correct?

6    A.        Yes.

7    Q.        All right.  And it talks about the

8    duties and responsibilities of the major position.

9    Did you -- you didn't review any type of -- other

10   than that job posting where it talks about

11   responsibilities, did you review the position

12   description?

13   A.        I'm sure I did, but I don't remember

14   this format.

15   Q.        Okay.

16   A.        I don't remember this format.

17   Q.        And the date on that, it says it was

18   updated in 2012, correct?

19   A.        It says it was approved by Timothy

20   Riordan 12-17, 2012.

21   Q.        Right.  And, again, it has the minimal

22   education requirement of a Bachelor's degree in

23   law enforcement, criminal justice, law

24   enforcement, or related field, correct?

25   A.        Uh-huh.

83

1   Q.        Yes?

2   A.        Yes.

3   Q.        And, again, you didn't have a degree in

4   criminal justice or law enforcement.  So the

5   question became whether your general studies

6   degree would be enough to meet the minimal

7   qualifications, right?

8   A.        Yes.

9   Q.        And you felt like it didn't, but then

10  you were told that it did and you were permitted

11  to apply.

12  A.        Right.

13                      - - - - -

14            Thereupon, Deposition Exhibit C is

15  marked for purposes of identification.

16                      - - - - -

17  Q.        All right.  Okay.  Showing you what's

18  been marked as Defendant's Exhibit C, and at the

19  bottom of that page I know it's just a copy, but

20  is that your signature?

21  A.        Yes.

22  Q.        All right.  And you were signing under

23  penalty of perjury that you had read the charges

24  above and that they were true and accurate,

25  correct?

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

84

1   A.         Yes.

2   Q.         And this is the charge -- the first

3   charge that you filed with the Ohio Civil Rights

4   Commission for discrimination, correct?

5   A.         Let's see when this was dated, because

6   I did two of them.

7   Q.         Right.  And this one's dated May 10th,

8   2016.  Do you see that at the bottom?

9   A.         Okay.  That is the first one.

10  Q.         All right.  So I just want to go

11  through the timing of everything.  That's what

12  we're going to go through here.

13          But you got the notice at least through

14  an e-mail back in, say, the March time frame of

15  2016, and then in May of 2016, May 10th, you filed

16  a charge of discrimination, correct, with the Ohio

17  Civil Rights Commission?

18  A.         Yes.

19  Q.         And in there you said that the

20  requirements of the position of major were

21  changed.  Do you see that, under III A?

22  A.         Okay.  Yes.

23  Q.         Okay.  It says, "The requirements for

24  the...position were changed when I was up for the

25  position, usually filled arbitrarily; going by

85

1    seniority, a degree and years of experience."

2              So am I correct, then, that you were

3    filing a discrimination charge at least in part on

4    May 10th, 2016, because you felt like you did not

5    meet the minimum educational requirements for the

6    position after it was changed to require a law

7    enforcement or related degree; is that true?

8    A.         That's partially true.  But because the

9    whole process was changed from the 2012 process

10   and it occurred when it got to -- when I was the

11   next person to be promoted, because previous to me

12   they had been all white males.

13   Q.         Okay.

14   A.         So that's what -- even though all

15   that's not said, stated in there, it's -- because

16   there's only a certain amount of space.

17   Q.         Right.  But you were -- I mean, you

18   were -- obviously felt like you were aggrieved in

19   some fashion because you were not able to apply

20   for the major position.  That's why you went to

21   file a charge, at least in part, right?

22   A.         In part.

23   Q.         Okay.  All right.  But with regard to

24   applying for the position, after you filed this

25   charge, you were able to apply for -- you were

86

1    told you were able to apply for the position,

2    correct?

3    A.          I got an e-mail from Mr. Couch.

4    Q.          Okay.  It was after this charge?

5    A.          Yes.

6    Q.          Okay.  Do you remember when you got the

7    e-mail from Mr. Couch?

8    A.          No.  I don't remember offhand.

9                          - - - - -

10                Thereupon, Deposition Exhibit D is

11   marked for purposes of identification.

12                          - - - - -

13   Q.          All right.  Showing you what's been

14   marked as Defendant's Exhibit D.  Again, is that

15   your signature at the bottom of that document?

16   A.          Yes, it is.

17   Q.          Okay.  And this is the second charge

18   that you filed with the Ohio Civil Rights

19   Commission, correct?

20   A.          Yes.

21   Q.          All right.  Why did you file a second

22   charge?

23   A.          Well, when I went back and spoke with

24   Ms. Freeman and told her I received this e-mail

25   from Mr. Couch --

87

1   Q.          Okay.

2   A.          -- is that okay?  Is it standard?

3   Should that have occurred or not?  And she

4   explained to me that, you know, it's -- you

5   basically have the same complaint.  So why was

6   he -- it's the same thing.  So she did two -- she

7   did a second complaint.

8   Q.          Well, what was different from May 10th,

9   2016, in terms of everything that had happened to

10  you in your employment until May 26, 2016?

11  A.          I don't understand your question.

12  Q.          You filed a second charge on May 26,

13  2016, and my question is what -- what changed?

14  What additional conduct or treatment or action was

15  taken against you from May 10th, 2016, until May

16  26, 2016, when you filed the second charge?

17  A.          Like I said, I contacted Ms. Freeman

18  again and told her that I had been contacted by

19  Mr. Couch, is this normal.  And she felt that it

20  was not normal and that we needed to file a second

21  one.

22  Q.          Okay.  And, for the record,

23  Ms. Freeman is the Ohio Civil Rights investigator?

24  A.          Right.

25  Q.          So she told you to file a second one?

88

```
 1   A.          Yes.

 2   Q.          All right.  The only thing I see here

 3   that's different in terms of what you're alleging

 4   from the first charge is that you said that in the

 5   second paragraph at the last line that you

 6   believed that Respondent, meaning the City of

 7   Dayton, is being deceptive.

 8   A.          Okay.  Where's that?

 9   Q.          Second paragraph, last line.

10   A.          Oh.  I believe that --

11   Q.          It's prefaced by saying that I do

12   now -- you were told basically I do now meet the

13   minimum qualifications and I believe that

14   Respondent is being receptive.

15   A.          Well, my thing is why wasn't it

16   clarified from the beginning, because it's not

17   clear.  I know that Mr. Couch said that it should

18   have been clear, but it's clear if you put it in

19   writing.  They didn't put it in writing.  The only

20   thing they put in writing was you need a degree in

21   criminal justice, law enforcement, or a related

22   field.  So that was supposed to be clear to me?

23   It wasn't.  And that's okay that it wasn't clear

24   to me.

25   Q.          Right.  Which is what's contained in
```

89

```
1    your May 10th, 2016, charge, that you weren't able

2    to apply for the position because you felt like it

3    was -- you didn't meet the minimum educational

4    requirements.

5              And then my question is on May 26,

6    2016, what's changed at that point in terms of any

7    type of discriminatory conduct that you're

8    alleging?

9    A.        I don't understand your question.  I'm

10   sorry.

11   Q.        What do you mean by, "The Respondent

12   was continuing to be deceptive"?

13   A.        Because it changed.  Why wasn't it this

14   way from the beginning?  Why am I suddenly now

15   qualified?  Why do I suddenly meet --

16   Q.        Did you want to not be qualified?  You

17   wanted to qualify, right?

18   A.        Meet the minimum qualifications.

19   Q.        You did meet the minimum

20   qualifications, correct?

21   A.        Yes, according to him.

22   Q.        So you're claiming that you were

23   discriminated against because you were allowed to

24   apply for the position?

25   A.        No, I'm not.  I'm saying that they're
```

1   being deceptive because why are they changing?

2   Either I'm qualified for it the first time or I'm

3   not.

4   Q.        Well, I think what you've indicated is

5   that Mr. Couch told you that you did meet the

6   requirements because you had a Bachelor's degree

7   in a related field, which is what it says, right?

8   A.        But that's not the way it was worded

9   from the beginning.  He told me that afterwards.

10  Q.        It was worded -- the job description or

11  the job posting didn't change?

12  A.        No.  The job posting didn't change.

13  Q.        The language is the same --

14  A.        It is.

15  Q.        -- from May 10th --

16  A.        It is.

17  Q.        -- to May 12th, 2016?

18  A.        It is, but apparently in between that

19  time, I got his e-mail.

20  Q.        Right.  Saying that all along you

21  qualified for the position, you meet the -- you

22  met the minimum educational requirements for the

23  position.

24  A.        Mr. Bazelak, I'm telling you what I

25  believed, and that's what you're asking.  You're

91

1  arguing with me about what I believed, and it's

2  not going to change.

3  Q.        Yeah.  I'm trying to get what you

4  believe, why you filed the second charge when the

5  only thing that changed between May 10th and May

6  26th is you received a notification from the HR

7  director, Mr. Couch, that you did meet the minimum

8  educational qualifications --

9            MS. BROWN:  I'm going to object.

10 Q.        -- and you could apply for the

11 position.

12           MS. BROWN:  I think she's answered that

13 several times, so my objection is asked and

14 answered.

15 Q.        You can answer.

16 A.        Then why didn't they change the

17 requirement on the paper?  That looks weird to me.

18 It did appear to be deceptive to me.  So why am

19 I -- why do I get this e-mail from you when we're

20 in the middle of this?  It just didn't seem proper

21 to me.

22 Q.        And you felt that that was

23 discriminatory based on your race and gender?

24 A.        And I felt it was deceptive.  And

25 that's not the only thing.  We're only talking

92

1    about this.  We haven't even gotten into the part

2    about the harassment.

3    Q.          It's all in your May 10th, 2016,

4    charge.  My only question is why are we having

5    another charge on May 26, 2016?

6    A.          Well, my question is what does it

7    matter?  They say the same thing.  To me, if it

8    was deceptive for him to contact me, it was

9    deceptive.

10            MS. BROWN:  And I want to object here.

11   She's answered this question several times.  We're

12   not here based on the charge that was filed with

13   the OCRC.  We filed a complaint.  So these things

14   aren't even relevant to the matter that we're here

15   about.

16            MR. BAZELAK:  Okay.

17            MS. BROWN:  Plus we've already found

18   probable cause.  The OCRC found probable cause for

19   these charges listed.  So, again, asked and

20   answered.  They're irrelevant.  The objections are

21   pretty long.

22   Q.          Okay.  So, again, deceptive is really

23   what you felt was the need to file another charge

24   was that somehow the whole communication regarding

25   the fact that you met the minimum educational

93

1   requirements was deceptive.  That's what you put

2   in here, right?

3   A.          I put in there what it said.

4   Q.          Okay.  All right.  You ultimately went

5   through the application process, correct, for the

6   major position?

7   A.          Yes.

8   Q.          And you submitted your application and

9   resume --

10  A.          Yes.

11  Q.          -- right?

12              And you went through an assessment

13  center exercise, correct?

14  A.          Yes.

15                          - - - - -

16              Thereupon, Defendant's Exhibit E is

17  marked for purposes of identification.

18                          - - - - -

19  Q.          Showing you what's been marked as

20  Defendant's Exhibit E.  Have you seen that

21  document before?

22  A.          Never.

23  Q.          You've never seen the assessment center

24  report document?

25  A.          Never.

94

1   Q.          I'll give you a chance to review it.

2   And, just for the record, you've never seen it

3   before, but the first page of the exhibit is a

4   cover letter which says that this is the

5   candidates for the major position, the "final

6   scores and remarks from the assessment team" after

7   you went through the assessment center exercises,

8   right?

9   A.          "Enclosed are the candidates' final

10  scores and notable remarks from the assessment

11  team.  Please call...if you have questions."

12  Q.          Right.  And while you may not have seen

13  this document, did you ultimately become aware of

14  how well you did on the assessment center

15  exercises?

16  A.          Only where we were ranked.

17  Q.          Okay.  And you were ranked last or

18  second to last?

19  A.          Second to last.

20  Q.          With a score of 75.42?

21  A.          I never got a score.

22  Q.          Okay.  But that's on the --

23  A.          I don't think I did.  I don't remember.

24  Q.          There are no pages, but -- yes, it is,

25  page 5.

95

1    A.         Okay.

2    Q.         Okay.  So these are the overall scores

3    on the various exercises, and Eric Henderson was

4    the highest, correct?

5    A.         Yes.

6    Q.         And then Wendy Stiver was second?

7    A.         Yes.

8    Q.         And then it went to Joseph Wiesman,

9    third, Matthew Dickie -- or, no, you fourth, and

10   Matthew Dickie, fifth, correct?

11   A.         Uh-huh.  Yes.

12   Q.         And Matthew Dickie was 75 and you were

13   75.42.

14   A.         Yes.

15   Q.         Wiesman was 79.17, correct?

16   A.         Right.

17   Q.         Stiver, 84.9, correct?

18   A.         Yes.

19   Q.         And Henderson, 89.58?

20   A.         Yes.

21   Q.         And the two people ultimately selected

22   for the major position were Eric Henderson and

23   Wendy Stiver.

24   A.         Yes.

25   Q.         Do you take issue with anything on the

96

1  narrative for yourself on page 10?

2  A.        Okay.  What was your question again?

3  Q.        Do you take issue with any of the

4  statements made in the narrative about yourself

5  that were --

6  A.        No.

7  Q.        Okay.  The people that were involved in

8  this process were not associated with the City of

9  Dayton, correct?  They weren't employed by the

10 City of Dayton?

11 A.        Not as far as I know.

12 Q.        Okay.  Did you know any of them

13 beforehand?

14 A.        I know Chief Oliver, because he taught

15 some of our courses at PELC and CLEEP.

16 Q.        Okay.

17           THE REPORTER:  I'm sorry.  Some of your

18 courses on?

19           THE WITNESS:  PELC, the Police

20 Executive Leader College; and CLEEP, Certified Law

21 Enforcement Executive Program.

22 Q.        All right.  And Chief Oliver -- they've

23 got bios of all the individuals.  Chief Oliver,

24 what's his race?

25 A.        He's a black male.

97

1   Q.       And Chief O'Dell is a former chief of

2   police of Kettering since 1985, correct?

3   A.       Yes.

4   Q.       White male?

5   A.       Yes.

6   Q.       And then you had Lieutenant Colonel

7   Cindy Combs Roth, white female?

8   A.       Yes.

9   Q.       Were those the three that were involved

10  in the exercises?

11  A.       Yes.

12  Q.       Okay.  How well did you -- how did you

13  think you did in the exercises?

14  A.       I don't think I did my best considering

15  what I had been going through for quite some time,

16  the environment that I was in for quite some time.

17  Q.       Okay.  What did you feel you didn't do

18  well?

19  A.       I didn't do my best on anything.

20  Q.       Okay.  What did you feel you didn't do

21  your best on?

22  A.       On nothing.  On any of the components I

23  don't feel that I did my best on.

24  Q.       So is there any particular area you

25  feel like you may not have done --

98

1    A.          I don't think I did --

2    Q.          -- well at all or, I mean, all of them

3    basically you just feel like you didn't do that

4    well in every area, because there's --

5    A.          I didn't say I done that well.  I said

6    I didn't do my best.  Had I not been subjected to

7    what I had been subjected to, I'm sure I would

8    have done much better.

9    Q.          Okay.  All right.  And there were

10   various exercises.  There was a written

11   problem-solving exercise, correct?

12   A.          Right.

13   Q.          There was a structured oral

14   presentation?

15   A.          Right.

16   Q.          There was a citizen interaction

17   exercise?

18   A.          Yes.

19   Q.          And there was a structural oral

20   presentation simulation.

21   A.          Right.

22   Q.          Did you tell anybody that you feel like

23   there was something going on with you mentally,

24   emotionally that you didn't -- couldn't perform

25   your best?

99

1   A.          No.  I didn't tell anybody.

2   Q.          And you're not alleging that any of

3   these individuals discriminated against you in the

4   performance of their assessment, are you?

5   A.          No.

6   Q.          With regard to -- and I'll get back to

7   this, but with regard to the two individuals who

8   were promoted, Eric Henderson, African-American

9   male, correct?

10  A.          Yes.

11  Q.          And Wendy Stiver, white female,

12  correct?

13  A.          Yes.

14  Q.          In terms of experience with the

15  Department, do you know how long they had been

16  with the Department?

17  A.          I'm not sure.  I know I was a sergeant

18  when they went to the Academy.  I was already a

19  sergeant, so they had to have come on sometime

20  1999 or later.

21  Q.          Okay.  Do you know when they were

22  promoted to sergeant?

23  A.          I have no idea.

24  Q.          Okay.  So you don't know how long they

25  had served in supervisory roles compared to you --

```
1    A.        No.

2    Q.        -- at the time the decision was made to

3    promote them?

4    A.        To major?

5    Q.        Yeah.

6    A.        I had more experience than them.

7    Q.        Time with the department, but I'm

8    talking about experience as a sergeant or above --

9    A.        And I had --

10   Q.        -- or lieutenant and above.

11   A.        I did have more experience just as a

12   supervisor, because I was a supervisor when they

13   came on, when they were in the Academy, and I'd

14   had various positions.  I had two stints as an

15   administrative aide for a major, and that is huge.

16   That gave me a lot of knowledge.  I had to

17   communicate back and forth with City Hall for

18   things and work with other departments, divisions.

19   So I had already done those things.

20   Q.        But in terms of how long they had been

21   lieutenants compared to you being lieutenant, do

22   you know if that was similar?

23   A.        I was a -- I had more seniority than

24   them as a lieutenant.

25   Q.        How much more in terms of lieutenant,
```

1   being lieutenant?

2   A.          I think -- I think Wendy was -- I was

3   promoted in 2010.  I think she and Henderson were

4   promoted in 2011.

5   Q.          Okay.  So you also -- did you

6   participate in an interview process?

7   A.          Yes.

8   Q.          Okay.  Tell me about that.  Who did you

9   interview with?

10  A.          All the people that I filed the

11  discrimination complaint against except for the

12  black female.  It was Chief Biehl --

13  Q.          You've only --

14  A.          -- Carper.

15  Q.          You've only filed a discrimination

16  complaint against Chief Biehl individually.

17  A.          Well, it was supposed to be everybody

18  else, too.  I didn't know that you had to put

19  everybody's name on there.  But Carper, Ecton, and

20  then Ken Couch was in there to make sure that

21  everything apparently was -- was asked properly.

22  Q.          All right.  So the people you indicated

23  were Carper, Ecton, Couch, Biehl.  Anybody else?

24  A.          There was a black female there.  I

25  don't remember her name.

102

1          But I knew it was a farce.  Everybody

2   knew in the department that Stiver and Henderson

3   were going to be the selected ones even before the

4   assessment center.  That was the talk all through

5   the Department.

6   Q.        Anybody else you interviewed with?

7   A.        No.

8   Q.        Any conversations with City manager?

9   A.        No.

10  Q.        And you're aware that the City

11  manager's the one who ultimately made the decision

12  to appoint Wendy Stiver and Eric Henderson to

13  major?

14  A.        That's what I've been told.

15  Q.        Do you believe Shelley, the City

16  manager, has some type of racial or gender bias

17  against you?

18  A.        I think she does.

19  Q.        What's that?

20  A.        And she may not be aware of it because,

21  you know, there's implicit bias.  Sometimes we

22  don't know, especially with those of us or those

23  of you all who believe that you have these

24  egalitarian views and oh, I'm not racist.  Of

25  course consciously you're not, but unconsciously,

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

```
1   everybody knows -- I mean, science bears it out

2   that we all have implicit biases.

3   Q.        And that bias resulted in her

4   appointing an African-American --

5   A.        I think it had --

6   Q.        -- male and white female --

7   A.        I think it influenced it.

8   Q.        -- instead of you?

9   A.        Not to mention the fact I was next in

10  line.  Now, had I been -- had it been a group of

11  five people and I had been somewhere in there I

12  wouldn't have had anything to say.  But I was next

13  on the list, and he had gone according to and

14  whoever the previous City managers were approved

15  them step by step, white males, until it got to

16  me.

17  Q.        What list are you referring to?

18  A.        I didn't say there was a list.

19  Q.        You said you were "next on the list."

20  A.        Oh, the seniority list.  And that's

21  what Chief used to appoint the previous white male

22  majors.  They went according to seniority.

23  Q.        Do you believe that some type of

24  seniority list is used to determine who gets

25  promoted to the major position?
```

104

1    A.          That was the way it had been, at least

2    until -- at least as of 2012 when we took the exam

3    in -- well, we didn't have an exam in 2012, but

4    when we applied in 2012, he selected based on

5    seniority until it got to me, and now he wants to

6    do an assessment center.  But then he did the same

7    thing to Ecton.

8              MR. BAZELAK:  Al right.  I'd like to

9    take a break, but we've got to move on.  And then

10   we'll take a lunch break in a little bit if that's

11   okay with you.

12   A.          That's okay.

13   Q.          You guys all right?

14   A.          But if you want to take a break, I'm

15   okay with that.

16   Q.          No, I'm good.

17              Okay.  So the City manager ultimately

18   selected two candidates for the major position

19   that -- and did not select you, and the two she

20   selected were the two highest candidates on the

21   assessment score, correct?

22   A.          Yes.  But how much was the assessment

23   center worth versus the interview versus your

24   experience versus your seniority?  Were any of

25   those considered?  We don't know.  We don't know

1   what was weighted.

2            None of those things -- and, like I

3   said, everybody knew in the police department or

4   that was the word on the street that everybody

5   knew that Stiver and Henderson were going to get

6   it, even before the assessment centers took place

7   they were going to be promoted.

8   Q.       Let's do this first.

9                     - - - - -

10           Thereupon, Deposition Exhibit F is

11  marked for purposes of identification.

12                    - - - - -

13  Q.       I'm showing you what's been marked as

14  Defendant's Exhibit F.  We were talking about

15  Shellie Dickstein, the City manager, being the

16  decisionmaker to determine who was going to be

17  promoted to the major position.

18           Have you seen this document before,

19  Exhibit F?

20  A.       I don't think so.

21  Q.       All right.  It's an affidavit that we

22  filed in the Civil Rights proceeding, and it

23  describes Ms. Dickstein's review of your candidacy

24  and the other individuals' candidacy and what she

25  took into account.

106

1          Have you ever seen that?

2   A.          I don't think -- it doesn't look

3   familiar.

4   Q.          Okay.  And she determined that

5   Lieutenant Stiver and Henderson were the best

6   candidates to be promoted based upon reviewing --

7   A.          Okay.

8   Q.          -- documents and the candidacies,

9   correct?

