1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4                  * * *

5  KIMBERLY HILL,

6      Plaintiff,

7      vs.          CASE NO. 3:17-CV-00334

8  CITY OF DAYTON POLICE

9  DEPARTMENT, et al.,

10      Defendants.

11                 * * *

12        Deposition of TIMOTHY REBOULET, Witness

13  herein, called by the Plaintiff for

14  cross-examination pursuant to the Rules of Civil

15  Procedure, taken before me, Stacey L. Kimmel, a

16  Notary Public in and for the State of Ohio, at the

17  City of Dayton, Law Department, 101 West Third

18  Street, Dayton, Ohio, on Wednesday, March 27,

19  2019, at 10:35 o'clock a.m.

20                 * * *

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department, et al.   Timothy Reboulet

2

1    EXAMINATIONS CONDUCTED  PAGE

2 BY MS. BROWN:.........................  4

3

4    EXHIBITS MARKED

5 (Thereupon, Plaintiff's Exhibit 1, a

6 copy of an interview, was marked for

7 purposes of identification.)..........  33

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

3

```
 1  APPEARANCES:

 2    On behalf of the Plaintiff:

 3       Walton & Brown, LLP

 4    By:  Chanda L. Brown
         Attorney at Law
 5        395 East Broad Street
         Suite 200
 6        Columbus, Ohio  43215

 7    On behalf of the Defendants:

 8       City of Dayton, Ohio

 9    By:  Leonard J. Bazelak
         Attorney at Law
10        101 West Third Street
         Dayton, Ohio  45401

11                  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          TIMOTHY REBOULET

2 of lawful age, Witness herein, having been first

3 duly cautioned and sworn, as hereinafter

4 certified, was examined and said as follows:

5          CROSS-EXAMINATION

6 BY MS. BROWN:

7      Q.  Good morning.

8      A.  Good morning.

9      Q.  My name is Chanda Brown.  We met

10 briefly a few minutes ago.

11      A.  Yes, ma'am.

12      Q.  I'm an attorney.  I represent

13 Lieutenant Kim Hill.  Before we begin, can you

14 please state your full name.

15      A.  It's Timothy Reboulet,

16 R E B O U L E T.

17      Q.  And have you ever had your

18 deposition taken before?

19      A.  Yes, I believe so.

20      Q.  Okay.  In what kind of case was

21 it?

22      A.  You know, for the life of me, I

23 was trying to remember.  I don't remember.  It

24 was -- I don't remember.  It was a case that

25 was investigated out on the east side of

1 Dayton.

2      Q.   Okay.

3      A.   And I think it's about a report

4 that I took while I was in internal affairs.

5      Q.   Okay.  So it was a civil case,

6 somebody had filed a lawsuit, or it was in a

7 deposition in a criminal trial?

8      A.   It was not criminal.  It was

9 civil.

10      Q.   Okay.

11      A.   I think it was seeking damages

12 but, honestly, I cannot remember the specifics

13 of the case.

14      Q.   Okay.  How many years ago was it?

15      A.   Ten maybe.

16      Q.   Okay.  All right.  Well, I'll go

17 over some of the ground rules really quickly

18 just because it's been so long since your last

19 one.  No. 1, please make sure you answer the

20 questions out loud.  If it's a yes or no

21 question, make sure you say yes or no.  Try to

22 avoid the uh-huhs and the huh-uhs that you and

23 I may understand but may be difficult to get

24 typed up later; is that fair?

25      A.   That's fair.

6

1      Q.   No. 2, please wait until I get

2  done asking my question before you start

3  answering the question so that there's no

4  overlap.  Sometimes in everyday conversation

5  you may know where I'm going with a question

6  and be eager to respond, but please try to wait

7  until I get done; is that fair?

8      A.   That's fair.

9      Q.   Okay.  And No. 3, sometimes I talk

10  fast, I try to consciously tell myself to slow

11  down, but if you don't understand my question

12  for whatever reason, please ask me to rephrase

13  it, otherwise, I'm going to assume by you

14  answering the question that you understood the

15  question; is that fair?

16      A.   Fair.

17      Q.   All righty.  What's your current

18  address?

19          MR. BAZELAK:  Since he's a former

20  police officer, I would just give your -- your --

21  I mean, I would give your -- where you worked at

22  the time in terms of your professional address

23  because --

24          THE WITNESS:  Professional address

25  was 335 West Third Street.

7

1      Q.   Okay.  And how long have you

2  lived -- well -- what -- what is your current

3  occupation?

4      A.   Current occupation, I retired

5  Dayton Police sergeant.  I am currently driving

6  a school bus for Fairborn City Schools.

7      Q.   Okay.

8      A.   Which is a part-time job.

9      Q.   And when did you retire?

10     A.   April of 2017.  I think maybe

11  April 21st, 2017.

12     Q.   And you retired as a sergeant?

13     A.   Correct.

14     Q.   And that was at the Dayton Police

15  Department?

16     A.   Yes, ma'am.

17     Q.   And how long had you worked with

18  the Dayton Police Department before you

19  retired?

20     A.   March, 2017, would have been 29

21  years.  So just shy of 29 years.

22     Q.   Okay.  It's not a memory test, so

23  I don't want you to think back to everything

24  you've done for the last, you know, 30 years,

25  but brief summary of the different positions

Case: 3:17-cv-00334-TMR Doc #: 17 Filed: 05/24/19 Page: 8 of 69 PAGEID #: 545
Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

8

1  you've had since starting with the Dayton

2  Police Department.

3        A.   I started out in patrol.  You

4  want, like, locations?

5        Q.   Sure, what was your patrol?

6        A.   My patrol was assigned to 3rd

7  District, which was Southwest Dayton,

8  midnights, from there I went to 1st District,

9  which is Northeast Dayton, I worked days for a

10  little while.

11        Q.   For the 3rd District, do you

12  remember who your commander or reporting

13  officer was?

14        A.   Good golly, no.  I want to say

15  Lieutenant Hess was out there when I first got

16  out there --

17        Q.   Okay.

18        A.   -- and Lieutenant Thomas,

19  Lieutenant Miller, and then from there I went

20  to the 1st District and worked -- got the day

21  shift there.

22        Q.   Okay.

23        A.   Had some -- had some things at

24  home that I needed days and that's where I was

25  able to fit in.  And Lieutenant Randy Bean, I

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

9

1   believe, was lieutenant, yeah, because he's the

2   one that brought me in and I worked days there

3   for a while and then I went to -- I don't

4   remember how long I was there.  It was maybe a

5   year until I was able to get things in line,

6   then I went back to midnights, just

7   seniority-wise.  People with more seniority

8   went to days.  Then I went -- I'm trying to

9   think -- from there I went to DMHA Task Force.

10        Q.   DMHA?

11        A.   DMHA.  That's called something

12  else now.  Just patrolled the different --

13        Q.   Let me stop you.  These were all

14  as --

15        A.   All as patrol.

16        Q.   All as patrol?

17        A.   Sorry.

18        Q.   That's all right.

19        A.   Patrol.

20        Q.   And so who was your lieutenant at

21  the DMHA Task Force?

22        A.   Well, it was more -- I had --

23  Sergeant Luke Williams was the sergeant.

24        Q.   Okay.

25        A.   I believe it was -- we reported to

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

10

1  Lieutenant Jerry Smith.

2      Q.  Okay.

3      A.  I had very little contact with

4  Lieutenant.  It was all through Sergeant

5  Williams.

6      Q.  Okay.

7      A.  And while on that unit, I was

8  promoted to sergeant.

9      Q.  Okay.  And what year were you

10  promoted to sergeant?

11      A.  Yes, there was a year.  Let's

12  see --

13          MR. BAZELAK:  Approximate.

14          THE WITNESS:  Well, I'm just

15  thinking, like, the Twin Towers was 2001.  So I

16  think it was toward the end of 2001, maybe

17  beginning of 2002'ish.

18      Q.  And how long had you been at the

19  police department before your promotion to

20  sergeant?

21      A.  Well, I'm guessing like 12, 13

22  years.

23      Q.  Okay.  And that was a civil

24  service exam you had to take for the sergeant

25  position?

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

11

1       A.   Civil service exam and also an

2   assessment center.

3       Q.   Okay.  And after the 2001 sergeant

4   promotion, where did you work?

5       A.   I went back to home, 3rd District.

6       Q.   Okay.  As a sergeant there?

7       A.   As a sergeant, yes.

8       Q.   Were you still doing patrol?

9       A.   It was patrol sergeant --

10      Q.   Okay.

11      A.   -- supervisor.  We were on -- we

12  were on four ten-hour days at that time so the

13  same guys work with each other every day for

14  ten hours.  So I had the same group of people

15  four days a week.

16      Q.   Okay.

17      A.   And if you ask me hours, I don't

18  really remember.  I know I started early

19  evening, went through the night.

20      Q.   Let me pause and go off the record

21  for a second.

22          (Pause in proceedings.)

23      Q.   So let's go back on.  So you were

24  doing ten-hour days in the 3rd District as a

25  patrol sergeant?

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

12

1          A.   Correct.

2          Q.   Okay.  And how long were you there

3    as a patrol sergeant in the 3rd District?

4          A.   You know, I don't remember.  I

5    mean, it was a few years.

6          Q.   Okay.  And who was your sergeant?

7          A.   My lieutenant.

8          Q.   I'm sorry.  Lieutenant?

9          A.   I think it had to be -- I don't

10   remember.  Wow.  I honestly don't remember

11   which lieutenant was out there at that time.

12         Q.   Okay, that's fine.

13         A.   I know I did report still.  Golly,

14   I'm sorry.  I don't remember exactly who that

15   would have been.

16         Q.   Okay.  And so after you -- at some

17   point you left the patrol sergeant position in

18   the 3rd District?

19         A.   The sergeant -- we had our own

20   dispatch center at the time so it was pretty

21   much the low sergeant off of probation, being

22   probation as a sergeant, got drafted up to

23   dispatch and I got drafted to dispatch.

24         Q.   Okay.  As a sergeant there in the

25   dispatch?

13

1      A.   Correct.

2      Q.   And do you remember who your

3  lieutenant was there?

4      A.   I'm pretty sure it was back -- I

5  know Lieutenant Randy Bean was there and

