1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION

4                     *   *   *

5   KIMBERLY HILL,

6         Plaintiff,

7        vs.                CASE NO. 3:17-CV-00334

8   CITY OF DAYTON POLICE

9   DEPARTMENT, et al.,

10        Defendants.

11                    *   *   *

12          Deposition of ROBERT JOSEPH RIKE,

13  Witness herein, called by the Plaintiff for

14  cross-examination pursuant to the Rules of Civil

15  Procedure, taken before me, Stacey L. Kimmel, a

16  Notary Public in and for the State of Ohio, at the

17  City of Dayton, Law Department, 101 West Third

18  Street, Dayton, Ohio, on Wednesday, March 27,

19  2019, at 1:36 o'clock p.m.

20                    *   *   *

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

2

```
 1              EXAMINATIONS CONDUCTED        PAGE

 2   BY MS. BROWN:........................     4

 3

 4                  EXHIBITS MARKED

 5   (Thereupon, Plaintiff's Exhibit 2, a

 6   copy of an interview, was marked for

 7   purposes of identification.)..........    26

 8   (Thereupon, Plaintiff's Exhibit 3, a

 9   copy of an e-mail, was marked for

10   purposes of identification.)..........    66

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

3

```
 1   APPEARANCES:

 2      On behalf of the Plaintiff:

 3           Walton & Brown, LLP

 4      By:  Chanda L. Brown
             Attorney at Law
 5           395 East Broad Street
             Suite 200
 6           Columbus, Ohio  43215

 7      On behalf of the Defendants:

 8           City of Dayton, Ohio

 9      By:  Leonard J. Bazelak
             Attorney at Law
10           101 West Third Street
             Dayton, Ohio  45401
11
                          *   *   *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1              ROBERT JOSEPH RIKE
2  of lawful age, Witness herein, having been first
3  duly cautioned and sworn, as hereinafter
4  certified, was examined and said as follows:
5              CROSS-EXAMINATION
6  BY MS. BROWN:
7        Q.   Hello.
8        A.   Hi.
9        Q.   My name's Chanda Brown.  I'm an
10 attorney.  I represent Kimberly Hill.  Could
11 you please state your full name.
12       A.   Robert Joseph Rike, R I K E.
13       Q.   Okay.  And your business address?
14       A.   335 West Third Street, Dayton, 02,
15 45402.
16       Q.   Okay.  And have you ever had your
17 deposition taken before?
18       A.   I do not believe I have.
19       Q.   Okay.  Well, I promise to try not
20 to make it too painful for you.
21       A.   Thank you.
22       Q.   You know, it goes where it goes.
23 What's your current occupation?
24       A.   I'm a Dayton Police sergeant.
25       Q.   Okay.  And how long have you been
```

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

5

1   a sergeant?

2        A.   I have been a sergeant for -- I

3   believe it will be 17 years June or July.

4        Q.   Okay.  And how long have you been

5   with the Dayton Police?

6        A.   I have been with the City for 27

7   years.  I will be a sworn officer 27 years this

8   May.

9        Q.   Okay.  So you started with the

10  City as a --

11       A.   A recruit, a recruit, yes, ma'am.

12       Q.   And before you became an officer

13  or a recruit, tell me about your employment

14  history like prior to --

15       A.   Prior to being a police officer?

16       Q.   Yes.

17       A.   I was in the United States Navy

18  from '86 till my active duty ended in '89.  I

19  was in the reserves until '92.  After that I

20  took a -- I took a little time off and then I

21  worked at the Dayton International Airport as

22  airport security until I got into the academy

23  in December of '91.

24       Q.   Okay.  And tell me a little bit

25  about the places or different positions you've

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

6

1    had within the City of Dayton as an officer or

2    sergeant.

3            A.    Well, I'll just go through my

4    history.  When I came out of the academy in

5    '92, I was a patrol officer in the 1st

6    District, which is now referred to as EPOD

7    North, East Patrol Operations Division North.

8                 I was there for -- as a patrol

9    officer for probably, roughly, five years,

10   maybe five and a half years, and then I went

11   into the special investigations division as a

12   member of what we call the Dayton Metropolitan

13   Housing Authority Task Force, DMHA Task Force.

14   I did that for probably between five and six

15   years.

16                 And then in, I want to say June or

17   July, I honestly can't remember for some

18   reason, I was promoted in 2002.

19           Q.    Okay.

20           A.    And then I left that unit in 2002.

21   After being --

22           Q.    Promoted to sergeant?

23           A.    Yes, ma'am.

24           Q.    Okay.

25           A.    After my promotion I was

Kimberly Hill vs City of Dayton Police Department, et al.                     Robert Rike

7

1  reassigned, actually, back to the 1st

2  District --

3          Q.   Okay.

4          A.   -- as a patrol sergeant.  It

5  wasn't -- it wasn't long after that I was

6  assigned as the supervisor in charge of what we

7  called at that time the SET team, the Special

8  Enforcement Team.  And in, I think it was,

9  spring or summer of 2004 I was drafted to the

10 dispatch center, and what that means is when

11 you're promoted to sergeant, you're going to

12 eventually do a year in the dispatch center.

13         Q.   Okay.

14         A.   I -- I actually did a year in the

15 dispatch center, and the schedule in the shift

16 was so good I stayed for a couple years.

17         Q.   Okay.

18         A.   In, I believe, July of 2007 -- I

19 was in dispatch center in July of 2007 and then

20 I was assigned to -- transferred to the

21 Internal Affairs Bureau, which is now the

22 Professional Standards Bureau.  My primary

23 assignment at that time was public records

24 administrator for the department.

25              I did that and I was in charge

Kimberly Hill vs City of Dayton Police Department, et al.                Robert Rike

8

1  of -- I was in charge of random drug testing

2  and I -- at that time early on I didn't carry a

3  caseload but I would respond to callouts and

4  do, you know, assist with investigations.  I

5  just didn't -- I was not assigned

6  investigations because I had so much to do with

7  the other things that I was doing.

8         Q.   Okay.

9         A.   And then I -- I want to say maybe

10 late maybe 2010, early 2011 they took the --

11 because we had lost -- we started out with

12 three sergeants in that unit when I was there

13 and when one retired and they chose not to fill

14 that sergeant's position, they took the public

15 records administrator job out of that -- out of

16 our unit and took the random drug testing out

17 of our unit because it was not feasible to try

18 to do all the things that the sergeant has to

19 do and that stuff.

20         So at that point I basically just

21 was an IA supervisor and investigator.  So I

22 did strictly investigations at that point, no

23 more -- I was not the records administrator

24 anymore.

25         Q.   Okay.  Going back to your -- I

Kimberly Hill vs City of Dayton Police Department, et al.          Robert Rike

 1  know we're going back a little bit.

 2          A.   Sure.

 3          Q.   But your patrol when you first

 4  started in the 1st District, do you know who

 5  your lieutenant or sergeant was?

 6          A.   My first lieutenant was Lieutenant

 7  Randy Bean, and there's two of them, so it was

 8  the senior Randy Bean.

 9          Q.   Okay.

10          A.   My sergeant, my first sergeant,

11  out of the academy was sergeant by the name of

12  Robert Mannix, who subsequently became a

13  lieutenant and has since retired.

14          Q.   M A N O X?

15          A.   M A N N I X, I believe.

16          Q.   And then when you were in the

17  SI -- in the DM --

18          A.   DMHA.

19          Q.   Yeah.

20          A.   My direct supervisor was a

21  sergeant by the name of David Williams.  During

22  my time there I believe the lieutenant switched

23  off different times.  I know at one point my

24  supervisor in that unit was Lieutenant Mike

25  Wilhelm.  I believe that's W I L H E L M.

Case: 3:17-cv-00334-TMR Doc #: 18 Filed: 05/24/19 Page: 10 of 79 PAGEID #: 616
Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

10