10  A.          Okay.

11  Q.          Do you see that?

12  A.          That's what she said.

13  Q.          Okay.  Have you ever talked to her

14  about it?

15  A.          I don't have anything to say to

16  Shelley.

17  Q.          Okay.  All right.  Do you know when

18  Stiver and Henderson were promoted?

19  A.          Sometime in 2016.

20  Q.          Okay.  Well, I think we identified that

21  the assessment center exercise, and you have that

22  exhibit in front of you, went forward on June 9th,

23  2016, correct?

24  A.          That sounds about right.

25  Q.          All right.  And then this letter's

107

1    dated June 13th, 2016 --

2    A.          Right.

3    Q.          -- where the report's being sent to the

4    City of Dayton, correct?

5    A.          Yes.

6    Q.          All right.  And do you agree that

7    sometime around the August time frame 2016 would

8    have been the time that the promotions -- the

9    decision was actually made in terms of who was

10   going to be promoted to major?

11   A.          That sounds about right.

12                     - - - - -

13              Thereupon, Deposition Exhibits G and H

14   are marked for purposes of identification.

15                     - - - - -

16   Q.          Okay.  You're familiar with what

17   documents in the City forms called P-1's?

18   A.          Vaguely.

19   Q.          Okay.  Let me show you what's been

20   marked as Defendant's Exhibit G and Defendant's

21   Exhibit H, and those are P-1s showing that, if you

22   look at effective date of August 8th, 2016, for

23   both Henderson and Stiver, and you see there that

24   the reason for the personnel change is promotion.

25   A.          Yes.

108

1    Q.          And it's to the position classification

2    of major --

3    A.          Yes.

4    Q.          -- correct?

5    A.          Yes.

6    Q.          So you agree with me that the effective

7    date of the promotions for Eric Henderson and

8    Wendy Stiver was August 8th, 2016.

9    A.          Yes.

10   Q.          Okay.  All right.  Now, I'm going to

11   take you through kind of some history that we have

12   through the Ohio Civil Rights case that you filed.

13            You filed these two separate charges.

14   Go back to those exhibits.  The first charge of

15   May 10th, 2016.  That one has got a date of -- it

16   says -- see the charge number?

17   A.          Yes.

18   Q.          It says (DAY) A6 (25679) --

19   A.          Yes.

20   Q.          -- right?  And it's got 05102016.  I

21   think that's just the date, May 10th, 2016.

22   A.          Right.  That's what it looks like.

23   Q.          Okay.  So the first charge is

24   identified by that number.  That's the May 10th

25   charge, 25679, correct?

1    A.          Yes.

2    Q.          And then the May 26 charge is (DAY) 76

3    (25715), and then the date again, 05262016,

4    correct?

5    A.          Yes.  Yes.

6    Q.          All right.  So ultimately your charges

7    were investigated by Ms. Freeman of the Ohio Civil

8    Rights Commission, correct?

9    A.          Yes.

10   Q.          All right.  And both of your charges

11   were investigated and the Ohio Civil Rights

12   Commission's regional office and

13   Ms. Freeman's -- the charges Ms. Freeman

14   investigated, it was determined that there was no

15   probable cause to issue a complaint of

16   discriminatory practices, correct?  Do you recall

17   that initially?

18   A.          Initially I remember there was a

19   finding of no probable cause.

20                        - - - - -

21          Thereupon, Deposition Exhibits I and J

22   are marked for purposes of identification.

23                        - - - - -

24   Q.          So showing you what we've marked as

25   Defendant's Exhibit I and J, those are the

Kimberly Hill vs City of Dayton Police Department                Kimberly Annette Hill

110

1    determination letters that the Ohio Civil Rights

2    Commission sent out on both the May 10th, 2016,

3    charge and the May 26, 2016, charge determining

4    there was no probable cause to determine that

5    there was discriminatory actions, correct?

6    A.          That's what it says.

7    Q.          Okay.  And then what happened after

8    that is you filed a motion to reconsider that,

9    correct, those determinations?

10   A.          Yes.

11   Q.          All right.  And you went up to the full

12   board of the Ohio Civil Rights Commission and had

13   a hearing and they made some determinations on

14   both charges.  That's your understanding?

15   A.          Yes.

16                      - - - - -

17              Thereupon, Deposition Exhibit K is

18   marked for purposes of identification.

19                      - - - - -

20   Q.          Okay.  Showing you what's been marked

21   as Defendant's Exhibit K, and go ahead and look at

22   the number up there in terms of what this

23   references, the charge that this references.

24   That's the May 10th, 2016, charge, correct?

25   A.          Yes.

111

1   Q.          The date of that letter is April 27th,

2   2017, correct?

3   A.          Yes.

4   Q.          So with regard to the May 10th, 2016,

5   charge that you have as an exhibit there and all

6   the allegations that you put in that May 10th,

7   2016, charge, upon reconsideration of the no

8   probable cause determination, the full board

9   determined itself that there was no probable cause

10  to believe that the City engaged in discriminatory

11  practices with regard to the May 10th charge,

12  correct?

13          That's Exhibit I in front of you.  No.

14  No, Exhibit K.

15          MS. BROWN:  I'm going to object here to

16  discussion of information she didn't write or

17  didn't have any --

18          MR. BAZELAK:  That's fine.

19          MS. BROWN:  If you know.

20  A.          It just says that, "After the finding

21  of No Probable Cause, Charging Party applied for

22  reconsideration."

23  Q.          Right.  We talked about that.  You had

24  the full hearing in front of the board and then

25  they came back with regard to the May 10th charge

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

112

1   and said that there was no probable cause.  You

2   see that on -- the decision on page 2?

3   A.          Okay.

4              MS. BROWN:  Is there a question?  Are

5   you asking her can she read the document?

6              MR. BAZELAK:  Yeah.  I've got to go

7   through it.

8              MS. BROWN:  We can stipulate to the --

9              MR. BAZELAK:  I've got to go through

10  it.

11             MS. BROWN:  We don't.  We can stipulate

12  that these are authentic documents.  I think these

13  were provided to you, so we don't have to read

14  them.  If there's a question about it, fine, but

15  we're willing to stipulate to the authenticity.

16             MR. BAZELAK:  We've got to go through

17  it.

18  Q.          So this was the decision on the

19  reconsideration for the May 10th charge.  That's

20  your understanding?

21  A.          I guess this is what this is.

22  Q.          Okay.  And then the May 26 charge that

23  we looked at before, there was a determination

24  upon reconsideration for that particular charge

25  that there was probable cause.  Do you see that,

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

113

1    on Defendant's Exhibit -- did I mark that yet?  Do

2    you have J?  I think you have one -- the May 18th

3    one?  You don't have that one.

4    A.          This is Exhibit J.

5                MS. BROWN:  May 16th.  That's a

6    different one.

7    Q.          Let's mark that, then.

8                      - - - - -

9                Thereupon, Deposition Exhibit L is

10   marked for purposes of identification.

11                     - - - - -

12   Q.          So showing you what's been marked as

13   Exhibit L, that's the letter of determination upon

14   reconsideration for the May 26 charge, and the

15   determination was there was probable cause,

16   correct?

17   A.          Okay.  Oh, okay.  I see.  There's two.

18   They did them separately.

19   Q.          Right.  They did them separately.  And

20   the one that you got a probable cause

21   determination on was the May 26 charge --

22   A.          Okay.

23   Q.          -- right?

24                And then as a result of that probable

25   cause determination on the May 26 charge, there

114

 1    was a complaint filed on your behalf and you

 2    participated in as a party to that case with the

 3    Civil Rights Commission, a complaint filed.  Do

 4    you remember that?

 5    A.        I remember going before the board.

 6    Q.        Well, this is different.  This is after

 7    the board came out with that decision in Exhibit

 8    L.  Then there was a complaint filed on your

 9    behalf before the Ohio Civil Rights Commission.

10    I'll show it to you.

11    A.        Okay.

12                    - - - - -

13             Thereupon, Deposition Exhibit M is

14    marked for purposes of identification.

15                    - - - - -

16    Q.        Showing you what's been marked as

17    Defendant's Exhibit M.

18    A.        And this is what?

19    Q.        That's your complaint that was filed on

20    your behalf by the Attorney General's Office with

21    the Ohio Civil Rights Commission based upon the

22    probable cause finding related to the May 26,

23    2016, charge that was filed with the Ohio Civil

24    Rights Commission.

25    A.        Okay.

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

1  Q.        Right?

2  A.        I guess.  This is what it looks like.

3  Q.        Okay.  Now, with regard to the -- let's

4  mark that.

5                  - - - - -

6            Thereupon, Deposition Exhibit N is

7  marked for purposes of identification.

8                  - - - - -

9  Q.        Okay.  Showing you what's been marked

10 as Defendant's Exhibit N.  With regard to the no

11 probable cause determination on the May 10th,

12 2016, charge, you were -- you received -- it says

13 your name at the top there, correct?

14 A.        Yes.

15 Q.        Kimberly Hill.  You received a notice

16 of what we call the right-to-sue letter.

17 A.        I could have.  I haven't -- I haven't

18 looked at this stuff in a while.

19 Q.        Okay.  All right.  So this is -- what's

20 the date on that, June 26, 2017, correct?

21 A.        Right.

22 Q.        All right.  So this is the right-to-sue

23 letter that you got because the Civil Service

24 Commission said there was no probable cause to

25 find discriminatory treatment and allowed you to

116

1   file a lawsuit in federal court regarding the no

2   probable cause determination, correct?

3   A.        Oh, okay.

4   Q.        Is that your understanding?

5   A.        No.

6   Q.        Okay.

7   A.        Because I didn't realize that there

8   was -- that they said no to one and yes to the

9   other one.

10  Q.        Mark that.

11  A.        So what's the point?

12                      - - - - -

13            Thereupon, Deposition Exhibit O is

14  marked for purposes of identification.

15                      - - - - -

16  Q.        Now, with regard to the complaint,

17  Exhibit M that was filed with the Ohio Civil

18  Rights Commission, that was with regard to the May

19  26 charge that you filed, correct?

20  A.        Okay.

21  Q.        All right.  And that was -- that

22  complaint was ultimately withdrawn.  Did you

23  withdraw that complaint, do you know?

24  A.        Not to my knowledge.

25  Q.        Okay.

117

1    A.          I mean, I could have.  I don't know.

2                THE WITNESS:  Did I withdraw that

3    complaint?

4                MS. BROWN:  I'm going to object to all

5    these questions --

6                MR. BAZELAK:  That's fine.

7                MS. BROWN:  -- calling for a legal

8    conclusion.  You wouldn't know.

9    Q.          Okay.  Showing you what's been marked

10   as Exhibit O.

11   A.          Okay.  And what is this?

12   Q.          Okay.  Exhibit O is your right-to-sue

13   letter for your 2000 -- May 26, 2016, complaint.

14   A.          Okay.

15   Q.          It says the EEOC was terminating the

16   processing of that charge.  If you look at that

17   charge, EEOC charge No. 22A-2016-1977, look at the

18   exhibit for the May 26 charge that you had seen,

19   if you can find that one.

20   A.          What does it look like?

21   Q.          The actual charge, the charge that

22   initiated all this on May 26th, the second charge

23   that we were referring to.

24   A.          Oh, one of these?

25   Q.          Yes.

1    A.          That would be this one.

2    Q.          Right.  What's the number of that

3    charge?

4    A.          (DAY) 76 (25715), and then the date

5    02 -- 05262016.

6    Q.          All right.  So do you know if this is

7    the -- this is the right-to-sue letter that you

8    received with regard to the charge of May 26,

9    2016?

10   A.          To be honest with you, I put all my

11   things in a binder and -- but relating number to

12   number, I didn't do that.

13   Q.          Okay.

14   A.          So I never knew that one was -- I

15   received probable cause on one and not on the

16   other one.  I just thought I received probable

17   cause on -- because they're the same complaint.

18   Q.          Well, right.  And then there's some

19   statements in your complaint saying that you filed

20   this complaint after receiving a probable cause

21   determination, but you filed your federal

22   complaint after receiving a right to sue on the

23   complaint -- on the charge where there was no

24   probable cause.  Isn't that what happened?

25              If you don't know, you don't know.

1  That's fine.

2  A.          I don't know.

3  Q.          All right.  Maybe you can answer this,

4  though:  Have you ever filed another charge after

5  May 26, 2016, with the Ohio Civil Rights

6  Commission regarding you not receiving the

7  promotion in August of 2016?

8  A.          Not that I know of.

9              MR. BAZELAK:  All right.  Let's

10 take -- can we take like a half an hour?

11             MS. BROWN:  Sure.

12                   - - - - -

13             Thereupon, a luncheon recess is taken

14             at 12:50 p.m.

15                   - - - - -

16

17

18

19

20

21

22

23

24

25

120

1          Tuesday Afternoon Session

2          May 26, 2019, 1:33 p.m.

3              - - - - -

4          MR. BAZELAK:  Back on the record.

5    Q.          Lieutenant Hill, we're back on the

6    record after a short lunch break.  And I am going

7    to circle back now and talk to you about your

8    position in the PSB as commander through the

9    present day and also talk to you about the

10   allegations that you've put in your federal

11   complaint, okay?

12   A.          Okay.

13   Q.          Your complaint in paragraph 13 talks

14   about the subordinates in your department not

15   liking your course of action and not taking your

16   authority as a female seriously.

17          First of all, the subordinates, who are

18   you referring to?

19   A.          All of them.  Primarily the sergeants,

20   but the detectives were the same way, because they

21   took their cues from the sergeants.

22   Q.          Okay.  So all the detectives that we

23   went through during the course of your time at

24   PSB?

25   A.          There was a question.  There was always

Kimberly Hill vs City of Dayton Police Department      Kimberly Annette Hill

121

1   a question if I made an assignment why do I have

2   to do that, or they would become angry if I made

3   an assignment.  Some of them just wouldn't -- just

4   would never -- they just wouldn't do the

5   assignment.

6   Q.         Okay.  Who would not do an assignment

7   that you gave to them?

8   A.         Well, for example, I gave Rob Rike, I

9   assigned him a particular case, and he was so

10   angry his face turned red like what's on that can

11   he was so angry.  That's what we do is investigate

12   citizen complaints.  He eventually did it.

13          I also gave him -- we were going to

14   look and evaluate traffic crashes and see where we

15   could -- if there was anything we could evaluate,

16   or if during the evaluation we could determine how

17   we could decrease the cruiser crashes.

18          He never did that.  He asked me well,

19   what is an evaluation?  Well, what do you mean?

20   What does it -- these are -- these are sergeants

21   in internal affairs and you're going to ask me

22   what an evaluation is?  So it was just a constant,

23   like, pulling teeth to get anything done.

24   Q.         Okay.  So the one case you gave to

25   Rike, you said he was angry and you --

122

1    A.        Extremely.

2    Q.        -- just knew that by the -- him turning

3    red and --

4    A.        Just his body language in general.

5    Q.        Okay.  Body language and turning red.

6    But did you have any further conversation?  Did he

7    tell you that he wasn't going to do it?

8    A.        No.  Oh, he did it.

9    Q.        He did it?  Okay.  And the other one

10   was with Rike in terms of a traffic crash

11   evaluation project.  Was that a written assignment

12   he was given?

13   A.        Yes.

14             THE WITNESS:  I've got that e-mail for

15   you on that one.

16   Q.        Okay.  When was that e-mail, do you

17   know?

18   A.        Oh, gosh.  I don't remember.

19   Q.        Do you have a copy of it?

20   A.        Yes.  I'll have to give it to my

21   attorney.

22   Q.        Okay.  If you can get that to your

23   attorney, she can get that to me.

24             And did he -- how did he -- did he

25   e-mail you back?

Kimberly Annette Hill

123

1   A.          No.  He just never did it.  He sat in

2   my office and asked me what was -- well, what is

3   an evaluation?  Oh, he said it was the

4   responsibility of the Academy to handle training

5   and that wasn't a PSB responsibility, although

6   this directive came from the Chief.

7   Q.          Okay.

8   A.          And it never got done.

9   Q.          All right.  Any other events in which

10  your subordinates did anything to suggest to you

11  that they didn't like your course of action and

12  didn't take your authority as a female seriously?

13  A.          Besides the fact that they would

14  withhold information from me.  I would ask a

15  question about a process or something that needed

16  to be done, and they would either give me the

17  wrong answer and I would later hear about it from

18  Ecton.  Well, I didn't know it was wrong because

19  that's just what they told me.  Or either they

20  would say they didn't know the answer to it.  And

21  sometimes they would actually tell the truth.

22  They would really be right.  So I was always

23  confused.

24  Q.          Can you give me an example of that?

25  A.          One example is we were preparing for

124

1    firearms review board for a hearing for an

2    officer-involved shooting, and Detective Howard

3    Jordan was the primary investigator on that one.

4              Well, part of the scheduling the

5    firearm review board, you have to make calls to

6    the deputy chief, the major, to another

7    lieutenant, and to the Academy in order to

8    schedule this firearms review board hearing.  And

9    so we were all in a meeting.  It was the three

10   investigators and the two sergeants and me.  And

11   Detective Jordan, apparently he said that it was

12   up to him to schedule.  This was my first hearing.

13   And he said it was up to him to contact the deputy

14   chief and everybody for the hearing.  And so I

15   said are you sure?  He said yeah.  This is how we

16   do it.  And I had the other ones all at the table,

17   and not one person spoke up and said anything.

18   Well, it turns out I'm supposed to do that.

19   Because that was strange to me why would an

20   investigator be the one to contact the deputy

21   chief?  Because we had to get everybody scheduled

22   now so we know when we're going to set up this

23   firearms review board.  And that should have been

24   my responsibility, but he insisted that it was

25   him.

125

1   Q.          "He" being Howard Jordan?

2   A.          Right.  And that was a big issue with

3   Ecton and, like I told him, I didn't know.  This

4   is what they told me, or this is what Jordan told

5   me, and nobody said anything.  Nobody spoke up.

6              So after I had met with Ecton, after I

7   got a new butt hole chewed, I went back over there

8   and I confronted Rike and Reboulet.  I said why

9   didn't you guys tell me that was the proper

10  procedure?  Well, Rike lied and said he didn't

11  hear it.  Reboulet said well, I heard it, but I

12  don't know why I didn't say anything.  These are

13  the kinds of things that I experienced.

14  Q.          Heard what?

15  A.          The conversation between me and

16  Detective Jordan about the firearms review board.

17  They all sat there knowing that what he was

18  telling me wasn't correct, but nobody said

19  anything.  And they knew I didn't know because I

20  was new.

21  Q.          Did you ask Detective Jordan why he

22  said it?

23  A.          No, but I asked the sergeants why they

24  didn't say anything.

25  Q.          Well, apparently the wrong information

1    was coming from Detective Jordan.

2    A.        It came -- that was just one example.

3    And they didn't say anything, but they knew.

4    Well, like Reboulet saying, yeah, I heard it, but

5    he said I don't know why I didn't say anything.

6    So there were things like that that happened, and

7    they happened regularly.

8              Or they would -- like I said, they

9    would withhold information, but then Ecton did the

10   same thing, so it was --

11   Q.        So it says here --

12   A.        I didn't have a chance.

13   Q.        -- authority was edged away, coworkers

14   either completely ignored her -- ignored you or

15   made you feel that you imagined the issues.

16             What's your factual basis for that

17   allegation?

18   A.        Yeah.  I would -- for instance, I was

19   always confused because, like I said, they would

20   tell me -- I would ask them how, you know, for

21   example, we have to do -- and you know this.  Oh,

22   shoot.  What are they called?  Moral obligation

23   claims.  So if we conducted the investigation, if

24   the investigation was conducted in professional

25   standards and there was a moral obligation claim,

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

127

```
 1   then we should do the moral obligation claim, too.

 2           Well, I asked them.  I said, well, is

 3   this how you all have done it in the past?  Oh, I

 4   don't know.  Because if it's an investigation in

 5   internal affairs, everything should stay internal

 6   affairs.  And they claimed they didn't know.

 7   Well, come to find out they should have stayed in

 8   internal affairs.  Well, they've been there for

 9   years so they knew the process and they didn't

10   tell me.

11           And, like I said, sometimes they would

12   say they didn't know and sometimes they probably

13   really didn't know.  I had to go find it somewhere

14   else.  Or sometimes they would tell me the truth.

15   So I was always confused about what, you know -- I

16   couldn't really tell.  I was always off balance.

17   Q.        Okay.  It says, "Other lieutenants and

18   majors from within the department also used the

19   same tactics."  You referred to Colonel Ecton.

20   A.        Right.

21   Q.        Colonel Ecton, African-American male,

22   right?

23   A.        Right.

24   Q.        Is he one of the others that used the

25   same tactics?
```

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

128

1   A.          Uh-huh.

2   Q.          Yes?

3   A.          Yes.

4   Q.          Okay.  What other lieutenants and

5   majors within the police department --

6   A.          I had problems with Brian Johns, of

7   course Carper, Wendy Stiver, Andy Booher.

8   Q.          Okay.  Can you tell me what actions

9   that they took that you considered created a

10  hostile work environment?

11  A.          For example, just not -- treating me

12  like I wasn't there, like I was just invisible.

13  And they would communicate with the sergeants, the

14  white male sergeants and not me.

15          And initially I thought it was just

16  because they were accustomed to talking to them as

17  opposed to me, but eventually everybody knew I was

18  there.

19          And, for example, we sent out citizen

20  letters when we finish completing an

21  investigation.  We do it in professional standards

22  and they do it in the divisions.  Well, the

23  citizen letter, the last paragraph states that if

24  you have any questions to contact the commander or

25  major, whoever the division's coming from, or if

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

129

1   you have any questions about anything else, you

2   can contact the commander of professional

3   standards lieutenant whoever at this number.

4   Well, they would either put -- and I've got

5   examples for you, too.  They would put contact

6   Sergeant Timothy Reboulet in internal affairs

7   knowing that I was there, or they would just say

8   contact professional standards bureau at this.  I

9   was never acknowledged as a commander there.

10  Q.       Who was writing -- who was the author

11  of these letters?

12  A.       One came from Henderson's division and

13  one came from Brian Johns' division.  Now, sure,

14  there were more, but those were just the only two

15  that I came -- that I was actually able to pull

16  out of the blue team, because I didn't go over

17  to -- I just eventually -- I stopped dealing with

18  blue team all together, but I'm sure there were

19  others.  That was just a standard, I'm sure.