6  Lieutenant -- golly, I can see the guy.  I'm

7  sorry.  I'm bad with names too.

8      Q.   That's all right.

9      A.   He retired.

10      Q.   It was a male though?

11      A.   Male.

12      Q.   Okay.

13      A.   Yeah.

14      Q.   And so after -- how long were you

15  at dispatch?

16      A.   I was there a couple years because

17  I took over from dispatch center.  I also --

18  also ended up taking over the -- I can't

19  remember the name, recording and everything --

20  everything that goes up to dispatch is

21  recorded, all radio traffic, all calls, 9-1-1,

22  any calls, whether it's dispatch --

23  everything's recorded and the courts often

24  would ask for, like, I need the 9-1-1 tape of

25  this, I need radio traffic of this, and I was

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

14

1 doing all of that as well, supplying it for the

2 court.

3      Q.  Okay.  And so after dispatch where

4 was your next assignment?

5      A.  In -- it was called internal

6 affairs at that time.

7      Q.  Okay.  And when did you start at

8 internal affairs?

9      A.  Yeah, I was trying to think of

10 that too.  I retired in '17, so I'm thinking

11 like around 2007 maybe --

12      Q.  Okay.

13      A.  -- 2008.  I'm trying to remember

14 if I was there ten years, nine years, eight

15 years.  I don't really recall.

16      Q.  And when you started at internal

17 affairs, you started as a sergeant there?  I

18 mean, you were a sergeant, so you were sergeant

19 with internal affairs?

20      A.  Yes, ma'am.

21      Q.  And what was your job

22 responsibilities or what were your

23 responsibilities?

24      A.  Well, I was sergeant of internal

25 affairs, I supervised detectives, we handled

Kimberly Hill vs City of Dayton Police Department, et al.       Timothy Reboulet

15

1  internal -- we handled incoming calls, internal

2  complaints, callouts on serious offenses where,

3  you know, maybe officer-involved shootings,

4  officer was hurt, cruiser accidents, which

5  there was a substantial risk of litigation as

6  far as we handled all, I guess, important --

7  every investigation's important, but maybe high

8  profile cases.

9     Q.  Okay.  And so you -- did you tell

10  me the year you started there?

11     A.  I don't remember.

12     Q.  I think you said you didn't but --

13     MR. BAZELAK:  2007 or so?

14     THE WITNESS:  Yes.

15     Q.  Okay.  Sorry.  I missed that.  Who

16  was your lieutenant?

17     A.  When I first got there, it was

18  Lieutenant John Huber.

19     Q.  Hubert?

20     A.  Huber, H U B E R.  I can remember

21  that because he's the one that asked me to

22  come.

23     Q.  Okay.  And let me back you up a

24  little bit.  Lieutenant Hess, is that a white

25  male, do you know?

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

16

1      A.  Yes.

2      Q.  Lieutenant Thomas?

3      A.  Lieutenant Thomas, yes.

4      Q.  Lieutenant Miller?

5      A.  Black male.

6      Q.  Lieutenant Bean?

7      A.  White male.

8      Q.  Sergeant Williams?

9      A.  He was white male.

10     Q.  Lieutenant Smith?

11     A.  White male.

12     Q.  And we already said Lieutenant

13  Bean.  So Lieutenant Bean was your lieutenant

14  at the 3rd District and then again at dispatch?

15     A.  Lieutenant Bean was at 1st

16  District and at dispatch.

17     Q.  Okay.  And Lieutenant John Huber

18  is a white male?

19     A.  He's white male.

20     Q.  Okay.  And how long was he your

21  lieutenant in the internal affairs?

22     A.  I honestly don't remember when he

23  retired.

24     Q.  So he retired at some point while

25  you were working there?

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

17

1        A.   Yeah, he was there for a good

2   amount of time while I was there.

3        Q.   Okay.  And when he retired, who

4   replaced him?

5        A.   I believe Lieutenant Carper at the

6   time replaced him.  I can't remember the length

7   of time in between that there was a lag.

8        Q.   Okay.  And Lieutenant Carper is

9   white male?

10       A.   Correct.

11       Q.   And how long was Lieutenant Carper

12  there as the lieutenant in the internal

13  affairs?

14       A.   He was -- he was -- I don't know.

15  Maybe a couple years, a year.  I don't know.  I

16  don't remember --

17       Q.   Okay.

18       A.   -- the time frames, sorry.

19       Q.   That's all right.  Do you remember

20  when he left?

21       A.   He got promoted -- I'm sorry.  He

22  got promoted to major.  I'm not real sure when

23  he got promoted to major.

24       Q.   Was it around maybe 2012 that he

25  got promoted?  Do you know?

18

1　　　A.　That sounds about right.

2　　　Q.　Okay.  And so after he was

3　promoted, who was the next lieutenant there?

4　　　A.　Lieutenant Hill.

5　　　Q.　Okay.  So was there any time

6　period between his promotion and when

7　Lieutenant Hill took over as the lieutenant

8　there?

9　　　A.　Yes, it was a significant time

10　period between the two.

11　　　Q.　Okay.  I read somewhere maybe it

12　was 18 months or so.

13　　　A.　Yes, 18 months was going in my

14　head.  I was just afraid to say it.

15　　　Q.　So tell me about who was

16　commanding -- it's still internal affairs at

17　this point or had the name changed to

18　Professional Standards?  Do you remember?

19　　　A.　I think we went under Professional

20　Standards under Lieutenant Carper.  I'm pretty

21　sure it was under Lieutenant Carper.

22　　　Q.　And so Lieutenant Carper was

23　promoted and that left kind of a vacancy in the

24　lieutenant position in Professional Standards;

25　correct?

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

19

1          A.   Correct.

2          Q.   So during that vacancy, were you

3    asked to take over any additional duties?

4          A.   Yes.

5          Q.   Okay.  Tell me about that.

6          A.   Both myself and Sergeant Rike, is

7    the other sergeant in internal affairs, we

8    would alternate -- I can't remember if we did

9    it monthly or three months at a time or what,

10   but we would take over the responsibilities of

11   lieutenant position in that department as well

12   along with our normal duties.

13         Q.   Was there any extra pay given to

14   you for doing that?

15         A.   There was.  It was very

16   insignificant.  I mean, it was just -- it -- it

17   was very small for a big headache, yes.

18         Q.   Very small compared to the extra

19   amount of work you had to take on?

20         A.   Correct.

21         Q.   So was it like an hourly pay or

22   you just got pay stipend?  How did that extra

23   pay work?

24         A.   You get prorated.  So your hourly

25   pay is prorated.

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

20

1      Q.   Okay.  And did you have to have a

2   written plan on what you and Sergeant Rike

3   would -- the extra responsibilities?  Was there

4   anything -- a formal written plan about your

5   responsibilities?

6      A.   No written plan, no.

7      Q.   Okay.  Were you ever told why they

8   didn't have another lieutenant come in more

9   quickly than the amount of time that it took?

10      A.   I believe there was just a

11   shortage of lieutenants at the time in that

12   period of time.

13      Q.   Had you ever thought about going

14   and taking the lieutenant's exam?

15      A.   I never took the lieutenant's

16   exam.

17      Q.   So tell me about the different

18   things that you had to do, you know, the kind

19   of interim commander role for the standards

20   bureau that you didn't have to do previously?

21      A.   Well, with the lieutenant's

22   position, you do the findings for

23   investigations, findings for investigations

24   from the detectives and I did the findings

25   investigations from Sergeant Rike.  I had to

21

1  meet regularly -- well, we talked to the next

2  step up, which at that time was Major Ecton,

3  about the cases we were working.  We're

4  responsible for -- we got the calls for the

5  callouts and we would be responsible for

6  deciding who would go out to these callouts,

7  who would be assigned cases.

8       Q.  Okay.  And so for the findings you

9  said that you and Rike -- you would still be

10  doing your investigation role on some of the

11  cases; correct?

12       A.  Correct.

13       Q.   And then you would do the findings

14  for Rike and Rike would do the findings for

15  you?

16       A.  Correct, and whoever that month

17  was handling the lieutenant's position would do

18  any kind of findings from the detectives that

19  would come up, that would be completed.

20       Q.  So you got alternating months then

21  on who would be taking on --

22       A.  Yeah.  I don't remember if we did

23  it monthly or two months, three months at a

24  time or -- I really don't recall how that

25  worked.

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

22

1      Q.   But it was never concurrent to

2  lieutenant -- two acting lieutenants?  There

3  was a rotation of acting lieutenant?

4      A.   Correct.

5      Q.   And were you paid for the weeks

6  that you were acting as the lieutenant?

7      A.   Correct.

8      Q.   And that would be something you

9  would report to payroll this week, I acted as

10  lieutenant and this week I didn't?  How would

11  that work?

12      A.   It would be a special report.  I

13  believe we would complete the special report

14  and Major Rike would sign off on it and it

15  would go to payroll.  I think they were special

16  reports or -- yeah, that was --

17      Q.   Okay.  Do you -- during that time

18  frame were you actively trying to find a new

19  lieutenant to come into PSB?

20      A.   That -- I had nothing to do with

21  that.

22      Q.   So that would be above your grade

23  on who would be looking for the new lieutenant?

24      A.   Well above my grade, yes.

25      Q.   Was there any input or interviews

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

23

1  or request of you about recommendations for a

2  new lieutenant?

3       A.  We went to -- we -- I mean we -- I

4  believe -- I wouldn't say for Sergeant Rike but

5  I know I talked to Colonel Chabali --

6       Q.  Okay.

7       A.  I'm just trying to pull these

8  names out, he was the assistant chief at the

9  time -- to see if it was possible when we might

10  get a lieutenant in that position.

11       Q.  Mm-hm.

12       A.  It was just a matter of other

13  holes needed to be plugged first and I felt

14  like, yeah, we just -- they didn't have enough

15  lieutenants to fill that spot at that time.

16       Q.  Okay.  Did you -- were you ever