```
 1          Q.   Okay.  And your 1st District
 2   sergeant position, who would have been your
 3   lieutenant?
 4          A.   I believe -- I believe when I
 5   initially got promoted, Lieutenant Randy Bean
 6   was still there and then Lieutenant Mike
 7   Wilhelm moved into that position at one point.
 8          Q.   Okay.
 9          A.   And just -- I mean, I -- when I
10   was a patrol officer in the 1st District, I
11   had -- you move around a lot, so I had multiple
12   sergeants --
13          Q.   Okay.
14          A.    -- and a few different lieutenants
15   actually so --
16          Q.   Okay.  And when you first got to
17   the IAB, now PSB, who was the lieutenant there?
18          A.   Lieutenant was Mark Hess, H E S S.
19   He ended up being the assistant chief and now
20   is the chief of MetroParks.
21          Q.   Okay.
22          A.   And then there were a few after
23   that.
24          Q.   Okay.  So -- let's see.  I know --
25   so you've been with the IAB PSB since -- what
```

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

11

1   year was that, 2007?

2          A.   2007, mm-hm.

3          Q.   And you had Lieutenant Mark Hess.

4   Who were the other lieutenants that have been

5   there since 2007?

6          A.   I believe, and I'm getting old, so

7   bear with me --

8          Q.   Okay.

9          A.   -- I believe that when Mark Hess

10  was promoted, Lieutenant John Huber took over.

11         Q.   Is that H U B E R?

12         A.   H U B E R, mm-hm.  Following --

13  Lieutenant Huber ended up retiring from that

14  position.

15         Q.   Okay.

16         A.   And at that point I believe is

17  when Lieutenant Matt Carper was assigned to

18  that position and then Lieutenant Carper was

19  promoted to major at -- I want to say -- I want

20  to say sometime around 2012, 2013.

21         Q.   Okay.

22         A.   And then we didn't have a

23  lieutenant for -- I'm guessing it was -- it was

24  well over a year, probably close to a year and

25  a half, and then Lieutenant Hill was assigned

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

12

1    to the position.

2              Q.    Okay.

3              A.    And I think she arrived in 2014.

4              Q.    Okay.  Have any of your

5    lieutenants, other than Lieutenant Hill, been a

6    female?

7              A.    Yes.

8              Q.    Okay.  Who was that?

9              A.    That was Lieutenant Barbara Bent,

10   I believe that's B E N T.  That was while I

11   was -- she did a -- she was -- she was one of

12   the lieutenants at the 1st District.

13             Q.    Okay.

14             A.    That was while I was patrol

15   officer.

16             Q.    Okay.  And so that would have been

17   in around when you first started, '92?

18             A.    That would have been between '92

19   and when I left in -- I want to say I left in

20   '97 --

21             Q.    Okay.

22             A.    -- to go to the DMHA Task Force.

23             Q.    Okay.

24             A.    And --

25             Q.    Since then have you had any female

 1  lieutenants or supervisors, sergeants --

 2          A.   Yes.

 3          Q.   -- or lieutenants?

 4          A.   Yes.  While again -- well, since

 5  the majority of my career was in the 1st

 6  District, a lot of it's going to be in the

 7  1st -- in the 1st District, Sergeant Carlene

 8  Maynes, M A Y N E S.

 9          Q.   Let me go back -- I'm sorry --

10  Barbara Bent, was that a lieutenant or a

11  sergeant?

12          A.   That was a lieutenant.

13          Q.   Go ahead.  Sergeant --

14          A.   Carlene Maynes was a sergeant.

15          Q.   And when was that?

16          A.   That would have been -- she was my

17  sergeant, I believe, when I left the 1st

18  District, so probably for two or three years --

19  oh, maybe -- maybe '95 to '9 -- in that area,

20  in that area.

21          Q.   Okay.  All right.  Any other

22  female supervisors?

23          A.   Yes.

24          Q.   Okay.

25          A.   I believe it was prior to Sergeant

Kimberly Hill vs City of Dayton Police Department, et al.                Robert Rike

14

1  Maynes taking over as our sergeant we had a

2  sergeant by the name of Clydette, and please

3  don't ask me to spell that.

4        Q.   Okay.

5        A.   I'm not sure -- Clydette

6  North-Burke.  It's hyphenated.

7        Q.   Okay.

8        A.   And she was -- she was our

9  sergeant for maybe a year before Sergeant

10 Maynes took over.

11       Q.   Okay.  So that would have been

12 before '95?

13       A.   I think so.  And I'm -- I'm trying

14 to recall this.

15       Q.   Sure.

16            MR. BAZELAK:  Are you just asking

17 about sergeants or even both?

18            MS. BROWN:  Yeah, sergeants or

19 lieutenants, anyone that was a supervisor.  So a

20 sergeant when you were a patrol and then

21 lieutenant --

22            MR. BAZELAK:  Just a direct

23 supervisor because --

24            THE WITNESS:  Okay.  And for the

25 record, I was an officer when Lieutenant Bent was

15

1　my -- was my lieutenant.

2　　　　　Q.　Okay.

3　　　　　A.　So she would not have been my

4　direct supervisor.　It would have been one of

5　the other sergeants I mentioned.

6　　　　　Q.　Okay.

7　　　　　A.　I believe -- I believe that is the

8　extent.

9　　　　　Q.　Okay.　Were any of these female

10　sergeants and lieutenants African-American

11　female?

12　　　　　A.　Sergeant Clydette North-Burke,

13　yes, ma'am.

14　　　　　Q.　And that was --

15　　　　　A.　It was in that area.

16　　　　　Q.　All right.　I'm not going to hold

17　you to it explicitly?

18　　　　　A.　This has been a long time ago.

19　　　　　Q.　Okay.　Other than this case here,

20　have you ever been the subject or accused of

21　being part of any discriminatory actions with

22　any other employees or coworkers or anything

23　while with the City of Dayton?

24　　　　　A.　No, ma'am, never.

25　　　　　Q.　Okay.　And you're currently

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

16

1   employed with the City; correct?

2          A.   Yes, ma'am.

3          Q.   Okay.  What's your current job

4   title?

5          A.   Department advocate.

6          Q.   Okay.  And who's your current

7   chain of command?

8          A.   My lieutenant is Lieutenant Eric

9   Sheldon.

10         Q.   Okay.  And are you still with the

11  PSB?

12         A.   Yes, ma'am, it's a -- it's an

13  assignment within -- within PSB.

14         Q.   Okay.  Is it different from your

15  assignment when you were working under

16  Lieutenant Hill?

17         A.   Yes, ma'am.

18         Q.   Tell me about the difference.

19         A.   The difference is I don't work in

20  the office with -- I'm not an investigator, for

21  one.

22         Q.   Okay.

23         A.   I work in the safety building

24  where all the other members of the unit work

25  over in the One Stop building.  My job is

17

1   primarily -- I do -- I'm back to random drug

2   testing.

3            Q.   Okay.  That sounds fun.

4            A.   Just lucky, I guess.  And I

5   primarily, I guess for lack of a better term,

6   facilitate the disciplinary process.  If

7   there's discipline that's going to -- if an

8   officer's going to discipline, the discipline

9   comes to me, I log it, I make sure that the

10  appropriate charge has been made and then I

11  send it out to be served if there is a -- if

12  there is a -- if it's a disciplinary process.

13            If it's going to involve something

14  greater than a reprimand, some type of

15  suspension, maybe termination, then I will -- I

16  will -- there will be a hearing, an

17  administrative hearing, if the employee so

18  chooses and then I will -- I'm the person that

19  sets in and states the -- states the

20  departments, the facts of the department's

21  investigation.

22            Q.   Okay.  So you don't do the

23  investigation but you might review an

24  investigation and report those facts from

25  someone else's investigation?

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

18

1      A.    Right.   The investigation, once it

2   takes the course that it takes and there's

3   going to be a -- and there's going to be what

4   we call charges and specifications, then the

5   investigation comes to me, I get it over here

6   to HR law where they -- they review it, type up

7   the appropriate charge and specifications

8   and -- and then, ultimately, once those charges

9   and specifications are returned to me, I see to

10  it that they're served.

11           And then if there's going to be a

12  hearing, I'll review the investigation so -- so

13  that, like I said, I do a little thing prior,

14  just explaining the facts and the circumstances

15  of the investigation and then the hearing

16  officer hears the mitigation.

17      Q.    Okay.   And when did you take over

18  this position?

19      A.    I want to say December 12th of

20  2017.

21      Q.    And before that you were a

22  sergeant with -- an investigative sergeant?

23      A.    Yes, ma'am, I was actually an

24  investigator supervisor over in the One Stop

25  office in PSB.

Kimberly Hill vs City of Dayton Police Department, et al.                      Robert Rike

19

1          Q.    And how long had you been in that

2     position?

3          A.    Technically, I had been a

4     supervisor in PSB since I got there in 2007.  I

5     started doing full time investigations after

6     they took away the public records and the drug

7     testing in probably, I want to say, early 2011.

8          Q.    Okay.

9          A.    So from 2011 on I primarily did

10    the work of a PSB supervisor and carried a

11    caseload of investigations.

12         Q.    Okay.  And so this was sometime

13    after when Lieutenant Carper was promoted to

14    major that there was no lieutenant assigned to

15    the PSB?

16         A.    That is correct.

17         Q.    Okay.  And so at that point -- I

18    spoke to Sergeant Reboulet earlier today and he

19    testified that you -- you guys kind of shared

20    the duties a little bit --

21         A.    We did.

22         Q.    -- as interim commanders.  Tell me

23    about that.

24         A.    For the time that we were without

25    a lieutenant, I think we did it in, basically,

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

20

1   two-month shifts.  He would take two months and

2   then I would take two months just simply

3   because you -- like I said, we carry a caseload

4   just like the detectives do and we have -- we

5   have things that sergeants do.  So we would --

6   we shared a responsibility throughout that year

7   and change that we did it, yes.

8          Q.   Now, did the sergeants versus

9   the -- I guess they're detectives in -- they're

10  called detectives?

11         A.   Yes, ma'am.

12         Q.   But they're officers?

13         A.   Yeah, they're the rank of officer,

14  yes, ma'am.

15         Q.   Did the detectives versus the

16  sergeants, did the sergeants have different

17  types of cases --

18         A.   (Witness shakes head from side to

19  side.)

20         Q.   -- or did you investigate the same

21  thing the officer --

22         A.   Yes, it would basically go in --

23  if we took a callout on an officer-involved

24  shooting or bad accident or something like that

25  and the officers -- each one of the detectives

Case: 3:17-cv-00334-TMR Doc #: 18 Filed: 05/24/19 Page: 21 of 79 PAGEID #: 627
Kimberly Hill vs City of Dayton Police Department, et al.                Robert Rike

21