20  Q.       All right.  Anything else?

21  A.       Oh, there's a lot, but for now this is

22  a good example.

23  Q.       Well, anything that you can tell me in

24  terms of what you consider to be discriminatory or

25  retaliatory treatment based upon your race and/or

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

130

1   gender by subordinates or lieutenants or majors.

2   A.        I'm sorry.  Was that a question?

3   Q.        Yes.  Any other --

4   A.        They would.

5   Q.        -- examples of events or actions that

6   were taken.

7   A.        This happened over a long period of

8   time, so there are a lot of things.  So I can't,

9   you know, sit and tell you every single thing.  We

10  don't have time for that.  But those are some

11  examples of it.

12  Q.        It says, "Before he took over the

13  Department was temporary commanded by two

14  Caucasian sergeants."  That would be Rike and

15  Reboulet?

16  A.        Yes.

17  Q.        "This temporary authority gave the

18  sergeants exposure to additional power and control

19  they did not want to relinquish to a woman once

20  Lieutenant Hill took over the division."

21            What's your basis for saying they

22  didn't want to relinquish it to you?

23  A.        They never acknowledged that I was the

24  commander.  They -- everything stayed like it was.

25  And I talked to Ecton about it and told him,

131

1  because he would do the same thing.  He would send

2  an e-mail and he would send it to me, Rike, and

3  Reboulet.  And I said Major, you can't do that

4  because I need to establish myself as the

5  commander.  Whatever information you have, send it

6  to me and then I'll let them know.  But even, you

7  know, even when I got different sergeants, he

8  still continued to do the same thing.  So I was

9  never able to really establish myself as a

10  commander.  But once again, that's just an

11  example.

12  Q.        You don't believe that Sergeants Rike

13  and Reboulet wanted to relinquish the control over

14  that department before you came in terms of being

15  a commander?

16  A.        Mr. Bazelak, you're a white male.  That

17  is -- it's your world, and we know how it is with

18  power, men, testosterone, ego.  All those things

19  go together.  They had never had a black or female

20  commander.  You've been in charge for 15 months

21  and then you get me.  I mean, it's just, you

22  know -- you all know that's natural.  That's a

23  natural tendency.  We all know that.

24  Q.        Okay.  So we're going to get

25  to -- there's an e-mail dated September 8th, 2015.

Kimberly Hill vs City of Dayton Police Department          Kimberly Annette Hill

132

1      Before September 8th, 2015, had you

2   complained to anybody, any superior of yours

3   within the police department about any type of

4   treatment that you received?

5   A.      Yes.

6   Q.      Who?

7   A.      Chief and Ecton.

8   Q.      When did you complain to them before

9   September 2015?

10  A.      I had a meeting with Chief.  I believe

11  it was December or January.  No, it must have been

12  December of 2014.  No.  Yeah, 2014.  And I told

13  him about some things that were going on there.

14  Q.      What did you tell him?

15  A.      Yeah.  I don't remember specifically,

16  but I do remember telling him that their next

17  commander, they shouldn't have a long gap between

18  the time that I leave and another commander comes

19  in, that it should happen fairly soon so that we

20  avoid that power struggle there.  So he knew about

21  it.

22      Further, he also knew that I had a

23  problem that Chabali was an issue, too.  And I

24  talked to him about Chabali in that meeting that I

25  had there, too, but it was the Friday before

133

1     Mother's Day of 2014 that there was a big blowup

2     with me and Ecton over investigations and Chabali

3     and -- because the standards for me were set high,

4     and I could never understand why I had Chabali,

5     who had never been a PSB commander, Ecton, who had

6     never been a PSB commander, and these people

7     telling me when -- that I should have certain

8     things done at a certain time, but they never sat

9     in my seat.  I never understood that.  How can you

10    tell me?  How can you say this should be done at a

11    certain time?  That didn't make sense to me.

12            So we had a big blowup and I told him

13    to assign me -- tell the Chief to assign me

14    somewhere else.  That was the Friday before

15    Mother's day in 2014.

16            We ended up talking the following day,

17    that Saturday, and he said Chief was not going to

18    reassign me.  And -- oh, and I was also supposed

19    to start training that Monday, because I hadn't

20    had training for internal affairs yet, and then I

21    had to go to training.  So that's why I stayed.

22            But they knew that I was having

23    problems internally and with -- at least with

24    Chabali.

25    Q.        So you asked to be reassigned from PSB

134

1   even before you were trained?

2   A.          Yes, because I was having problems with

3   them ever since I got there, and nobody was

4   listening to me.

5                     - - - - -

6            Thereupon, Deposition Exhibit P is

7   marked for purposes of identification.

8                     - - - - -

9   Q.          Showing you what's been marked as

10  Defendant's Exhibit P.  Is this the e-mail that

11  you're referencing in paragraph 18 of your

12  complaint dated September 8, 2015?

13  A.          Yes.

14  Q.          You used the words "vehement

15  opposition" in the e-mail.  What was your basis

16  for saying that you had received "vehement

17  opposition"?  Have we already talked about those

18  things, or is there something else?

19  A.          Yeah, I talked to him about it.

20  Q.          Have we discussed that in this

21  deposition, also, that "vehement opposition," or

22  are there other things that you're referring to in

23  terms of the "vehement opposition"?

24  A.          Yeah, we've discussed some of it here,

25  but there's just so much of it because it occurred

135

1    over such a long period of time, so, you know,

2    like I said, if I discussed every single thing,

3    we'd be here for a year.

4    Q.          Well, I'm interested in anything that

5    you believe created a hostile work environment

6    that was so significant to you that it affected

7    you in terms of your job or so severe that it

8    was -- it was a hostile work environment for you.

9    That's what I'm interested in.

10   A.          That it continued for such a long time

11   and nobody did anything, just the constant -- like

12   I said, the hatefulness and whining, you know.  I

13   would send something -- as a matter of fact, I

14   stopped sending things through me.  I would send

15   them back through the white male sergeants,

16   because if there was something that needed to be

17   corrected, they were okay if it went to the white

18   male sergeants.

19            But the bottom line is if I sent it

20   back to them, that was the issue.  That's when I

21   would get, you know, well, there's nothing wrong

22   with it, I'm not going to change it, or whatever.

23   And that's what I told here.  Until that time I

24   would no longer make recommendations for change or

25   review any investigations, because if I review

136

1    them and find things that are incorrect, you know,

2    then I'd get people wanting to crucify me, you

3    know.  I was done.

4    Q.          Okay.  So in this e-mail, you sent it

5    to Ecton and Biehl, correct?

6    A.          Yes.

7    Q.          And did you have any conversations with

8    them about the e-mail?

9    A.          No.

10   Q.          It says here that you "requested an

11   outside agency to perform an audit," correct?

12   What were you referring to in terms of an audit

13   and that -- the processes in PSB?

14   A.          As far as the investigations, there was

15   no oversight.  Chief or the majors could basically

16   do whatever it is they wanted to do.  And we had

17   them sending in -- we would know that there was a

18   violation in one district or one division and the

19   same violation in another division.  The person in

20   this division would get nothing, the person in

21   this division would receive discipline.  And there

22   had to be some person or some entity that could

23   say this is -- this is happening and it shouldn't

24   be, and we were the ones to bring that to their

25   attention.  But, you know, every time I did, there

137

1   was a -- there was an issue, so --

2   Q.          Okay.  There's another issue that you

3   had that you put in your complaint about citizen

4   complaints or complaint receipts.  Do you recall

5   that?

6   A.          Could be.

7   Q.          Well, it's in your complaint.

8   A.          Okay.

9   Q.          It says January 7th, 2015, e-mail to

10  Major Johns.  Do you recall that one?

11  A.          I'd have to see it.

12                       - - - - -

13               Thereupon, Deposition Exhibit Q is

14  marked for purposes of identification.

15                       - - - - -

16  Q.          Showing you what's been marked as

17  Defendant's Exhibit Q, e-mail from you regarding

18  complaint receipts.  Do you recall that one?

19  A.          Oh, yeah.  Yes, I do.

20  Q.          And you were -- in your complaint you

21  say that you pointed out several problems with the

22  complaint receipt and recommended additional

23  investigation, and that Major Johns and other

24  sergeants treated you with hostility and

25  retaliation for you reporting the problems on

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

138

1    complaint receipts.

2              What is your basis for that allegation?

3    A.        They eventually did a full

4    investigation on this one.

5    Q.        On which one?

6    A.        On this particular complaint they made

7    a full investigation as opposed to a complaint

8    receipt.  But I had to go back and forth.  This is

9    not the only part of it.  It's got two or three

10   pages, so --

11   Q.        Okay.  Again, it's in your complaint

12   here about pointing out problems, recommending

13   additional investigation, and you being treated

14   with hostility in retaliation for reporting

15   problems.

16              Tell me what the -- tell me what you're

17   talking about there.

18   A.        They just did what they wanted to do.

19   Sometimes they would change them.  Sometimes they

20   wouldn't if it came from me.  Now, if they came

21   from a white male sergeant, they did.  They made

22   the changes.

23   Q.        Going to paragraph 22, it says that you

24   applied for a promotion for major in the spring of

25   16.  We talked about that.  You were not promoted

```
1    to the position.  You said you were the most

2    qualified for the promotion and had the most

3    seniority of all lieutenants that applied for the

4    position.

5              First question is do you believe

6    Lieutenant Stiver and Henderson were qualified for

7    the position as well?

8    A.         I believe they could do the job, and

9    I'm not the only one who could do the job.

10   Anybody could do the job, really --

11   Q.         Okay.

12   A.         -- any of the lieutenants.

13   Q.         All right.  And then we talked about

14   the seniority issue before, but you do understand

15   that the major position is not a seniority

16   position within the City of Dayton?

17   A.         Yes.  I understand that.

18   Q.         All right.  And to be fair, I mean,

19   you're just saying that that's how it was done in

20   the past, but there's no requirement to use

21   seniority when determining who to pick as a major

22   within the Dayton Police Department.  Do you agree

23   with that?

24   A.         There's no requirement --

25   Q.         Right.
```

```
 1    A.          -- but that's how it had been done
 2    previously when they were all white males until it
 3    got to me, and then the process changed.
 4    Q.          All right.  And then with regard to you
 5    having the most seniority of all the lieutenants,
 6    again, we talked about that where you had maybe a
 7    year or so more time as a lieutenant than
 8    Henderson and Stiver had as a lieutenant, correct,
 9    just in terms of --
10    A.          Not only in terms of seniority, but in
11    terms of experience, in terms of successes in
12    solving difficult problems, I had more seniority
13    than them.  I mean, I had more experience than
14    them.
15    Q.          All right.  Do you have any basis for
16    saying your qualifications and your experience
17    were not considered by Ms. Dickstein?
18    A.          I don't know what she was thinking.  I
19    have no idea.  I haven't talked to her.
20    Q.          Well, your complaint says that the only
21    logical conclusion is that your qualifications and
22    seniority were not considered in the process.
23    A.          Well, that is a logical conclusion.
24    Q.          But you have no idea of what
25    qualifications you had or experience you had,
```

141

1    whether that was considered by the decisionmaker,

2    the City manager?

3    A.        No.  I don't know.  It doesn't appear

4    to have been.

5    Q.        And what is your basis to say that it's

6    your reasonable belief that race and sex and your

7    desire to make changes to the racist tactics of

8    the City of Dayton were the driving factors in

9    Ms. Dickstein to not promote you?

10   A.        Because I challenged the system, and I

11   didn't know I wasn't supposed to.  I thought I was

12   here to protect the City and protect the Chief,

13   you know.  I thought it was -- I was supposed to

14   protect us from liability and bring things forward

15   and say I think we could do things differently

16   this way so it would be better, because I know

17   Chief doesn't -- I mean, there's no way he can

18   know everything.  He just can't.  That's why you

19   have people in positions that can bring things to

20   you and let you know.  I see this as, you know,

21   this is a potential pitfall for this, and we need

22   to shore it up so that we don't have issues.

23   Q.        Do you have any evidence to show that

24   your race or your sex or your desire to make

25   changes to the Department were the driving factors

142

1    in the decision as opposed to your qualifications?

2    A.          Because I feel that I was the most

3    qualified.  I had the most experience.  Everybody

4    else is a white male, or white or male.  Nobody

5    else is a black female.  I'm not part of the in

6    group.  I'm part of the out group.  And everybody

7    likes the like minds, and we all sit around the

8    table and, you know, we co-sign each other on

9    everything, but then you get somebody there who's

10   different who may not co-sign.

11          That's why I said I wasn't there

12   to -- I'm not there to be a token, to be a bobble

13   head.  That's not me.  So that's what makes me

14   think that yes, their decisions were based on race

15   and gender, because if he wanted to -- like he

16   said in -- we had one meeting with OCRC.  The

17   Chief said well, I now had diversity.  So then

18   he -- this is when he came up with this bright

19   idea to have this assessment center, which the

20   assessment center in and of it itself is okay.  I

21   don't have a problem with the assessment center,

22   you know.  I don't have a problem with the scores.

23   That's what -- you score what you score.  I don't

24   think that the people scoring at the assessment

25   center were racist in any way.  It's just an

143

```
 1   assessment center.

 2          But where Chief lied is when he said

 3   that he now had diversity.  He had diversity in

 4   2012.  I was a lieutenant.  Stiver was a

 5   lieutenant.  Henderson was a lieutenant.  We were

 6   all lieutenants in 2012.  But he didn't go through

 7   the assessment center process, so that's a lie.

 8   Q.        What's the lie?  I'm not understanding

 9   that.  What's the lie?

10   A.        Okay.  He said in the meeting with OCRC

11   that in 2016 I now have diversity.  So he now

12   implements this assessment center.  He didn't just

13   get diversity in 2016.  He had diversity in 2012.

14   The same people who were lieutenants in '16 were

15   lieutenants in 2012.  He didn't implement an

16   assessment center in 2012.  He implemented it in

17   2016.

18   Q.        Well, he implemented it in 2015 with

19   the --

20   A.        Right.

21   Q.        -- Ecton/Carper appointments.

22   A.        That wasn't for a major position.  That

23   was for the deputy chief.  So either way it wasn't

24   implemented in 2012 when he still had the same

25   people on the list.
```

144

1    Q.         The assessment center exercise was not

2    the first time it was used with regard to your

3    major position.

4    A.         But it was the time it was used for --

5    Q.         Just answer my question.  Yes?

6    A.         What was your question?  I'm sorry.

7    Q.         The assessment center exercise was not

8    used for the first time in your process to apply

9    for the major position.  It had been used before

10   for the deputy director position, correct?

11   A.         It was the first time it was used for

12   the major's position.  It had been used for the

13   deputy chief position --

14   Q.         Right.

15   A.         -- when the senior major was African-

16   American.  So that's -- that's very telling for

17   me.

18   Q.         And you don't know for sure, but you

19   think it may have been used before in civil

20   service positions in the sergeants?

21   A.         In the lieutenants.  I know it was in

22   the lieutenants.

23   Q.         When was that?

24   A.         That was in 2003.

25   Q.         So it had been used before?

145

1    A.         Yes.

2    Q.         And, again, I'm still not getting the

3    diversity.  You say he lied.  I'm not getting a

4    lie.  Where are you -- you're using?

5    A.         I understand.

6    Q.         That's a strong word.  What's the --

7    A.         I understand, Mr. Bazelak.  I

8    understand you don't --

9    Q.         No, I don't understand the lie.  I can

10   understand lies if you tell me what you're saying.

11   A.         I'll try it a different way so you can

12   understand what I'm saying.  Did you --

13              MS. BROWN:  I get it.

14   A.         He said in 2016 he now had diversity

15   amongst the lieutenants, so he implemented this

16   assessment center because oh, now I have

17   diversity.

18              He had diversity in 2012.  He didn't

19   realize what he was saying.  He had the same

20   people in 2016 who were lieutenants were the same

21   people in 2012 who were lieutenants, too.  So he

22   had diversity in 2012.  He didn't implement an

23   assessment center system then.  He went according

24   to seniority, because all the senior ones were

25   white male until it got to me.  Now all of a

146

1    sudden -- for the major's position.  Now all of a

2    sudden I have diversity.  I was a lieutenant.

3    Stiver was a lieutenant.  Henderson was a

4    lieutenant all in 2012.

5    Q.          All right.  Anyway, that's all based on

6    something that you heard him say in a meeting in

7    the Ohio Civil Rights Commission?

8    A.          Yes.

9    Q.          All right.

10   A.          And it's something that actually

11   occurred.

12   Q.          Let's talk about your performance

13   evaluations.  You didn't get one in 2015, right?

14   A.          Right.

15   Q.          And the person that would have done

16   that would have been Ecton?

17   A.          Yes.

18   Q.          And then the one for 2014, you had an

19   exceeds or meets expectation reviews in each

20   category on your evaluation?

21   A.          Yes.

22   Q.          All right.  And then in 2014 there was

23   an indication on your performance evaluation that

24   your development had been slowed because you were

25   attending the Certified Law Enforcement Executives

147

1    Program, or CLEEP.

2    A.          That's what he put.

3    Q.          Right.  That's what your evaluation

4    was.

5    A.          Right.

6    Q.          And that he anticipated in 2015 that

7    you'd have more exceeds standard ratings.

8    A.          I think that's what he put.

9    Q.          All right.  We talked about that.

10           I don't know, but in paragraphs 28

11   through 32 you talk about Ecton's promotion and

12   the assessment center that was used to promote

13   Ecton and Carper, and I guess I'm -- I guess I'll

14   just ask what that has to do with your case.

15   A.          Same thing.  That wasn't implemented

16   until you now have a black male who's up

17   for -- who could be promoted, and he implemented

18   the assessment center process.

19           Prior to that he selected Chabali for

20   the deputy chief.  Chabali, who considers himself

21   white.  I think he's actually -- I think he's

22   actually Cuban but he considers himself a white

23   male.  He had been a major for maybe a year, maybe

24   year and a half, and Ecton had been a major for

25   12, 13, 14 years or so, and he selected Chabali.

Case: 3:17-cv-00334-TMR Doc #: 14-1 Filed: 04/16/19 Page: 148 of 192 PAGEID #: 220
Kimberly Hill vs City of Dayton Police Department          Kimberly Annette Hill

148

```
1   There was no assessment center.
2           So then he wanted to -- later on, after
3   Chabali was leaving, he needed to fill that
4   position again, and he wanted Carper because
5   Carper and Chabali are best buddies.  So he wanted
6   to fill that -- and they had the Chief's ear.  And
7   we all know how that works, how politics works.
8   It's everywhere.  So they've got his ear now.
9           And he wanted Carper over Ecton, so
10  then he decided to once again implement this
11  assessment center when it came down to now there's
12  this African-American that he already skipped over
13  once, so now he's going to introduce this
14  assessment center again.  He's got him again.
15  Q.      And he was promoted.
16  A.      He was promoted, yes.
17  Q.      Okay.  And then you have Major Johns
18  was appointed to lieutenant colonel along with
19  Colonel Ecton.  That's a mistake, right?
20  A.      That's a mistake.
21  Q.      It should say major -- should say
22  Carper.
23  A.      Carper, yes.
24  Q.      So what is your basis for saying that
25  the promotion of Major Carper, it says Johns but
```

Case: 3:17-cv-00334-TMR Doc #: 14-1 Filed: 04/16/19 Page: 149 of 192 PAGEID #: 221
Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

149

1    it should be Carper in paragraph 32, was

2    implemented to usurp authority from

3    Lieutenant Ecton?

4    A.        It was because historically

5    African-Americans in law enforcement -- and all

6    the research, the research is there.  It's

7    difficult to put an African-American over someone

8    who's white, and when they do, they typically, you

9    know, reduce your power.  That's politically --

10   it's in the research.  I can show it to you.

11   Q.        But if you had some intent to exclude

12   African-American applicants through the use of an

13   assessment center process, you would think you

14   would not promote the African-American after the

15   use of the assessment center.  In this case, the

16   African-American was promoted to the position

17   after the assessment center, right?  Colonel Ecton

18   was promoted.

19   A.        He was promoted, but he wasn't number

20   one.

21   Q.        Okay.  Next it says that you -- again,

22   I'm going to go over this, and if you know, you

23   know.  If you don't, you don't.  But we went

24   through a bunch of documents before and it says on

25   May 18th, 2017, you received a letter of

150

1   determination from OCRC finding that there was

2   enough evidence to show charging party was

3   subjected to discrimination based upon membership

4   in a protected class."

5              That was for the other charge, not the

6   May 10th charge.  We've established that, right?

7   A.         Okay.

8   Q.         All right.  And for that one you have

9   not filed a federal lawsuit, correct?

10  A.         I didn't realize that I'd

11  received -- that their ruling was only for one.  I

12  thought it was -- since the complaints are the

13  same, I thought it was for the same thing.

14  Q.         Okay.  You have filed a lawsuit after

15  you received a right-to-sue letter, which is

16  paragraph 36 in your complaint with regard to the

17  May 10th, 2016, charge, correct?

18  A.         Okay.

19  Q.         All right.  Can you tell me any

20  evidence that you have or actions that you believe

21  were in retaliation for you engaging in legal acts

22  or filing claims or anything like that, for filing

23  the charge, anything that you believe you were

24  retaliated against?

25  A.         One example, I believe that

151

1   Chief -- after one complaint, the last complaint

2   when -- I think it was the end of September when I

3   just couldn't take any more, after an e-mail that

4   I sent I think Chief changed the way e-mails went

5   out, because we no longer got information that we

6   normally got.  They were mostly just

7   informational-type things for just advertisements,

8   you know, for cultural works and stuff like that,

9   but no police business.

10          And then just the attitude changed, and

11  when he came over for a meeting I think it was

12  October 2nd he mentioned -- that was after that

13  e-mail that I sent to Reboulet that showed

14  how -- when I told Chief finally this is what's

15  been happening to me all along, I think it made

16  him mad and he came over, and he had a meeting --

17  oh, thanks.  He had a meeting with me and the

18  sergeants and the department advocate and Ecton,

19  and he said that he gave the majors latitude in

20  how they wanted to do the investigations.

21          And then he said -- and then I -- we

22  must have had some conversation about

23  education-based discipline, which is something

24  that I wanted to implement.  It was my capstone

25  project.  And when I told him that I wanted to

152

1    prepare the PowerPoint because it was my project,

2    he just rolled his eyes up in his head like that

3    and --

4    Q.        When you say, "he," you're referring to

5    Chief?

6    A.        Yes.  And so he was exasperated and

7    he -- basically he just, you know -- I knew that I

8    had no support.