17  asked about Lieutenant Hill coming in and

18  filling the spot before she actually took the

19  spot?

20       A.  Ask -- I'm not sure what you're

21  saying -- ask me --

22       Q.  Did a discussion of Lieutenant

23  Hill coming in to take the lieutenant's spot in

24  the PSB come up in discussion with any

25  management or upper level before she actually

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

24

1  took the spot?

2       A.   When we were told they were going

3  to have a Lieutenant come in, Major Ecton sat

4  down with Rob Rike and I and asked if we had

5  any input on who we'd like to see in that

6  position.

7       Q.   Okay.  Do you recall giving an

8  interview on October 4, 2016 in relation to

9  Lieutenant Hill's OCRC complaint?

10      A.   Yes.

11      Q.   Okay.  So I'm going to ask you

12 some questions about that.

13      A.   Okay.

14      Q.   I just want to verify if this was

15 actually said.  So I think the question -- a

16 note's mentioned -- there's a question, how did

17 you receive lieutenant's authority over you,

18 how did you feel about it.

19          So the response in here said Major

20 Ecton did come to us to get insight to which of

21 the lieutenants did we think could do a good

22 job.  Do you recall having a conversation with

23 Major Ecton about that?

24      A.   That's the meeting I was just

25 referring to.

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

25

1      Q.  What time frame was that?

2      A.  I have no idea.

3      Q.  It was before she came in?  So
4  sometime probably 2012 or 2013?

5      A.  When did she come in?

6      Q.  I think she came in 2013.

7      A.  I'm talking it might have been the
8  week before her assignment.  It was soon before
9  her assignment.

10     Q.  Okay.  So within the same three
11  months or so of her assignment or probably
12  quicker than that?

13     A.  Definitely within the same three
14  months.  It was probably quicker than that,
15  yes.

16     Q.  And did Major Ecton ask you who
17  you thought would do a good job in the
18  position?

19     A.  Yes.

20     Q.  We talked about Eric Henderson,
21  Gregg Gabby, Kenny Hill, Andy Booher?

22     A.  Correct.

23     Q.  Did she get those names right?
24  Eric Henderson?

25     A.  Eric Henderson, Gabby.

Kimberly Hill vs City of Dayton Police Department, et al.    Timothy Reboulet

26

1      Q.  Eric Henderson is a black male?

2      A.  Black male.

3      Q.  Gregg Gabby -- Gabby?

4      A.  Gabby, white male.

5      Q.  Kenny Biehl?

6      A.  Black male.

7      Q.  Is that -- is he related to Chief

8 Biehl --

9      A.  No.

10     Q.  -- that you know of?  Okay.  No

11 relation to Kenny Biehl?

12    A.  No relation.

13    Q.  You said white male?

14    A.  Yes.

15    Q.  And then Andy Booher?

16    A.  Andy Booher, B O O H E R, Booher.

17    Q.  B O O H E R, and that's a white

18 male?

19    A.  Yes.

20    Q.  And then next sentence, from us

21 she never came into our minds because she had a

22 past history of not performing.  I think -- do

23 you recall giving that statement?

24    A.  Something along the lines.

25    Q.  So you think that Lieutenant Hill

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

27

1   had a past history of not performing?

2        A.  Yes.

3        Q.  Okay.  Tell me about that.

4        A.  I've never worked directly for

5   Lieutenant Hill.  At the time before her

6   assignment to us, I believe it was lieutenant

7   over investigations, and from all accounts I

8   heard detective section was pretty much in

9   shambles.  I don't know what part she played in

10  that or if it was the major at the time.  I

11  just heard just -- when she was west pod

12  lieutenant --

13       Q.  Well, let me back you up.  You

14  just heard from who about the accounts in her

15  previous --

16       A.  I can't tell you exactly who I

17  spoke to or what I heard or -- I couldn't tell

18  you.

19       Q.  Okay.  Did you ever see any of her

20  work product from her previous positions?

21       A.  Yes.  One of her final reports was

22  on -- there was an investigation that was

23  started into detective section, administrative

24  investigation, on -- I'm trying to think of his

25  name.

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

28

1      Q.   Was it Larry Tolpin?

2      A.   Bingo.  Yeah, it was Larry Tolpin.

3   Thank you.  I know we were getting

4   information -- I think the investigation ended

5   up coming to internal affairs.  Scott Culham, I

6   believe, was the detective.  I'm almost a

7   hundred percent sure Scott Collum was the

8   detective.

9           We were getting -- he was

10  getting -- he was receiving information from

11  Lieutenant Hill.  I'm not sure how he got it,

12  if it was directly or if it was Lieutenant Hill

13  to -- whatever process it was.  But he got

14  information and I went on interviews with him

15  over to the care center and going into them --

16  I remember going into interviews with Libby

17  Nichols or Nicholson who was the head of the

18  care center at the time over there --

19      Q.   Okay.

20      A.   -- that she was supposed to be

21  having a major problem with Larry Tolpin not

22  doing the job.  We went in that interview and

23  pretty much Larry Tolpin sounded like he walked

24  on water.  He did everything he could for them,

25  anything that was asked.  They had no problems

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

29

1   with him at all.

2        Q.   So that was what Larry Tolpin told

3   you in the interview?

4        A.   No, that's what Libby Nichols --

5        Q.   So you interviewed her?

6        A.   Right.

7        Q.   So I'm trying to get to the bottom

8   of -- so you think that Lieutenant Hill did a

9   poor investigation of Larry Tolpin then?  Break

10  it down for me.

11       A.   It felt like they were just trying

12  to run Larry Tolpin out of the unit.  Again,

13  that's a feeling I got.

14       Q.   Okay.  You think that Lieutenant

15  Hill was trying to run him out of the unit?

16       A.   Again, like I said before, I don't

17  know if this was coming from Lieutenant Hill or

18  Major Williams.

19       Q.   Okay.

20       A.   At the time, I think, yes.

21       Q.   Okay.  Anything else that you knew

22  of that reflected poorly on Lieutenant Hill's

23  previous abilities or previous work product or

24  anything?

25       A.   I mean, the only direct -- direct

Kimberly Hill vs City of Dayton Police Department, et al.                Timothy Reboulet

30

1    link I ever had with Lieutenant Hill when she

2    was -- I was a new sergeant out in the 3rd

3    District.  She was a sergeant for -- sergeant's

4    aid for Kenton Rainey, I think was his name,

5    Major Kenton Rainey.

6         Q.   Yeah.  Well, your next sentence

7    was, I had experience with her when she was a

8    sergeant under Rainey.

9         A.   Okay.

10        Q.   R A I N E Y?

11        A.   Geez -- I think that's right,

12   Rainey, where she was, you know.  Our

13   administrative investigations at that time went

14   through one -- one person and he was the final

15   approving authority and it would cross her desk

16   first and -- it was my understanding that she

17   reviewed the investigations and they went to

18   the major.

19             I remember getting investigation

20   back with a paper with a list of questions on

21   it which were all in the original

22   investigation.  I just highlighted the

23   different spots to answer the question in the

24   investigation and resubmitted the same

25   investigation and it went through and I felt

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

1  that -- I mean, that investigation was up to

2  her quite a while.

3          And, again, I don't know if this

4  came from -- it was my feeling it came from

5  Lieutenant Hill to kick it back through, maybe

6  reset time limits on them or -- but it very

7  well could have been Kenton Rainey with these

8  questions that were in that report.

9      Q.  So, again, you don't know if it

10  was necessarily her neglecting any duties but

11  that's what you -- that's the opinion or the

12  conclusion that you reached?

13      A.  It's the conclusion I reached.  If

14  it was Kenton Rainey with these questions, she

15  should have been able to, well, here's the

16  answers to those questions, you know.

17      Q.  So you don't think she answered

18  the questions correctly or not to your standard

19  on how the questions should have been handled?

20      A.  I don't know what you mean by to

21  my standard.  I just felt like these

22  investigations -- I felt like the

23  investigations -- if you just want to know my

24  feelings because that's all I got here --

25      Q.  Sure.

1      A.   -- I felt like the investigations

2  probably sat on her desk and got kicked back to

3  reset time limits because she had the

4  investigation for so many weeks and kicking it

5  back, getting it back, reset time limits.

6      Q.   Okay.  And then you say I heard

7  she was kicked out, hard to get things done

8  when she was over in west pod, therefore,

9  problems over there.  Do you recall saying

10  something to that regard?

11      A.   I do remember saying that.  I

12  remember -- I don't remember who it was but I

13  remember -- because that was -- she was over

14  there during the transition of -- we went from

15  districts to pods so, like, 3rd and 5th

16  District combined, and she was over there at

17  that time and I just remember hearing things

18  weren't getting done for that transition.

19      Q.   Okay.  And so you heard she got

20  kicked out of the department then?

21      A.   That's what I said back then.  I

22  don't remember saying -- but -- she was moved.

23  I mean, she went from there to -- I don't

24  really know if she went from there to the

25  detective section or -- I honestly don't

Kimberly Hill vs City of Dayton Police Department, et al.         Timothy Reboulet

33

1  remember the reasoning or what I heard about

2  her leaving west pod.

3       Q.  Okay.  And you don't remember who

4  would have told you that?

5       A.  No.

6       Q.  And so then there's a question,

7  how do you think she's doing, and there's a

8  response written, Reboulet, no, I don't think

9  she's done a good job, I don't think that is

10  because of any feelings of her incompetence

11  that came with her.  Do you recall saying that

12  you don't think she's done a good job?

13       MR. BAZELAK:  Let me just object in