```
1   were actively working on three different
2   investigations and I had one, I'd take it.  It
3   was just the caseload was shared.  And we took
4   our fair share.
5        Q.   Okay.  So did you supervise
6   detectives in their process or in their
7   investigations at all?
8        A.   I guess it would depend on your
9   definition, yes.  We would oversee, we would go
10  through different steps with them of the
11  investigative process, we would review their
12  investigations prior to -- prior to the final
13  product being turned in to the lieutenant.
14       Q.   Okay.
15       A.   Yes, ma'am.
16       Q.   What -- who were the detectives
17  that were working in the PSB during the time
18  that you were there with Lieutenant Hill?
19       A.   With Lieutenant Hill?
20       Q.   Narrow down a time frame a little
21  bit.  So, basically, 2013 to 20 -- you left in
22  2017; right?
23       A.   Yes, ma'am.  To the best of my
24  knowledge, as I recall the -- when Lieutenant
25  Hill got there, I know that Detective Scott
```

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

22

1    Culham was there, C U L H A M.  I know that
2    Detective --
3              Q.   And he's white male?
4              A.   Yes.
5              Q.   Okay.
6              A.   And I know that Detective Howard
7    Jordan was there.
8              Q.   And his race?
9              A.   He's a black male.  And I
10   believe -- I believe that at some point during
11   that Detective Doug Hall may have been there
12   for some part of that.
13             Q.   Okay.
14             A.   And he is a white male, yes,
15   ma'am.
16             Q.   Okay.
17             A.   Oh, I'm sorry, yes.  Those -- the
18   people I just mentioned left during the time
19   that Lieutenant Hill was there.
20             Q.   Okay.
21             A.   In that time period as they -- as
22   they moved out, I believe -- I don't know the
23   order in which they went.  I don't want to get
24   it wrong.
25             Q.   Okay.

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

23

1         A.    As one would move out, you would

2   replace them with another detective.

3         Q.    Okay.

4         A.    As one of those detectives moved

5   out, I believe Detective Darrel Smith was the

6   first to come into the -- to come into -- to

7   come into the office.

8         Q.    Okay.

9         A.    Next was Detective Dennis Murphy,

10  M U R P H Y, and then the last detective was

11  Detective Krista Gorsuch, and I believe that is

12  G O R S U C H.  I think it's with a K --

13  actually, I know it's with a K, K R I S T A.

14        Q.    And race and ethnicity?  I can't

15  speak today.

16        A.    Detective Smith is a black male,

17  Detective Murphy is a white male and Detective

18  Gorsuch is a white female.

19        Q.    Okay.

20        A.    And those three detectives are

21  currently still active in PSB.

22        Q.    Okay.  And who are the current

23  sergeants that you know that are in PSB?

24        A.    I do.  Sergeant Richard Taylor and

25  Sergeant Justin Poe, P O E.

24

1          Q.   Okay.  And the current lieutenant

2    is Sheldon?

3          A.   Yes, ma'am.

4          Q.   So during the time that you and

5    Sergeant Reboulet were -- were kind of sharing

6    the duties of the, you know, lieutenant --

7    lieutenant responsibilities, were you receiving

8    any additional benefits or pay from the City of

9    Dayton?

10         A.   You know, I believe that when you

11   are -- when we were -- when we were doing the

12   job as lieutenant, you were given a -- and I

13   can't think of the term right now -- but, yes,

14   I wasn't making lieutenant's pay but you -- you

15   did get -- you did get something additional.

16   It wasn't to the point where you would notice

17   it.

18         Q.   So when -- so when Lieutenant Hill

19   came in as the lieutenant, did those benefits

20   stop for you?

21         A.   They would -- yeah, we wouldn't --

22   you'd only get it when you were the acting

23   lieutenant, yes, ma'am.

24         Q.   So for those two months time frame

25   when you were alternating with Sergeant

Kimberly Hill vs City of Dayton Police Department, et al.      Robert Rike

25

1    Reboulet --

2              A.    That's correct.

3              Q.    -- you would get extra.  Was there

4    any explanation provided to you why there was a

5    delay in having a lieutenant there in the PSB

6    during that time frame?

7                    MR. BAZELAK:  Objection.  Go ahead.

8                    THE WITNESS:  Initially, I was

9    told -- I was told that there was -- that we -- we

10   had one lieutenant available and that there was

11   two spots and the other unit was getting the

12   lieutenant.

13             Q.    Okay.

14             A.    I never asked many times.  That

15   was the only -- that was the only time anybody

16   ever really told me anything.

17             Q.    Okay.

18             A.    And that was very early on, yes.

19             Q.    Okay.  And so was there ever any

20   discussion about selecting a new lieutenant for

21   the PSB?

22             A.    We had a discussion with -- and I

23   don't know what the time frame was so I don't

24   know if it was Major or Lieutenant Colonel Mark

25   Ecton.  Towards the -- towards the time that

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

26

1  Lieutenant Hill was assigned, prior to that he

2  had come over to our office and sat down and

3  just wanted to know if we had any ideas

4  about -- about Lieutenant and we talked very

5  briefly about it.

6          Q.   Okay.  Was -- do you recall

7  speaking to Colonel Ecton about whether

8  Lieutenant Hill would come over into the

9  position during that meeting?

10         A.   I don't remember having a

11 conversation with him about Lieutenant Hill.

12         Q.   Okay.

13         A.   If -- he may have brought

14 Lieutenant Hill's name up, I remember, because

15 I remember her name coming up but there wasn't

16 any real discussion about it.

17         Q.   Okay.  Do you recall coming into

18 the OCRC office or having a meeting with Ohio

19 Civil Rights Commission representative and

20 giving a statement or talking about --

21         A.   I remember, yes.

22         Q.   -- her charges?  Okay.

23              (Thereupon, Plaintiff's Exhibit 2, a

24 copy of an interview, was marked for purposes of

25 identification.)

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

27

1          Q.    Hand you what's been marked as

2    Exhibit 2.  And so I'll represent to you that

3    this is part of the records that we received

4    from the OCRC as their summary of an interview

5    that they're saying happened on October 4, 2016

6    with you.  Do you recall having this interview

7    around that time -- that date, October 4?

8          A.    If it says that, I'm -- I don't

9    recall when -- it seemed like it was forever.

10         Q.    Yeah.

11         A.    I won't argue.

12         Q.    Okay.  And so I want to go -- one

13   of the statements in here that I wanted to talk

14   to you about, third paragraph down, there's a

15   Sergeant Rike, and it says Lieutenant Hill, she

16   doesn't communicate with us.  If there is

17   face-to-face, we usually initiate that.

18   There's very little that she does that benefits

19   this office.  Do you recall making that

20   statement to the OCRC?

21         A.    I do not recall it.

22         Q.    Okay.

23         A.    But if it's here, like I said, I

24   won't argue with it.

25         Q.    Okay.  Did -- did you feel that

28

1  way at the time or do you feel that way about

2  her?

3          A.   Not really.  I mean, there were --

4  I guess I would -- the way I would explain this

5  is there were times when she would not talk to

6  us --

7          Q.   Okay.

8          A.   -- period.  I think that's what I

9  was referring to.

10         Q.   Okay.  So you don't recall saying

11 that there's little that she does to benefit

12 the office?

13         A.   Well, if, like I said, it's right

14 here --

15              MR. BAZELAK:  It's not a transcript.

16              THE WITNESS:  No, I don't remember

17 that, no.

18              MR. BAZELAK:  This is the

19 investigators -- what she said so --

20              THE WITNESS:  No, I don't -- I

21 don't -- I remember very little from that.  I'll

22 be honest.  I'll tell you right now, okay.

23         Q.   So if you go down, next sentence

24 after that, I don't know if it's

25 incompetence -- I don't know if incompetence is

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

29

1  the right word or not.  Sergeant Rike went on

2  to explain this is a paramilitary type of

3  organization and you follow commands

4  accordingly.  Is that an accurate statement?

5          A.    That is an accurate statement.

6          Q.    So explain to me what you meant by

7  you following commands accordingly in the

8  paramilitary organization.

9          A.    Well, what it is is -- and what

10  that means is we have a rank structure in the

11  Dayton Police Department and we have officers

12  and we have sergeants and we have lieutenants

13  and majors and lieutenant colonels and chiefs

14  and officers.

15          If it's a reasonable order, you

16  take orders from sergeants and lieutenants and

17  you follow those orders just as you would in

18  the military.  If in our situation here I'm a

19  sergeant, Lieutenant Hill is a lieutenant.  If

20  Lieutenant Hill gave me an order, gave me an

21  assignment, then I did it because that's --

22  that's how this -- that's the only way the

23  process worked.  It's the only way the

24  department runs.  So I think that's -- that

25  would be what my --

Kimberly Hill vs City of Dayton Police Department, et al.      Robert Rike

30

1        Q.   Okay.  And so next sentence, we

2  have said many times and told her of things

3  were to be done.  Do you recall making a

4  statement about you had told Lieutenant Hill

5  about things that were to be done?

6        A.   I'm not even sure what that means.

7  I'm reading it and I don't know what it means.

8           MR. BAZELAK:  Take your time and read

9  the whole thing if you need to.

10         THE WITNESS:  Okay.

11         (Pause in proceedings.)

12         THE WITNESS:  Okay.  And if I said

13  that, again, this is what I was saying earlier, if

14  we had -- if we didn't see eye to eye on

15  something, it didn't really matter because we

16  worked for her and we did what was asked of us.

17         Now, here when we -- when I,

18  apparently, made the statements things were to be

19  done, when Lieutenant Hill came to the -- came to

20  PSB, and let me be clear, I, for one, was

21  ecstatic.  We needed a lieutenant because we

22  needed to quit trying to do multiple jobs.

23        Q.   Well, let me pause you there.

24        A.   Mm-hm.

25        Q.   Was she -- were you ecstatic that

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

31

1  Lieutenant Hill came or did you want someone

2  else?

3           A.    No, we wanted a lieutenant.

4           Q.    Okay.

5           A.    It really wouldn't have mattered.

6           Q.    Well, because I say that because

7  if you go to the next page one of the questions

8  is like I didn't get good -- well, I guess the

9  question was, why didn't you seek the job level

10 of PSB division lieutenant, and the response is

11 I didn't get the job because I'm not a

12 lieutenant.  Is that a correct statement?

13          A.    That's correct.

14          Q.    I was pretty glad to see a

15 lieutenant come in here as you stated before;

16 correct?

17          A.    That's correct.

18          Q.    But we didn't get to stop our

19 regular extra duties.

20          A.    To an extent, that's correct.

21          Q.    Okay.  And tell me about that.

22          A.    Part of the job of lieutenant, and

23 as I explained to Lieutenant Hill, when she

24 came into the unit just to -- just give her an

25 idea of what was expected, you know, a lot of

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

32

1   times a lieutenant is -- lieutenants respond to

2   callouts, lieutenants do findings and

3   lieutenants attend a lot of meetings.

4          Q.   Okay.

5          A.   These are things that -- that I,

6   for one, I won't speak for Sergeant Remley, but

7   I, for one, spent a lot of time in meetings and

8   I had a lot of things to do back at my office,

9   so we were very happy to have a lieutenant in

10  there to, among other things, attend meetings.

11  And then as soon as Lieutenant Hill arrived,

12  advised us that we were going to attend all the

13  meetings.

14         Q.   Okay.

15         A.   That was -- I'm not sure where I'm

16  at here.  That was the -- that was the -- that

17  was the basis of that statement is that we had

18  finally, after better than a year, got a

19  lieutenant over there to take over the

20  meeting -- the meetings that the lieutenant

21  goes to and then we ended up going to them all

22  anyway.

23         Q.   Okay.

24         A.   I think that he was the -- that

25  was the extra duty that I -- that I spoke of.

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

33

1          Q.   Okay.

2          A.   Okay.

3          Q.   So the next sentence there, same

4   page, Lieutenant Hill was not our first choice

5   or our second choice, she wasn't even on the

6   list.  Do you -- do you -- is that an accurate

7   statement?

8          A.   That's accurate.

9          Q.   Okay.  To me, Lieutenant Hill

10  wasn't on our list because of her past.

11         A.   That's correct.

12         Q.   That's correct.  Okay.  Tell me

13  about her past that made you not want her to be

14  on the list.

15         A.   Well, and --