9    Q.        What e-mail are you referring to with

10   regard to Reboulet?

11   A.        It was signed and dated September 28th.

12   Q.        Of?

13   A.        2015.

14   Q.        Referencing what?

15   A.        There was some -- a media request for

16   information.  And I had told Reboulet to do it.

17   There's a certain way -- I instructed him to do it

18   a certain way, to prepare the information, to put

19   certain information in it.  And he didn't do that,

20   and he sent the information to the media without

21   preparing it the way I had instructed him, and

22   somehow -- and I told him to just go ahead and

23   send it.  When he was finished making the

24   corrections, to go ahead and send it to Chief and

25   whatever media outlet it was.

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

153

1          And he didn't put the information in it

2     that I wanted him to put, so Chief got ahold of

3     it, because he sent it to Chief, too, and then

4     Chief goes through and says something like, you

5     know, we need to have a conversation about this

6     and we need to bring it up in a staff meeting,

7     because he wanted -- the things I specifically

8     told Reboulet to put in it is what Chief wanted,

9     and he didn't do that.

10          And so my response was this is what I

11    have been telling Chief and Ecton had done that to

12    me all along, and he basically ignored it again.

13    So instead of making changes that needed to be

14    made, he just started changing the way -- he told

15    us don't send any more e-mails out.  If you have

16    something you want me to know, pick up the phone

17    and call me.  So -- because now I think he no

18    longer wanted any paper trails, so -- and that's

19    when he decided sending, you know, just little

20    advertisement-type stuff to us.

21    Q.          You have not been given any type of pay

22    reduction, not been demoted in any fashion or

23    given any type of punishment or anything that you

24    believe is retaliation for anything you've done,

25    have you?

154

1   A.          No.  I've not had a reduction in pay or

2   rank or anything.  But my current assignment just

3   has me working by myself, and they're just, you

4   know -- I just have little dinky paper things to

5   do, but nothing really meaningful to do.

6   Q.          Well, we'll talk about that here in a

7   second.  But I do want to give you another final

8   chance to tell me -- I mean, we've talked about

9   the promotion decision, and I just want to give

10  you another chance to tell me any other actions

11  that you're aware of as you sit here today that

12  you believe constitute either retaliation or acts

13  that rise to the level of creating a hostile work

14  environment for you in the workplace other than

15  what we've talked about.  And you've gone over

16  several things, but I want to -- anything else?

17  A.          I'm sure there are specific things, but

18  just being left out and being -- to me is being

19  ostracized, and being treated as though I'm not

20  believed or that what I told them wasn't

21  important.

22  Q.          One of the things that you put in the

23  retaliation section was being denied training.

24  Have you been denied training?

25  A.          In 2017 I requested to go to Harvard

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

155

1    Kennedy school, and Ecton initially approved it,

2    and then it was later denied because they said due

3    to the cost it had to go through the City

4    manager's office.  And then it was later denied.

5    So I don't know if it ever made it to the City

6    manager's office or if he was just -- if he just

7    changed his mind or Chief changed his mind.  I

8    don't know --

9    Q.        Anybody else --

10   A.        -- but at the same --

11   Q.        -- go to that?

12   A.        Mark Hess went as a lieutenant.

13   Q.        Right.  But during the time that you

14   requested, did anybody else get to attend that

15   training?

16   A.        Nobody else, to my knowledge, put in

17   for it --

18   Q.        Okay.

19   A.        -- but they would -- Joe Wiesman went

20   to the FBI academy, and so did Eric Henderson,

21   since I put in my request to go to Harvard

22   Kennedy.  Plus chief told us in a meeting that

23   that was one of the places we could go for

24   professional development, but then when it came to

25   me asking for it, then it was denied.

156

1      And getting back --

2    Q.        There was another major promotion that

3    occurred after you were appointed major, or after

4    you applied for major, correct?

5    A.        Right.

6    Q.        Stiver and Henderson became major and

7    then later on Wiesman.

8    A.        Yes.

9    Q.        Lieutenant Wiesman was appointed major.

10   A.        Yes.

11   Q.        Do you know when that occurred?

12   A.        I'm not sure.

13   Q.        Okay.  You did not apply for that major

14   position at the time, correct?

15   A.        We never had another assessment center.

16   I'm assuming they took it from that list.

17   Q.        Right.  But my question is did you

18   apply for the position?

19   A.        There was never an application process.

20   Q.        And you haven't filed any other charge

21   with the Civil Rights Commission from the date of

22   that promotion, have you?

23   A.        No.

24   Q.        Okay.  You were transferred in 2018, I

25   believe, to the inspections and audits position.

Kimberly Hill vs City of Dayton Police Department          Kimberly Annette Hill

157

1    A.          Yes.

2    Q.          All right.  And that was after you had

3    received some disciplinary charges.

4    A.          I received charges, yes, but no

5    discipline.

6    Q.          Right.  And the charges stemmed from

7    your failure to timely complete findings in the

8    professional standards bureau, true?

9    A.          Yes.

10   Q.          And I think there were three cases at

11   least that were put in the disciplinary charges.

12   Do you remember that?

13   A.          There was three, but those weren't the

14   only ones.

15   Q.          Okay.  And as I understand it, your

16   response to the charges, to command staff or the

17   people doing the investigation, was that you had

18   been under some mental distress, emotional

19   distress, post-traumatic stress disorder, and that

20   that's the reason you couldn't complete the

21   findings; is that fair?

22   A.          As a result of what I experienced at

23   work.

24   Q.          Okay.  Regardless of whether it was

25   because of that or any other reason, that's

1   what -- that's what you said?

2   A.          But that is important, because that's

3   the only way -- how else would I have -- I mean, I

4   was normal before.  I wasn't sick before.

5   Q.          All right.  But you acknowledge that

6   you were not performing the job that you were

7   supposed to perform as commander.

8   A.          But they kept the same person --

9   Q.          Yes, you were not getting the findings

10  done.  You did not get the findings done, true?

11  A.          Right.  Yes.

12  Q.          And you gave them a reason, and that

13  reason resulted in the City engaging with you in

14  terms of a potential transfer based upon your

15  mental condition.

16  A.          No.

17  Q.          Well --

18  A.          I filled out paperwork.

19  Q.          You went to a physician?

20  A.          Yes.

21  Q.          And the physician did a report to the

22  City --

23  A.          Yes.

24  Q.          -- about your emotional condition?

25  A.          Yes.

159

1   Q.          And, as a result, as a result of that,

2   though, the City determined that it was best for

3   you to transfer out of the PSB and into another

4   position --

5   A.          Right.

6   Q.          -- due to those things that you were

7   experiencing --

8   A.          Yes.

9   Q.          -- regardless of whether they were

10  because of everything that was done to you or at

11  workplace or other reasons, that's why they did

12  it.  Do you agree with that?

13              MS. BROWN:  Objection.

14  Q.          Because of you mental condition or your

15  inability to do the job at PSB because of those

16  conditions, that's why you were transferred out?

17  A.          That's what they said.

18  Q.          And --

19  A.          I kept asking them when Rike was going

20  to leave PSB.  I kept asking Ecton and he never

21  gave me an answer.  But after he left, my

22  condition improved.

23  Q.          All right.  Let's talk about that.  Are

24  you taking any type of medication for any type of

25  emotional distress --

160

1   A.        Yes.

2   Q.        -- currently?  What are you taking?

3             THE WITNESS:  Do I have to answer that?

4             MS. BROWN:  I mean, if it's related to

5   damages from here, then yes.

6   A.        I'm taking Zoloft and -- oh, there's

7   another one.  I can't think of the name of it.

8   Q.        Is the other medication like an

9   antidepressant, anti --

10  A.        They both are.

11  Q.        Both antidepressants?

12  A.        I think they are, yeah.  And I also

13  take Ativan.

14  Q.        Okay.  Who prescribes these medications

15  for you?

16  A.        The doctor, psychiatrist.

17  Q.        Who?

18  A.        Dr. Onady.

19  Q.        Can you spell that?

20  A.        O-n-a-d-y, Alice.

21  Q.        And who is Dr. Onady?

22  A.        My psychiatrist.

23  Q.        And how long have you been treating

24  with Dr. Onady?

25  A.        I want to say March of maybe 2017, I

1   think.

2   Q.          Okay.  Have you ever before March 17

3   made any complaints to any medical care provider

4   about emotional issues, mental distress, those

5   type of things?  Yes?  When?

6   A.          I complained to my family doctor.

7   Q.          Who is your family doctor?

8   A.          Dr. Kimberly Bethel.

9   Q.          Kimberly?

10  A.          Bethel.

11  Q.          Bethel, B-e --

12  A.          B-e-t-h-e-l.

13  Q.          -- t-h-e-l?

14  A.          Because I had some physical problems

15  that I believe were stress related.

16  Q.          Okay.  What physical problems?

17  A.          Just my ankles swelling and

18  primarily -- and then I did see a psychologist.  I

19  don't know her -- I don't remember her name.  I

20  saw her before I went to talk to Dr. Onady, but

21  she didn't prescribe me any medication.

22  Q.          Can you provide the name of that

23  psychologist, go back and look in your records and

24  provide the name of the psychologist that you saw

25  before Dr. Onady?

162

1    A.          Giovanni, G-i-o-v-a-n-n-i, Bonds is the

2    last name, B-o-n-d-s.

3    Q.          B-o-n-d-s?  And that was a

4    psychologist?

5    A.          Yes.

6    Q.          And when did you treat with Dr. Bonds?

7    A.          I think it was January 2016 through

8    September or October of 2016.  Oh, and I think I

9    actually went to Dr. Onady in December of 2016,

10   and I didn't tell her --

11   Q.          Okay.  Any other complaints to medical

12   care providers about mental health issues?

13              When was the first time you complained

14   to Dr. Bethel, your family doctor, about problems?

15   And I'm not talking about problems related to work

16   or anything.  I'm talking about any mental health

17   issues that you would have had in the past.

18   A.          No.  That was --

19   Q.          Anxiety, depression, post-traumatic

20   stress disorder, anything in the past that you've

21   complained of to any doctor, that's what I'm

22   asking.

23   A.          That was -- that was -- I talked to her

24   about that, and that was the only time.  I think

25   it might have been 2015 maybe.  I'd have to go

163

1    back through and look at my records.  And I just

2    talked to her about what was going on, but she

3    only treated my swelling.

4    Q.        Okay.  What hospital would you go to if

5    you had any physical ailments?

6    A.        Probably Miami Valley.

7    Q.        Have you talked to anybody at Miami

8    Valley Hospital about any mental stress --

9    A.        No.

10   Q.        -- depression, anxiety, anything like

11   that?

12   A.        No.

13   Q.        Have you had any stressful events that

14   occurred in your life in the last several years

15   that have caused you to have emotional distress?

16   A.        Other than my sister dying nine years

17   ago.  She was a police officer.  She had breast

18   cancer.

19           MS. BROWN:  Can we take a break for a

20   second?

21           MR. BAZELAK:  Sure.

22           MS. BROWN:  Let's take a break.

23           MR. BAZELAK:  We're about done, too.

24           (A recess was taken.)

25           MR. BAZELAK:  Back on the record.

1    Q.          I just want to, again, find out any

2    kind of treatment that you've had for stress,

3    depression, anxiety, anything like that.

4    A.          Prior to this?

5    Q.          Prior to this.

6    A.          I've had major life events like my

7    mom's death, my sister's death, because we're a

8    very tight-knit family, so --

9    Q.          Yeah.  I read that in the record.  And

10   so you mentioned that your mom died in 2000, and

11   I've been through that and I know it's stressful,

12   and I just wanted to know if you had any type of

13   longstanding treatment or anything --

14   A.          No.

15   Q.          -- medications or anything to get

16   through your grief or any type of mental distress?

17   A.          No.

18            MR. BAZELAK:  Okay.  So we'll get an

19   authorization to you for the doctors that she's

20   mentioned that she's treated with.

21   Q.          Okay.  Have you filed any type of

22   formal complaint of discrimination with -- ever

23   with the City, like the HR department --

24   A.          No.

25   Q.          -- or anybody in the police department?

165

1    A.          No.  This was -- this was just -- I

2    mean, I never -- I don't know.  I didn't know what

3    to do.

4    Q.          But the first formal complaint that you

5    filed alleging discrimination was when you filed

6    the charge with the Civil Rights Commission, true?

7    A.          Right.  Right.  I've never experienced,

8    other than just, you know, general people things,

9    you know.  I have a good relationship with my

10   peers, my subordinates, my bosses.

11              And that's why this was such a

12   traumatic thing for me, to have reports that I'd

13   been followed, that people -- that Rike and

14   Reboulet followed me when I wasn't in the office,

15   that they passed my house, that they would call

16   Carper.

17   Q.          Who told you that?

18   A.          One of my detectives said he heard.

19   Q.          Who's that?

20   A.          Dennis Murphy.

21   Q.          Dennis Murphy told you, but he said he

22   had heard?  He didn't have any knowledge of it?

23   A.          He said he heard Rike on the phone with

24   Carper telling him that I wasn't in the office and

25   that he would tell Reboulet come on, let's take a

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

166

1   right around on Hawthorn Street.  That's where I

2   live.

3   Q.          Is it not fair to say that you were out

4   of the office quite a bit?

5   A.          I cried every single day going to the

6   office --

7   Q.          But you --

8   A.          -- and I felt better when I wasn't

9   there because I was afraid.

10  Q.          But you were out of the office quite a

11  bit; is that fair?

12  A.          I would go sit down -- I'd just go sit

13  in my car sometimes.

14  Q.          Okay.  I mean, is it also fair to say

15  that because of whatever, you know, you were

16  experiencing that you were kind of distant at

17  times with people that you worked with; is that

18  fair?

19  A.          I wasn't distant.  They created it.

20  They created the atmosphere.  I kept my door

21  closed sometimes because I was afraid, but it's

22  weird, because I don't think anybody was going to

23  hurt me, because we all had guns, but I was

24  afraid.  So I would keep my door closed sometimes.

25  And I was afraid to stay home by myself because

167

1    they were passing my house, and even -- I even

2    thought that they were -- somebody was tapping

3    into my computer.

4    Q.          You ever uncover any evidence of that?

5    A.          No.  Just weird things would happen,

6    and there would be police cruisers that would pass

7    by my house.  I was going to take my trash out one

8    night and there's an alley behind my house and

9    when I raised my garage door, this cruiser just

10   went flying by.

11            And I don't live on a main street.  I

12   live -- you have to come into the neighborhood in

13   order to pass my house.  So you have to be coming

14   there deliberately.  I mean, you're not going to

15   just -- you can't just pass by and say oh, she's

16   at home.  You're coming there specifically to

17   check on me.  My niece lives with me now because I

18   still don't feel safe, because they had no

19   business following me anywhere.

20   Q.          You correct me if I'm wrong, but my

21   understanding is that you had, for the most part,

22   a professional, cordial workmanlike relationship

23   with Sergeant Rike and Reboulet for the most part.

24   You got along.  You were -- exchanged pleasantries

25   in the office.  There was no, like, fights or

168

1    tension or anything like that.

2    A.          Oh, yeah.  It was there.

3    Q.          I'm sorry?

4    A.          It was there.

5    Q.          Okay.  But you agree with my

6    assessment?

7    A.          We didn't have --

8    Q.          And we've talked about all the things

9    that you said were there and that you felt, but

10   for the most part, it was fairly cordial,

11   appropriate workplace interactions; is that fair?

12   A.          Everything was covert.

13   Q.          Right.  But answer my question.  Was

14   that -- was that --

15   A.          We weren't -- I mean, I'm the

16   commander.  I was the commander --

17   Q.          Right.

18   A.          -- and I'm a professional.  So, I mean,

19   we're not people who are in the streets fighting

20   and cussing and clowning and carrying on.  That's

21   just not who we are.  It's not who I am.  I had a

22   responsibility for everybody there so that we

23   could get the work done, so I kept it as -- as

24   cordial as I needed to for my investigators,

25   because I still had -- I still had them to worry

169

1   about, even though they knew what was going on,

2   because I didn't keep it from Daryl or Murphy or

3   Krista.  They knew there was -- and then they

4   could see it, but I had to make it -- because I

5   was the commander and it was my responsibility so

6   we could get our work done.

7   Q.        You've never filed for any type of

8   disability claim?

9   A.        No.

10  Q.        You ever filed a lawsuit before this

11  one?

12  A.        No.

13  Q.        Ever filed for a Workers' Compensation

14  claim?

15  A.        No.

16  Q.        Have you kept any type of diary or

17  notes or anything about things that you've

18  experienced or interactions that you've had or --

19  A.        Periodically --

20  Q.        Okay.  And --

21  A.        -- I talked to my -- my family and I

22  are very close and --

23  Q.        Okay.  If you have any notes

24  that -- any type of documentation of any of the

25  events that we've talked about that you've written

170

1  down, notes or a diary or anything, anything

2  that's not something that your attorney had you

3  prepare or something you've written to your

4  attorney, I'm not interested in that.  On your own

5  as things were happening contemporaneously and you

6  wrote things down and you took notes, if you have

7  those, could you provide those to your attorney?

8  And I'd request a copy of those.

9  A.         Okay.  Okay.

10  Q.         All right.

11  A.         I don't have a lot, but I do have some.

12  Q.         Okay.  How are you doing now in your

13  current position?

14  A.         I'm bored.

15  Q.         Less stress?

16  A.         I'm not really interested.

17  Q.         Any problems in terms of what's going

18  on now in getting your job accomplished?

19  A.         Well, I still have problems with my

20  focus and concentration, but -- it's better than

21  it was, but it's still there.  I think taking a

22  class every now and then helps me.

23  Q.         Your complaint says that the

24  discriminatory conduct of the City has caused you

25  to suffer lost pay, benefits and prestige.

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

171

1           The lost pay, that's only referring to

2   lost pay not being promoted to major?

3   A.         Yes.

4   Q.         Okay.  And do you know what that

5   difference is in terms of the major pay versus

6   lieutenant pay?

7   A.         I'm not sure what it is.

8   Q.         Okay.

9   A.         Offhand I'm not sure.

10          You asked me about some other

11  situations in which my -- I had a hostile

12  environment.

13  Q.         Right.

14  A.         Okay.  There was a door that was right

15  next to my door and it led to the outside hallway.

16  I mean, there were like these two doors.  They

17  were closer than these two doors.  And Rike and

18  Reboulet would use that door next to my office

19  regularly to come in and out of, and it would

20  slam, bam, bam, bam, and I think it caused my

21  anxiety.  And actually it was Rike, Reboulet, Doug

22  Hall, and Culham.

23          And what was weird was that I

24  started -- they did it so much during the course

25  of the day I started writing down how long they

172

1    would go out and come in and out, because the

2    men's bathroom was right across the hall, but

3    there was another door that they could come

4    through that was actually closer, but they would

5    come all the way around by my office and go out

6    and the door would slam, bam, bam.  It was all

7    day.

8    Q.          What kind of door was it?

9    A.          Just a regular office door, and it had

10   the -- you know, the hinge that's on the top, but

11   we had to -- and it would -- I called -- I can't

12   remember who it was and who did building stuff,

13   and he sent some guys over to put some little

14   stoppers on it so that it would absorb the sound,

15   but it didn't help.

16          But the guys would come in and out that

17   door, Mr. Bazelak, and they would go into the

18   bathroom.  Like I know once Scott Culham went over

19   there and he was over there for ten seconds and

20   then he'd be over there for like 18 seconds, 23

21   seconds.  So they were just coming in and out of

22   that door constantly, bam, bam, bam, boom.  And

23   then it rattled me because I was trying to focus

24   on my work.  And finally, it was January 2017, I

25   told -- I sent Rike and Reboulet an e-mail and

1   told them and asked them to stop using that door.

2   But I had told Ecton about it and he didn't -- he

3   didn't do anything, because I don't think he

4   thought it was a big deal.

5           And we got new cars and I sent this

6   to -- I was so -- I was angry, because I was tired

7   of things, of just the disrespect.  When Ecton

8   gave PSB two new cars, but the sergeants, he sent

9   them right to the sergeants and they distributed

10  the cars the way they wanted to.  And I was

11  furious because it was just another example of how

12  I was disregarded on a regular basis, and

13  everybody -- because we have a paramilitary

14  organization and we use the chain of command, that

15  is how we remain organized.  We don't go around

16  other people, other people in the chain and duck

17  business.  That's not how that works, and he knows

18  it.  And I think he was a lieutenant colonel at

19  that time.

20          So there are -- I mean, like I said, I

21  could talk forever about the things that I

22  experienced.

23                  - - - - -

24          Thereupon, Deposition Exhibit R is

25  marked for purposes of identification.

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

174

1                              - - - - -

2    Q.           Showing you what's been marked as

3    Defendant's Exhibit R.  Is that what you're

4    referring to in terms of the car issue?  Does that

5    reference the assignment of the vehicles?

6    A.           Yes.

7    Q.           Okay.  And that is an e-mail from

8    Lieutenant Colonel Ecton to you regarding the car

9    issue?

10   A.           Yes.

11   Q.           And what does he -- he addresses that

12   with you?

13   A.           Yeah, but this is not how things are

14   done, either.  It wasn't his responsibility to

15   distribute resources.  That's part of my command.

16               And he says here that he "took a car

17   from CPOD and" west pod "to give to two senior

18   people in PSB because I thought they were

19   deserving."  It's not up to him.  I work with them

20   directly.  He wasn't in there.  He wasn't over

21   there.  I was.  That's my responsibility.

22   Q.           Okay.  And with regard to Rike and

23   Reboulet, though, it was Ecton that was the person

24   that was deciding that they were going to get new

25   vehicles, right?

175

1   A.          And that's what I said.  He goes around

2   me, and that's what I told him to do.  I said

3   major, can't do that, because I need to establish

4   myself as the commander; never happened.

5   Q.          And at that time, he's above you.

6   A.          He always was.

7   Q.          All right.  Anything else that you

8   believe constituted a hostile work environment?

9   A.          Those things happened on a regular

10  basis.  It wasn't just once or twice.  And the

11  noise period, just the noise outside my office.

12  They would stand there and just laugh and joke and

13  play, and it was disruptive to me.