14  that you're asking questions from a statement and

15  he doesn't have the statement in front of him.  So

16  if you have the statement in front of him that he

17  can put everything into context --

18       THE WITNESS:  I don't --

19       (Thereupon, Plaintiff's Exhibit 1, a

20  copy of an interview, was marked for purposes of

21  identification.)

22       Q.  I'm handing you what's been marked

23  as Exhibit 1.  This is the statement that I'm

24  looking at.  It's just a part of the OCRC file.

25  I wasn't going to admit it as an exhibit

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

34

1  because I think they're statements that someone

2  else wrote down that she said.  So I just want

3  to confirm or deny if these things were

4  mentioned by you.  If you want to look at them,

5  we can take a look.

6          A.  I do remember them asking -- I'm

7  not sure if it came up do you think she's doing

8  a good job or do you think she's doing the job

9  or what but, no, I don't believe she was doing

10  the job.

11          Q.  I'm sorry.  You don't believe she

12  was doing --

13          A.  I don't believe she was doing the

14  job.

15          Q.  You mean the job that she had

16  previously or the job that she was doing in the

17  Professional Standards?

18          A.  Specifically, her job at

19  Professional Standards.

20          Q.  Okay.  And did you feel she was

21  being incompetent in her job?

22          A.  No, she's a very smart person.

23  I've never seen -- I mean, typos or grammar --

24  grammatical errors she would catch on all the

25  investigations, very smart person, very capable

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

35

1    of doing the job, she just was not doing the

2    job.

3            Q.   Okay.  And so the next sentence,

4    and I'm looking down there in the middle of

5    actually -- so we're starting here.  And so

6    there's a statement here where -- like, four

7    paragraphs up from the bottom, second sentence.

8    The investigation of Officer Larry Tolpin, I

9    think, was not substantiated in my opinion.

10           And then there's a note, what

11   Lieutenant Reboulet is referring to in the

12   beginning which she, Lieutenant Hill, was

13   ordered to conduct an investigation of fellow

14   Officer Tolpin.  Tim Reboulet and others,

15   including staff under Lieutenant Hill at PSB,

16   felt the investigation led to his dismissal or

17   removal from the force.  Is that a correct

18   summary of what went on with Larry Tolpin?

19           A.   He was a sergeant.  Lieutenant

20   Hill was a lieutenant.  I was a sergeant.  I

21   wasn't a lieutenant.  But that's what I was

22   referring to earlier.  I believe that, for lack

23   of a better term, kind of a witch hunt probably

24   on Larry Tolpin.  I did not work directly with

25   Larry, but what reputation and contact I did

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

36

1 have with him, I thought he was a pretty sharp

2 guy.  He left the department after this

3 investigation and I believe -- I mean, I

4 believe he stayed on the payroll for several

5 months just -- I think it was some kind of

6 bargain they made.  I don't know.

7      Q.  Okay.  So the last sentence,

8 Sergeant Reboulet and other staff felt that the

9 investigation conducted by Lieutenant Hill

10 unfairly destroyed Officer Tolpin's career?

11      A.  I don't ever remember using the

12 words destroyed his career.

13      Q.  Okay.

14      A.  I believe it was -- I believe it

15 was an unfair -- I don't want to say attack on

16 Sergeant Tolpin, but everything I saw in the

17 investigation seemed to be -- how do I want to

18 put this -- like, overboard.  I believe I

19 remember reading -- hoping my memory's right --

20 but him being insubordinate because he wouldn't

21 have his office painted or something along them

22 lines, yeah.

23      Q.  Okay.  And did your feelings about

24 that investigation have any effect on your

25 feelings about sergeant -- about Lieutenant

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

1  Hill?

2      A.  No.

3      Q.  And do you know if she wanted to

4  come to the PSB when she came in?

5      A.  I do not know if she wanted to

6  come.  She never expressed an interest to me

7  about wanting to be there.

8      Q.  Okay.  Did she ever express any

9  desire to be transferred out of PSB to you?

10     A.  Not to me, no.

11     Q.  And do you know if the other

12  lieutenants had expressed -- if any other

13  lieutenants ever expressed any interest in

14  coming to PSB?

15     A.  The lieutenant that you mentioned

16  that I mentioned earlier, Eric Henderson, he's

17  a sharp guy, Lieutenant Gabby, yes, he

18  expressed interest, Lieutenant Booher expressed

19  interest and Kenny Biehl all expressed interest

20  like they -- in the position that they would

21  like to have that.

22     Q.  Okay.  And they expressed it to

23  you?

24     A.  Yes.

25     Q.  Did you ever get any explanation

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

38

1  from any higher-ups on why Lieutenant Hill was

2  chosen over any of the other lieutenants?

3      A.  That meeting that we referred to

4  earlier with Major Ecton, Eric Henderson, he's

5  in a position that they weren't going to move

6  him from.  Gregg Gabby, we didn't want him

7  because he was SWAT and didn't want him to be

8  sharing the time.  I remember telling him

9  that -- Gregg maybe expressed to us or to me

10 that he was old and just wanted to pass it on

11 to the younger guys.  He said that Andy Booher

12 was too immature, and I can't remember what he

13 said about Lieutenant Biehl.

14      Q.  Okay.  So there seemed to be, at

15 least what you received, was some thought

16 process into why Lieutenant Hill was chosen

17 over other lieutenants?

18      A.  I can't answer that question.  I'm

19 not sure what the thought process was.

20      Q.  There was an express to you, at

21 least some process, on how they eliminated some

22 of the other lieutenants, at least some of the

23 factors that went into it?

24      A.  It was my understanding that he

25 already had selected Lieutenant Hill prior to

39

1  talking to us.

2      Q.   Okay.

3      A.   Anything anybody said, he just had

4  a reason why he didn't want that person.  He

5  said Gregg Gabby, SWAT, I don't want anybody on

6  SWAT, and after telling him he was going to

7  leave SWAT if he got this position, there was

8  no response.

9      Q.   Okay.  So was there any issues

10  with Lieutenant Hill when she first started in

11  the PSB position, the lieutenant there?

12      A.   I don't know what -- what kind of

13  issues are you talking about?

14      Q.   I don't know.  Let's do this.

15  There was a question if you go on the report --

16  how did you show support for Lieutenant Hill,

17  and there's a response here that they're

18  attributing to you, I asked her what she

19  needed, I took over some of her tasks to keep

20  it in line.  We didn't have a bad working

21  relationship in the beginning.

22      A.   No, we didn't.  I was going to say

23  are you talking personal issues or work issues?

24  I don't remember when the investigation started

25  stacking up without findings.  I don't know

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

40

1   exactly -- it happened pretty soon.  It

2   happened soon after the assignment but I don't

3   remember exactly when they really started

4   stacking up.  No, I got along with Lieutenant

5   Hill.  We went to the academy together.  I know

6   Kim, pleasant person --

7        Q.  Okay.

8        A.  -- you know.  So at the beginning

9   there weren't any issues.  She was -- this

10  thing I was talking about, taking over some of

11  her tasks, it was a weekly case review update

12  and it was just listing all open cases and PSB

13  and where they're at, what stage are they at,

14  and that's a task that she was falling behind.

15          We -- it was a meeting with

16  Major -- I think he was still Major Ecton at

17  that time, and I was asked to -- can you

18  take -- can you handle this weekly case update.

19  That was one of the things I -- that we tried

20  to help keep things moving and keep things

21  going.

22       Q.  Okay.  Now, did she ever express

23  to you that she felt like there were some

24  issues with her authority in the PSB when she

25  came in?

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

41

1          A.   No.

2          Q.   Okay.  Did anyone ever come to you

3   and tell you that Lieutenant Hill had

4   complained about issues with her authority in

5   the PSB?

6          A.   No.  Are you talking about -- no.

7          Q.   Nobody ever interviewed you?

8          A.   No.

9          Q.   Nobody ever asked you to talk to

10  Lieutenant Hill or to make any changes in

11  your -- in how you respond to investigations?

12         A.   No.

13         Q.   Did you ever complain to anybody

14  else about Lieutenant Hill?

15         A.   No.  We talked to -- I mean, I

16  talked to like -- we run the mail, and part of

17  running the mail would be taking things to

18  Major Ecton, and when he got promoted to

19  lieutenant colonel, investigations still flowed

20  through his office about the amount of

21  investigations getting stacked up.

22         Q.   Okay.  Was there any point in time

23  where you were asked or on your own would go to

24  Lieutenant Hill's house?

25         A.   I never went to -- oh, have I ever

42

1  been to Lieutenant Hill's house?  Oh, no, no.

2  She was involved in an accident near her house,

3  but I've never been to Lieutenant Hill's house.

4       Q.   Did you ever drive past her house

5  to check that she was there?

6       A.   No.

7       Q.   At any point?

8       A.   No, I mean, there was times where

9  we would go by -- I'd have to go by like west

10 pod, which is down Washington and -- no.  As

11 far as going by there specifically to check to

12 see if she was there, no.

13      Q.   Okay.  There's a mention in here

14 about there was calls for Lieutenant Hill and

15 for one reason or another she could not be

16 located.

17      A.   Yeah, there were calls.  Yeah, I

18 don't know -- there were calls, she couldn't be

19 located.

20      Q.   Okay.  Did you ever do anything to

21 try to find her?

22      A.   We made calls, I mean, yeah.

23      Q.   Or would you ever send an officer

24 by her house to try and find her?

25      A.   No.

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

43

1      Q.   Okay.  Did you ever tell any other