16              MR. BAZELAK:  Read the whole thing,

17  too, because she's asking about specific things

18  and I want to make sure you have a fair

19  opportunity to read -- read the whole summary that

20  was prepared by the investigator.

21              (Pause in proceedings.)

22              THE WITNESS:  Okay.  And, you know, I

23  can't -- there are things I can't put my finger

24  on.  I've been here for a long time.  When -- when

25  Lieutenant Hill -- there were things that gave

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

34

1   us -- gave me areas of concern, and that was when

2   Lieutenant Hill was a sergeant and worked as a

3   major's aide for the major of operations, Kenton

4   Rainey, there became a log jam of investigations

5   that would never -- that seemed to never make it

6   through the process and we would, as sergeants, as

7   supervisors, we would continuously receive

8   investigations back, and these are investigations

9   that Lieutenant Hill, as the major's aide,

10  would -- as part of her duties would, I assume, be

11  expected to review prior to getting to the major.

12  That's the idea.

13              And we would get investigations back

14  with things that -- with questions that made no

15  sense.  We would get things back with a note with

16  writing on our investigation saying you mention

17  here this happened, please explain in greater

18  detail.  And the greater detail was in the next

19  paragraph.

20              So we would write notes back and say

21  see next paragraph and then we would send them

22  back.  And, honestly, I don't know if it was

23  coming back from Major Rainey or I don't know if

24  it was coming back from Lieutenant Hill, but the

25  fact is is very few things got through.

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

35

1          And when you constantly got back

2    reports saying please answer this question and the

3    question is two paragraphs down, then you have to

4    ask yourself, is somebody in that office actually

5    reading these things and reviewing them or are

6    they just finding something.

7          And you got to understand, we have

8    time limits in this department.  And when you're a

9    sergeant and you have -- and you have time limits,

10   it -- it just kills you to keep receiving the same

11   investigation back over and over because now in

12   the time period that it's taking you to send this

13   one up through and you get it back, you have three

14   more.

15          Q.   Okay.  Let me pause you for a

16   second.

17          A.   Sure.

18          Q.   What types of investigations were

19   these?

20          A.   Use of force, cruiser accidents,

21   citizen complaints, you know, complaints of

22   misconduct, things of that --

23          Q.   Complaints of misconduct of police

24   officers?

25          A.   Police officer.

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

36

1          Q.   So you said use of force.  So that
2     would be police officers involved in some type
3     of injury or use of force with a citizen;
4     correct?
5          A.   That is correct.
6          Q.   And then cruiser accidents would
7     be police officers causing a car accident with
8     a citizen?
9          A.   Just being involved in an
10    accident.
11         Q.   Okay.
12         A.   Whether it was our fault or not,
13    it would have to be investigated, yes, ma'am.
14         Q.   Okay.  And so someone, we don't
15    know if it was Lieutenant Hill, what you're
16    saying is someone would put notes on these
17    investigations and say we need more explanation
18    when it was your opinion that there had already
19    been enough explanation already in the report;
20    correct?  Is that a fair summary?
21         A.   Not my opinion.  The answers to
22    the questions would be in the report.
23         Q.   Okay.
24         A.   And as I said, the major's aide,
25    their responsibility was to review reports

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

37

1   prior to handing them to the major because you

2   want them to be complete for the major --

3           Q.   Okay.

4           A.   -- so he can look at them, sign

5   off on them and be done.

6           Q.   Okay.

7           A.   So either -- either she --

8   Lieutenant Hill was sending these through to

9   him with these questions unanswered or if he

10  had a question and said why does this -- why is

11  this -- why is this not answered here but it's

12  answered in the next paragraph, then you

13  would -- then it would be something that she

14  could say, Major, this is in the next

15  paragraph, just --

16          Q.   Okay.  Anything else about her

17  past that made you, you know, made her not be

18  your first or second choice or on the list to

19  come into the PSB?

20          A.   And, again, I won't -- I'm in this

21  department.  It's not a big department.

22          Q.   Okay.

23          A.   I was aware of just, you know,

24  things in west pod when she moved to lieutenant

25  and went to that -- went to that area that some

38

1    things were not making it through the process

2    in a timely manner.

3          Q.    Like what?

4          A.    As I said, investigations.  Like I

5    said, I can't put my finger on it.  These are

6    things that I -- that I heard.

7          Q.    Okay.

8          A.    I can't give you facts.

9          Q.    Okay.

10         A.    I'm just telling you -- but these

11   things -- again, when you hear these things, it

12   gives you a moment of concern --

13         Q.    Okay.

14         A.    -- because the job of a PSB

15   commander is an important job.  These

16   investigations are not minor cruiser accidents,

17   these are not your everyday use of force.

18   These are officer involved shootings, these are

19   investigations where people have -- they're

20   fatal cruiser accidents, these are things where

21   people, you know, have something serious that's

22   happened if we're investigating it.

23              There are officers who are

24   involved in these things who need for the

25   process to work.  They are -- they wait and

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

39

1  it's -- and because it's a PSB investigation,

2  it takes time, and these officers deserve to

3  have these things done efficiently and in a

4  timely manner because these are things that --

5  that bother -- when an officer's involved in a

6  incident where someone dies, someone's injured,

7  they need some closure, and when --

8          Q.   Let me stop you.

9          A.   Sure.

10         Q.   So would you say the intent is to

11 close the investigations faster?

12         A.   No, no.

13         Q.   But it's to make sure that you get

14 closure for the officers?

15              MR. BAZELAK:  Go ahead.

16              THE WITNESS:  Correct.  No, the

17 investigations are never to -- I'm sorry.  The

18 investigations, as I said, a PSB investigation

19 takes forever.

20         Q.   Okay.

21         A.   But when it is finished, when it

22 is finished and the findings are completed, we

23 can -- we can send information to the officer

24 saying the investigation is completed, you were

25 cleared of any wrongdoing.  That's big.  The --

40

1   the issue was you can't have these things not

2   make it through the process in a timely manner,

3   okay, that was my -- that was my concern.

4          Q.   Was there ever any time where you

5   found that an officer wasn't cleared and you

6   didn't send him a letter saying he didn't -- he

7   was cleared of any wrongdoing involving a use

8   of force claim?

9          A.   I don't understand what you're --

10  say that again for me, please.

11         Q.   Correct me if I'm phrasing it

12  incorrect but --

13         A.   Mm-hm.

14         Q.   But what you've said previously

15  was you like to close these investigations and

16  send the officer a letter; correct?

17         A.   And explain to him that it's gone

18  through the process up to the chief of police

19  and it has been determined that they -- or

20  whatever the case may be.

21         Q.   Okay.   So have there ever been

22  situations where you have to send a letter

23  saying that we haven't cleared you of

24  wrongdoing and you have violated our use of

25  force policy in these serious use of force

1 situations?

2        A.   No, ma'am, there's no letter
3 saying that.

4        Q.   Okay.

5        A.   That is -- that is where the
6 reprimands and the charges and specifications
7 come in.

8        Q.   Okay.

9        A.   If you've been cleared, we're
10 going to send you a letter and tell you that
11 you've been cleared.  If you've not been
12 cleared, then you're going to receive your
13 level of discipline that has been decided by
14 the department.

15        Q.   Okay.

16        A.   So either way, you are being
17 advised that this case is closed.

18        Q.   Okay.  And so it was your fear or
19 your concern that Lieutenant Hill would not be
20 able to review the processes quickly enough
21 based on your prior knowledge of how she
22 responded in similar-type situations?

23        A.   I'm not even sure.  I don't even
24 believe it was that.  I just thought at the
25 time there was people that I had worked with

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

42

1  who -- who might have -- who I thought would do

2  the job well.  I'm not saying that she

3  wouldn't.

4          Q.   Do the job better than her?

5          A.   I don't even know that.  I don't

6  know that.  That's why when she was assigned

7  this, we were very happy.  I've known

8  Lieutenant Hill for 27 years.  She's very --

9  she's a very intelligent woman.  She is -- she

10 is a very intelligent police officer.

11          She -- she -- when she does her

12 work, it's a lot -- a lot of times it's

13 flawless.  She writes very well, she corrects

14 our things very well.  You give her a summary

15 of something written and there are not

16 many better that can bring it back to you and

17 have it -- have it tweaked up, grammar, very --

18 very intelligent.  I had no doubt that

19 Lieutenant Hill could do that job and I wish

20 she would have.

21          Q.   And that was my next question.  So

22 you don't think that she did it very well?

23          A.   No, I don't.

24          Q.   Okay.  And why is that?

25          A.   Simply because one of the

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

43

1    responsibilities of PSB commander was doing

2    findings, and it became clear not long after

3    she became commander and was transferred over

4    that some of these investigations were getting

5    completed, however, the findings were not

6    leaving our office and it was -- it was -- it

7    started becoming frustrating because, as I

8    said, we have -- we have time limits, we have

9    disciplinary time limits, and these

10   investigators work very hard on these

11   investigations to get them done efficiently,

12   thoroughly and as detailed as they possibly can

13   and turned in to the lieutenant in a timely

14   manner.

15               And findings, which are the

16   responsibility of the lieutenant, were not

17   getting done.  By the time it was said and

18   done -- when Lieutenant Hill and -- Lieutenant

19   Hill left the assignment after I did -- but

20   when I left the assignment, there were upwards

21   of 23 investigations that had -- that had

22   none -- did not have findings with them.  That

23   is what we do.  I -- believe me, I -- I wanted

24   Lieutenant Hill to succeed more than anybody.

25   It's -- the assignment is a great assignment

Kimberly Hill vs City of Dayton Police Department, et al.          Robert Rike

44

1   and she had all the tools to do the job and I

2   don't -- to this day, I don't understand what

3   happened --

4          Q.   Okay.

5          A.   -- but -- I'm sorry.

6          Q.   Well, did you ever get any

7   feedback from management, either majors, either

8   other lieutenants or chief about Lieutenant

9   Hill complaining or bringing up any issues she

10  was having with you and Sergeant Reboulet while

11  she was there at the PSB?

12              MR. BAZELAK:  Objection, form.  Go

13  ahead.

14              THE WITNESS:  No.

15         Q.   Okay.  So no one ever talked to

16  you about issues that Lieutenant Hill was

17  having while working in the PSB, particularly,

18  with you and Sergeant Reboulet?

19              MR. BAZELAK:  Objection.

20              THE WITNESS:  No, ma'am, not that I'm

21  aware of.

22         Q.   Okay.  So I want to go back to

23  that Exhibit 2 there, same paragraph.  I think

24  he had got kind of cut off.

25         A.   Yes, ma'am.

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

45

1          Q.    So Lieutenant Hill -- because of

2    her past and we talked about that.

3          A.    Yes, ma'am.

4          Q.    Next sentence, prior to coming

5    here she was a lieutenant in criminal

6    investigations and admin services or records

7    keeper.  Do you recall referring to her as a

8    records keeper?

9          A.    No, I don't know what that means.

10         Q.    Okay.

11         A.    I don't believe -- I believe this

12   is -- I didn't say that.

13         Q.    You didn't refer to her as a

14   records keeper?

15         A.    No.

16         Q.    Okay.  Next sentence, the place

17   was a wreck, they ran out one of the best

18   officers, Larry Tolpin, one of the most

19   intelligent officers, they ran him out and drug

20   him through the mud.  Do you recall talking

21   about --

22         A.    Yes.

23         Q.    -- them running out Larry Tolpin?

24         A.    Yes.

25         Q.    Tell me about that.  What happened