14          MR. BAZELAK:  Okay.  I don't have any

15  further questions.  I appreciate your time,

16  Lieutenant Hill.

17          THE WITNESS:  Thank you.

18          MR. BAZELAK:  Thank you.

19          MS. BROWN:  And we'll read it.

20          (Signature not waived.)

21              - - - - -

22          Thereupon, the foregoing proceedings

23          concluded at 3:02 p.m.

24              - - - - -

25

1          I, Kimberly Annette Hill, do hereby

2   certify that the foregoing is a true and accurate

3   transcription of my testimony.

4

5

6

7

8

9                                    _____

10

11                  Dated   _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

177

1   State of Ohio       :          C E R T I F I C A T E

2   County of Franklin :  SS

3           I, Reva Chafin Mundy, a Notary Public
    in and for the State of Ohio, do hereby certify
    the within named Kimberly Annette Hill was by me
4   first duly sworn to testify to the whole truth in
    the cause aforesaid; testimony then given was by
5   me reduced to stenotypy in the presence of said
    witness, afterwards transcribed by me; the
6   foregoing is a true record of the testimony so
    given; and this deposition was taken at the time
7   and place as specified on the title page.

8           I do further certify I am not a
    relative, employee or attorney of any of the
9   parties hereto, and further I am not a relative or
    employee of any attorney or counsel employed by
10  the parties hereto, or financially interested in
    the action.

11          IN WITNESS WHEREOF, I have hereunto set
12  my hand and affixed my seal of office at Columbus,
    Ohio, on this 3rd day of April, 2019.

13

14

15

16

17                  *Reva Chafin Mundy*

18          _____
            REVA CHAFIN MUNDY, RPR, RMR, CRR
19          NOTARY PUBLIC, STATE OF OHIO

20          My commission expires on 06-23-2022.

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department          Kimberly Annette Hill

---

**(**

**(25679)** 108:18

**(25715)** 109:3 118:4

---

**0**

**02** 118:5

**05102016** 108:20

**05262016** 109:3 118:5

---

**1**

**1-7-15** 5:6

**10** 96:1

**105** 4:12

**107** 4:13,15

**109** 4:16,18

**10:15** 3:2

**10th** 84:7,15 85:4 87:8,15 89:1 90:15 91:5 92:3 108:15,21,24 110:2,24 111:4,6,11,25 112:19 115:11 150:6,17

**11-2-16** 5:8

**110** 4:19

**113** 4:21

**114** 4:22

**115** 4:24

**116** 5:3

**12** 147:25

**12-17** 82:20

**12:50** 119:14

**12th** 90:17

**13** 52:16,17 120:13 147:25

**134** 5:5

**137** 5:6

**13th** 107:1

**14** 147:25

**15** 131:20

**16** 66:11 67:5,21 138:25 143:14

**16th** 113:5

**17** 161:2

**173** 5:8

**18** 134:11 172:20

**18th** 113:2 149:25

**1977** 9:4,16 15:17

---

**1978** 9:17

**1980** 10:5

**1982** 10:16 18:7

**1985** 11:1,5 18:4 97:2

**1988** 18:11

**1989** 18:12 19:18

**1999** 26:15 99:20

**1:33** 120:2

---

**2**

**2** 40:22,23 112:2

**2-23-17** 4:16

**20** 39:25

**2000** 19:4,5 28:18 34:4,10 117:13 164:10

**2002** 34:11,15

**2003** 30:2 35:2 144:24

**2004** 35:3,11 37:15,21

**2005** 23:12 25:1

**2006** 12:12 13:3,17

**2007-2008** 13:25

**2008** 41:6,8

**2010** 37:11,15,18,19,21 38:3,6,14 39:22 40:17 45:20 101:3

**2011** 46:3 47:7 101:4

**2012** 48:8,9 49:15 50:3 76:4,11,12 82:18,20 85:9 104:2,3,4 143:4,6,13,15, 16,24 145:18,21,22 146:4

**2013** 47:13,18 64:23 65:25 66:13

**2014** 52:15 132:12 133:1, 15 146:18,22

**2015** 131:25 132:1,9 134:12 137:9 143:18 146:13 147:6 152:13 162:25

**2016** 76:3,13,15 77:6,13 78:16 84:8,15 85:4 87:9, 10,13,15,16 89:1,6 90:17 92:3,5 106:19,23 107:1,7, 22 108:8,15,21 110:2,3,24 111:4,7 114:23 115:12 117:13 118:9 119:5,7 143:11,13,17 145:14,20 150:17 162:7,8,9

**2017** 111:2 115:20 149:25 154:25 160:25 172:24

**2018** 75:6 156:24

**2019** 3:2 120:2

**22** 138:23

---

**22A-2016-1977** 117:17

**22nd** 77:10,13

**23** 172:20

**25679** 108:25

**26** 3:2 87:10,12,16 89:5 92:5 109:2 110:3 112:22 113:14,21,25 114:22 115:20 116:19 117:13,18 118:8 119:5 120:2

**26th** 91:6 117:22

**27th** 111:1

**28** 147:10

**28th** 152:11

**2nd** 151:12

---

**3**

**3-16-17** 4:18

**3-22-16** 4:6

**32** 147:11 149:1

**335** 8:8

**36** 150:16

---

**4**

**4-27-17** 4:19

**45402** 8:9

---

**5**

**5** 94:25

**5-10-16** 4:8

**5-18-17** 4:21

**5-24-17** 4:22

**5-26-16** 4:9

---

**6**

**6** 4:3 29:10 33:14

**6-13-16** 4:11

**6-26-17** 4:24

---

**7**

**70** 39:20 40:3

**71** 39:19

**75** 95:12

**75.42** 94:20 95:13

**76** 4:6 109:2 118:4

**79.17** 95:15

---

**7th** 137:9

---

**8**

**8** 33:14 134:12

**8-8-16** 4:15

**81** 4:7 10:5

**82** 10:15

**83** 4:8

**84.9** 95:17

**85** 10:6 17:15

**86** 4:9

**89** 26:7,12

**89.58** 95:19

**8th** 107:22 108:8 131:25 132:1

---

**9**

**9-8-15** 5:5

**91** 19:1

**92** 19:1

**93** 4:11

**99** 25:16 26:1,7,13

**9th** 18:12 19:18 106:22

---

**A**

**a.m.** 3:2

**A6** 108:18

**aback** 64:7

**ability** 8:11

**Abshire** 25:8

**absorb** 172:14

**academy** 18:11 19:18 24:15,23 99:18 100:13 123:4 124:7 155:20

**access** 66:21

**accomplished** 170:18

**account** 105:25

**accurate** 8:12 83:24

**accustomed** 128:16

**acknowledge** 158:5

**acknowledged** 129:9 130:23

**acting** 67:24,25 68:2

**action** 4:13,14 59:20,21 87:14 120:15 123:11

**actions** 56:17 110:5 128:8 130:5 150:20 154:10

---

**acts** 150:21 154:12

**actual** 12:15 14:9 32:16 117:21

**additional** 87:14 130:18 137:22 138:13

**address** 8:7 28:25

**administered** 28:23

**administration** 14:19

**administrative** 27:12 33:19 34:16 35:5 43:6 63:1 66:20 100:15

**advantage** 66:19

**adverse** 59:21

**advertisement-type** 153:20

**advertisements** 151:7

**advocate** 151:18

**affairs** 67:8 121:21 127:5, 6,8 129:6 133:20

**affected** 135:6

**affidavit** 4:12 105:21

**afraid** 166:9,21,24,25

**African-** 144:15

**African-american** 59:12 71:21 73:8 74:11 99:8 103:4 127:21 148:12 149:7,12,14,16

**African-americans** 149:5

**Afternoon** 120:1

**agency** 136:11

**aggrieved** 85:18

**agree** 107:6 108:6 139:22 159:12 168:5

**agreement** 3:9

**ahead** 110:21 152:22,24

**ahold** 153:2

**aide** 33:19,24 34:16,19 35:5 43:6 66:20 67:2 100:15

**ailments** 163:5

**aired** 53:19

**airing-out** 57:18

**airport** 34:7

**Alice** 160:20

**alive** 19:6

**allegation** 126:17 138:2

**allegations** 111:6 120:10

**alleging** 88:3 89:8 99:2 165:5

**alley** 167:8

**allowed** 89:23 115:25

**alongside** 38:13

**American** 144:16

**amount** 85:16

**and/or** 129:25

**Andy** 128:7

**angry** 121:2,10,11,25 173:6

**ankles** 161:17

**Annette** 3:5 6:1 8:8

**answers** 6:24 8:12

**anti** 160:9

**anticipate** 12:14

**anticipated** 147:6

**anticipates** 42:4

**antidepressant** 160:9

**antidepressants** 160:11

**anxiety** 162:19 163:10 164:3 171:21

**anymore** 9:2 16:1

**apparent** 71:4

**apparently** 40:20 70:16 90:18 101:21 124:11 125:25

**appears** 76:25

**applicants** 149:12

**application** 39:2 76:6 78:23 81:5 93:5,8 156:19

**applied** 39:13 76:4 80:3, 14 104:4 111:21 138:24 139:3 156:4

**apply** 76:15 81:9 83:11 85:19,25 86:1 89:2,24 91:10 144:8 156:13,18

**applying** 76:2 85:24

**appoint** 102:12 103:21

**appointed** 42:18 45:20 78:8 148:18 156:3,9

**appointing** 103:4

**appointments** 143:21

**appoints** 78:12

**appreciated** 7:10 45:11

**approval** 39:4

**approved** 82:19 103:14 155:1

**approximately** 16:8 21:8

**April** 111:1

**arbitrarily** 84:25

**area** 97:24 98:4

**areas** 32:5

**arguing** 91:1

**Army** 10:23 11:1 17:9,11, 12,16,17

**arts** 10:1,2 12:5

**assault** 63:23

**assessment** 28:9,11 29:4,21,25 78:25 93:12,23 94:6,7,10,14 99:4 102:4 104:6,21,22 105:6 106:21 142:19,20,21,24 143:1,7, 12,16 144:1,7 145:16,23 147:12,18 148:1,11,14 149:13,15,17 156:15 168:6

**assessment-type** 28:23

**assessments** 79:2

**assign** 133:13

**assigned** 19:25 25:1 26:18,22 30:4 35:20 45:5 62:25 64:1 121:9

**assignment** 19:23 23:5 35:12 42:22 50:6 62:19 63:14 121:1,3,5,6 122:11 154:2

**assignments** 23:7 43:20 66:20 69:13

**assist** 66:25 67:2

**Associate's** 9:22 10:1,4 11:5

**assuming** 39:9 156:16

**Ativan** 160:13

**atmosphere** 166:20

**attached** 82:3

**attend** 155:14

**attendance** 3:5

**attended** 27:5 44:15

**attending** 9:10 10:18 13:10 146:25

**attention** 52:7 136:25

**attitude** 151:10

**attorney** 7:25 114:20 122:21,23 170:2,4,7

**audible** 6:24 7:8

**audit** 136:11,12

**audits** 75:11 156:25

**August** 107:7,22 108:8 119:7

**authentic** 112:12

**authenticity** 112:15

**author** 129:10

**authority** 120:16 123:12 126:13 130:17 149:2

**authorization** 164:19

**automatically** 40:10

**avoid** 132:20

**aware** 56:16 94:13 102:10, 20 154:11

---

**B**

**B-E** 161:11

**B-E-T-H-E-L** 161:12

**B-O-N-D-S** 162:2,3

**babies** 16:21

**Bachelor's** 23:16 79:14, 22 80:19 82:22 90:6

**back** 15:15 23:13,25 24:1, 8 28:17 29:8 32:5 33:11, 13,22 34:7 36:23 39:22 40:17 43:5 52:11 53:3 54:22,25 63:4 69:22 76:14 78:16 80:12 84:14 86:23 99:6 100:17 108:14 111:25 120:4,5,7 122:25 125:7 135:15,20 138:8 156:1 161:23 163:1,25

**background** 8:15,16,24 9:6 12:24 13:1 15:16 17:8 19:22 24:20 27:7 39:7,11

**Bailey** 45:4

**balance** 127:16

**bam** 171:20 172:6,22

**Bardun** 44:11,12,13 45:8 46:17

**based** 47:17 58:11 59:22 60:1 91:23 92:12 104:4 106:6 114:21 129:25 142:14 146:5 150:3 158:14

**basic** 10:15 17:14 18:7 30:25 66:17

**basically** 12:4 74:7 81:1 87:5 88:12 98:3 136:15 152:7 153:12

**basis** 126:16 130:21 134:15 138:2 140:15 141:5 148:24 173:12

**bathroom** 172:2,18

**Bazelak** 4:3,16,17 6:4,7 65:13 90:24 92:16 104:8 111:18 112:6,9,16 117:6 119:9 120:4 131:16 145:7 163:21,23,25 164:18 172:17

**bearing** 76:12

**bears** 103:1

beginning 88:16 89:14 90:9

behalf 114:1,9,20

belief 141:6

believed 38:8 88:6 90:25 91:1 154:20

benefit 17:1 51:1,13 54:21

benefits 75:18 170:25

bet 29:19

Bethel 161:8,10,11 162:14

bias 102:16,21 103:3

biases 103:2

Biehl 4:19,20 101:12,16, 23 136:5

big 125:2 133:1,12 173:4

binder 118:11

biochemistry 13:22

bios 96:23

bit 52:4 104:10 166:4,11

black 58:20,22 71:22 72:9 73:16,25 96:25 101:12,24 131:19 142:5 147:16

blew 51:1

blowup 133:1,12

blue 16:2,3,23 33:21,22,24 34:18 64:10 129:16,18

board 27:8 39:5 110:12 111:8,24 114:5,7 124:1,5, 8,23 125:16

bobble 142:12

body 122:4,5

Boggs 4:19,21

Bonds 162:1,6

Booher 5:6 128:7

boom 172:22

bored 170:14

born 8:21

bosses 165:10

bottom 83:19 84:8 86:15 135:19

boundaries 58:7

break 7:24 24:6 38:5 104:9,10,14 120:6 163:19, 22

breast 163:17

breathe 61:10

Brian 128:6 129:13

briefly 30:7 63:20

bright 64:9 142:18

bring 136:24 141:14,19 153:6

bringing 55:19

brought 72:12

BROWN 91:9,12 92:10,17 111:15,19 112:4,8,11 113:5 117:4,7 119:11 145:13 159:13 160:4 163:19,22

buddies 148:5

building 53:19 172:12

bumped 40:22

bunch 149:24

bureau 52:14 61:8 63:1 66:4,15 67:12 68:1 129:8 157:8

business 151:9 167:19 173:17

butt 125:7

bypass 74:18

---

## C

call 30:15 44:9 46:21 60:16 115:16 153:17 165:15

call...if 94:11

called 3:6 12:7 31:16 67:6 107:17 126:22 172:11

calling 117:7

calls 30:20,21 44:16 124:5

camera 54:12

cameras 54:7

cancer 163:18

candidacies 106:8

candidacy 105:23,24

candidates 42:7 94:5 104:18,20 106:6

candidates' 94:9

Cann 73:10

capacity 31:3

capstone 151:24

car 166:13

care 18:22,24 51:25 54:15 161:3 162:12

career 22:2 56:17 75:22

Carlene 20:6

Carper 36:6 37:4,20 48:1, 3,14 49:13 53:3,17 55:5 56:4,23 59:19 61:9 62:8, 14,15,23 63:6 71:10,11,23 74:1,5,9 76:7 101:14,19,23

128:7 147:13 148:4,5,9,22, 23,25 149:1 165:16,24

Carper's 60:25 70:15 71:9

carrying 168:20

cars 173:5,8,10

case 78:24 108:12 114:2 121:9,24 147:14 149:15

cases 157:10

category 146:20

Caucasian 130:14

caught 58:5

caused 163:15 170:24 171:20

center 15:23 29:4,25 93:13,23 94:7,14 102:4 104:6,23 106:21 142:19, 20,21,25 143:1,7,12,16 144:1,7 145:16,23 147:12, 18 148:1,11,14 149:13,15, 17 156:15

center-type 28:9,11

centers 105:6

central 35:14 36:1,16 48:11,18 54:24 55:2 61:8 62:3,6,20 63:22 65:21 68:18 72:14

cents 53:16

certified 6:2 96:20 146:25

Chabali 34:14 55:16 56:4 66:7 74:1,9,18,19 132:23, 24 133:2,4,24 147:19,20, 25 148:3,5

chain 173:14,16

chair 58:6

challenged 141:10

chance 94:1 126:12 154:8,10

change 36:17 90:11,12 91:2,16 107:24 135:22,24 138:19

changed 84:21,24 85:6,9 87:13 89:6,13 91:5 140:3 151:4,10 155:7

changing 63:2 90:1 153:14

character 3:12

charge 4:8,9 35:21,22,23 48:20 84:2,3,16 85:3,21,25 86:4,17,22 87:12,16 88:4 89:1 91:4 92:4,5,12,23 108:14,16,23,25 109:2 110:3,23,24 111:5,7,11,25 112:19,22,24 113:14,21,25 114:23 115:12 116:19 117:16,17,18,21,22 118:3, 8,23 119:4 131:20 150:5,6,

17,23 156:20 165:6

charges 83:23 92:19 108:13 109:6,10,13 110:14 157:3,4,6,11,16

charging 111:21 150:2

check 24:20 39:7,12 167:17

chemistry 12:1,3

chewed 125:7

chief 55:24 66:8 68:7 77:19,21,23 96:14,22,23 97:1 101:12,16 103:21 123:6 124:6,14,21 132:7, 10 133:13,17 136:15 141:12,17 142:17 143:2,23 144:13 147:20 151:1,4,14 152:5,24 153:2,3,4,8,11 155:7,22

Chief's 148:6

children 8:19 16:15,21

Chris 40:6,20

churches 27:6

Cindy 97:7

circle 76:14 120:7

circumstance 51:4

citizen 30:23 67:16 98:16 121:12 128:19,23 137:3

City 6:12 18:10,19 19:18 23:19 78:9 81:2 88:6 96:8, 10 100:17 102:8,10,15 103:14 104:17 105:15 107:4,17 111:10 139:16 141:2,8,12 155:3,5 158:13, 22 159:2 164:23 170:24

civil 24:17 28:3,20,22 38:23 39:1,4,10,12 40:8 42:19 78:16 84:3,17 86:18 87:23 105:22 108:12 109:7,11 110:1,12 114:3,9, 21,23 115:23 116:17 119:5 144:19 146:7 156:21 165:6

claim 126:25 127:1 169:8, 14

claimed 127:6

claiming 76:9 89:22

claims 126:23 150:22

clarified 88:16

clarify 8:2

class 11:17 150:4 170:22

classes 10:19,20 11:9,12, 17,22 13:22 14:14,15 15:1, 4 80:23

classification 108:1

classified 78:6

Case: 3:17-cv-00334-TMR Doc #: 14-1 Filed: 04/16/19 Page: 181 of 192 PAGEID #: 253

Kimberly Hill vs City of Dayton Police Department · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · Kimberly Annette Hill

**clear** 51:3 57:15 59:11 80:18 88:17,18,22,23

**CLEEP** 96:15,20 147:1

**close** 169:22

**closed** 166:21,24

**closely** 45:19 46:8

**closer** 171:17 172:4

**closet** 54:8 58:4

**closet all** 54:13

**clowning** 168:20

**Co-op** 9:1 10:18 15:18,20

**co-sign** 142:8,10

**colleague** 46:20

**College** 96:20

**colonel** 48:14,16 68:9,11 69:12,19 97:6 127:19,21 148:18,19 149:17 173:18

**combined** 32:19 34:18

**Combs** 97:7

**comfortable** 65:23

**command** 157:16 173:14

**commanded** 130:13

**commander** 36:19 42:25 44:4,10 45:24 47:5,11,12 49:22 53:9 54:2 57:24 66:10,15,24 67:6,22 68:3 75:5,13,14 120:8 128:24 129:2,9 130:24 131:5,10, 15,20 132:17,18 133:5,6 158:7 168:16 169:5

**commanders** 45:6 61:21 68:1

**comments** 60:12

**commission** 10:25 17:15 18:4 19:1 84:4,17 86:19 109:8 110:2,12 114:3,9,21, 24 115:24 116:18 119:6 146:7 156:21 165:6

**Commission's** 109:12

**common** 58:19 66:18

**communicate** 100:17 128:13

**communication** 92:24

**community** 33:20

**compared** 99:25 100:21

**Compensation** 169:13

**competition** 58:13

**complain** 132:8

**complained** 132:2 161:6 162:13,21

**complaint** 4:22 65:2 87:5, 7 92:13 101:11,16 109:15

114:1,3,8,19 116:16,22,23 117:3,13 118:17,19,20,22, 23 120:11,13 134:12 137:3,4,7,18,20,22 138:1, 6,7,11 140:20 150:16 151:1 164:22 165:4 170:23

**complaints** 38:7 62:9 67:16 121:12 137:4 150:12 161:3 162:11

**complete** 157:7,20

**completely** 126:14

**completing** 128:20

**components** 97:22

**computer** 167:3

**concentration** 11:23 14:18 170:20

**conclusion** 117:8 140:21, 23

**condition** 158:15,24 159:14,22

**conditions** 159:16

**conduct** 87:14 89:7 170:24

**conducted** 126:23,24

**confronted** 125:8

**confused** 53:6 78:5 123:23 126:19 127:15

**confusing** 53:12 79:20

**confusion** 53:5 55:6 57:5, 7,10

**consciously** 102:25

**considered** 68:22 104:25 128:9 140:17,22 141:1

**considers** 147:20,22

**consist** 28:5 38:21

**consisted** 28:22,24

**constant** 121:22 135:11

**constantly** 172:22

**constitute** 154:12

**Cont'd** 5:1

**contact** 92:8 124:13,20 128:24 129:2,5,8

**contacted** 87:17,18

**contained** 88:25

**contemporaneously** 170:5

**continuation** 55:2

**continue** 56:2 59:8

**continued** 131:8 135:10

**continuing** 89:12

**continuous** 13:2

**control** 130:18 131:13

**conversation** 57:17 81:7 122:6 125:15 151:22 153:5

**conversations** 102:8 136:7

**copy** 83:19 122:19 170:8

**cordial** 167:22 168:10,24

**Corporation** 15:25

**correct** 10:5 12:21 13:18 19:19 20:16 22:3 27:24 39:5 42:15 43:13,16,20 45:16 48:18 49:5 57:2 58:4,9 62:4,20 65:8,16,17 73:21 75:24 76:3,16 78:1, 11,22 81:23 82:5,18,24 83:25 84:4,16 85:2 86:2,19 89:20 93:5,13 95:4,10,15, 17 96:9 97:2 98:11 99:9,12 104:21 106:9,23 107:4 108:4,25 109:4,8,16 110:5, 9,24 111:2,12 113:16 115:13,20 116:2,19 125:18 136:5,11 140:8 144:10 150:9,17 156:4,14 167:20