2  detectives, officers in your department that

3  you were going by Lieutenant Hill's house?

4      A.   No.  I do remember seeing her car

5  out there.  I don't even know which house would

6  have been hers.

7      Q.   Okay.

8      A.   But she's got that -- she had a

9  white Ford Fusion maybe, regular city car.

10      Q.   Okay.  And you saw her car where?

11      A.   At -- on the street.  I don't even

12  remember what street she lived on.

13      Q.   Okay.

14      A.   Area over by west pod.

15      Q.   She said she lives on Hawthorne.

16      A.   Maybe.  If that's where she lives,

17  that's where she lives.

18          MR. BAZELAK:  I wouldn't go any

19  further on the address --

20          MS. BROWN:  Okay.

21          MR. BAZELAK:  -- for her benefit.

22          MS. BROWN:  Okay.  She told me it's

23  fine to talk about it.

24      Q.   Let me ask you this because she

25  said in her deposition too -- is that a side

1  street that she lives on?

2      A.  It is a side street, yes.

3      Q.  Okay.  And so you saw her car on

4  the side street?

5      A.  I might have gone by there to -- I

6  mean, not gone by there but taken a different

7  route to west pod to go through that

8  neighborhood, Lieutenant's not around, you

9  know, but I don't ever go there and like

10  document like, okay, she's not here or she's at

11  home when she should be at work or anything

12  like that --

13      Q.  Okay.

14      A.  -- you know.

15      Q.  Did you have a problem with

16  communicating with Lieutenant Hill at all?

17      A.  No.  When we would be, we're not

18  communicating --

19      Q.  That's what I was going to say.  I

20  think there's kind of a reference in here --

21  let me find it -- that she wouldn't talk

22  directly to you or you guys never had direct

23  conversations?

24      A.  There was a report concerning

25  complaint receipts and -- long story, but

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

45

1  complaint receipts did not have dispositions on

2  them founded, unfounded, whatever because

3  they're not investigative reports. It was one

4  of the reports we generated for the chief and

5  the chief wanted to know the disposition of

6  these cases.

7          So there was -- so I tried to find

8  out what type -- how do you want to handle

9  this, how are we going to handle this, and it

10  was like just do the report. She didn't

11  communicate how she thought -- I said, what

12  does the chief want. Well, the chief doesn't

13  know what he wants.

14          So I did the report with like

15  closed, for lack of a better term, all these

16  complaint receipts were closed, and then there

17  was an e-mail sent to me in which she CC'd,

18  like, the chief of police and all the command

19  staff pretty much saying something along the

20  lines of -- made me sound incompetent saying

21  that she gave me specific instructions on how

22  to complete this report and I failed to follow

23  her instructions.

24          It made me sound like an idiot. I

25  didn't respond to that e-mail. I went into her

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

1  office to ask her what's this about and the

2  only response I got was we're not talking about

3  this, Timothy, just said we'd have a meeting

4  with the major, which we never did.

5          There was a meeting with the major

6  later on.  I said, we're here, I want to break

7  this up.  And, again, we're not talking about

8  that thing.  So that issue was never -- never

9  solved.  I don't know.

10         Q.   Did she ever appear distressed or

11  depressed in any way to you?

12         A.   I wouldn't be qualified to tell if

13  someone's depressed or distressed.  She's

14  never -- besides that incident of kind of like

15  snapping a little bit saying just do the

16  report, probably pretty level keel.

17         Q.   Okay.  Did she close the door to

18  her office more than other lieutenants did that

19  you worked for?

20         A.   No.  She did work behind closed

21  doors at times.  I closed my doors at times

22  when I had reports that I was trying to knock

23  out and things I wanted to concentrate on.  My

24  office door was right next to the kitchen so

25  nothing -- I mean, there was a time period

1  where when she did come into work, she did sit

2  and close the door but --

3          Q.   Okay.  Now, how was the duties

4  that -- the interim duties that you and Rike

5  were taking on as interim lieutenants, I guess,

6  or acting commanders, was there ever an

7  official process or official memorandum or case

8  note or any direction on how those duties were

9  going to be transferred over to Lieutenant

10  Hill?

11          A.   No.  It was just -- it's practice.

12  I mean, we didn't have a lieutenant.  We did

13  the job.  When we got a lieutenant, lieutenant

14  did the lieutenant's job.

15          Q.   Okay.  Was there ever any instance

16  where you were still doing kind of some of the

17  lieutenant duties because you felt like

18  Lieutenant Hill wasn't doing them or couldn't

19  do them?

20          A.   The only -- what I did was -- what

21  I was asked to do was like the weekly case

22  update log.

23          Q.   Okay.  You stated in here that you

24  took over some of her tasks to keep it in line.

25  Is that what you're referring to?

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

1          A.   That is the weekly case update

2    log, to keep updated -- keep everything in

3    line, what investigations we actually had open

4    in our unit and where they were at and where

5    are they at in the process, if we're waiting

6    on -- some investigations held for a while, if

7    we're waiting on the criminal case to be

8    disposed of or gone through and time limits.

9    Once someone gets what we call an S93, which is

10   the signature of acknowledging an investigation

11   is being done, there's time limits, contractual

12   time limits to stay within --

13          Q.   Okay.  Do you know if there was

14   any discussion about Lieutenant Hill coming

15   into the command at PSB, whether it was only

16   going to be a temporary position and she wasn't

17   supposed to be there that long or permanently?

18          A.   I have no information on that.

19   That was never discussed with me.

20          Q.   Did you hear rumors about that or

21   this is the first time you heard this being

22   mentioned?

23          A.   That is the first I ever heard it

24   being mentioned.

25          Q.   Okay.  Had you ever heard that she

1    had made good changes in the west patrol and

2    reorganized it to make it more efficient?  Was

3    that ever a rumor that you heard?

4         A.  That's not a rumor I heard, no.

5         Q.  Okay.  Had you ever heard that she

6    had negotiated a contract with Central State to

7    get extra space for the people over in the west

8    patrol?

9         A.  I'm not aware of that.

10        Q.  Okay.  And that she had gotten a

11   lot of attention for great accomplishments over

12   in the west patrol?  Had you ever heard that

13   rumor?

14        A.  I never heard that.

15        Q.  Okay.  Had you ever heard any good

16   rumors about Lieutenant Hill?

17            MR. BAZELAK:  Objection as to rumors.

18   Go ahead.

19            THE WITNESS:  Rumors, no.

20        Q.  Do you remember an incident with

21   some patrol vehicles being assigned that were

22   assigned by someone else other than Lieutenant

23   Hill in the department?

24        A.  Talking about -- are you talking

25   about vehicles in our unit?

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

50

1        Q.   Yes.

2        A.   Yes.

3        Q.   Okay.  What do you remember about

4   that?

5        A.   I remember -- I think he was

6   Colonel Ecton then maybe -- Tom Albright, he

7   was getting a different vehicle and -- yeah, I

8   remember him saying he was getting a different

9   vehicle.  He got a Ford Fusion and he had an

10  old Ford Taurus maybe.  I don't know.  One of

11  the better cars that we had though --

12       Q.   Okay.

13       A.   -- that we wanted to keep.  Then

14  soon after that I got a call from the vehicle

15  coordinator, Powers, Sergeant Powers, saying

16  that the unit was also going to get a Ford --

17  one of the small cars, it's what I was driving,

18  terrible city car.

19       Q.   Ford Focus?

20       A.   Was it a Focus?  Was Focus a

21  small -- yeah, it was a Focus, and he wanted

22  these two cars back, which are the older cars

23  in the unit.  We had the highest mileage ones.

24  He wanted these two cars back.  So Rob -- Rob's

25  car he was driving was one car we was going to

51

1   keep.  I think the car that Darrel Smith was

2   driving and -- I work with these guys -- Des

3   Murphy --

4       Q.   Okay.

5       A.   -- Des Murphy was driving, they

6   were taking those two cars away.  Howard Jordan

7   was still in the unit.  He was driving an older

8   car.  I went to Howard Jordan and asked, you

9   know, what's his preference, does he want to

10  stay in that car or possibly does he want to

11  move into Rob's car that was being shuffled

12  into the -- he said he only had a few more

13  months left, he wanted to stay where he was at.

14          The next person with seniority was

15  Darrel Smith who was now going to be without a

16  car.  What do you want to do, do you want the

17  new Ford Focus or the Taurus we're keeping from

18  Rob.  He said I need more room, I'll take the

19  Taurus.  Dennis Murphy, being the low man,

20  ended up with the Focus.

21          This all happened bam, bam, bam.

22  We didn't get the cars.  This is just, you

23  know, what I knew was coming in.  I went to

24  Lieutenant Hill and said, apparently, we're

25  getting a couple cars and then I kind of ran it

52

1  down to her, you know, what it was about, you

2  know, Major Ecton or colonel, I think, at the

3  time, him calling, got Rob the car and how

4  everything else fell in line.

5          And she was like, okay, run that

6  by me again, and I was like -- so I ran it by

7  her again and, again, these cars weren't

8  assigned to anybody.  We don't even got the

9  cars yet.  At any time she could have said that

10  isn't what I want to do or anything.  We didn't

11  have the cars yet but they were coming.

12          She said, okay, thanks, Tim -- or

13  Timothy, I think, thanks, Timothy.  This was an

14  e-mail the following day.  I think I took the

15  day off.  There was an e-mail the following day

16  how I went around her or -- I don't remember