```
 1  with Larry Tolpin?
 2          A.   The -- and I can't give you dates.
 3          Q.   Okay.
 4          A.   But at one point we were asked to
 5  contact Lieutenant Hill, who was over
 6  investigation administrative services, about a
 7  complaint from CARE House which is -- do you
 8  know what CARE House -- CARE House is where
 9  the -- it's the child special victims unit --
10          Q.   Okay.
11          A.   -- where a couple of complaints
12  that originated from the CARE House about
13  Sergeant Larry Tolpin and Detective Jerry Dix.
14               I believe I was the one who
15  initially spoke to Lieutenant Hill and it was a
16  very brief conversation, just the nuts and
17  bolts that there was a -- that Detective Dix,
18  it had been reported that he had missed a
19  couple meetings, regular meetings that you
20  could miss but you had to have a good reason
21  and he didn't, something along those lines.
22               And then the information received
23  about Sergeant Tolpin, I believe it was the
24  director of CARE House, Libby Nicholson, was
25  reporting that Sergeant Tolpin was not doing
```

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

47

1    his -- not handling the responsibilities of the

2    supervisor there and was not doing his duty,

3    was -- basically, was not doing the work that

4    was expected of him.

5              We ultimately assigned this case

6    to Detective Scott Culham, who naturally then

7    takes it and speaks to everybody again.  My

8    conversation was very brief.  I believe

9    Detective Culham had a thorough and detailed

10   conversation with Lieutenant Hill about the

11   particulars of the complaint.

12             And then after getting that he

13   went to the CARE House and spoke to Libby

14   Nicholson and, I believe, a few -- possibly a

15   few others but I know he spoke to Libby

16   Nicholson, and the response was Libby Nicholson

17   was basically -- she didn't have any idea what

18   anybody was talking about.

19             They loved Larry Tolpin, he did a

20   fantastic job and they couldn't ask for

21   anything more.  Well, I can't give you all the

22   details of what happened or what took place,

23   but through the process of this investigation

24   Larry Tolpin ended up leaving the department

25   and that was tragic because he was an

48

1   exceptional supervisor, he was an exceptional

2   officer, and he left before it was time for him

3   to leave and that was -- I mean, it just -- it

4   is what it is.

5                It's just -- the fact of the

6   matter is that whatever -- whatever route this

7   investigation took, Sergeant Tolpin,

8   apparently, felt he needed to leave the

9   department and it just -- like I said, it is

10  what it is.  I don't know the details or who

11  did what.

12          Q.   Did you attribute any fault or

13  blame or responsibility to Lieutenant Hill for

14  Larry Tolpin leaving the police department?

15          A.   I don't think that I -- because I

16  didn't know all the details, so I didn't

17  attribute anything to anything.  I knew what I

18  knew.

19          Q.   Okay.

20          A.   I knew that there had been an

21  allegation made against Larry Tolpin, and when

22  that allegation was investigated, it was -- it

23  was unfounded.

24          Q.   Okay.

25          A.   That's what I knew about the whole

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

49

1   thing.  So I don't know what happened behind

2   the scenes.  I'm sure a lot of things happened

3   behind the scenes --

4           Q.    Yeah.

5           A.    -- it always does, but I did

6   not -- I had no firsthand knowledge after what

7   I just told you I knew.

8           Q.    Okay.

9           A.    So I didn't attribute -- it's not

10  that I blamed anybody.  It was tragic.  It was

11  just sad to see a good officer that you knew

12  worked hard have to leave before his time.

13          Q.    Okay.  I only say that because it

14  looks like you brought it up when they asked

15  you questions about Lieutenant Hill, in their

16  mind it had to be some type of connection;

17  correct?

18          MR. BAZELAK:  Objection.  Go ahead.

19          THE WITNESS:  Well, the connection is

20  what I told you.  This started -- the entire

21  investigation started with an allegation that was

22  forwarded to us by Lieutenant Hill about Larry

23  Tolpin that had supposedly come from CARE House

24  and then we found out that it didn't come from

25  CARE House.

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

50

1          So there's -- I mean, she was

2    involved in this.  I just do not know to what

3    extent and I don't know how -- I don't think

4    anyone ever figured out why what Lieutenant Hill

5    relayed to us was different than what was relayed

6    to us by the people, supposedly, making the

7    allegation.  So she was part of the investigation.

8    I don't know to what extent it ended up being.

9          Q.   Do you recall ever complaining to

10   Carper or to any other management about

11   Lieutenant Hill missing time from work or being

12   off, you know, missing during the day?

13          A.   Missing time from work?

14          Q.   Or being off in the middle of the

15   day.

16          A.   I don't know.  I don't recall

17   complaining to anybody.  It wasn't my place.

18          Q.   Do you recall telling Carper that

19   you were having a difficult time accepting

20   Lieutenant Hill into -- as the Lieutenant in

21   the PSB?

22          A.   No.

23          Q.   Do you recall telling Carper that

24   you had reservations about Lieutenant Hill's

25   qualifications for her job?

Kimberly Hill vs City of Dayton Police Department, et al.          Robert Rike

51

1          A.   No, I don't honestly remember

2    having a conversation like that.

3          Q.   Okay.  Do you recall telling

4    Carper that -- express concern to Carper that

5    findings are months behind or lagging behind?

6          A.   I don't know that I specifically

7    told Carper that.  I don't think it was a

8    secret.

9          Q.   Okay.

10         A.   I honestly don't.  I think it was

11   common knowledge.  There was no reason to go --

12         Q.   Okay.  Do you recall telling

13   Carper that Lieutenant Hill doesn't speak to

14   you or that she goes in her office and,

15   basically, shuts her door?

16         A.   I don't recall that.  I'm not

17   saying I didn't because that's -- that was --

18   it was a fact, but I don't remember

19   specifically telling Lieutenant Colonel Carper

20   that, no.

21         Q.   Okay.  But -- so you can confirm

22   that while you were working there, you felt

23   there were times where she would go in her

24   office and shut her door?

25         A.   That wasn't really --

Kimberly Hill vs City of Dayton Police Department, et al.        Robert Rike

52

1        Q.   More than normal or you would

2  expect?

3        A.   That wasn't really -- I don't

4  really find that an issue.  I don't know that I

5  ever really found that an issue.

6        Q.   Okay.  And you didn't bring it up

7  with Carper?

8        A.   No.

9        Q.   Okay.  Did you ever bring it up

10  with Carper that you don't know where

11  Lieutenant Hill is for long periods of time?

12        A.   I don't believe so, no.

13        Q.   Okay.  Was there any times where

14  you have drove past Lieutenant Hill's home, her

15  personal residence?

16        A.   I don't think I ever actually

17  drove past her house, so to speak.

18        Q.   Okay.

19        A.   I could probably -- once or twice

20  on that -- when we were -- we'd be on that side

21  of town and we hadn't seen her all day and it

22  was late in the afternoon.  I would say maybe

23  once, maybe twice, never pulled down her

24  street.  We would just -- if we were close

25  enough to see her street, see if her car was

Kimberly Hill vs City of Dayton Police Department, et al.          Robert Rike

53

1    there, at least we knew she was not dead in the

2    ditch somewhere but, no, it was never

3    consciously made a trip to go do anything.

4            Q.   Okay.  When you say we, who else

5    are you referring to?

6            A.   I say we because usually when I

7    was out traveling around, Sergeant Reboulet was

8    with me, but I don't know that he was -- I

9    can't honestly say that he was with me.

10           Q.   Okay.  Did Carper ever tell you to

11   drive past Lieutenant Hill's house to make sure

12   her car was there?

13           A.   No.  Again, I never purposely

14   drove past her house to check on her.  If I was

15   in that area, and like I said, I think it may

16   have happened once just on a -- on a day where

17   nobody had heard or seen from her.

18           Q.   Okay.

19           A.   But no, nobody -- nobody ever told

20   anybody to go past anybody's house.

21           Q.   Now, how did you know what --

22   where her house was?

23           A.   I don't know that -- I have no

24   idea.

25           Q.   Okay.  Had you ever been to it

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

54

1   before previously like for a social gathering

2   or anything?

3          A.   No, and I don't know that I knew

4   exactly where her house was, but believe it or

5   not, Lieutenant Hill and I had -- we would

6   spend a lot of time talking, okay, you know, we

7   had -- Lieutenant Hill's a very pleasant

8   person.  We had -- we had a lot of

9   conversations.  I remember when she explained

10  to me that she moved from -- she was moving

11  from her house.

12          MR. BAZELAK:  Don't give any

13  addresses of personal residences or anything like

14  that.

15          THE WITNESS:  No.

16          MR. BAZELAK:  She's still a police

17  officer.

18          THE WITNESS:  Right.

19          MR. BAZELAK:  You're still a

20  police --

21          THE WITNESS:  And I don't know any

22  address.

23          MR. BAZELAK:  Or even streets because

24  there was a street mentioned in that last

25  deposition.  I don't want to go down that path.

1          Q.    All right.

2          A.    To finish up, she had moved from

3   her residence to another residence and she had

4   told us all about the new residence.

5          Q.    Okay.

6          A.    I think a family member lived

7   there prior or something like that.

8          Q.    Okay.  Do you think that

9   Lieutenant Hill is a -- is a truthful person in

10  what you've witnessed?

11         A.    I really --

12               MR. BAZELAK:  Objection.

13               THE WITNESS:  I have no idea.

14         Q.    You've known her for 25 years?

15         A.    I have worked in the same

16  department with her for over 25 years.

17         Q.    Okay.  And you just said that

18  you've had lots of conversations?

19         A.    I certainly did.

20         Q.    You don't have an opinion of

21  whether she seems honest or truthful?

22               MR. BAZELAK:  Objection.  Go ahead.

23               THE WITNESS:  I have not the

24  slightest idea whether Lieutenant Hill is truthful

25  or not.

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

56

 1          Q.    Okay.  So you don't think she's

 2    truthful?

 3          A.    I don't really have --

 4                MR. BAZELAK:  Objection.

 5          Q.    You either think someone's

 6    truthful or you don't.  I don't understand how

 7    you say you don't have an opinion about whether

 8    someone seems truthful or not.

 9                MR. BAZELAK:  Objection.  Asked and

10    answered.  So, I mean, answer again.

11                THE WITNESS:  I -- I never considered

12    the fact that Lieutenant Hill would be untruthful.

13    She's a police officer.  As I said, she's worked

14    in the same department that I have for 27 years.

15    It wouldn't cross my mind that she would be

16    untruthful.

17          Q.    Okay.  But in your position, you

18    know, for years investigating these, you know,

19    officer complaints, did you have occasion to

20    listen to witnesses and listen to their

21    statements and have to make some type of

22    conclusion on whether they seemed truthful or

23    not in their statements?

24          A.    Yes.

25          Q.    So you have the ability to listen

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

57

1    to someone and think if they seem truthful or

2    not but just -- it's not something that you

3    employed or had to use with your situation with

4    Lieutenant Hill?

5          A.   Well, to answer that question,

6    when I speak to -- when I'm conducting

7    investigations and I'm speaking to someone,

8    sometimes there's a reason to believe that they

9    may not be truthful with me, so I need -- so

10   you need to pay attention and look for