**corrected** 135:17

**corrections** 152:24

**cost** 155:3

**Couch** 4:10 80:8 86:3,7,25 87:19 88:17 90:5 91:7 101:20,23

**counsel** 3:4 6:21

**County** 16:5,6,17

**couple** 9:10 12:4 13:22 25:9 29:3 38:15 64:7,23,25

**courses** 14:12 96:15,18

**court** 6:13 7:1 116:1

**courtesy** 7:15

**cover** 94:4

**covert** 60:15 168:12

**coveted** 68:23

**coworkers** 126:13

**crash** 122:10

**crashes** 121:14,17

**created** 52:10 53:4 56:18 61:1 128:9 135:5 166:19, 20

**creating** 55:6 154:13

**cried** 166:5

**crime** 63:24

**criminal** 14:18,25 15:1,4 79:15 80:19,25 82:23 83:4 88:21

**critical** 44:16

**Cross** 4:3 16:3

**cross-examination** 3:7

**Cross/blue** 16:24

**crucify** 136:2

**cruiser** 121:17 167:9

**cruisers** 167:6

**Cuban** 147:22

**cues** 120:21

**Culham** 70:5 72:11 73:11, 12 171:22 172:18

**cultural** 151:8

**curious** 43:5

**current** 75:9 154:2 170:13

**cussing** 168:20

---

**D**

**daily** 59:12

**damages** 160:5

**Darryl's** 72:9

**Daryl** 72:6,17 73:16 169:2

**date** 18:2 77:8 80:11 82:17 107:22 108:7,15,21 109:3 111:1 115:20 118:4 156:21

**dated** 84:5,7 107:1 131:25 134:12 152:11

**Dave** 40:6 41:12,13,14,16

**day** 22:19 23:2 36:16,19 47:5,11,12 49:6,7 54:9 57:23 64:14 74:17 108:18 109:2 118:4 120:9 133:1, 15,16 166:5 171:25 172:7

**day-to-day** 35:6

**Dayco** 15:25

**days** 22:13 64:13

**Dayton** 8:9,22 12:11 13:17 19:19 32:7,9,10 88:7 96:9,10 107:4 139:16,22 141:8

**deal** 59:12 173:4

**dealing** 129:17

**dealings** 54:3

**death** 164:7

**December** 35:2 132:11,12 162:9

**decent** 52:6

**deceptive** 88:7 89:12 90:1 91:18,24 92:8,9,22 93:1

**decided** 66:11,12 148:10

153:19

**decision** 100:2 102:11 107:9 112:2,18 114:7 142:1 154:9

**decisionmaker** 105:16 141:1

**decisions** 142:14

**decrease** 121:17

**deduced** 71:16

**Defendant's** 76:23 81:18 83:18 86:14 93:16,20 105:14 107:20 109:25 110:21 113:1 114:17 115:10 134:10 137:17

**Defendants** 3:7

**degree** 9:11,22,24 10:4 12:7,10,16 13:17 14:9 17:16 23:17 24:9 79:14,18, 22 80:4,19 82:22 83:3,6 85:1,7 88:20 90:6

**dehumanize** 60:9

**deliberately** 167:14

**demanded** 30:21

**demoted** 153:22

**denied** 154:23,24 155:2,4, 25

**Dennis** 72:12 165:20,21

**department** 6:11 15:23 17:6 19:19,22,24 27:9 38:9 42:3 68:22 75:24 78:1 99:15,16 100:7 102:2,5 105:3 120:14 127:18 128:5 130:13 131:14 132:3 139:22 141:25 151:10 164:23,25

**departments** 100:18

**depended** 13:7

**deposes** 6:3

**deposition** 3:5,9 4:5 5:2 6:16,17,20 76:19 81:14 83:14 86:10 105:10 107:13 109:21 110:17 113:9 114:13 115:6 116:13 134:6,21 137:13 173:24

**depression** 162:19 163:10 164:3

**deputies** 78:7

**deputy** 66:8 124:6,13,20 143:23 144:10,13 147:20

**describe** 30:8

**describes** 105:23

**description** 4:7 81:22 82:12 90:10

**desire** 141:7,24

**detail** 8:16 29:20

**detective** 55:16 70:21 71:15 72:2 124:2,11 125:16,21 126:1

**detectives** 53:5,8,10 54:4 70:2,8,10 72:4,18 120:20, 22 165:18

**determination** 110:1 111:8 112:23 113:13,15, 21,25 115:11 116:2 118:21 150:1

**determinations** 110:9,13

**determine** 103:24 105:16 110:4 121:16

**determined** 106:4 109:14 111:9 159:2

**determining** 110:3 139:21

**development** 146:24 155:24

**diary** 169:16 170:1

**Dickie** 4:6 76:24 95:9,10, 12

**Dickstein** 4:12 105:15 140:17 141:9

**Dickstein's** 105:23

**died** 19:4 164:10

**difference** 171:5

**differently** 141:15

**difficult** 55:11 56:24 140:12 149:7

**dinky** 154:4

**direct** 33:7 36:5 57:1 74:24

**directive** 123:6

**directly** 43:8 48:25 70:1

**director** 91:7 144:10

**disability** 169:8

**disadvantaged** 16:19

**disciplinary** 67:18 157:3, 11

**discipline** 136:21 151:23 157:5

**discriminated** 89:23 99:3

**discrimination** 76:10 84:4,16 85:3 101:11,15 150:3 164:22 165:5

**discriminatory** 38:8 47:16 52:10 61:1 89:7 91:23 109:16 110:5 111:10 115:25 129:24 170:24

**discuss** 79:21

**discussed** 134:20,24

135:2

**discussion** 111:16

**discussions** 69:1,3

**Dismissal** 4:23

**disorder** 157:19 162:20

**disregarded** 173:12

**disrespect** 173:7

**dissension** 53:5 55:6

**distant** 166:16,19

**distress** 157:18,19 159:25 161:4 163:15 164:16

**distributed** 173:9

**distribution** 50:15

**district** 19:25 20:19 21:1, 3,4,7,9,16,20,22,23,25 22:3,15,17 23:8,13 25:2, 12,21,24 26:9 31:17,19,20 32:6,9 34:8 36:1 37:1 55:17,18 136:18

**districts** 26:12 31:22 32:20,21,23 55:19

**diversity** 142:17 143:3, 11,13 145:3,14,17,18,22 146:2

**divided** 32:16

**division** 27:9 30:5 32:20, 22 33:21 34:17,19,20 35:7, 14 37:10 48:22,23,24 54:25 55:10,15,21 67:23 68:6 70:11 73:24 129:12, 13 130:20 136:18,19,20,21

**division's** 128:25

**divisions** 32:22 71:16 100:18 128:22

**doctor** 160:16 161:6,7 162:14,21

**doctors** 164:19

**document** 81:19 86:15 93:21,24 94:13 105:18 112:5

**documentation** 169:24

**documents** 106:8 107:17 112:12 149:24

**door** 166:20,24 167:9 171:14,15,18 172:3,6,8,9, 17,22 173:1

**doors** 171:16,17

**doubt** 51:2,13 54:21

**Doug** 70:5,15 171:21

**downtown** 31:25 32:2,24 33:2 36:3 37:16 45:1,2

**dreamed** 56:11

**drill** 18:24

**drives** 27:6

**driving** 141:8,25

**duck** 173:16

**due** 155:2 159:6

**duly** 6:2

**duties** 27:2 30:8,13 63:20 66:18 82:8

**dying** 163:16

---

**E**

**e-mail** 4:6 5:4,6,7 50:8,13, 14 51:5,6,7 69:10 74:20 76:23 77:9,12 80:8 84:14 86:3,7,24 90:19 91:19 122:14,16,25 131:2,25 134:10,15 136:4,8 137:9, 17 151:3,13 152:9 172:25

**e-mails** 82:3 151:4 153:15

**ear** 148:6,8

**earlier** 25:18

**early** 28:18

**easier** 7:20

**east** 30:5 31:12,14,17 32:17,20 33:4,8,16 34:7 42:24 44:25 45:20 61:22, 24

**eat** 61:19

**Ecton** 5:4,7 68:9 69:2,19 74:18 75:1,2 76:24 77:22 80:2 81:7 101:19,23 104:7 123:18 125:3,6 126:9 127:19,21 130:25 132:7 133:2,5 136:5 146:16 147:13,24 148:9,19 149:3, 17 151:18 153:11 155:1 159:20 173:2,7

**Ecton's** 74:16 147:11

**Ecton/carper** 143:21

**edged** 126:13

**education** 14:24 15:7 79:13,24 80:4,17 82:22

**education-based** 151:23

**educational** 8:24 9:6 12:25 81:4 85:5 89:3 90:22 91:8 92:25

**EEOC** 4:23 5:3 117:15,17

**effective** 107:22 108:6

**egalitarian** 102:24

**ego** 131:18

**elated** 61:9

**eleven** 33:6,17

**Elizabeth** 15:22

Kimberly Hill vs City of Dayton Police Department                                    Kimberly Annette Hill

**emotional** 157:18 158:24 159:25 161:4 163:15

**emotionally** 98:24

**employ** 23:19

**employed** 96:9

**employee** 4:13,14 39:11

**employment** 15:18 19:11,13 24:7 74:23 87:10

**Enclosed** 94:9

**end** 59:7 151:2

**ended** 18:25 32:22 53:13, 17 133:16

**enforcement** 79:15 80:20 82:23,24 83:4 85:7 88:21 96:21 146:25 149:5

**enforcement/military** 17:20

**engaged** 111:10

**engaging** 150:21 158:13

**English** 12:1

**enrolled** 13:3 16:20

**entire** 23:4 75:22

**entitled** 59:24 60:3

**entitlement** 59:24

**entity** 136:22

**environment** 52:11 56:19 61:2 97:16 128:10 135:5,8 154:14 171:12

**equipment** 30:17 54:8

**Eric** 76:24 95:3,22 99:8 102:12 108:7 155:20

**Essentially** 32:19

**establish** 131:4,9

**established** 150:6

**estimate** 22:10

**evaluate** 121:14,15

**evaluation** 121:16,19,22 122:11 123:3 146:20,23 147:3

**evaluations** 146:13

**evening** 30:6

**event** 57:8 77:24

**events** 52:25 56:16 123:9 130:5 163:13 164:6 169:25

**eventually** 70:7 121:12 128:17 129:17 138:3

**everybody's** 101:19

**evidence** 55:4,8 57:2 58:8 59:4 141:23 150:2,20 167:4

**exam** 29:8 30:1 39:16 41:1 104:2,3

**Examination** 4:2

**examples** 50:18 129:5 130:5,11

**exams** 29:3

**exasperated** 152:6

**exceeds** 146:19 147:7

**excellent** 48:1

**exchanged** 167:24

**exclude** 149:11

**Executive** 96:20,21

**Executives** 146:25

**exercise** 28:24 29:21 93:13 98:11,17 106:21 144:1,7

**exercises** 94:7,15 95:3 97:10,13 98:10

**exhibit** 4:6,7,8,9,10,12,13, 14,16,17,19,20,22,23 5:3, 4,6,7 76:19,23 81:14,18 83:14,18 86:10,14 93:16, 20 94:3 105:10,14,19 106:22 107:20,21 109:25 110:17,21 111:5,13,14 113:1,4,9,13 114:7,13,17 115:6,10 116:13,17 117:10,12,18 134:6,10 137:13,17 173:24

**exhibits** 4:5 5:2 107:13 108:14 109:21

**exist** 16:1

**expectation** 146:19

**expensive** 12:19

**experience** 17:24 61:14 66:14 79:14 85:1 99:14 100:6,8,11 104:24 140:11, 13,16,25 142:3

**experienced** 125:13 157:22 165:7 169:18 173:22

**experiencing** 159:7 166:16

**expired** 42:1

**expires** 42:10

**explained** 87:4

**exposure** 130:18

**expressed** 71:14

**extend** 7:15

**extended** 19:11

**extent** 65:7

**Extremely** 122:1

**eyes** 152:2

**F**

**face** 27:17 60:16 121:10

**fact** 45:11 57:19 58:12 92:25 103:9 123:13 135:13

**factors** 141:8,25

**factual** 126:16

**failure** 76:10 157:7

**fair** 56:15 67:10 139:18 157:21 166:3,11,14,18 168:11

**fairly** 132:19 168:10

**fall** 59:8

**familiar** 106:3 107:16

**family** 161:6,7 162:14 164:8 169:21

**farce** 102:1

**fashion** 85:19 153:22

**father** 19:5

**favorably** 74:9

**FBI** 155:20

**February** 45:25 46:2 64:24

**federal** 6:13 116:1 118:21 120:10 150:9

**feel** 56:9 59:11,19,21,23 61:1 65:22 97:17,20,23,25 98:3,22 126:15 142:2 167:18

**feeling** 60:2 62:7

**felt** 47:15 52:10 57:3 59:16,23 69:7 74:8 83:9 85:4,18 87:19 89:2 91:22, 24 92:23 166:8 168:9

**female** 58:9,12,21 71:23 73:6,25 74:11 97:7 99:11 101:12,24 103:6 120:16 123:12 131:19 142:5

**field** 79:16,19 82:24 88:22 90:7

**fight** 61:11

**fighting** 53:14 168:19

**fights** 167:25

**figure** 50:11

**file** 85:21 86:21 87:20,25 92:23 116:1

**filed** 6:13 84:3,15 85:24 86:18 87:12,16 91:4 92:12, 13 101:10,15 105:22 108:12,13 110:8 114:1,3,8, 19,23 116:17,19 118:19,21 119:4 150:9,14 156:20 164:21 165:5 169:7,10,13

**filing** 85:3 150:22

**fill** 31:6 42:4 66:12 148:3,6

**filled** 84:25 158:18

**final** 94:5,9 154:7

**finally** 151:14 172:24

**find** 13:23 115:25 117:19 127:7,13 136:1 164:1

**finding** 109:19 111:20 114:22 150:1

**findings** 157:7,21 158:9, 10

**fine** 65:15 70:17 111:18 112:14 117:6 119:1

**finish** 7:13,18 23:15 128:20

**finished** 17:5 18:12 23:16 24:8 152:23

**firearm** 124:5

**firearms** 30:18,19 124:1, 8,23 125:16

**flying** 167:10

**focus** 170:20 172:23

**food** 16:21

**forever** 173:21

**forgot** 64:6

**Form** 4:13,14

**formal** 14:24 15:7 77:17 164:22 165:4

**format** 82:14,16

**forms** 107:17

**forward** 38:6 63:8 106:22 141:14

**found** 52:25 61:7 92:17,18

**fourth** 95:9

**frame** 13:25 31:16 52:19 60:23 76:3 84:14 107:7

**Freeman** 86:24 87:17,23 109:7,13

**Freeman's** 109:13

**Friday** 132:25 133:14

**friend** 70:16

**friendly** 61:20

**friends** 56:5 61:16 62:1

**front** 106:22 111:13,24

**full** 8:6 13:11 17:5 20:15 23:22 24:5 73:2 110:11 111:8,24 138:3,7

**furious** 173:11

Kimberly Hill vs City of Dayton Police Department                    Kimberly Annette Hill

## G

**G-I-O-V-A-N-N-I** 162:1

**G-O-R-S-U-C-H** 73:4

**gap** 132:17

**garage** 167:9

**gave** 17:1 51:1,13 54:21 66:21 80:10 100:16 121:7, 8,13,24 130:17 151:19 158:12 159:21 173:8

**gears** 74:24

**gender** 47:17 59:22 91:23 102:16 130:1 142:15

**general** 11:24 12:2,7 13:16 24:21 51:4 79:23 83:5 122:4 165:8

**General's** 114:20

**geographic** 32:5,16

**Giovanni** 162:1

**girl** 58:20

**give** 6:24 7:8,14 8:6,12 22:10 50:6 56:14 74:18 94:1 122:20 123:16,24 154:7,9

**glad** 62:19 63:7 65:23,25

**good** 6:5,6 42:2 50:25 56:5 68:24 72:11 104:16 129:22 165:9

**Gorsuch** 72:19 73:4

**gosh** 15:19 20:22 35:6 40:19 44:24 122:18

**grade** 29:23 40:2

**graduate** 9:3,9 10:3 14:12

**graduated** 9:7,8,16,21 10:17 15:17,24 19:17

**gravity** 59:5,6

**great** 53:20

**green** 33:22 34:18

**grief** 164:16

**ground** 6:20

**group** 44:8 103:10 142:6

**Guard** 10:23 17:9,17

**guess** 20:10 112:21 115:2 147:13

**guns** 166:23

**guys** 104:13 125:9 172:13, 16

## H

**half** 119:10 147:24

**hall** 70:5,15 73:14 100:17 171:22 172:2

**hallway** 171:15

**hand** 53:21

**handle** 123:4

**handled** 35:6

**handling** 35:9

**handwriting** 41:13

**happen** 132:19 167:5

**happened** 53:2 56:8 57:14 76:5 80:1,2 87:9 110:7 118:24 126:6,7 130:7

**happening** 50:1,4 61:12 136:23 151:15 170:5

**happy** 61:7

**harassment** 92:2

**hard** 18:23,25

**Harvard** 154:25 155:21

**hated** 58:25

**hatefulness** 135:12

**Hawthorn** 166:1

**head** 7:4 142:13 152:2

**health** 162:12,16

**hear** 60:19 70:23 81:2 123:17 125:11

**heard** 60:10 125:11,14 126:4 146:6 165:18,22,23

**hearing** 4:22 110:13 111:24 124:1,8,12,14

**held** 44:9

**helps** 170:22

**Henderson** 4:6,13 76:24 95:3,19,22 99:8 101:3 102:2,12 105:5 106:5,18 107:23 108:7 139:6 140:8 143:5 146:3 155:20 156:6

**Henderson's** 129:12

**hereinafter** 6:2

**Hess** 62:17 69:12 155:12

**high** 8:24 9:1,6,13 15:19 16:10 67:1 133:3

**highest** 95:4 104:20

**Hill** 3:6 4:6,16,17,19,20 5:4,7 6:1,5 8:8 115:15 120:5 130:20

**hinge** 172:10

**hired** 39:5

**historically** 149:4

**history** 12:24 15:15 52:6 74:23 108:11

**hold** 30:15

**hole** 125:7

**home** 14:7 166:25 167:16

**homicide** 63:23 72:15,18

**honest** 118:10

**horizontal** 59:8

**horrible** 41:14

**hospital** 163:4,8

**hostile** 52:11 56:19 61:2 128:10 135:5,8 154:13 171:11

**hostility** 137:24 138:14

**hour** 119:10

**hours** 57:23

**house** 165:15 167:1,7,8, 13

**Howard** 70:5 72:24 73:8 124:2 125:1

**HR** 81:8 91:6 164:23

**huge** 55:14 100:15

**huh-uhs** 7:5

**humanities** 12:5 80:24

**hurt** 166:23

## I

**idea** 53:20 99:23 140:19, 24 142:19

**identification** 76:20 81:15 83:15 86:11 93:17 105:11 107:14 109:22 110:18 113:10 114:14 115:7 116:14 134:7 137:14 173:25

**identified** 106:20 108:24

**Ill** 84:21

**imagined** 126:15

**immediately** 40:25

**impact** 8:11

**implement** 143:15 145:22 148:10 151:24

**implemented** 143:16,18, 24 145:15 147:15,17 149:2

**implements** 143:12

**implicit** 102:21 103:2

**important** 154:21 158:2

**improved** 159:22

**inability** 159:15

**inadvertently** 64:6

**incident** 65:6

**incidents** 31:9 44:16 56:16

**included** 35:8

**incorrect** 136:1

**indication** 146:23

**individually** 101:16

**individuals** 60:11 96:23 99:3,7

**individuals'** 105:24

**Infants** 16:14

**influenced** 103:7

**information** 14:5 17:2 111:16 123:14 125:25 126:9 131:5 151:5 152:16, 18,19,20 153:1

**informational-type** 151:7

**initially** 10:23 11:21 20:21 41:19 54:18 64:2 79:2 109:17,18 128:15 155:1

**initiated** 117:22

**insisted** 124:24

**inspections** 75:11 156:25

**instance** 126:18

**instructed** 152:17,21

**intent** 149:11

**interaction** 98:16

**interactions** 60:24,25 168:11 169:18

**interdisciplinary** 12:8

**interest** 69:7,9

**interested** 69:18 76:1 79:9,11 135:4,9 170:4,16

**internal** 67:8 121:21 127:5,8 129:6 133:20

**internally** 133:23

**interview** 78:24 101:6,9 104:23

**interviewed** 76:7 102:6

**introduce** 148:13

**investigate** 121:11

**investigated** 109:7,11,14

**investigating** 67:13

**investigation** 126:23,24 127:4 128:21 137:23 138:4,7,13 157:17

**investigations** 27:7 35:9 54:24 55:2 61:8 62:4,7,20 63:1,22 65:21 66:22 67:1 68:18 72:14 133:2 135:25 136:14 151:20

Kimberly Hill vs City of Dayton Police Department

**investigator** 87:23 124:3, 20

**investigators** 63:25 124:10 168:24

**invisible** 128:12

**involved** 46:17 96:7 97:9

**irrelevant** 92:20

**isolated** 65:6

**issue** 52:9 57:16 60:23 65:20 95:25 96:3 109:15 125:2 132:23 135:20 137:1,2 139:14

**issues** 47:14 49:17 52:8 126:15 141:22 161:4 162:12,17

**J**

**January** 26:7,12 35:3,11 37:15 47:13,18 64:23 132:11 137:9 162:7 172:24

**Jarush** 34:1

**Jeff** 20:23

**Jefferson** 34:1

**Jerry** 66:24

**job** 15:25 16:24 17:22 24:8 55:13 69:21 74:4 76:25 77:5,16 82:10 90:10,11,12 135:7 139:8,9,10 158:6 159:15 170:18

**jobs** 11:2 19:9

**Joe** 155:19

**John** 44:12,13 45:8

**Johns** 5:6 128:6 137:10, 23 148:17,25

**Johns'** 129:13

**join** 10:12

**joined** 10:8,19

**Jordan** 70:6 72:24 73:8 124:3,11 125:1,4,16,21 126:1

**Joseph** 95:8

**Judy** 25:7

**July** 34:4,10

**jumped** 53:23

**June** 34:11 106:22 107:1 115:20

**justice** 14:18 15:4 79:15 80:19,25 82:23 83:4 88:21

**justice-type** 15:1

**K**

**K-R-I-S-T-A** 73:3

**Ken** 101:20

**Kennedy** 155:1,22

**Kenton** 34:22

**Kettering** 97:2

**Kim** 64:8

**Kimberly** 3:5 6:1 8:8 115:15 161:8,9

**kind** 12:25 13:7 17:19 18:22,25 24:7 30:7 32:4,16 43:6 44:2,6,7,14 45:13,19 46:18 48:13 51:1 52:3 53:14 55:5 56:15,21,23 67:13,23 68:20 74:24 108:11 164:2 166:16 172:8