17  exactly -- remember how the e-mail was, but it

18  sounded like we were -- it was just another

19  example of insubordination --

20      Q.  Okay.

21      A.  -- which -- yeah.

22      Q.  Okay.  And you were rolling your

23  eyes and we'll put that on the record.  Did

24  you -- was that the first time you had heard

25  her say anything about insubordination?

53

1        A.   I believe so, yes.

2        Q.   Okay.  Was there ever any other

3   situation where you heard something like

4   insubordination being mentioned?

5        A.   Insubordination, no, just -- what

6   we talked about earlier on CRs, but that was

7   pretty much me being called incompetent or

8   something along them lines.

9        Q.   Do you recall Lieutenant Hill

10  giving Sergeant Rike a task of updating an SOP

11  that was never performed?

12       A.   SOP?

13       Q.   A standard operating procedure.

14       A.   I don't recall that.

15       Q.   Okay.  Did -- did majors ever

16  continue to call you directly or speak to you

17  directly about issues or things they needed

18  from the Professional Standards Bureau after

19  Lieutenant Hill came on?

20       A.   Are you talking about like --

21  concerning, like, callouts and cases like that?

22       Q.   Yeah, or anything.

23       A.   Well, there's a lot of things

24  like -- we went to a new system of reporting.

25  We went from paper to digital.  Blue team is

54

1  what they had on the street.  They would do

2  their investigations on blue team which had all

3  kind of different sheets that needed to be

4  filled, requirements for certain types of

5  investigations.  So, yeah, I would get calls,

6  like, is this needed in this report or things

7  like that, yeah.

8       Q.  Okay.

9       A.  Just procedural type of things

10 like -- or if there was a cruiser accident, the

11 use of force, do I have to do a cruiser

12 accident and a use of force or can it be done

13 on one investigation.  That's because I did

14 weekly updates --

15      Q.  Okay.

16      A.  -- on all open investigations to

17 all the different districts so the majors would

18 be able to know what was out there in their

19 assigned areas, their responsibility.

20      Q.  Okay.  Do you think there was --

21 that Lieutenant Hill brought benefit to the

22 office or any benefit to the office when she

23 came in?

24      A.  I believe the potential was there

25 but the -- just the performance wasn't there.

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

55

1  I don't know what a benefit would have been.

2      Q.   Do you believe that you did

3  everything you could to support Lieutenant Hill

4  when she came into the office to make sure she

5  transitioned smoothly in the leadership role

6  there?

7      A.   Absolutely.  We had a lot of

8  conversations early on about how things worked

9  and what needed to be done, where we were at

10  with things, yeah.  We created numerous other

11  monthly reports, yearly reports which we never

12  did before when she got there.  I say we.  I'm

13  the one that tried to figure out what was

14  needed in these reports and got put together.

15      Q.   Did you feel like before

16  Lieutenant Hill came that you and Sergeant Rike

17  were doing the job well or to the standards

18  that the DPD wanted before they came in?

19      A.   Yes, I believe I've done every job

20  I've done in the department for 29 years well.

21      Q.   Okay.  Do you feel like you had to

22  give instructions to Lieutenant Hill on how to

23  do her job?

24      A.   No.  She was lieutenant for a

25  while.  It's not really a different job, I

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

56

1   mean, it's just different location, you know.

2   I mean -- I don't remember giving -- feel like

3   I had to give her instructions on how to do the

4   job.  If she had any questions, I would answer

5   all her questions.

6        Q.   And is Sergeant Rike still in PSB?

7        A.   He -- his -- his position, I

8   think, is, from what I understand, it's still

9   under PSB.  Department advocate, I believe, is

10  what his position title is at this time.

11       Q.   Okay.

12       A.   I don't know who the lieutenant

13  is -- Sheldon maybe is what I heard is his

14  lieutenant so --

15       Q.   And so Sheldon was one of the ones

16  that you initially put on the list?

17       A.   No.  At that time I think he was

18  the sergeant at that time.

19       Q.   Okay.

20       A.   And I don't know Lieutenant --

21  Sergeant Sheldon or Lieutenant Sheldon.  I

22  can't remember his first name right now.

23            MR. BAZELAK:  Eric.

24       Q.   I'm sorry.  I got Eric Henderson

25  and Eric Sheldon confused.  So Eric Henderson

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

1  was one of the people that you wanted --

2      A.  Right, I worked with Eric.

3        MR. BAZELAK:  Henderson.

4        THE WITNESS:  Henderson.  Thank you.

5      Q.  Did you ever work with Eric

6  Sheldon?

7      A.  No.

8      Q.  Okay.  Had you ever worked with

9  Carper?

10      A.  No, not before he came to PSB.

11      Q.  So he was your lieutenant in PSB,

12  but before that you hadn't worked with him?

13      A.  I don't think I ever did, no.

14      Q.  Okay.  While Lieutenant Hill was

15  your lieutenant in the PSB, did you ever tell

16  Carper that you had difficulty accepting

17  Lieutenant Hill as the commander in PSB?

18      A.  As accepting her, no.

19      Q.  Okay.  Did you ever tell

20  Lieutenant Carp -- well, what is he?

21  Lieutenant commander?

22      A.  Lieutenant colonel.

23      Q.  -- Lieutenant Colonel Carper that

24  you had reservations about Lieutenant Hill's

25  qualifications for the job as lieutenant of

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

58

1    PSB?

2         A.   Her qualifications, no.

3         Q.   Did you ever tell Lieutenant

4    Commander -- Lieutenant Colonel Carper that you

5    had concerns or feelings that Lieutenant Hill's

6    findings were months behind or late?

7         A.   I think we had conversations -- I

8    mean, I don't remember going to him

9    specifically for that task, but we had had

10   conversations, yeah, and then Colonel Ecton.

11        Q.   Okay.  Did you tell Carper that

12   Lieutenant Colonel -- sorry -- Lieutenant Hill

13   doesn't speak to you but she goes into her

14   office and basically shuts the door?

15        A.   There was a time period that that

16   was happening, yes.

17        Q.   Okay.  Did you ever talk to

18   Lieutenant Hill about why she wouldn't speak to

19   you or go in the office and shut the door?

20        A.   I'll say I did not, no.

21        Q.   Okay.  Did you tell Carper that

22   there are long periods of time, according to

23   them, that you don't know where she is?

24        A.   Yeah.  There was a time where we

25   were all on time clocks -- would clock in but

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

59

1  not see her till late afternoon.

2      Q.  Did you ever feel that you were

3  reporting or handling issues outside of the

4  proper channel of command with any PSB?

5      A.  No.

6      Q.  Did anyone ever tell you that you

7  were doing things outside the chain of command?

8      A.  No.

9      Q.  Did Carper ever ask you to keep

10  tabs on Lieutenant Hill for her -- for hours or

11  amount of time she was working during her time

12  period?

13      A.  No.  I don't recall that, no.

14      Q.  Do you recall ever sending any

15  text messages about Lieutenant Hill's time that

16  she was working to anyone?

17      A.  Are you asking was I reporting to

18  somebody, no.  I don't remember sending any

19  text messages to anybody saying anything about

20  time.

21          MS. BROWN:  Okay.  I think that's all

22  the questions I have.  Thank you.

23          MR. BAZELAK:  We'll read.

24          (Thereupon, the deposition was

25  concluded at 11:47 o'clock a.m.)

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

60

1        I, TIMOTHY REBOULET, do hereby certify

2   that the foregoing is a true and accurate

3   transcription of my testimony.

4

5

6            _ _ _ _ _ _ _ _ _ _ _ _ _ _

7

8        Dated _ _ _ _ _ _ _ _ _ _ _ _ _ _

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Job: 190327SLK

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

61

1  STATE OF OHIO          )

2  COUNTY OF MONTGOMERY ) SS: CERTIFICATE

3          I, STACEY L. KIMMEL, a Notary

4  Public within and for the State of Ohio, duly

5  commissioned and qualified,

6          DO HEREBY CERTIFY that the

7  above-named TIMOTHY REBOULET, was by me first duly

8  sworn to testify the truth, the whole truth and

9  nothing but the truth.

10          Said testimony was reduced to

11  writing by me stenographically in the presence

12  of the witness and thereafter reduced to

13  typewriting.

14          I FURTHER CERTIFY that I am not a

15  relative or Attorney of either party, in any

16  manner interested in the event of this action,

17  nor am I, or the court reporting firm with which

18  I am affiliated, under a contract as defined in

19  Civil Rule 28(D).

20

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

62

1          IN WITNESS WHEREOF, I have hereunto set

2    my hand and seal of office at Dayton, Ohio, on

3    this 10th day of April, 2019.

4

5

6

7

8

9          STACEY L. KIMMEL
            NOTARY PUBLIC, STATE OF OHIO
            My commission expires 6-10-2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

---
**1**
---

**1** 5:19 33:19,23

**11:47** 59:25

**12** 10:21

**13** 10:21

**17** 14:10

**18** 18:12,13

**1st** 8:8,20 16:15

---
**2**
---

**2** 6:1

**2001** 10:15,16 11:3

**2002'ish** 10:17

**2007** 14:11 15:13

**2008** 14:13

**2012** 17:24 25:4

**2013** 25:4,6

**2016** 24:8

**2017** 7:10,11,20

**21st** 7:11

**29** 7:20,21 55:20

---
**3**
---

**3** 6:9

**30** 7:24

**335** 6:25

**3rd** 8:6,11 11:5,24 12:3,18 16:14 30:2 32:15

---
**4**
---

**4** 24:8

---
**5**
---

**5th** 32:15

---
**9**
---

**9-1-1** 13:21,24

---
**A**
---