11   things -- I never felt -- I never interrogated

12   Lieutenant Hill.  The conversations Lieutenant

13   Hill and I had were about work, about family,

14   things of that nature, nothing that would make

15   me feel that, boy, I need to make sure she's

16   telling the truth here.

17         Q.   Okay.  Did you give -- when

18   that -- I'm going back to your meeting with

19   Major Ecton or your kind of conversation with

20   him before Lieutenant Hill came into the PSB.

21   Was there any recommendation of other

22   lieutenants that you thought should be

23   considered for the position other than

24   Lieutenant Hill?

25         A.   I'll start by saying that was

Kimberly Hill vs City of Dayton Police Department, et al.          Robert Rike

58

1    about five years ago, but as I recall, I

2    believe that Lieutenant Kenny Biehl, Lieutenant

3    Greg Gabby, I'm sure there were -- I'm sure

4    there was -- those are the two names that jump

5    out at me.

6              Q.    Okay.

7              A.    I think Lieutenant Henderson was a

8    topic of conversation, possibly Lieutenant

9    Stiver.  I really -- it was a long time ago and

10   it was a very brief conversation.

11             Q.    Yeah, that's what I'm thinking.

12   And so was there ever any conversation that you

13   had or that -- that you and Reboulet had with

14   any of these other potential people about

15   whether they'd be willing to come over to PSB?

16             A.    No, I don't think so.  I'm not

17   saying there wasn't, but I don't remember

18   anything specific.  We were without a

19   lieutenant for so long -- I'll speak for

20   myself.  I say we a lot.  I'm sorry.  I'll

21   speak for myself -- I'd almost given up.

22             Q.    Okay.

23             A.    So it was kind of quick when we

24   found out we were getting a lieutenant and at

25   that point it was just relief.  We spent a long

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

 1   time doing a lot of jobs.

 2          Q.   Okay.  And so how did it go when

 3   Lieutenant Hill first started?  Did the issues

 4   with her slow reporting that you talked about,

 5   slow responses, start immediately?  Did they

 6   come sometime after she started?

 7               MR. BAZELAK:  Objection.

 8               THE WITNESS:  When Lieutenant Hill

 9   was assigned there, we -- I -- I welcomed her.  I

10   had no problem with anything, really, at that

11   point.  As I said, the desire to have a lieutenant

12   overtook anything else but -- and I remember

13   sitting down with her the first day and going over

14   everything I thought she needed to know and

15   thinking, well, this is -- this is going to work

16   out, and then it was the very first investigation

17   that there was a little hiccup with and we worked

18   that out and I thought, okay, now we're on

19   track --

20          Q.   Okay.

21          A.   -- because she -- it was a

22   disciplinary time limit thing that was pretty

23   far behind and we got it worked out and we got

24   it in under the wire and we decided that, okay,

25   that was the first one and everything -- we'll

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

60

1    get it worked out, we'll get it sorted out and

2    everything will run smooth.

3              Q.   Okay.  Do you want to go back to

4    page seven there in that exhibit.  It looks

5    like in the middle of the paragraph it goes

6    into bold print, the second to the bottom

7    paragraph.  Maybe it's bold on my screen.

8    Okay.  Here we go.  Put a little blue mark

9    right there.

10             So the sentence before that blue

11   mark, we have said many times and told her

12   things were to be done, I don't have a problem

13   with her, I was in the military, but I don't

14   think she should be here.  Do you recall saying

15   that?

16             A.   I don't recall saying probably any

17   of this because this thing was so long ago.

18             Q.   Okay.

19             A.   But the fact is -- and the line

20   after that -- the line right after that says

21   but I had been hopeful, and I was.

22             Q.   Okay.  And then the next sentence

23   says her being here doesn't change the way I do

24   things.

25             A.   That's -- okay, that's correct.  I

61

1    mean, I -- if you're asking me if I said it, I

2    really don't know.

3            Q.   Okay.  But that's a correct

4    statement, her being there didn't change the

5    way you did things?

6            A.   No.

7            Q.   Next sentence, we have had

8    disagreements, we have had no communication.

9            A.   And -- I'm sorry.

10           MR. BAZELAK:  Just wait for a

11   question.

12           Q.   Sure.  Is that a correct

13   statement, that you had disagreements and no

14   communication with Lieutenant Hill?

15           A.   This -- I think we have to

16   understand that this was done during the

17   interview at the point where we were so far

18   behind in cases that the frustration was

19   overwhelming.  So that is -- that is -- I think

20   that is where this come from.

21                At that point there were many

22   times when -- when I talk about communication

23   where Lieutenant Hill would come in and you

24   would walk down the hall and meet her in the

25   hall and say good morning and she would not

62

1  acknowledge you were there, and this would go

2  on for a couple hours or whatever and just --

3  we didn't have the flow that we had in the

4  beginning because we -- we spoke a lot.

5           I mean, we had a lot of

6  conversations.  We had good conversations.  We

7  had conversations with cases.  Nobody's ever

8  going to agree one hundred percent on cases.

9  That's why we have meetings every week.  We

10 would have meetings with every investigator and

11 sergeant and lieutenant would sit down and hash

12 out what angles we were going to work the

13 investigation, who might be interviewed, who we

14 might not need to interview, and nobody ever

15 was a hundred percent on the same page.  We had

16 disagreements.

17           Now, I never had -- her and I

18 never -- never -- in the five years or whatever

19 we were together over there, Lieutenant Hill

20 and I, I don't remember ever us actually having

21 an argument, if you will.

22      Q.   Mm-hm.

23      A.   But there were things with -- with

24 every case.  I had the same disagreements with

25 Lieutenant Matt Carper.  I had the same

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

63

1   disagreements with Lieutenant John Huber.  I

2   guess I don't know if disagreements is the

3   correct term.  You're working a case and

4   you're -- everyone is giving input and everyone

5   has different ideas and somebody's going to

6   say, boy, I don't -- I think you really should

7   interview that guy and somebody else go, I

8   don't -- I don't think it's relevant.

9            Those are the kind of things that

10  are hashed out in an update meeting.  We've

11  had -- of course, we've had disagreements.

12       Q.   Okay.

13       A.   She's never going to agree with

14  everything that I say, I'm probably never going

15  to agree with everything she says, but you work

16  those things out and, usually, we did.

17       Q.   Okay.  So I think -- the sentence

18  she certainly accused us -- told us respect --

19  she won't even say good morning.  I guess

20  that's what you're talking about, she wouldn't

21  say good morning to you?

22       A.   Just little things like that,

23  things that you didn't expect that caught you

24  off guard.

25       Q.   Okay.

A. Just the lack of acknowledging a good morning.

Q. Okay.

A. Our communication is bad to nonexistent?

Q. Do you remember saying that or is that a correct statement during that time frame, I guess, when you guys were having kind of the height of the issues, I suppose?

A. I don't know that there was a height of issues.

Q. Okay.

A. There were times -- and I guess this wasn't -- if this is what I said, this was not clear. There were times when we would go days with absolutely no communication whatsoever and then it would all just go back to -- to regular business as usual. It was just very bizarre.

Q. So our communication is bad to nonexistent, I did not initiate this lack of communication, she cannot speak to us at all.

A. A lot of times that was the case.

Q. No -- when I don't speak to her, I don't speak to her either.

Kimberly Hill vs City of Dayton Police Department, et al.          Robert Rike

65

1          A.   I don't really know what that

2    means.

3          Q.   Okay.  We went out of our way to

4    speak with you, I have talked to her when she

5    asked me just -- I have talked to her when she

6    asked me just yesterday.  Go ahead.

7          A.   No, I'm sorry.

8          Q.   I was going to say just

9    yesterday -- this is October, 2016.  So

10   yesterday would have been, I guess, October

11   3rd, 2016.  You were still kind of business as

12   usual with Lieutenant Hill, at least, in your

13   opinion?

14         A.   It was always business as usual,

15   just these -- just these times when things

16   would -- when things would go quiet.  We kept

17   up -- you had to keep -- you have to keep

18   working.  The work isn't going to stop, so

19   whatever's going on has to be secondary, you

20   have to do the work.

21         Q.   It's business as usual, I have a

22   work relationship with the woman but that's

23   all.

24              MR. BAZELAK:  Objection.  Wait for a

25   question.  She's just reading a statement.

Kimberly Hill vs City of Dayton Police Department, et al.          Robert Rike

66

 1                    THE WITNESS:  All right.

 2                    MR. BAZELAK:  And we need a question

 3   and an answer so --

 4          Q.    Is there -- do you recall saying

 5   that you have a working relationship but that's

 6   all with Lieutenant Hill?

 7          A.    I mean, I don't.

 8                    (Thereupon, Plaintiff's Exhibit 3, a

 9   copy of an e-mail, was marked for purposes of

10   identification.)

11          Q.    Hand you what's been marked as

12   Exhibit 3.  Give you a minute to read over it.

13                    (Pause in proceedings.)

14                    THE WITNESS:  Okay.

15          Q.    So Exhibit 3 I'll represent to you

16   is an e-mail that was provided to Lieutenant

17   Hill -- I only have one copy so -- from

18   Lieutenant Hill to Mark Ecton and copied to

19   Chief Biehl; correct?

20          A.    Yes.

21          Q.    Have you ever seen this e-mail

22   before?

23          A.    No.

24          Q.    And it's dated September 8th of

25   2015; is that correct?

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

67

 1          A.    That's what it says, yes, ma'am.

 2          Q.    So in this e-mail she refers to --

 3   that she's been the PSB commander for two years

 4   and most of that time she has experienced

 5   vehement opposition, both inside the bureau and

 6   outside the bureau, to practically everything

 7   she's proposed.  Do you recall her mentioning

 8   to you that she felt like she was getting

 9   opposition to any of the things that she was

10   proposing inside the PSB?

11          A.    No.

12          Q.    And after this e-mail, do you

13   recall there being any meetings between you and

14   Mark Ecton or with Chief Biehl about the

15   contents of this e-mail?

16          A.    No.  I remember occasional

17   meetings, regular -- we had one meeting with

18   the major, colonel and the chief, but I have

19   no -- no idea when it was.  It wasn't in

20   relation to this --

21          Q.    Okay.

22          A.    -- I can tell you that.  The one

23   meeting that I remember having had nothing to

24   do with this.

25          Q.    Okay.  And so Mark Ecton,

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

68

1    Lieutenant Colonel Ecton, retired.  He never

2    spoke to you about phone calls or text messages

3    or conversations that he had with Lieutenant

4    Hill about her issue she was having within the

5    PSB?

6              A.    No.

7              Q.    Okay.

8                    (Thereupon, an off-the-record

9    discussion was had.)

10             Q.    Just let me review my notes real

11   quick and then, hopefully, we can wrap up.

12             A.    Sure, sure.

13                   MS. BROWN:  Okay.  I don't have any

14   other questions.

15                   MR. BAZELAK:  Okay.  We'll read.

16                   (Thereupon, the deposition was

17   concluded at 2:58 o'clock p.m.)

18

19

20

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

69

1          I, ROBERT JOSEPH RIKE, do hereby certify

2   that the foregoing is a true and accurate

3   transcription of my testimony.

4

5

6                    _ _ _ _ _ _ _ _ _ _ _ _ _ _