**kinds** 125:13

**knew** 68:17 70:20 78:16 102:1,2 105:3,5 118:14 122:2 125:19 126:3 127:9 128:17 132:20,22 133:22 152:7 169:1,3

**knowing** 54:23 125:17 129:7

**knowledge** 58:19 100:16 116:24 155:16 165:22

**Krista** 73:3 169:3

**L**

**language** 65:12 90:13 122:4,5

**lapse** 56:2

**late** 28:18

**lateral** 63:9

**latitude** 151:19

**law** 6:11 17:20 79:15 80:20 82:23 83:4 85:6 88:21 96:20 146:25 149:5

**lawsuit** 6:12 76:9 116:1 150:9,14 169:10

**Leader** 96:20

**learn** 13:14

**leave** 11:17 23:14,18 54:16 63:3 64:3 65:23 69:20 70:20 132:18 159:20

**leaving** 148:3

**led** 171:15

**left** 23:10 70:13,15 72:24 154:18 159:21

**legal** 117:7 150:21

**Len** 6:7

**letter** 4:10,16,17,19,20 94:4 111:1 113:13 115:16, 23 117:13 118:7 128:23 149:25 150:15

**letter's** 106:25

**letters** 110:1 128:20 129:11

**level** 44:2 154:13

**liability** 141:14

**liberal** 10:1,2

**Liberty** 9:11 14:14,21

**lie** 143:7,8,9 145:4,9

**lied** 125:10 143:2 145:3

**lies** 145:10

**lieutenant** 6:5 17:18 33:10 34:12 36:20,21 37:11,19,22 38:3,20 39:13, 16,22 40:11,16,25 41:17 42:5,23 43:11,16 44:11,18, 19,20,23 45:20 46:17 47:19 48:14,16 49:3 53:23 55:18 56:1 58:22 63:3,5,12 66:17,19 75:16 97:6 100:10,21,24,25 101:1 106:5 120:5 124:7 129:3 130:20 139:6 140:7,8 143:4,5 146:2,3,4 148:18 149:3 155:12 156:9 171:6 173:18

**lieutenant's** 29:3,25 30:1

**lieutenants** 40:21 42:15 44:2 46:7 55:15,23 69:11 100:21 127:17 128:4 130:1 139:3,12 140:5 143:6,14, 15 144:21,22 145:15,20,21

**life** 163:14 164:6

**likes** 142:7

**liking** 120:15

**list** 39:24 40:21,22 41:17 42:6,7,9 69:16 78:22 103:13,17,18,19,20,24 143:25 156:16

**listed** 92:19

**listening** 134:4

**lists** 42:1

**live** 166:2 167:11,12

**lives** 167:17

**living** 19:3

**loans** 13:6

**locations** 32:17

**logical** 140:21,23

**long** 12:13,15,17 16:6 18:20 20:8,25 21:5,8,16 22:5 25:11 28:17 33:3,15

34:2,25 36:9 37:8 44:22 46:25 47:9 48:13 92:21 99:15,24 100:20 130:7 132:17 135:1,10 160:23 171:25

**longer** 19:12 135:24 151:5 153:18

**longstanding** 164:13

**looked** 63:7 64:12 112:23 115:18

**lost** 170:25 171:1,2

**lot** 11:24 43:23,24,25 66:5, 9 100:16 129:21 130:8 170:11

**love** 74:6

**loved** 47:19 58:25 74:1

**low** 39:19

**lunch** 57:17 104:10 120:6

**luncheon** 119:13

**Lynchburg** 14:22

**M**

**M-A-Y-N-E-S** 20:6

**mad** 151:16

**made** 26:14 50:24 57:19 61:12 96:4 100:2 102:11 107:9 110:13 121:1,2 126:15 138:6,21 151:15 153:14 155:5 161:3

**mail** 35:9 74:16,17

**main** 167:11

**maintain** 23:25

**maintained** 63:11

**major** 4:7 33:20,23,24,25 34:17,20,21 38:18 43:2,3, 4,8,13,16,18 46:10 47:3,4, 7 48:4,5,6,21 57:6 58:21 62:23,24 63:18 64:2,14 65:19 66:7 68:10,12 69:2 74:16 76:2,8 77:6,25 78:15 80:2 81:23,25 82:8 84:20 85:20 93:6 94:5 95:22 100:4,15 102:13 103:25 104:18 105:17 107:10 108:2 124:6 128:25 131:3 137:10,23 138:24 139:15, 21 143:22 144:3,9,15 147:23,24 148:17,21,25 156:2,3,4,6,9,13 164:6 171:2,5

**major's** 35:8 43:7 144:12 146:1

**majors** 42:17,18 78:6 103:22 127:18 128:5 130:1 136:15 151:19

**make** 7:19 30:15,18 38:7

55:11 56:24 60:11 62:8
65:2,10 101:20 124:5
133:11 135:24 141:7,24
169:4

**makes** 142:13

**making** 152:23 153:13

**male** 27:17 45:8 55:22
58:21 71:12,24,25 72:13
73:8,12,14,15,16,18 96:25
97:4 99:9 103:6,21 127:21
128:14 131:16 135:15,18
138:21 142:4 145:25
147:16,23

**males** 71:24 73:20 85:12
103:15 140:2

**manager** 78:9 102:8,16
104:17 105:15 141:2

**manager's** 102:11 155:4,
6

**managers** 103:14

**manipulator** 58:15

**manner** 47:17

**March** 3:2 18:12 19:18
26:7,12 45:25 64:24 77:10,
13 84:14 160:25 161:2

**mark** 62:16 76:23 113:1,7
115:4 116:10 155:12

**marked** 76:20,22 81:15,17
83:15,18 86:11,14 93:17,
19 105:11,13 107:14,20
109:22,24 110:18,20
113:10,12 114:14,16
115:7,9 116:14 117:9
134:7,9 137:14,16 173:25

**married** 8:17 66:24

**Master** 14:19

**Master's** 9:11

**math** 11:25

**Matt** 36:6 37:4,20

**matter** 53:24 92:7,14
135:13

**Matthew** 76:24 95:9,10,12

**Maynes** 20:6 22:18,25

**meaning** 88:6

**meaningful** 154:5

**meant** 57:22

**meddle** 54:5

**meddling** 53:7

**media** 152:15,20,25

**medical** 15:22,23 161:3
162:11

**medication** 159:24 160:8
161:21

**medications** 8:11 160:14
164:15

**meet** 61:21 79:24 80:4,5,9
81:11 83:6 85:5 88:12
89:3,15,18,19 90:5,21 91:7

**meeting** 64:4 74:5 80:1
124:9 132:10,24 142:16
143:10 146:6 151:11,16,17
153:6 155:22

**meetings** 35:10 64:3

**meets** 146:19

**membership** 150:3

**memory** 37:12

**men** 131:18

**men's** 172:2

**mental** 157:18 158:15
159:14 161:4 162:12,16
163:8 164:16

**mentally** 98:23

**mention** 103:9

**mentioned** 58:2 151:12
164:10,20

**mess** 53:13,14 59:10

**messed** 54:12 58:3

**met** 6:7 80:16 90:22 92:25
125:6

**Miami** 163:6,7

**microaggression** 59:13

**microaggressions**
59:13

**middle** 91:20

**midnight** 22:18 23:1

**midnights** 20:1 21:4,7
22:13

**Mike** 22:19 23:1

**military** 10:9,13,19 15:16
17:8

**milk** 16:22

**mind** 155:7

**minds** 142:7

**minimal** 82:21 83:6

**minimum** 80:10,17 85:5
88:13 89:3,18,19 90:22
91:7 92:25

**minute** 25:14 26:11

**misconduct** 67:14

**missed** 37:13

**mistake** 148:19,20

**mixed** 25:15

**mom** 18:21,24 64:15
164:10

**mom's** 164:7

**Monday** 133:19

**monetarily** 13:7

**Montgomery** 16:5

**months** 19:12 20:11 21:5,
11,17 22:11 23:11 24:3
33:5,6,17 42:25 45:23
48:10 64:23 66:11 67:5,21
131:20

**moral** 126:22,25 127:1

**morning** 3:1 6:5,6

**mother** 19:3

**Mother's** 133:1,15

**mothers** 16:19

**motion** 110:8

**move** 38:6 63:9 104:9

**movement** 43:23,25 66:5

**movements** 66:9

**Murphy** 72:12,17 73:18
165:20,21 169:2

**N**

**narrative** 96:1,4

**National** 10:23 17:9,17

**natural** 131:22,23

**neat** 54:10

**needed** 16:22 46:22 51:23
63:5 80:11 87:20 123:15
135:16 148:3 153:13
168:24

**neighborhood** 167:12

**niche** 13:23

**Nicholson** 20:23 21:13

**niece** 167:17

**nigger** 60:16

**night** 36:19 37:1 42:24
45:24 48:21 49:5,7,22 53:9
54:2 57:24,25 167:8

**Nineties** 28:18

**Nods** 7:4

**normal** 87:19,20 158:4

**north** 32:7

**northwest** 32:12,13

**notable** 94:10

**notary** 3:8,10,13

**note** 3:10

**notes** 169:17,23 170:1,6

**notice** 3:8 4:22,23 5:3
77:18 84:13 115:15

**noticed** 52:3

**noticing** 49:20

**notification** 77:16 91:6

**notified** 77:25

**November** 36:10 37:10,
15,19

**number** 108:16,24 110:22
118:2,11,12 129:3 149:19

**O**

**O'DELL** 4:10 97:1

**O-N-A-D-Y** 160:20

**object** 91:9 92:10 111:15
117:4

**objection** 91:13 159:13

**objections** 92:20

**obligation** 126:22,25
127:1

**obtain** 12:10

**occasion** 64:18

**occur** 49:10 59:14

**occurred** 26:25 52:25
85:10 87:3 134:25 146:11
156:3,11 163:14

**OCRC** 4:8,9,22 92:13,18
142:16 143:10 150:1

**October** 18:11 151:12
162:8

**odd** 19:9

**offensive** 53:1

**offer** 41:24 42:5

**offered** 41:23

**offhand** 27:18 86:8 171:9

**office** 35:8 43:7 54:8 58:5
64:8 109:12 114:20 123:2
155:4,6 165:14,24 166:4,6,
10 167:25 171:18 172:5,9

**office-type** 16:24

**officer** 20:4,15 23:5 25:4,
23 26:9,20,23 27:4,23
30:10 163:17

**officer-involved** 124:2

**officer/patrol** 30:10

**officers** 31:4

**officers'** 67:13

**official** 3:12

**Ohio** 84:3,16 86:18 87:23
108:12 109:7,11 110:1,12
114:9,21,23 116:17 119:5
146:7

Kimberly Hill vs City of Dayton Police Department

Kimberly Annette Hill

**Oliver** 96:14,22,23

**Onady** 160:18,21,24 161:20,25 162:9

**one's** 84:7

**online** 9:11 14:15,16

**open** 39:22 40:20 42:9 76:2

**opening** 40:13

**operations** 35:7 55:21

**opportunity** 56:15

**opposed** 32:23 128:17 138:7 142:1

**opposition** 134:15,17,21, 23

**oral** 27:7 98:13,19

**order** 28:1 39:5 54:10 124:7 167:13

**organization** 173:14

**organized** 27:5 173:15

**ostracized** 154:19

**outcome** 57:12,14

**outlet** 152:25

**overlapped** 11:16

**overseeing** 46:10

**overseen** 43:19

**oversight** 136:15

**P**

**P-1's** 107:17

**P-1S** 107:21

**p.m.** 119:14 120:2

**packet** 74:21 77:12,20

**pages** 94:24 138:10

**paper** 91:17 153:18 154:4

**paperwork** 158:18

**paragraph** 88:5,9 120:13 128:23 134:11 138:23 149:1 150:16

**paragraphs** 147:10

**paramilitary** 173:13

**park** 54:17 58:2

**parking** 58:3

**part** 13:4 74:21 77:11 85:3,21,22 92:1 124:4 138:9 142:5,6 167:21,23 168:10

**partially** 85:8

**participate** 101:6

**participated** 114:2

**parties** 60:17

**party** 111:21 114:2 150:2

**pass** 167:6,13,15

**passed** 40:1,4,11 165:15

**passing** 40:2,9 167:1

**past** 127:3 139:20 162:17, 20

**Pat** 33:9 47:7

**patrol** 20:1,25 23:5 25:4 26:1,9,11 27:23 30:5,12 31:13,14,17 32:17,20,21 33:1,4,8,16 34:7,17,19 35:7,14 36:1 42:24 44:25 45:20,24 46:12 47:4,6,10 48:3,4,21 49:8 54:25 55:14,20 56:21 67:2 71:16

**Patterson** 9:1 10:17 15:18,20

**pay** 52:7 75:18 153:21 154:1 170:25 171:1,2,5,6

**paying** 13:6

**peers** 165:10

**PELC** 96:15,19

**penalty** 83:23

**people** 28:21 30:16 31:1 38:12 39:25 44:8 50:9 51:25 52:22 57:9 58:17 60:8 67:7 69:20 95:21 96:7 101:10,22 103:11 133:6 136:2 141:19 142:24 143:14,25 145:20,21 157:17 165:8,13 166:17 168:19 173:16

**perform** 98:24 136:11 158:7

**performance** 99:4 146:12,23

**performing** 66:14 158:6

**period** 12:13 13:9 19:11 20:12,15 28:18 37:22 48:13 52:17,19 56:21 59:19 61:1,15 130:7 135:1

**Periodically** 169:19

**periods** 13:12

**perjury** 83:23

**permitted** 83:10

**person** 60:8 63:17 85:11 124:17 136:19,20,22 146:15 158:8

**personal** 8:16

**personnel** 107:24

**petty** 50:10

**phone** 61:20 153:16

165:23

**physical** 161:14,16 163:5

**physician** 158:19,21

**physiology** 12:3 13:23

**pick** 71:9 139:21 153:16

**pitfall** 141:21

**pizza** 53:18 57:8

**place** 105:6

**places** 155:23

**Plaintiff** 3:6

**plan** 56:24

**played** 54:23

**pleasantries** 167:24

**point** 21:2,19 31:23 36:11 37:12 39:19 62:13 68:16 76:1 89:6 116:11

**pointed** 137:21

**pointing** 138:12

**police** 4:7 17:6 19:19,22 20:15 30:10 81:24 96:19 97:2 105:3 128:5 132:3 139:22 151:9 163:17 164:25 167:6

**policing/field** 33:21

**politically** 149:9

**politics** 148:7

**position** 4:7 26:10 28:10 38:24 39:13 40:11,16 42:4 43:6 52:14 59:9 63:21 68:15,23,24 69:2 75:8,9 76:2 77:6 78:1,3,15,16 79:10,25 81:3,22,23 82:5, 8,11 84:20,25 85:6,20,24 86:1 89:2,24 90:21,23 91:11 93:6 94:5 95:22 103:25 104:18 105:17 108:1 120:8 139:1,4,7,15, 16 143:22 144:3,9,10,12, 13 146:1 148:4 149:16 156:14,18,25 159:4 170:13

**positions** 39:21 42:18 75:23 100:14 141:19 144:20

**post-traumatic** 157:19 162:19

**posting** 76:25 77:5,16,25 79:7 82:10 90:11,12

**potential** 141:21 158:14

**power** 130:18 131:18 132:20 149:9

**Powerpoint** 152:1

**practices** 109:16 111:11

**prefaced** 88:11

**prepare** 152:1,18 170:3

**preparing** 123:25 152:21

**prescribe** 161:21

**prescribes** 160:14

**presence** 3:11

**present** 120:9

**presentation** 98:14,20

**prestige** 170:25

**prestigious** 68:20

**pretty** 19:16 22:24 30:24 31:1 80:18 92:21

**previous** 40:21 61:14 66:23 85:11 103:14,21

**previously** 140:2

**primarily** 30:15 120:19 161:18

**primary** 124:3

**Prior** 147:19 164:4,5

**probable** 92:18 109:15,19 110:4 111:8,9,21 112:1,25 113:15,20,24 114:22 115:11,24 116:2 118:15, 16,20,24

**probationary** 20:12,14

**problem** 132:23 142:21, 22

**problem-solving** 98:11

**problems** 47:23 48:2,17 52:8,24 128:6 133:23 134:2 137:21,25 138:12,15 140:12 161:14,16 162:14, 15 170:17,19

**procedure** 125:10

**proceeding** 105:22

**process** 28:2,3,20 38:20 39:2,13 40:8 78:24 85:9 93:5 96:8 101:6 123:15 127:9 140:3,22 143:7 144:8 147:18 149:13 156:19

**processes** 67:19 136:13

**processing** 117:16

**professional** 8:6 52:14 65:24 66:4,10,15,23 67:12 68:18 69:16 126:24 128:21 129:2,8 155:24 157:8 167:22 168:18

**program** 16:12,20 96:21 147:1

**project** 122:11 151:25 152:1

**promote** 28:21 42:7 100:3 141:9 147:12 149:14

**promoted** 25:16 26:6,13, 15 27:1,22 28:1 29:11 30:4,9 37:11,18 38:2,16 40:10,21,24 41:3,4,16,20 42:23 48:5,8 49:14 76:10 78:19 85:11 99:8,22 101:3, 4 103:25 105:7,17 106:6, 18 107:10 138:25 147:17 148:15,16 149:16,18,19 171:2

**promotion** 38:19 107:24 119:7 138:24 139:2 147:11 148:25 154:9 156:2,22

**promotional** 29:8 39:15 41:1

**promotions** 29:15 43:24 66:6,9 107:8 108:7

**proof** 3:12 56:7 57:2

**proper** 30:17 91:20 125:9

**properly** 101:21

**protect** 141:12,14

**protected** 150:4

**provide** 161:22,24 170:7

**provided** 112:13

**provider** 161:3

**providers** 162:12

**PSB** 52:14,20 54:24 55:3 62:3 67:6 68:21 69:23 74:25 75:5 120:8,24 123:5 133:5,6,25 136:13 159:3, 15,20 173:8

**psychiatrist** 160:16,22

**psychologist** 161:18,23, 24 162:4

**public** 14:19

**pull** 129:15

**pulling** 121:23

**punishment** 153:23

**purposes** 76:20 81:15 83:15 86:11 93:17 105:11 107:14 109:22 110:18 113:10 114:14 115:7 116:14 134:7 137:14 173:25

**pursuant** 3:8

**put** 12:6 40:10 48:20 49:25 50:8,9 52:1,13,20 88:18, 19,20 93:1,3 101:18 111:6 118:10 120:10 129:4,5 137:3 147:2,8 149:7 152:18 153:1,2,8 154:22 155:16,21 157:11 172:13

**putting** 53:15 77:21

**Q**

**qualification** 3:13

**qualifications** 80:9,10,17 83:7 88:13 89:18,20 91:8 140:16,21,25 142:1

**qualified** 42:6 79:23 89:15,16 90:2,21 139:2,6 142:3

**qualify** 81:3 89:17

**question** 7:14,19 12:14 46:22 83:5 87:11,13 89:5,9 92:4,6,11 96:2 112:4,14 120:25 121:1 123:15 130:2 139:5 144:5,6 156:17 168:13

**questions** 6:14 7:1 8:1, 15,17 71:19 94:11 117:5 128:24 129:1

**quote** 22:25

**R**

**R-A-I-N-E-Y** 34:24

**R-A-N-E-Y** 34:23

**race** 47:17 59:22 91:23 96:24 129:25 141:6,24 142:14

**racial** 60:11 65:10,11 102:16

**racist** 102:24 141:7 142:25

**Rainey** 34:22

**raised** 53:20 167:9

**Raney** 34:23

**rank** 28:21 43:15 63:11 75:14 154:2

**ranked** 94:16,17

**ratings** 147:7

**rattled** 172:23

**read** 83:23 112:5,13 164:9

**real** 60:8

**realize** 116:7 145:19 150:10

**reason** 74:3 107:24 157:20,25 158:12,13

**reasonable** 141:6

**reasons** 159:11

**reassign** 133:18

**reassigned** 133:25

**Reboulet** 70:2 71:6 73:20 125:8,11 126:4 129:6 130:15 131:3,13 151:13

152:10,16 153:8 165:14,25 167:23 171:18,21 172:25

**recall** 12:16 17:3 18:1 19:8,12 22:22 29:19,20,22 34:13 36:17 43:22 45:18 46:9 47:14 50:18 52:15 69:2 109:16 137:4,10,18