**a.m.** 59:25

**abilities** 29:23

**Absolutely** 55:7

**academy** 40:5

**accepting** 57:16,18

**accident** 42:2 54:10,12

**accidents** 15:4

**accomplishments** 49:11

**accounts** 27:7,14

**acknowledging** 48:10

**acted** 22:9

**acting** 22:2,3,6 47:6

**actively** 22:18

**additional** 19:3

**address** 6:18,22,24 43:19

**administrative** 27:23 30:13

**admit** 33:25

**advocate** 56:9

**affairs** 5:4 14:6,8,17,19,25 16:21 17:13 18:16 19:7 28:5

**afraid** 18:14

**afternoon** 59:1

**age** 4:2

**ahead** 49:18

**aid** 30:4

**Albright** 50:6

**alternate** 19:8

**alternating** 21:20

**amount** 17:2 19:19 20:9 41:20 59:11

**Andy** 25:21 26:15,16 38:11

**answering** 6:3,14

**answers** 31:16

**apparently** 51:24

**approving** 30:15

**Approximate** 10:13

**April** 7:10,11

**Area** 43:14

**areas** 54:19

**assessment** 11:2

**assigned** 8:6 21:7 49:21, 22 52:8 54:19

**assignment** 14:4 25:8,9, 11 27:6 40:2

**assistant** 23:8

**assume** 6:13

**attack** 36:15

**attention** 49:11

**attorney** 4:12

**attributing** 39:18

**authority** 24:17 30:15 40:24 41:4

**avoid** 5:22

**aware** 49:9

---
**B**
---

**back** 7:23 9:6 11:5,23 13:4 15:23 27:13 30:20 31:5 32:2,5,21 50:22,24

**bad** 13:7 39:20

**bam** 51:21

**bargain** 36:6

**basically** 58:14

**BAZELAK** 6:19 10:13 15:13 33:11 43:18,21 49:17 56:23 57:3 59:23

**Bean** 8:25 13:5 16:6,13,15

**begin** 4:13

**beginning** 10:17 35:12 39:21 40:8

**benefit** 43:21 54:21,22 55:1

**Biehl** 26:5,8,11 37:19 38:13

**big** 19:17

**Bingo** 28:2

**bit** 15:24 46:15

**black** 16:5 26:1,2,6

**blue** 53:25 54:2

**Booher** 25:21 26:15,16 37:18 38:11

**bottom** 29:7 35:7

**break** 29:9 46:6

**briefly** 4:10

**brought** 9:2 54:21

**Brown** 4:6,9 43:20,22 59:21

**bureau** 20:20 53:18

**bus** 7:6

---
**C**
---

**call** 48:9 50:14 53:16

**called** 9:11 14:5 53:7

**calling** 52:3

**callouts** 15:2 21:5,6 53:21

**calls** 13:21,22 15:1 21:4 42:14,17,18,22 54:5

**capable** 34:25

**car** 43:4,9,10 44:3 50:18, 25 51:1,8,10,11,16 52:3

**care** 28:15,18

**career** 36:10,12

**Carp** 57:20

**Carper** 17:5,8,11 18:20, 21,22 57:9,16,23 58:4,11, 21 59:9

**cars** 50:11,17,22,24 51:6, 22,25 52:7,9,11

**case** 4:20,24 5:5,13 40:11, 18 47:7,21 48:1,7

**cases** 15:8 21:3,7,11 40:12 45:6 53:21

**catch** 34:24

**cautioned** 4:3

**CC'D** 45:17

**center** 11:2 12:20 13:17 28:15,18

**Central** 49:6

**certified** 4:4

**Chabali** 23:5

**chain** 59:7

**Chanda** 4:9

**changed** 18:17

**channel** 59:4

**check** 42:5,11

**chief** 23:8 26:7 45:4,5,12, 18

**chosen** 38:2,16

**city** 7:6 43:9 50:18

**civil** 5:5,9 10:23 11:1

**clock** 58:25

**clocks** 58:25

**close** 46:17 47:2

**closed** 45:15,16 46:20,21

**Collum** 28:7

**colonel** 23:5 41:19 50:6 52:2 57:22,23 58:4,10,12

**combined** 32:16

**command** 45:18 48:15 59:4,7

**commander** 8:12 20:19 57:17,21 58:4

**commanders** 47:6

**commanding** 18:16

communicate 45:11

communicating 44:16, 18

compared 19:18

complain 41:13

complained 41:4

complaint 24:9 44:25 45:1,16

complaints 15:2

complete 22:13 45:22

completed 21:19

concentrate 46:23

concerns 58:5

concluded 59:25

conclusion 31:12,13

concurrent 22:1

conduct 35:13

conducted 36:9

confirm 34:3

confused 56:25

consciously 6:10

contact 10:3 35:25

context 33:17

continue 53:16

contract 49:6

contractual 48:11

conversation 6:4 24:22

conversations 44:23 55:8 58:7,10

coordinator 50:15

copy 33:20

correct 7:13 12:1 13:1 17:10 18:25 19:1,20 21:11, 12,16 22:4,7 25:22 35:17

correctly 31:18

couple 13:16 17:15 51:25

court 14:2

courts 13:23

created 55:10

criminal 5:7,8 48:7

cross 30:15

CROSS-EXAMINATION 4:5

CRS 53:6

cruiser 15:4 54:10,11

Culham 28:5

current 6:17 7:2,4

**D**

damages 5:11

Darrel 51:1,15

day 8:20 11:13 52:14,15

days 8:9,24 9:2,8 11:12, 15,24

Dayton 5:1 7:5,14,18 8:1, 7,9

deciding 21:6

Dennis 51:19

deny 34:3

department 7:15,18 8:2 10:19 19:11 32:20 36:2 43:2 49:23 55:20 56:9

deposition 4:18 5:7 43:25 59:24

depressed 46:11,13

Des 51:2,5

desire 37:9

desk 30:15 32:2

destroyed 36:10,12

detective 27:8,23 28:6,8 32:25

detectives 14:25 20:24 21:18 43:2

difficult 5:23

difficulty 57:16

digital 53:25

direct 29:25 44:22

direction 47:8

directly 27:4 28:12 35:24 44:22 53:16,17

discussed 48:19

discussion 23:22,24 48:14

dismissal 35:16

dispatch 12:20,23,25 13:15,17,20,22 14:3 16:14, 16

disposed 48:8

disposition 45:5

dispositions 45:1

distressed 46:10,13

District 8:7,8,11,20 11:5, 24 12:3,18 16:14,16 30:3 32:16

districts 32:15 54:17

DMHA 9:9,10,11,21

document 44:10

door 46:17,24 47:2 58:14, 19

doors 46:21

DPD 55:18

drafted 12:22,23

drive 42:4

driving 7:5 50:17,25 51:2, 5,7

duly 4:3

duties 19:3,12 31:10 47:3, 4,8,17

**E**

e-mail 45:17,25 52:14,15, 17

eager 6:6

earlier 35:22 37:16 38:4 53:6

early 11:18 55:8

east 4:25

Ecton 21:2 24:3,20,23 25:16 38:4 40:16 41:18 50:6 52:2 58:10

effect 36:24

efficient 49:2

eliminated 38:21

end 10:16

ended 13:18 28:4 51:20

Eric 25:20,24,25 26:1 37:16 38:4 56:23,24,25 57:2,5

errors 34:24

evening 11:19

everyday 6:4

everything's 13:23

exam 10:24 11:1 20:14,16

examined 4:4

exhibit 33:19,23,25

experience 30:7

explanation 37:25

express 37:8 38:20 40:22

expressed 37:6,12,13,18, 19,22 38:9

extra 19:13,18,22 20:3 49:7

eyes 52:23

**F**

factors 38:23

failed 45:22

fair 5:24,25 6:7,8,15,16

Fairborn 7:6

falling 40:14

fast 6:10

feel 24:18 34:20 55:15,21 56:2 59:2

feeling 29:13 31:4

feelings 31:24 33:10 36:23,25 58:5

fell 52:4

fellow 35:13

felt 23:13 29:11 30:25 31:21,22 32:1 35:16 36:8 40:23 47:17

figure 55:13

file 33:24

filed 5:6

fill 23:15

filled 54:4

filling 23:18

final 27:21 30:14

find 22:18 42:21,24 44:21 45:7

findings 20:22,23,24 21:8,13,14,18 39:25 58:6

fine 12:12 43:23

fit 8:25

flowed 41:19

Focus 50:19,20,21 51:17, 20

follow 45:22

force 9:9,21 35:17 54:11, 12

Ford 43:9 50:9,10,16,19 51:17

formal 20:4

founded 45:2

frame 22:18 25:1

frames 17:18

front 33:15,16

full 4:14

Fusion 43:9 50:9

Kimberly Hill vs City of Dayton Police Department, et al.  Timothy Reboulet

**G**

**Gabby** 25:21,25 26:3,4 37:17 38:6 39:5

**gave** 45:21

**Geez** 30:11

**generated** 45:4

**give** 6:20,21 55:22 56:3

**giving** 24:7 26:23 53:10 56:2

**golly** 8:14 12:13 13:6

**good** 4:7,8 8:14 17:1 24:21 25:17 33:9,12 34:8 49:1,15

**grade** 22:22,24

**grammar** 34:23

**grammatical** 34:24

**great** 49:11

**Gregg** 25:21 26:3 38:6,9 39:5

**ground** 5:17

**group** 11:14

**guess** 15:6 47:5

**guessing** 10:21

**guy** 13:6 36:2 37:17

**guys** 11:13 38:11 44:22 51:2

**H**

**handing** 33:22

**handle** 40:18 45:8,9

**handled** 14:25 15:1,6 31:19

**handling** 21:17 59:3

**happened** 40:1,2 51:21

**happening** 58:16

**hard** 32:7

**Hawthorne** 43:15

**head** 18:14 28:17

**headache** 19:17

**hear** 48:20

**heard** 27:8,11,14,17 32:6, 19 33:1 48:21,23,25 49:3, 4,5,12,14,15 52:24 53:3 56:13

**hearing** 32:17

**held** 48:6

**Henderson** 25:20,24,25 26:1 37:16 38:4 56:24,25

57:3,4

**hereinafter** 4:3

**Hess** 8:15 15:24

**high** 15:7

**higher-ups** 38:1

**highest** 50:23

**highlighted** 30:22

**Hill** 4:13 18:4,7 23:17,23 25:21 26:25 27:5 28:11,12 29:8,15,17 30:1 31:5 35:12,15,20 36:9 37:1 38:1,16,25 39:10,16 40:5 41:3,10,14 42:14 44:16 47:10,18 48:14 49:16,23 51:24 53:9,19 54:21 55:3, 16,22 57:14,17 58:12,18 59:10

**Hill's** 24:9 29:22 41:24 42:1,3 43:3 57:24 58:5 59:15

**history** 26:22 27:1

**holes** 23:13

**home** 8:24 11:5 44:11

**honestly** 5:12 12:10 16:22 32:25

**hoping** 36:19

**hourly** 19:21,24

**hours** 11:14,17 59:10

**house** 41:24 42:1,2,3,4,24 43:3,5

**Howard** 51:6,8

**Huber** 15:18,20 16:17

**Hubert** 15:19

**huh-uhs** 5:22

**hundred** 28:7

**hunt** 35:23

**hurt** 15:4

**I**

**idea** 25:2

**identification** 33:21

**idiot** 45:24

**immature** 38:12

**important** 15:6,7

**incident** 46:14 49:20

**including** 35:15

**incoming** 15:1

**incompetence** 33:10

**incompetent** 34:21 45:20 53:7

**information** 28:4,10,14 48:18

**initially** 56:16

**input** 22:25 24:5

**insight** 24:20

**insignificant** 19:16

**instance** 47:15

**instructions** 45:21,23 55:22 56:3

**insubordinate** 36:20

**insubordination** 52:19, 25 53:4,5

**interest** 37:6,13,18,19

**interim** 20:19 47:4,5

**internal** 5:4 14:5,8,16,19, 24 15:1 16:21 17:12 18:16 19:7 28:5

**interview** 24:8 28:22 29:3 33:20

**interviewed** 29:5 41:7

**interviews** 22:25 28:14, 16

**investigated** 4:25

**investigation** 21:10 27:22,24 28:4 29:9 30:19, 22,24,25 31:1 32:4 35:8, 13,16 36:3,9,17,24 39:24 48:10 54:13

**investigation's** 15:7

**investigations** 20:23,25 27:7 30:13,17 31:22,23 32:1 34:25 41:11,19,21 48:3,6 54:2,5,16

**investigative** 45:3

**involved** 42:2

**issue** 46:8

**issues** 39:9,13,23 40:9,24 41:4 53:17 59:3

**J**

**Jerry** 10:1

**job** 7:8 14:21 24:22 25:17 28:22 33:9,12 34:8,10,14, 15,16,18,21 35:1,2 47:13, 14 55:17,19,23,25 56:4 57:25

**John** 15:18 16:17

**Jordan** 51:6,8

**K**

**keel** 46:16

**keeping** 51:17

**Kenny** 25:21 26:5,11 37:19

**Kenton** 30:4,5 31:7,14

**kick** 31:5

**kicked** 32:2,7,20

**kicking** 32:4

**Kim** 4:13 40:6

**kind** 4:20 18:23 20:18 21:18 35:23 36:5 39:12 44:20 46:14 47:16 51:25 54:3

**kitchen** 46:24

**knew** 29:21 51:23

**knock** 46:22

**L**

**lack** 35:22 45:15

**lag** 17:7

**Larry** 28:1,2,21,23 29:2,9, 12 35:8,18,24,25

**late** 58:6 59:1

**lawful** 4:2

**lawsuit** 5:6

**leadership** 55:5

**leave** 39:7

**leaving** 33:2

**led** 35:16

**left** 12:17 17:20 18:23 36:2 51:13

**length** 17:6

**level** 23:25 46:16

**Libby** 28:16 29:4

**lieutenant** 4:13 8:15,18, 19,25 9:1,20 10:1,4 12:7,8, 11 13:3,5,6 15:16,18,24 16:2,3,4,6,10,12,13,15,17, 21 17:5,8,11,12 18:3,4,7, 20,21,22,24 19:11 20:8 22:2,3,6,10,19,23 23:2,10, 17,22 24:3,9 26:25 27:5,6, 12 28:11,12 29:8,14,17,22 30:1 31:5 35:11,12,15,19, 20,21 36:9,25 37:15,17,18 38:1,13,16,25 39:10,11,16 40:4 41:3,10,14,19,24 42:1,3,14 43:3 44:16 47:9, 12,13,17,18 48:14 49:16, 22 51:24 53:9,19 54:21 55:3,16,22,24 56:12,14,20, 21 57:11,14,15,17,20,21, 22,23,24,25 58:3,4,5,12,18 59:10,15

Kimberly Hill vs City of Dayton Police Department, et al.                    Timothy Reboulet

lieutenant's 20:14,15,21
21:17 23:23 24:17 44:8
47:14

lieutenants 20:11 22:2
23:15 24:21 37:12,13 38:2,
17,22 46:18 47:5

life 4:22

limits 31:6 32:3,5 48:8,11,
12

lines 26:24 36:22 45:20
53:8

link 30:1

list 30:20 56:16

listing 40:12

litigation 15:5

lived 7:2 43:12

lives 43:15,16,17 44:1

located 42:16,19

location 56:1

locations 8:4

log 47:22 48:2

long 5:18 7:1,17 9:4 10:18
12:2 13:14 16:20 17:11
44:25 48:17 58:22

lot 49:11 53:23 55:7

loud 5:20

low 12:21 51:19

Luke 9:23

---

**M**

made 36:6 42:22 45:20,24
49:1

mail 41:16,17

major 17:22,23 21:2 22:14
24:3,19,23 25:16 27:10
28:21 29:18 30:5,18 38:4
40:16 41:18 46:4,5 52:2

majors 53:15 54:17

make 5:19,21 41:10 49:2
55:4

male 13:10,11 15:25 16:5,
7,9,11,18,19 17:9 26:1,2,4,
6,13,18

man 51:19

management 23:25

March 7:20

marked 33:20,22

matter 23:12

meet 21:1

meeting 24:24 38:3 40:15
46:3,5

memorandum 47:7

memory 7:22

memory's 36:19

mention 42:13

mentioned 24:16 34:4
37:15,16 48:22,24 53:4

messages 59:15,19

met 4:9

middle 35:4

midnights 8:8 9:6

mileage 50:23

Miller 8:19 16:4

minds 26:21

minutes 4:10

missed 15:15

Mm-hm 23:11

month 21:16

monthly 19:9 21:23 55:11

months 18:12,13 19:9