7

8          Dated _ _ _ _ _ _ _ _ _ _ _ _ _ _

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Job: 190327SLK

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

70

1  STATE OF OHIO          )

2  COUNTY OF MONTGOMERY ) SS: CERTIFICATE

3          I, STACEY L. KIMMEL, a Notary

4  Public within and for the State of Ohio, duly

5  commissioned and qualified,

6          DO HEREBY CERTIFY that the

7  above-named ROBERT JOSEPH RIKE, was by me first

8  duly sworn to testify the truth, the whole truth

9  and nothing but the truth.

10          Said testimony was reduced to

11 writing by me stenographically in the presence

12 of the witness and thereafter reduced to

13 typewriting.

14          I FURTHER CERTIFY that I am not a

15 relative or Attorney of either party, in any

16 manner interested in the event of this action,

17 nor am I, or the court reporting firm with which

18 I am affiliated, under a contract as defined in

19 Civil Rule 28(D).

20

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

71

1          IN WITNESS WHEREOF, I have hereunto set

2    my hand and seal of office at Dayton, Ohio, on

3    this 10th day of April, 2019.

4

5

6

7

8                              STACEY L KIMMEL

9                              NOTARY PUBLIC, STATE OF OHIO
                               My commission expires 6-10-2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kimberly Hill vs City of Dayton Police Department, et al.　　　　　Robert Rike

**0**

**02** 4:14

**1**

**12th** 18:19

**17** 5:3

**1st** 6:5 7:1 9:4 10:1,10
12:12 13:5,7,17

**2**

**2** 26:23 27:2 44:23

**20** 21:21

**2002** 6:18,20

**2004** 7:9

**2007** 7:18,19 11:1,2,5 19:4

**2010** 8:10

**2011** 8:10 19:7,9

**2012** 11:20

**2013** 11:20 21:21

**2014** 12:3

**2015** 66:25

**2016** 27:5 65:9,11

**2017** 18:20 21:22

**23** 43:21

**25** 55:14,16

**27** 5:6,7 42:8 56:14

**3**

**3** 66:8,12,15

**335** 4:14

**3rd** 65:11

**4**

**4** 27:5,7

**45402** 4:15

**8**

**86** 5:18

**89** 5:18

**8th** 66:24

**9**

**9** 13:19

**91** 5:23

**92** 5:19 6:5 12:17,18

**95** 13:19 14:12

**97** 12:20

**A**

**ability** 56:25

**absolutely** 64:16

**academy** 5:22 6:4 9:11

**accepting** 50:19

**accident** 20:24 36:7,10

**accidents** 35:20 36:6
38:16,20

**accurate** 29:4,5 33:6,8

**accused** 15:20 63:18

**acknowledge** 62:1

**acknowledging** 64:1

**acting** 24:22

**actions** 15:21

**active** 5:18 23:21

**actively** 21:1

**additional** 24:8,15

**address** 4:13 54:22

**addresses** 54:13

**admin** 45:6

**administrative** 17:17
46:6

**administrator** 7:24 8:15,
23

**advised** 32:12 41:17

**advocate** 16:5

**Affairs** 7:21

**African-american** 15:10

**afternoon** 52:22

**age** 4:2

**agree** 62:8 63:13,15

**ahead** 13:13 25:7 39:15
44:13 49:18 55:22 65:6

**aide** 34:3,9 36:24

**airport** 5:21,22

**allegation** 48:21,22 49:21
50:7

**alternating** 24:25

**angles** 62:12

**answers** 36:21

**anybody's** 53:20

**anymore** 8:24

**apparently** 30:18 48:8

**area** 13:19,20 15:15 37:25
53:15

**areas** 34:1

**argue** 27:11,24

**argument** 62:21

**arrived** 12:3 32:11

**assigned** 7:6,20 8:5
11:17,25 19:14 26:1 42:6
47:5 59:9

**assignment** 7:23 16:13,
15 29:21 43:19,20,25

**assist** 8:4

**assistant** 10:19

**assume** 34:10

**attend** 32:3,10,12

**attention** 57:10

**attorney** 4:10

**attribute** 48:12,17 49:9

**Authority** 6:13

**aware** 37:23 44:21

**B**

**back** 7:1 8:25 9:1 13:9
17:1 32:8 34:8,13,15,20,
22,23,24 35:1,11,13 42:16
44:22 57:18 60:3 64:17

**bad** 20:24 64:4,20

**Barbara** 12:9 13:10

**based** 41:21

**basically** 8:20 19:25
20:22 21:21 47:3,17 51:15

**basis** 32:17

**BAZELAK** 14:16,22 25:7
28:15,18 30:8 33:16 39:15
44:12,19 49:18 54:12,16,
19,23 55:12,22 56:4,9 59:7
61:10 65:24 66:2

**Bean** 9:7,8 10:5

**bear** 11:7

**beginning** 62:4

**benefit** 28:11

**benefits** 24:8,19 27:18

**Bent** 12:9 13:10 14:25

**Biehl** 58:2 66:19

**big** 37:21 39:25

**bit** 5:24 9:1 19:20 21:21

**bizarre** 64:19

**black** 22:9 23:16

**blame** 48:13

**blamed** 49:10

**blue** 60:8,10

**bold** 60:6,7

**bolts** 46:17

**bother** 39:5

**bottom** 60:6

**boy** 57:15 63:6

**briefly** 26:5

**bring** 42:16 52:6,9

**bringing** 44:9

**brought** 26:13 49:14

**Brown** 4:6,9 14:18

**building** 16:23,25

**Bureau** 7:21,22

**business** 4:13 64:18
65:11,14,21

**C**

**call** 6:12 18:4

**called** 7:7 20:10

**callout** 20:23

**callouts** 8:3 32:2

**car** 36:7 52:25 53:12

**CARE** 46:7,8,12,24 47:13
49:23,25

**career** 13:5

**Carlene** 13:7,14

**Carper** 11:17,18 19:13
50:10,18,23 51:4,7,13,19
52:7,10 53:10 62:25

**carried** 19:10

**carry** 8:2 20:3

**case** 15:19 40:20 41:17
47:5 62:24 63:3 64:23

**caseload** 8:3 19:11 20:3
21:3

**cases** 20:17 61:18 62:7,8

**caught** 63:23

**causing** 36:7

**cautioned** 4:3

**center** 7:10,12,15,19

**certified** 4:4

**chain** 16:7

**Chanda** 4:9

**change** 20:7 60:23 61:4

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

**charge** 7:6,25 8:1 17:10 18:7

**charges** 18:4,8 26:22 41:6

**check** 53:14

**chief** 10:19,20 40:18 44:8 66:19

**chiefs** 29:13

**child** 46:9

**choice** 33:4,5 37:18

**chooses** 17:18

**chose** 8:13

**circumstances** 18:14

**citizen** 35:21 36:3,8

**City** 5:6,10 6:1 15:23 16:1 24:8

**Civil** 26:19

**claim** 40:8

**clear** 30:20 43:2 64:15

**cleared** 39:25 40:5,7,23 41:9,11,12

**close** 11:24 39:11 40:15 52:24

**closed** 41:17

**closure** 39:7,14

**Clydette** 14:2,5 15:12

**Colonel** 25:24 26:7 51:19

**colonels** 29:13

**command** 16:7

**commander** 38:15 43:1,3

**commanders** 19:22

**commands** 29:3,7

**Commission** 26:19

**common** 51:11

**communicate** 27:16

**communication** 61:8,14, 22 64:4,16,20,22

**complaining** 44:9 50:9, 17

**complaint** 46:7 47:11

**complaints** 35:21,23 46:11 56:19

**complete** 37:2

**completed** 39:22,24 43:5

**concern** 34:1 38:12 40:3 41:19 51:4

**conclusion** 56:22

**conducting** 57:6

**confirm** 51:21

**connection** 49:16,19

**consciously** 53:3

**considered** 56:11 57:23

**constantly** 35:1

**contact** 46:5

**continuously** 34:7

**conversation** 26:11 46:16 47:8,10 51:2 57:19 58:8,10,12

**conversations** 54:9 55:18 57:12 62:6,7

**copied** 66:18

**copy** 26:24 66:9,17

**correct** 16:1 19:16 25:2 31:12,13,16,17,20 33:11, 12 36:4,5,20 39:16 40:11, 16 49:17 60:25 61:3,12 63:3 64:7 66:19,25

**corrects** 42:13

**couple** 7:16 46:11,19 62:2

**coworkers** 15:22

**criminal** 45:5

**cross** 56:15

**CROSS-EXAMINATION** 4:5

**cruiser** 35:20 36:6 38:16, 20

**Culham** 22:1 47:6,9

**current** 4:23 16:3,6 23:22 24:1

**cut** 44:24

**D**

**Darrel** 23:5

**date** 27:7

**dated** 66:24

**dates** 46:2

**David** 9:21

**day** 44:2 50:12,15 52:21 53:16 59:13

**days** 64:16

**Dayton** 4:14,24 5:5,21 6:1,12 15:23 24:9 29:11

**dead** 53:1

**December** 5:23 18:19

**decided** 41:13 59:24

**definition** 21:9

**delay** 25:5

**Dennis** 23:9

**department** 7:24 16:5 29:11,24 35:8 37:21 41:14 47:24 48:9,14 55:16 56:14

**department's** 17:20

**departments** 17:20

**depend** 21:8

**deposition** 4:17 54:25

**deserve** 39:2

**desire** 59:11

**detail** 34:18

**detailed** 43:12 47:9

**details** 47:22 48:10,16

**detective** 21:25 22:2,6,11 23:2,5,9,10,11,16,17 46:13,17 47:6,9

**detectives** 20:4,9,10,15, 25 21:6,16 23:4,20

**determined** 40:19

**dies** 39:6

**difference** 16:18,19

**difficult** 50:19

**direct** 9:20 14:22 15:4

**director** 46:24

**disagreements** 61:8,13 62:16,24 63:1,2,11

**disciplinary** 17:6,12 43:9 59:22

**discipline** 17:7,8 41:13

**discriminatory** 15:21

**discussion** 25:20,22 26:16

**dispatch** 7:10,12,15,19

**District** 6:6 7:2 9:4 10:1, 10 12:12 13:6,7,18

**ditch** 53:2

**division** 6:7,11 31:10

**Dix** 46:13,17

**DM** 9:17

**DMHA** 6:13 9:18 12:22

**door** 51:15,24

**doubt** 42:18

**Doug** 22:11

**drafted** 7:9

**drive** 53:11

**drove** 52:14,17 53:14

**drug** 8:1,16 17:1 19:6 45:19

**duly** 4:3

**duties** 19:20 24:6 31:19 34:10

**duty** 5:18 32:25 47:2

**E**

**e-mail** 66:9,16,21

**earlier** 19:18 30:13

**early** 8:2,10 19:7 25:18

**East** 6:7

**ecstatic** 30:21,25

**Ecton** 25:25 26:7 57:19 66:18

**efficiently** 39:3 43:11

**else's** 17:25

**employed** 16:1 57:3

**employee** 17:17

**employees** 15:22

**employment** 5:13

**ended** 5:18 10:19 11:13 32:21 47:24 50:8

**Enforcement** 7:8

**entire** 49:20

**EPOD** 6:6

**Eric** 16:8

**ethnicity** 23:14

**eventually** 7:12

**everyday** 38:17

**examined** 4:4

**exceptional** 48:1

**exhibit** 26:23 27:2 44:23 60:4 66:8,12,15

**expect** 52:2 63:23

**expected** 31:25 34:11 47:4

**explain** 28:4 29:2,6 34:17 40:17

**explained** 31:23 54:9

**explaining** 18:14

**explanation** 25:4 36:17, 19

**explicitly** 15:17

**express** 51:4

**extent** 15:8 31:20 50:3,8

**extra** 25:3 31:19 32:25

**eye** 30:14

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

**F**

face-to-face 27:17

facilitate 17:6

fact 34:25 48:5 51:18 56:12 60:19

facts 17:20,24 18:14 38:8

fair 21:4 33:18 36:20

family 55:6 57:13

fantastic 47:20

faster 39:11

fatal 38:20

fault 36:12 48:12

fear 41:18

feasible 8:17

feedback 44:7

feel 27:25 28:1 57:15

felt 48:8 51:22 57:11

female 12:6,25 13:22 15:9,11 23:18

figured 50:4

fill 8:13

final 21:12

finally 32:18

find 52:4

finding 35:6

findings 32:2 39:22 43:2, 5,15,22 51:5

finger 33:23 38:5

finish 55:2

finished 39:21,22

firsthand 49:6

flawless 42:13

flow 62:3

follow 29:3,17

force 6:13 12:22 35:20 36:1,3 38:17 40:8,25

forever 27:9 39:19

form 44:12

forwarded 49:22

found 40:5 49:24 52:5 58:24

frame 21:20 24:24 25:6,23 64:8

frustrating 43:7

frustration 61:18

full 4:11 19:5

fun 17:3

**G**

Gabby 58:3

gathering 54:1

gave 29:20 33:25 34:1

give 31:24 38:8 42:14 46:2 47:21 54:12 57:17 66:12

giving 26:20 63:4

glad 31:14

good 7:16 31:8 46:20 49:11 61:25 62:6 63:19,21 64:2

Gorsuch 23:11,18

grammar 42:17

great 43:25

greater 17:14 34:17,18

Greg 58:3

guard 63:24

guess 17:4,5 20:9 21:8 28:4 31:8 63:2,19 64:8,13 65:10

guessing 11:23

guy 63:7

guys 19:19 64:8

**H**

half 6:10 11:25

hall 22:11 61:24,25

Hand 27:1 66:11

handing 37:1

handling 47:1

happened 27:5 34:17 38:22 44:3 45:25 47:22 49:1,2 53:16

happy 32:9 42:7

hard 43:10 49:12

hash 62:11

hashed 63:10

head 20:18

hear 38:11

heard 38:6 53:17

hearing 17:16,17 18:12, 15

hears 18:16

height 64:9,11

Henderson 58:7

hereinafter 4:3

Hess 10:18 11:3,9

hiccup 59:17

Hill 4:10 11:25 12:5 16:16 21:18,19,25 22:19 24:18 26:1,8,11 27:15 29:19,20 30:4,19 31:1,23 32:11 33:4,9,25 34:2,9,24 36:15 37:8 41:19 42:8,19 43:18, 19,24 44:9,16 45:1 46:5,15 47:10 48:13 49:15,22 50:4, 11,20 51:13 52:11 54:5 55:9,24 56:12 57:4,12,13, 20,24 59:3,8 61:14,23 62:19 65:12 66:6,17,18

Hill's 26:14 50:24 52:14 53:11 54:7

history 5:14 6:4

hold 15:16

home 52:14

honest 28:22 55:21

honestly 6:17 34:22 51:1, 10 53:9

hopeful 60:21

hours 62:2

house 46:7,8,12,24 47:13 49:23,25 52:17 53:11,14, 20,22 54:4,11

Housing 6:13

Howard 22:6

HR 18:6

Huber 11:10,13 63:1

hundred 62:8,15

hyphenated 14:6

**I**

IA 8:21

IAB 10:17,25

idea 31:25 34:12 47:17 53:24 55:13,24

ideas 26:3 63:5

identification 26:25 66:10

immediately 59:5

important 38:15

incident 39:6

incompetence 28:25

incorrect 40:12

information 39:23 46:22

initially 10:5 25:8 46:15

initiate 27:17 64:21

injured 39:6

injury 36:3

input 63:4

intelligent 42:9,10,18 45:19

intent 39:10

interim 19:22

Internal 7:21

International 5:21

interrogated 57:11

interview 26:24 27:4,6 61:17 62:14 63:7

interviewed 62:13

investigate 20:20

investigated 36:13 48:22

investigating 38:22 56:18

investigation 17:21,23, 24,25 18:1,5,12,15 34:16 35:11 39:1,18,24 46:6 47:23 48:7 49:21 50:7 59:16 62:13

investigations 6:11 8:4, 6,22 19:5,11 21:2,7,12 34:4,8,13 35:18 36:17 38:4,16,19 39:11,17,18 40:15 43:4,11,21 45:6 57:7

investigative 18:22 21:11

investigator 8:21 16:20 18:24 33:20 62:10

investigators 28:19 43:10

involve 17:13

involved 36:2,9 38:18,24 39:5 50:2

involving 40:7

issue 40:1 52:4,5

issues 44:9,16 59:3 64:9, 11

**J**

jam 34:4

Jerry 46:13

job 8:15 16:3,25 24:12 31:9,11,22 38:14,15 42:2, 4,19 44:1 47:20 50:25

jobs 30:22 59:1

John 11:10 63:1

Jordan 22:7

Joseph 4:1,12

July 5:3 6:17 7:18,19

Kimberly Hill vs City of Dayton Police Department, et al.                                    Robert Rike

jump 58:4

June 5:3 6:16

Justin 23:25

---

**K**

keeper 45:7,8,14

Kenny 58:2

Kenton 34:3

kills 35:10

Kimberly 4:10

kind 19:19 24:5 44:24
57:19 58:23 63:9 64:8
65:11

knew 48:17,18,20,25 49:7,
11 53:1 54:3

knowledge 21:24 41:21
49:6 51:11

Krista 23:11

---

**L**

lack 17:5 64:1,21

lagging 51:5

Larry 45:18,23 46:1,13
47:19,24 48:14,21 49:22

late 8:10 52:22

law 18:6

lawful 4:2

leave 48:3,8 49:12

leaving 43:6 47:24 48:14

left 6:20 12:19 13:17 21:21
22:18 43:19,20 48:2

letter 40:6,16,22 41:2,10

level 31:9 41:13

Libby 46:24 47:13,15,16

lieutenant 9:5,6,13,22,24
10:3,5,6,17,18 11:3,10,13,
17,18,23,25 12:5,9 13:10,
12 14:21,25 15:1 16:8,16
19:13,14,25 21:13,18,19,
24 22:19 24:1,6,7,12,18,
19,23 25:5,10,12,20,24
26:1,4,8,11,14 27:15