**receipt** 137:22 138:8

**receipts** 137:4,18 138:1

**receive** 136:21

**received** 38:9 77:17 86:24 91:6 115:12,15 118:8,15, 16 132:4 134:16 149:25 150:11,15 157:3,4

**receiving** 118:20,22 119:6

**receptive** 88:14

**recess** 119:13 163:24

**recipient** 51:7

**recognize** 81:18

**recollection** 28:17

**recommendations** 135:24

**recommended** 137:22

**recommending** 138:12

**reconsider** 110:8

**reconsideration** 111:7, 22 112:19,24 113:14

**record** 7:6,22 87:22 94:2 120:4,6 163:25 164:9

**records** 15:23 161:23 163:1

**recruit** 27:6

**recruiting** 26:2,3,6,10,19, 20 27:3,24 30:11

**recruitment** 26:14,22 27:5

**recruits** 27:8

**red** 121:10 122:3,5

**reduce** 149:9

**reduced** 3:9

**reduction** 153:22 154:1

**refer** 67:7

**reference** 57:20

**references** 110:23

**referencing** 134:11 152:14

**referred** 127:19

**referring** 57:11 103:17 117:23 120:18 134:22 136:12 152:4,9 171:1

**regard** 57:16 62:7 65:18 85:23 99:6,7 111:4,11,25 115:3,10 116:16 118:8 140:4 144:2 150:16 152:10

**regional** 109:12

**regular** 172:9 173:12

**regularly** 126:7 171:19

**rehash** 56:22

**rehired** 23:23

**related** 79:15,18 80:21 82:24 85:7 88:21 90:7 114:22 160:4 161:15 162:15

**relating** 118:11

**relationship** 50:25 165:9 167:22

**relevant** 92:14

**relinquish** 130:19,22 131:13

**remain** 173:15

**remarks** 94:6,10

**remember** 10:14 11:14,15 16:3,4,8,11 18:20 21:20 22:7,15 25:9 28:15 29:7 33:12 37:23,24 38:1 39:16, 21,23 43:4,25 46:16 47:3,4 48:9 51:10 54:11 69:5,10 82:2,13,16 86:6,8 94:23 101:25 109:18 114:4,5 122:18 132:15,16 157:12 161:19 172:12

**remind** 15:12 77:4

**reminders** 6:23

**replace** 72:24

**replaced** 72:6,23

**report** 43:1 53:6,21,22,25 57:10 93:24 158:21

**report's** 107:3

**reported** 43:18 44:9 46:8, 9,11 49:1

**reporter** 7:2 96:17

**reporting** 43:8,11 137:25 138:14

**reports** 31:6 35:9 165:12

**represent** 6:12

**representative** 17:1

**request** 152:15 155:21 170:8

**requested** 30:23 62:24 63:6 136:10 154:25 155:14

**require** 85:6

**requirement** 79:24 80:4,5 82:22 91:17 139:20,24

**requirements** 81:4 84:20,23 85:5 89:4 90:6,22 93:1

**research** 149:6,10

**Reserve** 11:1

**Reserves** 17:17 18:14,15, 16,21

**resigning** 18:25

**respond** 30:19,22,23,24

**responded** 44:16

**Respondent** 88:6,14 89:11

**response** 79:7 153:10 157:16

**responses** 7:4 59:2

**responsibilities** 27:3 30:9,14 45:14 63:21 82:8, 11

**responsibility** 54:2 123:4,5 124:24 168:22 169:5

**rest** 74:23

**result** 113:24 157:22 159:1

**resulted** 103:3 158:13

**resume** 78:23 93:9

**retaliated** 150:24

**retaliation** 137:25 138:14 150:21 153:24 154:12,23

**retaliatory** 129:25

**retire** 63:4

**retired** 20:7,24 22:20 33:10 34:6 36:11,12,15 48:6 68:11 72:12,25

**revealing** 35:8

**review** 27:7 66:21 82:9,11 94:1 105:23 124:1,5,8,23 125:16 135:25

**reviewing** 106:6

**reviews** 146:19

**Rick** 41:10

**rid** 55:9 58:20

**right-to-sue** 115:16,22 117:12 118:7 150:15

**Rights** 4:24 84:3,17 86:18 87:23 105:22 108:12 109:8,11 110:1,12 114:3,9, 21,24 116:18 119:5 146:7 156:21 165:6

**Rike** 70:1 71:6 73:20 121:8,25 122:10 125:8,10 130:14 131:2,12 159:19 165:13,23 167:23 171:17, 21 172:25

**Riordan** 82:20

**rise** 154:13

**Rob** 121:8

**role** 34:3 54:23 68:14 75:4

**roles** 66:14 99:25

**roll** 30:15 44:9,16

**rolled** 152:2

**ropes** 44:6 45:13

**Ross** 4:16,18

**ROTC** 10:10 11:20 17:11, 12,22

**Roth** 97:7

**round** 29:15,17

**rules** 6:20

**ruling** 150:11

----

**S**

**safe** 167:18

**sat** 123:1 125:17 133:8

**Saturday** 133:17

**scenarios** 28:13,24

**scene** 63:24

**schedule** 124:8,12

**scheduled** 124:21

**scheduling** 35:10 124:4

**school** 8:25 9:1,6,13 13:10 15:19,20,21 16:10 17:4 23:16 155:1

**science** 10:1 11:25 14:20 80:23 103:1

**sciences** 12:6

**score** 94:20,21 104:21 142:23

**scored** 39:17,18

**scores** 94:6,10 95:2 142:22

**scoring** 142:24

**Scott** 70:5 72:11 73:10 172:18

**seasoned** 55:22

**seat** 133:9

**seconds** 172:19,20,21

**secretary** 73:25 74:1,13

**section** 70:21 71:15 154:23

**select** 104:19

**selected** 71:11 76:8 95:21 102:3 104:4,18,20 147:19,

25

**semester** 13:5

**semesters** 9:10 24:5

**send** 50:7 51:14,24 69:15 74:6 131:1,2,5 135:13,14 152:23,24 153:15

**sending** 135:14 136:17 153:19

**senior** 58:14 144:15 145:24

**seniority** 23:25 58:22 85:1 100:23 103:20,22,24 104:5,24 139:3,14,15,21 140:5,10,12,22 145:24

**sense** 59:24 133:11

**separate** 43:11 108:13

**separately** 113:18,19

**September** 47:7 50:2 65:25 131:25 132:1,9 134:12 151:2 152:11 162:8

**sergeant** 20:23 21:13 22:18,25 23:1,2 25:8,16,21 26:16 27:22 28:1,21 30:4, 10,14 32:3 33:4,8,16 35:21,22,23 36:15 38:16 42:5 43:11 51:9 70:1,2 99:17,19,22 100:8 129:6 138:21 167:23

**sergeant's** 28:10 29:8

**sergeants** 21:19 29:16 36:12 42:15 44:3 46:8 63:25 67:22 69:25 71:12, 24 120:19,21 121:20 124:10 125:23 128:13,14 130:14,18 131:7,12 135:15,18 137:24 144:20 151:18 173:8,9

**series** 6:14

**serve** 34:3 37:8

**served** 75:4 99:25

**service** 24:7,17 28:3,20, 23 30:20 38:23 39:2,5,10, 12 40:8 42:19 56:2 78:16 115:23 144:20

**services** 27:12 33:21 63:1

**session** 3:1 57:18 120:1

**set** 124:22 133:3

**seventies** 39:19

**severe** 135:7

**sex** 141:6,24

**sexist-type** 60:11 65:11, 12

**she'd** 58:2

**Shelley** 4:12 102:15 106:16

**Shellie** 105:15

**Shield** 16:3,24

**shift** 33:11 36:13,16 37:9 48:21 49:5,6,7

**shifts** 33:13 36:18

**shoot** 27:17 126:22

**shooting** 124:2

**shootings** 61:23

**shore** 141:22

**short** 120:6

**Shortly** 10:18

**show** 107:19 114:10 141:23 149:10 150:2

**showed** 44:6,15 45:13 151:13

**showing** 76:22 81:17 83:17 86:13 93:19 105:13 107:21 109:24 110:20 113:12 114:16 115:9 117:9 134:9 137:16

**sick** 18:21 158:4

**side** 61:24

**signature** 83:20 86:15

**signed** 30:18 152:11

**significance** 40:9

**significant** 19:10 135:6

**signing** 83:22

**similar** 100:22

**simply** 40:11

**simulation** 98:20

**Sinclair** 9:7,12,13,17,25 10:4,10,19,22 11:6,18,25 17:16

**single** 130:9 135:2 166:5

**sister** 163:16

**sister's** 164:7

**sit** 130:9 142:7 154:11 166:12

**sites** 16:18

**sitting** 56:12 58:6

**situations** 171:11

**skin** 52:4

**skipped** 148:12

**skirmishes** 38:16

**slam** 171:20 172:6

**slot** 40:23

**slowed** 146:24

**Smith** 66:24,25 72:7,17 73:16

**solving** 140:12

**sophisticated** 60:15

**sort** 6:19 31:18 67:6

**sound** 172:14

**sounds** 106:24 107:11

**south** 32:9

**southeast** 32:10

**southwest** 32:14,15

**space** 54:17 58:3 85:16

**span** 18:8

**special** 63:23 65:21

**specific** 69:3 154:17

**specifically** 51:10 132:15
153:7 167:16

**spell** 160:19

**spent** 27:23

**spoke** 86:23 124:17 125:5

**spring** 138:24

**squad** 30:6 31:1 63:23

**squads** 31:2

**St** 15:22

**staff** 153:6 157:16

**standard** 20:10 87:2
129:19 147:7

**standards** 52:14 65:25
66:4,10,15,23 67:12 68:19
69:16 126:25 128:21
129:3,8 133:3 157:8

**start** 7:14,18 8:5 11:12
18:9 63:7 133:19

**started** 9:17 10:18 11:9
12:2,17 17:5,9 18:3,18
21:10 48:2 49:18,20 50:3
55:1 62:18 64:3 153:14
171:24,25

**State** 9:9 13:20 14:10

**stated** 85:15

**statements** 65:3,19 96:4
118:19

**states** 128:23

**stay** 46:25 127:5 166:25

**stayed** 18:21 71:13 127:7
130:24 133:21

**stays** 42:9

**stemmed** 157:6

**stenotypy** 3:10

**step** 59:7 103:15

**stint** 22:16

**stints** 100:14

**stipulate** 112:8,11,15

**stipulated** 3:4

**Stiver** 4:14 49:21 53:3,7,
23 55:5 56:23 59:18 61:9,
15 62:8 95:6,17,23 99:11
102:2,12 105:5 106:5,18
107:23 108:8 128:7 139:6
140:8 143:4 146:3 156:6

**Stiver's** 60:24

**stood** 59:6

**stop** 173:1

**stopped** 64:12 65:5,8
129:17 135:14

**stoppers** 63:24 172:14

**strange** 124:19

**street** 8:9 63:5 105:4
166:1 167:11

**streets** 168:19

**stress** 157:19 161:15
162:20 163:8 164:2 170:15

**stressful** 163:13 164:11

**strong** 145:6

**structural** 98:19

**structured** 98:13

**struggle** 132:20

**student** 13:2,6

**studies** 9:9 11:24 12:2,7,8
13:16 79:23 83:5

**study** 13:21

**stuff** 24:17,21 25:15,18
26:1 54:16 77:21 115:18
151:8 153:20 172:12

**subject** 51:5

**subjected** 98:6,7 150:3

**subjects** 50:20

**submit** 78:23 81:5

**submitted** 93:8

**subordinates** 38:14
120:14,17 123:10 130:1
165:10

**success** 55:14

**successes** 140:11

**sudden** 146:1,2

**suddenly** 89:14,15

**sue** 5:3 118:22

**suffer** 170:25

**suggest** 123:10

**superior** 62:12 132:2

**superiors** 38:14 62:9

**supervised** 21:19 31:3
43:19

**supervising** 46:10 52:23

**supervision** 31:4

**supervisor** 22:19 30:22,
24 33:7 36:5,18 74:25
100:12

**supervisors** 20:21 22:16

**supervisory** 99:25

**support** 152:8

**supposed** 88:22 101:17
124:18 133:18 141:11,13
158:7

**swelling** 161:17 163:3

**switch** 74:24

**switched** 11:1 17:16
18:14 21:3 31:15

**sworn** 6:2

**system** 141:10 145:23

---

**T**

**t-h-e-l** 161:13

**T-U-S-S-I-N-G** 22:20

**table** 59:6 124:16 142:8

**tactics** 127:19,25 141:7

**taking** 10:20 11:9,12
13:13,15 14:14,17 40:25
53:17 120:15 159:24
160:2,6 170:21

**talk** 8:23 15:14 19:21
53:18 56:5 61:19,22 70:13
75:21 80:15 102:4 120:7,9
146:12 147:11 154:6
159:23 161:20 173:21

**talked** 15:7 19:13 48:12
106:13 111:23 130:25
132:24 134:17,19 138:25
139:13 140:6,19 147:9
154:8,15 162:23 163:2,7
168:8 169:21,25

**talking** 52:18,19 57:8
62:19 91:25 100:8 105:14
128:16 133:16 138:17
162:15,16

**talks** 82:7,10 120:13

**tangible** 56:13

**tapping** 167:2

**task** 29:12

**tasked** 55:19

**tasks** 27:2

**taught** 67:3 96:14

**team** 94:6,11 129:16,18

**technical** 15:20

**teeth** 121:23

**telling** 58:16 90:24 125:18
132:16 133:7 144:16
153:11 165:24

**temporary** 130:13,17

**ten** 23:11 24:2 31:1 33:5
172:19

**tendency** 131:23

**tension** 168:1

**terminating** 117:15

**terms** 19:10 24:7 40:8
44:1 45:14 70:22 75:23
80:16 81:4 87:9 88:3 89:6
99:14 100:20,25 107:9
110:22 122:10 129:24
131:14 134:23 135:7
136:12 140:9,10,11 158:14
170:17 171:5

**test** 28:6,8,14,22 29:8
38:22 39:4,25 40:5,9,12
41:4,5,22,23,24 42:6,12
78:19

**testing** 29:17

**testosterone** 131:18

**the...position** 84:24

**thing** 28:10,12 54:6 59:5
68:17 87:6 88:2,15,20
91:5,25 92:7 104:7 126:10
130:9 131:1,8 135:2
147:15 150:13 165:12

**things** 12:3,4 16:22 30:25
31:6 32:17 35:7 44:17
49:21,23,24,25 50:3,5,24
53:18 54:5,8,10,22 55:1,11
59:2,10 60:15 61:12 66:22
67:4 74:7 92:13 100:18,19
105:2 118:11 125:13 126:6
130:8 131:18 132:13 133:8
134:18,22 135:14 136:1
141:14,15,19 151:7 153:7
154:4,16,17,22 159:6
161:5 165:8 167:5 168:8
169:17 170:5,6 173:7,21

**thinking** 10:15 27:16
29:24 33:9 51:24 140:18

**thought** 49:20 53:19 64:5
65:5 118:16 128:15
141:11,13 150:12,13 167:2
173:4

**three-to-eleven** 36:13
37:9

**three-year** 18:8

**threw** 51:12

**tick** 54:14

**ticked** 54:6

**tight-knit** 164:8

Kimberly Hill vs City of Dayton Police Department | Kimberly Annette Hill

**till** 15:4 35:2 36:10 79:5

**time** 3:8 7:25 10:20 11:2,9 12:13,18,21 13:3,4,9,11,25 17:5,15 18:13,18 19:11 20:3,16,19 22:16 23:4,7,8, 22 24:5 27:23 28:7,17,18 29:14 31:16 33:17 34:17 37:6,21 41:21 43:2,7,24 45:4,6 46:11,18 48:13,18 49:25 51:11 52:17,18,19, 23 55:16 56:20 58:4 59:19 60:23,25 61:15 62:16 63:17 64:11,20 65:20 68:10,12 71:9 74:4 75:2 76:3 84:14 90:2,19 97:15, 16 100:2,7 107:7,8 120:23 130:8,10 132:18 133:8,11 135:1,10,23 136:25 140:7 144:2,4,8,11 155:13 156:14 162:13,24 173:19

**timely** 157:7

**times** 64:8,11,19 91:13 92:11 166:17

**timing** 66:7 84:11

**Timothy** 82:19 129:6

**tired** 173:6

**title** 81:24

**today** 6:14 8:12 50:1 56:12,15 154:11

**token** 142:12

**told** 44:7 56:20 60:22 61:4 63:6 64:14 71:7 74:4,5,15 80:3 83:10 86:1,24 87:18, 25 88:12 90:5,9 102:14 123:19 125:3,4 130:25 132:12 133:12 135:23 151:14,25 152:16,22 153:8,14 154:20 155:22 165:17,21 172:25 173:1,2

**top** 69:12 115:13 172:10

**traffic** 35:16,25 121:14 122:10

**trail** 5:6,8

**trails** 153:18

**train** 20:8

**trained** 134:1

**training** 10:9,15 11:20 17:14 18:7 20:4 24:14,24 30:19 50:2 123:4 133:19, 20,21 154:23,24 155:15

**transcribed** 3:11

**transfer** 68:21 158:14 159:3

**transferred** 66:3 68:6 69:4,24 75:7 156:24 159:16

**translate** 7:5

**translation** 7:22

**trash** 167:7

**traumatic** 165:12

**treat** 60:20 162:6

**treated** 47:16 74:8 137:24 138:13 154:19 163:3 164:20

**treating** 128:11 160:23

**treatment** 38:8 52:9 60:22 87:14 115:25 129:25 132:4 164:2,13

**true** 57:22 78:4 83:24 85:7,8 157:8 158:10 165:6

**truth** 123:21 127:14

**Tuesday** 3:1 120:1

**turned** 121:10

**turning** 122:2,5

**turns** 124:18

**Tussing** 22:20 23:1

**two-fifths** 60:7

**type** 8:4,10 11:22 12:2 17:20 24:6 28:24 30:19 31:9 38:7 49:16 52:9,24 59:20 60:11 61:2 62:7 65:10,11 67:18 76:10 82:9 89:7 102:16 103:23 132:3 153:21,23 159:24 161:5 164:12,16,21 169:7,16,24

**types** 66:22

**typical** 30:12 31:2

**typically** 42:1 149:8

**U**

**UD** 9:8 10:11 11:9,13,17, 21,23 12:1,16 13:3,24 17:5,9,11,24

**UD's** 12:19

**Uh-huh** 15:9 20:20 58:5 77:1 82:25 95:11 128:1

**uh-huhs** 7:5

**ultimately** 11:5 42:23 54:24 55:9 62:2 68:7 93:4 94:13 95:21 102:11 104:17 109:6 116:22

**unclassified** 78:3,6,7,8 82:5

**uncomfortable** 50:24 61:13

**unconsciously** 102:25

**uncover** 167:4

**underestimate** 64:15

**understand** 8:1 50:1,16

59:15 87:11 89:9 133:4 139:14,17 145:5,7,8,9,10, 12 157:15

**understanding** 40:7 78:9,11 110:14 112:20 116:4 143:8 167:21

**understood** 133:9

**unfairly** 47:16

**unit** 26:14,19,22 27:3,24 30:11 35:16,25 62:20 63:24 65:21

**University** 9:11 12:10 13:17 14:15,22

**updated** 82:18

**usurp** 149:2

**V**

**vacancies** 40:17

**vacancy** 40:14

**Vaguely** 107:18

**Valley** 163:6,8

**vehement** 134:14,16,21, 23

**verbal** 6:24

**versus** 104:23,24 171:5

**victims** 63:24

**views** 102:24

**violation** 136:18,19

**Virginia** 14:22

**volume** 67:1

**W**

**W-O-L-F-O-R-D** 41:15

**wait** 25:13 26:11 70:20

**waiting** 69:20

**waived** 3:13

**Wanda** 66:24

**wanted** 13:24 23:15 53:4 63:3,4 69:12,13 70:20,21 71:14 89:17 131:13 136:16 138:18 142:15 148:2,4,5,9 151:20,24,25 153:2,7,8,18 164:12 173:10

**wanting** 70:22 136:2

**watch** 42:24 44:4,10 45:6, 24 47:5,11,12 49:22 53:9 54:2 61:21 69:22

**week** 64:24

**weekdays** 18:23

**weekends** 18:23

**weeks** 15:21 64:25

**weighted** 105:1

**weird** 44:7 91:17 166:22 167:5 171:23

**Welsh** 33:9 47:7,19 48:6 57:6

**Wendy** 49:21 51:8 53:15 58:9 59:18 60:24 61:15 95:6,23 99:11 101:2 102:12 108:8 128:7

**west** 8:8 32:11,17,21 45:24 46:11 47:4,5,9 48:3, 4,21 49:8 54:25 55:14,20 56:21 61:22,24

**whining** 135:12

**white** 27:17 45:8 55:22 58:9,21 59:14 60:3,4 71:12,24,25 72:13 73:6,12, 14,15,18,20 85:12 97:4,7 99:11 103:6,15,21 128:14 131:16 135:15,17 138:21 140:2 142:4 145:25 147:21,22 149:8

**WIC** 16:12

**Wiesman** 95:8,15 155:19 156:7,9

**Wilhelm** 55:17

**Williams** 40:6,20 62:23 63:18 64:2 65:19

**wind** 59:4

**wing** 44:14

**withdraw** 116:23 117:2

**withdrawn** 116:22

**withhold** 123:14 126:9

**Wolford** 40:6 41:11,12,14, 16

**woman** 130:19

**Women** 16:14

**word** 105:4 145:6

**worded** 90:8,10

**words** 55:7 57:21 70:19 81:6 134:14

**work** 9:9 12:24 15:14 16:6 18:23 20:2 25:6 27:15 37:20 44:1 46:5,6 48:15 52:11 56:19 68:2,3 70:16, 22 71:2,20 72:2 100:18 128:10 135:5,8 154:13 157:23 162:15 168:23 169:6 172:24

**worked** 11:2 12:22 15:21, 22 16:2,5,14 31:22,24 33:14 36:20,21 37:4 38:12, 17 42:14 43:13 46:8 48:11, 13 49:19 57:22,23 70:10 72:5,13,18 73:24 166:17

**Workers'** 169:13

**working** 11:4 12:20 13:11
17:6 21:9,13 22:2 33:11
34:12 38:13 43:6 45:18
46:9 47:22 52:22 57:25
63:16 71:10,12 154:3

**workmanlike** 167:22

**workplace** 154:14 159:11
168:11

**works** 75:19 148:7 151:8
173:17

**world** 131:17

**worry** 61:11 168:25

**worth** 104:23

**Wright** 9:9 13:20 14:10

**write** 111:16

**writing** 3:10 56:9,10 70:24
88:19,20 129:10 171:25

**written** 28:6,8,14,22 38:22
39:4 98:10 122:11 169:25
170:3

**wrong** 123:17,18 125:25
135:21 167:20

**wrote** 170:6

---

**Y**

---

**year** 9:3,14 16:7 18:2 21:6,
17 23:11 24:1 135:3 140:7
147:23,24

**years** 16:4 18:6 22:1,11,14
42:2,9 85:1 127:9 147:25
163:14,16

**young** 16:19 54:19

---

**Z**

---

**Zoloft** 160:6

**zone** 33:21,22,24 34:18