21:20,23 25:11,14 36:5
51:13 58:6

morning 4:7,8

move 38:5 51:11

moved 32:22

moving 40:20

Murphy 51:3,5,19

---

**N**

names 13:7 23:8 25:23

necessarily 31:10

needed 8:24 23:13 39:19
53:17 54:3,6 55:9,14

neglecting 31:10

negotiated 49:6

neighborhood 44:8

Nichols 28:17 29:4

Nicholson 28:17

night 11:19

normal 19:12

Northeast 8:9

note 35:10 47:8

note's 24:16

numerous 55:10

---

**O**

object 33:13

Objection 49:17

occupation 7:3,4

OCRC 24:9 33:24

October 24:8

offenses 15:2

office 36:21 41:20 46:1,
18,24 54:22 55:4 58:14,19

officer 6:20 8:13 15:4
35:8,14 36:10 42:23

officer-involved 15:3

officers 43:2

official 47:7

older 50:22 51:7

open 40:12 48:3 54:16

operating 53:13

opinion 31:11 35:9

ordered 35:13

original 30:21

overboard 36:18

overlap 6:4

---

**P**

paid 22:5

painted 36:21

paper 30:20 53:25

paragraphs 35:7

part 27:9 33:24 41:16

part-time 7:8

pass 38:10

past 26:22 27:1 42:4

patrol 8:3,5,6 9:15,16,19
11:8,9,25 12:3,17 49:1,8,
12,21

patrolled 9:12

pause 11:20,22

pay 19:13,21,22,23,25

payroll 22:9,15 36:4

people 9:7 11:14 49:7
57:1

percent 28:7

performance 54:25

performed 53:11

performing 26:22 27:1

period 18:6,10 20:12
46:25 58:15 59:12

periods 58:22

permanently 48:17

person 30:14 34:22,25
39:4 40:6 51:14

personal 39:23

Plaintiff's 33:19

plan 20:2,4,6

played 27:9

pleasant 40:6

plugged 23:13

pod 27:11 32:8 33:2 42:10
43:14 44:7

pods 32:15

point 12:17 16:24 18:17
41:22 42:7

police 6:20 7:5,14,18 8:2
10:19 45:18

poor 29:9

poorly 29:22

position 10:25 12:17
18:24 19:11 20:22 21:17
23:10 24:6 25:18 37:20
38:5 39:7,11 48:16 56:7,10

positions 7:25 27:20

possibly 51:10

potential 54:24

Powers 50:15

practice 47:11

preference 51:9

pretty 12:20 13:4 18:20
27:8 28:23 36:1 40:1 45:19
46:16 53:7

previous 27:15,20 29:23

previously 20:20 34:16

prior 38:25

probation 12:21,22

problem 28:21 44:15

problems 28:25 32:9

procedural 54:9

procedure 53:13

proceedings 11:22

process 28:13 38:16,19,
21 47:7 48:5

product 27:20 29:23

professional 6:22,24
18:18,19,24 34:17,19
53:18

profile 15:8

promoted 10:8,10 17:21,
22,23,25 18:3,23 41:18

promotion 10:19 11:4
18:6

---

Kimberly Hill vs City of Dayton Police Department, et al.          Timothy Reboulet

**proper** 59:4

**prorated** 19:24,25

**PSB** 22:19 23:24 35:15
37:4,9,14 39:11 40:12,24
41:5 48:15 56:6,9 57:10,
11,15,17 58:1 59:4

**pull** 23:7

**purposes** 33:20

**put** 33:17 36:18 52:23
55:14 56:16

---

**Q**

**qualifications** 57:25 58:2

**qualified** 46:12

**question** 5:21 6:2,3,5,11,
14,15 24:15,16 30:23 33:6
38:18 39:15

**questions** 5:20 24:12
30:20 31:8,14,16,18,19
33:14 56:4,5 59:22

**quicker** 25:12,14

**quickly** 5:17 20:9

---

**R**

**radio** 13:21,25

**Rainey** 30:4,5,8,12 31:7,
14

**ran** 51:25 52:6

**Randy** 8:25 13:5

**reached** 31:12,13

**read** 18:11 59:23

**reading** 36:19

**real** 17:22

**reason** 6:12 39:4 42:15

**reasoning** 33:1

**Reboulet** 4:1,15 33:8
35:11,14 36:8

**recall** 14:15 21:24 24:7,22
26:23 32:9 33:11 53:9,14
59:13,14

**receipts** 44:25 45:1,16

**receive** 24:17

**received** 38:15

**receiving** 28:10

**recommendations** 23:1

**record** 11:20 52:23

**recorded** 13:21,23

**recording** 13:19

**reference** 44:20

**referred** 38:3

**referring** 24:25 35:11,22
47:25

**reflected** 29:22

**regard** 32:10

**regular** 43:9

**regularly** 21:1

**related** 26:7

**relation** 24:8 26:11,12

**relationship** 39:21

**remember** 4:23,24 5:12
8:12 9:4 11:18 12:4,10,14
13:2,19 14:13 15:11,20
16:22 17:6,16,19 18:18
19:8 21:22 28:16 30:19
32:11,12,13,17,22 33:1,3
34:6 36:11,19 38:8,12
39:24 40:3 43:4,12 49:20
50:3,5,8 52:16,17 56:2,22
58:8 59:18

**removal** 35:17

**reorganized** 49:2

**rephrase** 6:12

**replaced** 17:4,6

**report** 5:3 12:13 22:9,12,
13 31:8 39:15 44:24 45:10,
14,22 46:16 54:6

**reported** 9:25

**reporting** 8:12 53:24
59:3,17

**reports** 22:16 27:21 45:3,
4 46:22 55:11,14

**represent** 4:12

**reputation** 35:25

**request** 23:1

**requirements** 54:4

**reservations** 57:24

**reset** 31:6 32:3,5

**respond** 6:6 41:11 45:25

**response** 24:19 33:8
39:8,17 46:2

**responsibilities** 14:22,
23 19:10 20:3,5

**responsibility** 54:19

**responsible** 21:4,5

**resubmitted** 30:24

**retire** 7:9

**retired** 7:4,12,19 13:9
14:10 16:23,24 17:3

**review** 40:11

**reviewed** 30:17

**righty** 6:17

**Rike** 19:6 20:2,25 21:9,14
22:14 23:4 24:4 47:4 53:10
55:16 56:6

**risk** 15:5

**Rob** 24:4 50:24 51:18 52:3

**Rob's** 50:24 51:11

**role** 20:19 21:10 55:5

**rolling** 52:22

**room** 51:18

**rotation** 22:3

**route** 44:7

**rules** 5:17

**rumor** 49:3,4,13

**rumors** 48:20 49:16,17,19

**run** 29:12,15 41:16 52:5

**running** 41:17

---

**S**

**S93** 48:9

**sat** 24:3 32:2

**school** 7:6

**Schools** 7:6

**Scott** 28:5,7

**section** 27:8,23 32:25

**seeking** 5:11

**selected** 38:25

**send** 42:23

**sending** 59:14,18

**seniority** 9:7 51:14

**seniority-wise** 9:7

**sentence** 26:20 30:6 35:3,
7 36:7

**sergeant** 7:5,12 9:23
10:4,8,10,20,24 11:3,6,7,9,
25 12:3,6,17,19,21,22,24
14:17,18,24 16:8 19:6,7
20:2,25 23:4 30:2,3,8
35:19,20 36:8,16,25 50:15
53:10 55:16 56:6,18,21

**sergeant's** 30:3

**service** 10:24 11:1

**shambles** 27:9

**sharing** 38:8

**sharp** 36:1 37:17

**sheets** 54:3

**Sheldon** 56:13,15,21,25
57:6

**shift** 8:21

**shootings** 15:3

**shortage** 20:11

**show** 39:16

**shuffled** 51:11

**shut** 58:19

**shuts** 58:14

**shy** 7:21

**side** 4:25 43:25 44:2,4

**sign** 22:14

**signature** 48:10

**significant** 18:9

**sit** 47:1

**situation** 53:3

**slow** 6:10

**small** 19:17,18 50:17,21

**smart** 34:22,25

**Smith** 10:1 16:10 51:1,15

**smoothly** 55:5

**snapping** 46:15

**solved** 46:9

**someone's** 46:13

**SOP** 53:10,12

**sound** 45:20,24

**sounded** 28:23 52:18

**sounds** 18:1

**Southwest** 8:7

**space** 49:7

**speak** 53:16 58:13,18

**special** 22:12,13,15

**specific** 45:21

**specifically** 34:18 42:11
58:9

**specifics** 5:12

**spoke** 27:17

**spot** 23:15,18,19,23 24:1

**spots** 50:23

**stacked** 41:21

**stacking** 39:25 40:4

**staff** 35:15 36:8 45:19

**stage** 40:13

**standard** 31:18,21 53:13

**standards** 18:18,20,24
20:19 34:17,19 53:18
55:17

**start** 6:2 14:7

Kimberly Hill vs City of Dayton Police Department, et al.                                    Timothy Reboulet

**started** 8:3 11:18 14:16,17
15:10 27:23 39:10,24 40:3

**starting** 8:1 35:5

**state** 4:14 49:6

**stated** 47:23

**statement** 26:23 33:14,
15,16,23 35:6

**statements** 34:1

**stay** 48:12 51:10,13

**stayed** 36:4

**step** 21:2

**stipend** 19:22

**stop** 9:13

**story** 44:25

**street** 6:25 43:11,12 44:1,
2,4 54:1

**substantial** 15:5

**substantiated** 35:9

**summary** 7:25 35:18

**supervised** 14:25

**supervisor** 11:11

**supplying** 14:1

**support** 39:16 55:3

**supposed** 28:20 48:17

**SWAT** 38:7 39:5,6,7

**sworn** 4:3

**system** 53:24

———————

**T**

**tabs** 59:10

**taking** 13:18 20:14 21:21
40:10 41:17 47:5 51:6

**talk** 6:9 41:9 43:23 44:21
58:17

**talked** 21:1 23:5 25:20
41:15,16 53:6

**talking** 25:7 39:1,13,23
40:10 41:6 46:2,7 49:24
53:20

**tape** 13:24

**task** 9:9,21 40:14 53:10
58:9

**tasks** 39:19 40:11 47:24

**Taurus** 50:10 51:17,19

**team** 53:25 54:2

**telling** 38:8 39:6

**temporary** 48:16

**ten** 5:15 11:14 14:14

**ten-hour** 11:12,24

**term** 35:23 45:15

**terms** 6:22

**terrible** 50:18

**test** 7:22

**text** 59:15,19

**thing** 40:10 46:8

**things** 8:23 9:5 20:18
32:7,17 34:3 40:19,20
41:17 46:23 53:17,23 54:6,
9 55:8,10 59:7

**thinking** 10:15 14:10

**Thomas** 8:18 16:2,3

**thought** 20:13 25:17 36:1
38:15,19 45:11

**till** 59:1

**Tim** 35:14 52:12

**time** 6:22 11:12 12:11,20
14:6 17:2,6,7,18 18:5,9
19:9 20:9,11,12 21:2,24
22:17 23:9,15 25:1 27:5,10
28:18 29:20 30:13 31:6
32:3,5,17 38:8 40:17 41:22
46:25 48:8,11,12,21 52:3,
9,24 56:10,17,18 58:15,22,
24,25 59:11,15,20

**times** 42:8 46:21

**Timothy** 4:1,15 46:3
52:13

**title** 56:10

**told** 20:7 24:2 29:2 33:4
43:22

**Tolpin** 28:1,2,21,23 29:2,
9,12 35:8,14,18,24 36:16

**Tolpin's** 36:10

**Tom** 50:6

**Towers** 10:15

**traffic** 13:21,25

**transferred** 37:9 47:9

**transition** 32:14,18

**transitioned** 55:5

**trial** 5:7

**Twin** 10:15

**type** 45:8 54:9

**typed** 5:24

**types** 54:4

**typos** 34:23

———————

**U**

**uh-huhs** 5:22

**understand** 5:23 6:11
56:8

**understanding** 30:16
38:24

**understood** 6:14

**unfair** 36:15

**unfairly** 36:10

**unfounded** 45:2

**unit** 10:7 29:12,15 48:4
49:25 50:16,23 51:7

**update** 40:11,18 47:22
48:1

**updated** 48:2

**updates** 54:14

**updating** 53:10

**upper** 23:25

———————

**V**

**vacancy** 18:23 19:2

**vehicle** 50:7,9,14

**vehicles** 49:21,25

**verify** 24:14

———————

**W**

**wait** 6:1,6

**waiting** 48:5,7

**walked** 28:23

**wanted** 37:3,5 38:10 45:5
46:23 50:13,21,24 51:13
55:18 57:1

**wanting** 37:7

**Washington** 42:10

**water** 28:24

**week** 11:15 22:9,10 25:8

**weekly** 40:11,18 47:21
48:1 54:14

**weeks** 22:5 32:4

**west** 6:25 27:11 32:8 33:2
42:9 43:14 44:7 49:1,7,12

**white** 15:24 16:7,9,11,18,
19 17:9 26:4,13,17 43:9

**Williams** 9:23 10:5 16:8
29:18

**witch** 35:23

**words** 36:12

**work** 11:4,13 19:19,23
22:11 27:20 29:23 35:24
39:23 44:11 46:20 47:1
51:2 57:5

**worked** 6:21 7:17 8:9,20
9:2 21:25 27:4 46:19 55:8
57:2,8,12

**working** 16:25 21:3 39:20
59:11,16

**Wow** 12:10

**written** 20:2,4,6 33:8

**wrote** 34:2

———————

**Y**

**year** 9:5 10:9,11 15:10
17:15

**yearly** 55:11

**years** 5:14 7:21,24 10:22
12:5 13:16 14:14,15 17:15
55:20

**younger** 38:11

———————

**MIKE MOBLEY REPORTING**

**MMR**

*334 South Main Street*
*Dayton, Ohio 45402-2716*
*Office: 937-222-2259*
Fax: 937-222-9747

April 10, 2019

Tim Reboulet
c/o Leonard J. Bazelak, Esq.
Senior Attorney City of Dayton, Ohio
101 West Third Street
Dayton, OH 45401

Re: ***Hill, Kimberly v. City of Dayton Police Dept., et al.***

Dear Mr. Reboulet:

Enclosed is your transcribed deposition. The Rules of Civil Procedure allow ***thirty (30) days*** for you to read the transcript and return the signature page and corrections sheet to us.

If you have any corrections or changes to your transcript, please write them on the provided corrections sheet, including the appropriate page and line number from the transcript and any necessary explanation.

Please sign and date the signature page and return it with the corrections sheet in the enclosed envelope. We will forward these to the attorneys involved.

If you do not return the signature page within ***thirty (30) days***, a waiver of signature will be executed and the transcript may then be used as your sworn testimony.

Very truly yours,

MIKE MOBLEY REPORTING

Courtney Elliott

cc: Leonard J. Bazelak, Esq.
    Chanda L. Brown, Esq.