29:13,19,20 30:4,19,21
31:1,3,10,12,15,22,23
32:1,9,11,19,20 33:4,9,25
34:2,9,24 36:15 37:8,24
41:19 42:8,19 43:13,16,18,
24 44:8,16 45:1,5 46:5,15
47:10 48:13 49:15,22 50:4,
11,20,24 51:13,19 52:11,
14 53:11 54:5,7 55:9,24
56:12 57:4,12,20,24 58:2,
7,8,19,24 59:3,8,11 61:14,

23 62:11,19,25 63:1 65:12
66:6,16,18

lieutenant's 24:14

lieutenants 10:14 11:4
12:5,12 13:1,3 14:19 15:10
29:12,16 32:1,2,3 44:8
57:22

limit 59:22

limits 35:8,9 43:8,9

lines 46:21

list 33:6,10,14 37:18

listen 56:20,25

lived 55:6

log 17:9 34:4

long 4:25 5:4 7:5 15:18
19:1 33:24 43:2 52:11
58:9,19,25 60:17

lost 8:11

lot 10:11 13:6 31:25 32:3,
7,8 42:12 49:2 54:6,8
58:20 59:1 62:4,5 64:23

lots 55:18

loved 47:19

lucky 17:4

---

**M**

made 17:10 30:18 33:13
34:14 37:17 48:21 53:3

major 11:19 19:14 25:24
34:3,11,23 37:1,2,14 57:19

major's 34:3,9 36:24

majority 13:5

majors 29:13 44:7

make 4:20 17:9 33:18 34:5
39:13 40:2 53:11 56:21
57:14,15

making 24:14 27:19 30:3
38:1 50:6

male 22:3,9,14 23:16,17

management 44:7 50:10

manner 38:2 39:4 40:2
43:14

Mannix 9:12

mark 10:18 11:3,9 25:24
60:8,11 66:18

marked 26:24 27:1 66:9,
11

Matt 11:17 62:25

matter 30:15 48:6

mattered 31:5

Maynes 13:8,14 14:1,10

means 7:10 29:10 30:6,7
45:9 65:2

meant 29:6

meet 61:24

meeting 26:9,18 32:20
57:18 63:10

meetings 32:3,7,10,13,20
46:19 62:9,10

member 6:12 55:6

members 16:24

mention 34:16

mentioned 15:5 22:18
54:24

Metroparks 10:20

Metropolitan 6:12

middle 50:14 60:5

Mike 9:24 10:6

military 29:18 60:13

mind 49:16 56:15

minor 38:16

minute 66:12

misconduct 35:22,23

missed 46:18

missing 50:11,12,13

mitigation 18:16

mm-hm 11:2,12 30:24
40:13 62:22

moment 38:12

months 20:1,2 24:24 51:5

morning 61:25 63:19,21
64:2

move 10:11 23:1

moved 10:7 22:22 23:4
37:24 54:10 55:2

moving 54:10

mud 45:20

multiple 10:11 30:22

Murphy 23:9,17

---

**N**

name's 4:9

names 58:4

Narrow 21:20

naturally 47:6

nature 57:14

Navy 5:17

needed 30:21,22 48:8
59:14

Nicholson 46:24 47:14,16

Nobody's 6:7

nonexistent 64:5,21

normal 52:1

North 6:7

North-burke 14:6 15:12

note 34:15

notes 34:20 36:16

notice 24:16

nuts 46:16

---

**O**

Objection 25:7 44:12,19
49:18 55:12,22 56:4,9 59:7
65:24

occasion 56:19

occupation 4:23

OCRC 26:18 27:4,20

October 27:5,7 65:9,10

office 16:20 18:25 23:7
26:2,18 27:19 28:12 32:8
35:4 43:6 51:14,24

officer 5:7,12,15 6:1,5,9
10:10 12:15 14:25 18:16
20:13,21 35:25 38:18
39:23 40:5,16 42:10 48:2
49:11 54:17 56:13,19

officer's 17:8 39:5

officer-involved 20:23

officers 20:12,25 29:11,
14 35:24 36:2,7 38:23
39:2,14 45:18,19

Ohio 26:18

operations 6:7 34:3

opinion 36:18,21 55:20
56:7 65:13

opportunity 33:19

order 22:23 29:15,20

orders 29:16,17

organization 29:3,8

originated 46:12

oversee 21:9

overtook 59:12

overwhelming 61:19

---

**P**

painful 4:20

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

**paragraph** 27:14 34:19, 21 37:12,15 44:23 60:5,7

**paragraphs** 35:3

**paramilitary** 29:2,8

**part** 15:21 22:12 27:3 31:22 34:10 50:7

**particulars** 47:11

**past** 33:10,13 37:17 45:2 52:14,17 53:11,14,20

**path** 54:25

**patrol** 6:5,7,8 7:4 9:3 10:10 12:14 14:20

**pause** 30:11,23 33:21 35:15 66:13

**pay** 24:8,14 57:10

**people** 22:18 38:19,21 41:25 50:6 58:14

**percent** 62:8,15

**period** 22:21 28:8 35:12

**periods** 52:11

**person** 17:18 54:8 55:9

**personal** 52:15 54:13

**phrasing** 40:11

**place** 45:16 47:22 50:17

**places** 5:25

**Plaintiff's** 26:23 66:8

**pleasant** 54:7

**pod** 37:24

**Poe** 23:25

**point** 8:20,22 9:23 10:7 11:16 19:17 22:10 24:16 46:4 58:25 59:11 61:17,21

**police** 4:24 5:5,15 29:11 35:23,25 36:2,7 40:18 42:10 48:14 54:16,20 56:13

**policy** 40:25

**position** 8:14 10:2,7 11:14,18 12:1 18:18 19:2 26:9 56:17 57:23

**positions** 5:25

**possibly** 43:12 47:14 58:8

**potential** 58:14

**prepared** 33:20

**pretty** 31:14 59:22

**previously** 40:14 54:1

**primarily** 17:1,5 19:9

**primary** 7:22

**print** 60:6

**prior** 5:14,15 13:25 18:13 21:12 26:1 34:11 37:1 41:21 45:4 55:7

**problem** 59:10 60:12

**proceedings** 30:11 33:21 66:13

**process** 17:6,12 21:6,11 29:23 34:6 38:1,25 40:2,18 47:23

**processes** 41:20

**product** 21:13

**Professional** 7:22

**promise** 4:19

**promoted** 6:18,22 7:11 10:5 11:10,19 19:13

**promotion** 6:25

**provided** 25:4 66:16

**PSB** 10:17,25 16:11,13 18:25 19:4,10,15 21:17 23:21,23 25:5,21 30:20 31:10 37:19 38:14 39:1,18 43:1 44:11,17 50:21 57:20 58:15

**public** 7:23 8:14 19:6

**pulled** 52:23

**purposely** 53:13

**purposes** 26:24 66:9

**put** 33:23 36:16 38:5 60:8

---

**Q**

**qualifications** 50:25

**question** 31:9 35:2,3 37:10 42:21 57:5 61:11 65:25 66:2

**questions** 31:7 34:14 36:22 37:9 49:15

**quick** 58:23

**quickly** 41:20

**quiet** 65:16

**quit** 30:22

---

**R**

**race** 22:8 23:14

**Rainey** 34:4,23

**ran** 45:17,19

**random** 8:1,16 17:1

**Randy** 9:7,8 10:5

**rank** 20:13 29:10

**read** 30:8 33:16,19 66:12

**reading** 30:7 35:5 65:25

**real** 26:16

**reason** 6:18 46:20 51:11 57:8

**reasonable** 29:15

**reassigned** 7:1

**Reboulet** 19:18 24:5 25:1 44:10,18 53:7 58:13

**recall** 14:14 21:24 26:6,17 27:6,9,19,21 28:10 30:3 45:7,20 50:9,16,18,23 51:3,12,16 58:1 60:14,16 66:4

**receive** 34:7 41:12

**received** 27:3 46:22

**receiving** 24:7 35:10

**recommendation** 57:21

**record** 14:25

**records** 7:23 8:15,23 19:6 27:3 45:6,8,14

**recruit** 5:11,13

**refer** 45:13

**referred** 6:6

**referring** 28:9 45:7 53:5

**regular** 31:19 46:19 64:18

**relationship** 65:22 66:5

**relayed** 50:5

**relevant** 63:8

**relief** 58:25

**remember** 6:17 26:10,14, 15,21 28:16,21 51:1,18 54:9 58:17 59:12 62:20 64:6

**Remley** 32:6

**replace** 23:2

**report** 17:24 36:19,22

**reported** 46:18

**reporting** 46:25 59:4

**reports** 35:2 36:25

**represent** 4:10 27:2 66:15

**representative** 26:19

**reprimand** 17:14

**reprimands** 41:6

**reservations** 50:24

**reserves** 5:19

**residence** 52:15 55:3,4

**residences** 54:13

**respect** 63:18

**respond** 8:3 32:1

**responded** 41:22

**response** 31:10 47:16

**responses** 59:5

**responsibilities** 24:7 43:1 47:1

**responsibility** 20:6 36:25 43:16 48:13

**retired** 8:13 9:13

**retiring** 11:13

**returned** 18:9

**review** 17:23 18:6,12 21:11 34:11 36:25 41:20

**reviewing** 35:5

**Richard** 23:24

**Rights** 26:19

**Rike** 4:1,12 27:15 29:1

**Robert** 4:1,12 9:12

**roughly** 6:9

**route** 48:6

**run** 60:2

**running** 45:23

**runs** 29:24

---

**S**

**sad** 49:11

**safety** 16:23

**sat** 26:2

**scenes** 49:2,3

**schedule** 7:15

**Scott** 21:25 47:6

**screen** 60:7

**secondary** 65:19

**secret** 51:8

**security** 5:22

**seek** 31:9

**selecting** 25:20

**send** 17:11 34:21 35:12 39:23 40:6,16,22 41:10

**sending** 37:8

**senior** 9:8

**sense** 34:15

**sentence** 28:23 30:1 33:3 45:4,16 60:10,22 61:7 63:17

**September** 66:24

**sergeant** 4:24 5:1,2 6:2,

Case: 3:17-cv-00334-TMR Doc #: 18 Filed: 05/24/19 Page: 77 of 79 PAGEID #: 683

Kimberly Hill vs City of Dayton Police Department, et al.    Robert Rike

22 7:4,11 8:18 9:5,10,11,
21 10:2 13:7,11,13,14,17,
25 14:1,2,9,20 15:12 18:22
19:18 23:24,25 24:5,25
27:15 29:1,19 32:6 34:2
35:9 44:10,18 46:13,23,25
48:7 53:7 62:11

**sergeant's** 8:14

**sergeants** 8:12 10:12
13:1 14:17,18 15:5,10
20:5,8,16 23:23 29:12,16
34:6

**served** 17:11 18:10

**services** 45:6 46:6

**SET** 7:7

**sets** 17:19

**shakes** 20:18

**share** 21:4

**shared** 19:19 20:6 21:3

**sharing** 24:5

**Sheldon** 16:9 24:2

**shift** 7:15

**shifts** 20:1

**shooting** 20:24

**shootings** 38:18

**shut** 51:24

**shuts** 51:15

**SI** 9:17

**side** 20:18,19 52:20

**sign** 37:4

**similar-type** 41:22

**simply** 20:2 42:25

**sit** 62:11

**sitting** 59:13

**situation** 29:18 57:3

**situations** 40:22 41:1,22

**slightest** 55:24

**slow** 59:4,5

**Smith** 23:5,16

**smooth** 60:2

**social** 54:1

**somebody's** 63:5

**someone's** 39:6 56:5

**sorted** 60:1

**sounds** 17:3

**speak** 23:15 32:6 51:13
52:17 57:6 58:19,21 64:22,
24,25 65:4

**speaking** 26:7 57:7

**speaks** 47:7

**special** 6:11 7:7 46:9

**specific** 33:17 58:18

**specifically** 51:6,19

**specifications** 18:4,7,9
41:6

**spell** 14:3

**spend** 54:6

**spent** 32:7 58:25

**spoke** 19:18 32:25 46:15
47:13,15 62:4

**spots** 25:11

**spring** 7:9

**Standards** 7:22

**start** 57:25 59:5

**started** 5:9 8:11 9:4 12:17
19:5 43:7 49:20,21 59:3,6

**state** 4:11

**stated** 31:15

**statement** 26:20 27:20
29:4,5 30:4 31:12 32:17
33:7 61:4,13 64:7 65:25

**statements** 27:13 30:18
56:21,23

**states** 5:17 17:19

**stayed** 7:16

**steps** 21:10

**Stiver** 58:9

**stop** 16:25 18:24 24:20
31:18 39:8 65:18

**street** 4:14 52:24,25 54:24

**streets** 54:23

**strictly** 8:22

**structure** 29:10

**stuff** 8:19

**subject** 15:20

**subsequently** 9:12

**succeed** 43:24

**summary** 27:4 33:19
36:20 42:14

**summer** 7:9

**supervise** 21:5

**supervisor** 7:6 8:21 9:20,
24 14:19,23 15:4 18:24
19:4,10 47:2 48:1

**supervisors** 13:1,22 34:7

**suppose** 64:9

**supposedly** 49:23 50:6

**suspension** 17:15

**switched** 9:22

**sworn** 4:3 5:7

———————————

**T**

**takes** 18:2 39:2,19 47:7

**taking** 14:1 35:12

**talk** 27:13 28:5 61:22

**talked** 26:4 44:15 45:2
59:4 65:4,5

**talking** 26:20 45:20 47:18
54:6 63:20

**Task** 6:13 12:22

**Taylor** 23:24

**team** 7:7,8

**Technically** 19:3

**telling** 38:10 50:18,23
51:3,12,19 57:16

**term** 17:5 24:13 63:3

**termination** 17:15

**testified** 19:19

**testing** 8:1,16 17:2 19:7

**thing** 18:13 20:21 30:9
33:16 49:1 59:22 60:17

**things** 8:7,18 20:5 30:2,5,
18 32:5,8,10 33:17,23,25
34:14,15,25 35:5,22 37:24
38:1,6,11,20,24 39:3,4
40:1 42:14 49:2 57:11,14
60:12,24 61:5 62:23 63:9,
16,22,23 65:15,16

**thinking** 58:11 59:15

**thought** 41:24 42:1 57:22
59:14,18

**till** 5:18

**time** 5:20 7:7,23 8:2 9:22
15:18 19:5,24 21:17,20
22:18,21 24:4,24 25:6,15,
23,25 27:7 28:1 30:8 32:7
33:24 35:8,9,12 39:2 40:4
41:25 43:8,9,17 48:2 49:12
50:11,13,19 52:11 54:6
58:9 59:1,22 64:7

**timely** 38:2 39:4 40:2
43:13

**times** 9:23 25:14 28:5 30:2
32:1 42:12 51:23 52:13
60:11 61:22 64:13,15,23
65:15

**title** 16:4

**today** 19:18 23:15

**told** 25:9,16 30:2,4 49:7,20
51:7 53:19 55:4 60:11

63:18

**Tolpin** 45:18,23 46:1,13,
23,25 47:19,24 48:7,14,21
49:23

**tools** 44:1

**topic** 58:8

**town** 52:21

**track** 59:19

**tragic** 47:25 49:10

**transcript** 28:15

**transferred** 7:20 43:3

**traveling** 53:7

**trip** 53:3

**truth** 57:16

**truthful** 55:9,21,24 56:2,6,
8,22 57:1,9

**turned** 21:13 43:13

**tweaked** 42:17

**two-month** 20:1

**type** 17:14 18:6 29:2 36:2
49:16 56:21

**types** 20:17 35:18

———————————

**U**

**ultimately** 18:8 47:5

**unanswered** 37:9

**understand** 35:7 40:9
44:2 56:6 61:16

**unfounded** 48:23

**unit** 6:20 8:12,16,17 9:24
16:24 25:11 31:24 46:9

**United** 5:17

**untruthful** 56:12,16

**update** 63:10

**upwards** 43:20

**usual** 64:18 65:12,14,21

———————————

**V**

**versus** 20:8,15

**victims** 46:9

**violated** 40:24

———————————

**W**

**wait** 38:25 61:10 65:24

**walk** 61:24

**wanted** 26:3 27:13 31:3
43:23

Kimberly Hill vs City of Dayton Police Department, et al.                    Robert Rike

week 62:9

welcomed 59:9

west 4:14 37:24

whatever's 65:19

whatsoever 64:17

white 22:3,14 23:17,18

Wilhelm 9:25 10:7

Williams 9:21

wire 59:24

witnessed 55:10

witnesses 56:20

woman 42:9 65:22

word 29:1

work 16:19,23,24 19:10
38:25 42:12 43:10 47:3
50:11,13 57:13 59:15
62:12 63:15 65:18,20,22

worked 5:21 29:23 30:16
34:2 41:25 49:12 55:15
56:13 59:17,23 60:1

working 16:15 21:1,17
44:17 51:22 63:3 65:18
66:5

wreck 45:17

write 34:20

writes 42:13

writing 34:16

written 42:15

wrong 22:24

wrongdoing 39:25 40:7,
24

_____

Y

year 7:12,14 11:1,24 14:9
20:6 32:18

years 5:3,7 6:9,10,15 7:16
13:18 42:8 55:14,16 56:14,
18 58:1 62:18

yesterday 65:6,9,10

**MIKE MOBLEY REPORTING**

**MMR**

*334 South Main Street*
*Dayton, Ohio 45402-2716*
*Office: 937-222-2259*
Fax: 937-222-9747

April 10, 2019

Rob Rike
c/o Leonard J. Bazelak, Esq.
Senior Attorney City of Dayton, Ohio
101 West Third Street
Dayton, OH  45401

Re:     ***Hill, Kimberly v. City of Dayton Police Dept., et al.***

Dear Mr. Rike:

Enclosed is your transcribed deposition. The Rules of Civil Procedure allow ***thirty (30) days*** for you to read the transcript and return the signature page and corrections sheet to us.

If you have any corrections or changes to your transcript, please write them on the provided corrections sheet, including the appropriate page and line number from the transcript and any necessary explanation.

Please sign and date the signature page and return it with the corrections sheet in the enclosed envelope. We will forward these to the attorneys involved.

If you do not return the signature page within ***thirty (30) days***, a waiver of signature will be executed and the transcript may then be used as your sworn testimony.

Very truly yours,

MIKE MOBLEY REPORTING

Courtney Elliott

cc:     Leonard J. Bazelak, Esq.
        Chanda L. Brown, Esq.