# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**Kimberly Hill,**

        *Plaintiff,*

v.
                                            Case No. 3:17-cv-334
                                            Judge Thomas M. Rose

**City of Dayton, et al.,**

        *Defendants.*

---

## ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT. ECF 13.

---

        This matter is before the Court on Defendant's Motion for Summary Judgment. ECF 13. Plaintiff Kimberly Hill, Lieutenant in the City of Dayton Police Department, filed the instant action on September 26, 2017, alleging that Defendants the City of Dayton and Richard Biehl, in his official capacity as the Chief of the Dayton Police Department, denied her a promotion, harassed her and retaliated against her because of her sex and race. Hill's first claim asserts that her rights under Title VII of the Civil Rights Act of 1964 and the Ohio Civil Rights Act, Ohio Revised Code § 4112.02, were violated by race discrimination; her second claim that her rights under Title VII of the Civil Rights Act and Ohio Revised Code §4112.02 were violated by virtue of sex discrimination; her final claim asserts that she was retaliated against, in violation of Title VII of the Civil Rights Act and Ohio Revised Code § 4112.02. ECF 28.

        On April 16, 2019, Defendants moved for summary judgment on all claims. ECF 13. Plaintiff has responded, and Defendants have replied, rendering the matter ripe for decision.

# I.    Background

Lieutenant Kimberly Hill is an African American female in the City of Dayton Police Department.    Hill protests that she was not selected for a promotion in 2016. See ECF 25, Exhibit 10 – Hill Resume.

In 2012, Chief of Police Richard Biehl sent an email to all lieutenants in the department inviting them to apply for a vacant police major position. See ECF 25, Exhibit 1.   The position required a "Bachelor's degree and three (3) years of Police Department supervisory experience OR Associate's degree and seven (7) years of Police Department supervisory experience." Id.   Lt. Hill submitted her resume for the Police Major position.   Less than a month after the submission deadline ended, it was announced via email that Lt. Matt Carper would be promoted to major at an awards ceremony on May 11, 2012. Id.

After the May 2012 promotion of Matt Carper, there remained ten lieutenants in the department. See ECF 25, Exhibit 3.   Lt. Hill was ranked sixth on this list based on seniority, behind Lieutenants Beane, Wilhelm, Williams, Johns, and Wolford.   Beane and Wilhelm were approaching retirement and had no interest in promotions; Beane retired in 2012 and Wilhelm retired soon after.

Lt. Hill took over command of the Professional Standards Bureau in 2013.   Prior to Lt. Hill taking over as Commander of Professional Standards Bureau, the department was commanded by Sergeant Timothy Reboulet and Sergeant Robert Rike for eighteen months. Reboulet depo., 19: 5-12.   From her early days in the position as commander, Lt. Hill questioned the processes within the Bureau and the value of taking an interest in the citizen complaints received. Hill aff'd at ¶ 6.

Between January 2015 and August 2015, Lt. Hill emailed her supervisor, Major Mark Ecton, on at least seven occasions requesting changes to the citizen complaint process, pointing out issues in the Professional Standards Bureau processes, and noting that her authority was being challenged in the Bureau. See ECF 25, Exhibits 14, 16, 17, 18, 19, 20. Upset that nothing was being done to address her concerns, on September 8, 2015, Lt. Hill sent an email directly to Major Ecton and Chief Biehl. She noted of her subordinates that "I have been the [Bureau] Commander for two years. Most of the time I experienced vehement opposition…from those who do not have the training, knowledge, breadth or depth of experience that I have" and she went on to note that she was preparing a special report requesting that an[] audit of the Professional Standards Bureau be conducted by an outside agency." See ECF 25, Exhibit 22.

On September 23, 2015, Lt. Hill sent an email to Sgt. Reboulet, whom she supervised, concerning how to respond to a request for public records of citizen complaints. See ECF 25, Exhibit 23. Lt. Hill instructed Sgt. Reboulet to "use the findings" on the complaints; Reboulet questioned Lt. Hill's decision to do so. Exactly forty-three minutes later, Reboulet emailed Chief Biehl, Major Ecton, and another major without copying Lt. Hill, and asked if they wanted him to use the findings. Id. Chief Biehl responded back, essentially telling him to use the findings. Id. Enraged, Lt. Hill emailed Chief Biel and Major Ecton separately, stating she was "sick of the apathy, complacency and entitlement mentalities! This is not a game." See ECF 25, Exhibit 23.

On March 29, 2016, Lt. Hill sent a text message to Lt. Colonel Ecton and asked him if he thought that she was a "token." She then spoke directly with Ecton and explained in more detail that she felt that she was not being taken seriously in her position and that her race and sex played a role in how she was being received by the department. L. Hill aff'd at ¶ 15.

Hill points to other examples that she believes shows her authority in the Bureau was not being taken seriously: letters that were sent out to citizens never had her name on them, See ECF 25, Exhibit 25; emails and information that should come directly to her were sent to Rike and Reboulet.  When Lt. Hill noticed that this was being done, she began making requests for the emails to come directly to her.  Despite these requests, the emails continued to be sent to Rike and Reboulet. See attached Exhibit 15.

On August 16, 2015, Major Mark Ecton was promoted to Deputy Director, creating a vacant Major position.  The "Position Action" form for this position was not completed until February 23, 2016. See ECF 25, Exhibit 2.  The application process did not open until April 2016. See ECF 25, Exhibit 4.  The position was not filled until August 2016.

The terms and conditions of the 2016 major job description were different than in previous years.  In 2012, Chief Biehl emailed all the Majors directly and the interview process was directly with Chief Biehl. See ECF 25, Exhibit 1.

Also, the 2016 candidates were required to have a "Bachelor's Degree in Criminal Justice, Law Enforcement, or related field." See ECF 25, Exhibit 4.  Lt. Hill has a degree in General Studies. See ECF 25, Exhibit 10.

According to the Human Resources representative who had responsibility for collecting and reviewing the resumes following the April 2016 posting, the position had been vacant for several months, longer than similar positions were normally vacant and Chief Biehl had conducted private interviews of who he wanted to fill the vacant Major positions prior to the position being posted. Id.  Lt. Hill was not one of these private interviews. Id. at ¶ 8.

Hill filed a charge with the Ohio Civil Rights Commission on May 10, 2016. See ECF 25, Exhibit 6. Hill filed a subsequent charge on May 26, 2016, realleging most of the complaints that were part of the May 10, 2016 charge. See ECF 25, Exhibit 7.

The position was reposted, and Lt. Hill again applied for it. Instead of an interview with Chief Biehl like in the previous years, in 2016 the City had enlisted the services of a third party "assessment center" process. Eric Henderson (black male) and Wendy Stiver (white female) were the top scorers, and they were each promoted in August 2016. See ECF 25, Exhibit 27 and Exhibit 2. Joseph Wiseman scored third on the list, and he was promoted to Major in June 2017. Id.

Plaintiff was advised in May of 2016 that she met the minimum educational qualification to apply for the posted position of major within the Department. Affidavit of Kenneth R. Couch attached as Exhibit A at para. 9. While she did not have a bachelor's degree in Law Enforcement or Criminal Justice, she did have a "General Studies" degree. Id. and Deposition of Kimberly Hill at pp. 79-80.

The Kettering Group performed an Assessment Center exercise to evaluate and rank candidates for the position of Major. Id. The candidates went through several exercises and were all given a score. Hill Depo. Exhibit E. Plaintiff scored a total average score of 75.42 on the assessment, which was second to last of the five candidates, and .43 points away from being ranked last. Id. The top two candidates, Lt. Eric Henderson and Lt. Wendy Stiver, averaged 89.58 and 84.79 respectively, with the third ranked candidate averaging 79.17. Id.

The evaluators were not affiliated with the Dayton Police Department and consisted of a former Police Chief in Cleveland, Patrick Oliver, an African-American male, a former Kettering, Ohio Police Chief James O'Dell, a white male, and a retired Lt. Colonel with the Cincinnati Police

Department Cindy Roth Combs, a white female. Hill Depo., pp. 96-98 and Hill Depo. Exhibit E. There were several exercises and Lt. Hill felt she did not do her best on any of the exercises. Hill Depo. at 94-101. Lt. Hill does not believe the people scoring the candidates at the assessment center were racist in any way. Hill Depo. at p. 142. She had no problem with the scores. Id.

There was also an interview process conducted by the department. Affidavit of Ken Couch at para. 13-15. The interviewers were not aware of the scores on the assessment center when they scored the candidates on the oral interview process. Id. The people present for the interviews were Lt. Colonel Matt Carper, a white male, Lt. Colonel Mark Ecton, an African-American male, Chief Richard Biehl, a white male, Human Resources Director Kenneth Couch, a white male, and a black female whose name Lt. Hill could not recall. Hill Depo. p. 101. Lt. Hill again did not rank highly in the interviews. Couch Affidavit at para. 13-15. Lt. Henderson, an African-American male and Lt. Wendy Stiver, a white female, were ranked the top two in the interviews as well. Id. and Hill Depo. Exhibit E.

After reviewing the applications, resumes and results of the assessment center and interviews, the City Manager, Shelley Dickstein, a white female, chose Lt. Henderson and Lt. Stiver as the two Majors to fill the positions. Affidavit of Shelly Dickstein attached as Hill Depo. Exhibit F at para. 8. The decision was based upon the overall candidacies of the applicants, including their performances on the assessment center and the interviews. Id. As regards experience in the department, while Lt. Hill had more overall seniority within the department as an employee, Lt. Henderson and Lt. Stiver had similar experience serving as Lieutenants in the department, having been promoted to Lieutenant in 2011. Hill Depo. at p. 100-101.

Lt. Henderson and Lt. Stiver were promoted to the positions of major on August 8, 2016. Lt. Hill was aware of those promotions in August 2016. Hill Depo. at p. 106-108.   Lt. Hill after August 8, 2016 has never filed a charge with the Ohio Civil Rights Commission or Equal Employment Opportunity Commission based upon her non-selection to the Major position in 2016. Hill Depo. at p. 119.   She filed two previous charges in May of 2016. Hill depo. pp. 108- 119 and Hill Depo. Exhibits C and D.   The first charge of May 10, 2016 was based upon her claim that she was being disqualified by the minimum educational qualifications in the job description, and the second charge was filed in response to being notified that she did meet the minimum educational qualifications and her claim that the City was being deceptive in telling her that.   She also raised hostile work environment/retaliation general claims in both charges

Plaintiff's May 10, 2016 charge was dismissed for "no probable cause," resulting in the right to sue letter of June 26, 2016. Hill Depo. Exhibit I and N.   Her May 26, 2016 charge was pursued at the Ohio Civil Rights Commission level.

On September 29, 2017, Plaintiff had filed a claim in this Court. ECF 1.

On April 4, 2018, the EEOC terminated Plaintiff's May 26, 2016 charge and issued Plaintiff a notice that she must file a lawsuit within 90 days of the receipt of that notice. Hill Depo. Exhibits J, L, M, and O.   Defendants decry that Plaintiff has not filed a lawsuit on that charge and therefore any claims arising out of that charge have not been preserved to file in this Court.

During the Ohio Civil Rights Commission investigation, Sgt. Reboulet stated that Lt. Hill was his direct supervisor, but that he could not recall "any instructions coming from Lieutenant Hill that he had to follow." See ECF 25, Exhibit 7, p. 8. Id.   He further noted he never wanted Lt. Hill to come to the Bureau, and has suggested several other male candidates for her position. Id.

When asked how he thought Lt. Hill was doing in her position as Bureau Commander, Sgt. Reboulet replied that "I don't think she's done a good job..." Id.  Reboulet went on to note that he did not think he had a "bad relationship" with Lt. Hill "in the beginning." Id. at p. 9.

Sergeant Robert Rike was also interviewed by the Ohio Civil Rights Commission on October 4, 2016. Id. at p. 10.  Sgt. Rike opined that there is "very little that [Lt. Hill] does that benefits this office.  I don't know if incompetence is the right word or not." Id.  Sgt. Rike explained that the police department is a military type organization and you "follow commands accordingly." Id.  According to Rike, he told Lt. Hill many times of how "things were to be done" and that their communication was "bad to nonexistent" and he has a "working relationship with the woman but that's all."  Sgt. Rike also stated that he and Reboulet "did the job for [a] year without any help." Id. at p. 11.  He went on to complain that "within my career, I don't think I've had to instruct any commander on how to do their job.  Others have known how to do their job. I sat under four lieutenants Mark Hess [white male], John Huber [white male], and Terry Zimmerman [white male] and now Lieutenant Hill." Id.

According to Sgt. Rike, he was adamantly opposed to Lt. Hill coming into the Bureau from the beginning, before he had ever even worked with her: "Lt. Hill was not our 1st, or our 2nd choice.  She wasn't even on the list…to me, Lt. Hill wasn't on our list because of her past….prior to coming here to our office, she was…our records keeper." Id.

Lt. Hill never worked as a "records keeper."  Immediately prior to coming to command the Bureau, she was the Central Investigations Bureau Commander, the Day Watch Commander on West Patrol Operations, the Night Watch Commander on East and West Patrol, and a Patrol Sergeant. See ECF 25, Exhibit 10 – Kim Hill Resume. From June 2002 to December 2003 she

worked as an Administrative Aide in the Patrol Operations Division, where she assisted with the division budget and managed day-to-day activities.

Another onsite interview was conducted by the Ohio Civil Rights Commission on October 19, 2016. Present at this conference were Chief Biehl, Assistant Chief Matt Carper, Assistant Chief Mark Ecton, Human Resources Director Tim Couch, Plaintiff Kim Hill, and the attorneys for the parties. Id. at p. 22. During the interview, Couch explained that Chief Biehl is the person who initially recommended the assessment center for the available Major position being vacated by Mark Ecton because "diversity was an issue" and that they wanted a "neutral process." Id. at p. 23. Chief Biehl also mentioned that he did not accept bids for the company to do the assessment. Chief Biehl had a "previous working relationship" with one of the owners of the company they chose to complete the Assessment Center. Id. at p. 23.

Assistant Chief Carper stated that he was aware that Sgts. Rike and Reboulet were having a "difficult time accepting…and had reservations about Lieutenant Hill's qualifications for the job." When asked what the Command Staff did to addresses the apparent concerns that Lt. Hill and Sgts. Rike and Reboulet were having about each other, Assistant Chief Ecton stated that Lt. Hill did follow the "chain of command" when she complained to him, but Ecton stated that he did not talk to Rike and Reboulet directly because he thought that "she [Hill] would talk to them." (Id. at p. 26).

In 2019, the City of Dayton created a new Major Position, position number 014430, and had another assessment center process to fill it. See ECF 25, Exhibits 2 and 4. This position was later filled by Christopher Malson, a white male, in March of 2019. See City of Dayton Police Department, West Patrol Operations, https://www.daytonohio.gov/655/West-Patrol-Operations

(last visited May 24, 2019). Major Malson, although given a different position number, took over as the West Patrol Commander, the same position that was previously held by Matt Carper until he was promoted in August 2016.

The Ohio Civil Rights Commission, initially found no probable cause. ECF 14-10, PageID 289. Upon reconsideration of Hill's May 26 application, the Ohio Civil Rights Commission did find probable cause. ECF 20-7, PageID 770.

Plaintiff filed her initial Complaint in September 2017. The Complaint made references to the allegations in both charges filed with the Ohio Civil Rights Commission. ECF 1. She amended her complaint on July 18, 2019, dismissing claims against Richard Biehl in his official capacity. Hill's first claim asserts that her rights under Title VII of the Civil Rights Act of 1964 and the Ohio Civil Rights Act, Ohio Revised Code §§ 4112.02, were violated by race discrimination; her second claim that her rights under Title VII of the Civil Rights Act and Ohio Revised Code §4112.02 were violated by virtue of sex discrimination; her final claim asserts that she was retaliated against, in violation of Title VII of the Civil Rights Act and Ohio Revised Code § 4112.02. ECF 28.

The right to sue letter in the second charge was received April 4, 2018. See ECF 25, Exhibit 30.

## II.     Standard of Review

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party.

*Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

The instant case involves questions of state law. In reviewing an Ohio claim, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994).

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III. Analysis

Defendants protest both that Plaintiff filed her complaint prior to obtaining a right to sue letter for her May 26th EEOC charge and that Plaintiff complains of alleged discriminatory acts that occurred more than 300 days prior to the filing of her first EEOC charge.

In order to assert Title VII claims, a plaintiff must file a complaint with the EEOC within 300 days after the alleged unlawful employment practice occurred. *Han v. University of Dayton*, 2012 WL 5576961 at *3 (S.D. Ohio December 21, 2012) citing *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980). Failure to file an EEOC complaint within the 300 day window warrants dismissal of the claims. Id. Plaintiff claims denial of a promotion due to a protected class. Defendants point out that the promotion to the position of major did not occur until August 8, 2016. Neither charge filed by her in May of 2016 could have included a "failure to promote" claim as the promotions, and her non-selection as Major had yet to occur.

However, Plaintiff's May 10th and May 26th, 2016 charges contain specific reference to discriminatory denial of promotion to the Police Major position. See Response, Exhibit 4, 6 & 7.

Technicalities will not prevent the Court from reaching the merits of Plaintiff's complaint. The Sixth Circuit, in a case where plaintiff brought suit under Title VII and Ohio state law for sexual discrimination prior to obtaining a right-to-sue letter from the EEOC, noted that, "[w]e see no reason to bar [the plaintiff's] claim solely on the grounds of a non-jurisdictional requirement whose brief absence caused [Defendant] no prejudice in this case." *Portis v. Ohio*, 141 F.3d 632 (6th Cir. 1998). The Court held that "the proper time for Ohio to raise this argument was between the filing of the lawsuit and [the plaintiff's] receipt of the letter." Id. at 635.

*Portis*, however, does not stand for the proposition that the 300 day limitation is not enforced; it is. Plaintiff having filed her first EEOC charge May 10, 2016, the Court will not entertain allegations of discrete discriminatory actions predating July 15, 2015. As courts have recognized in addressing the timeliness of charges filed for "failure to promote" claims, such acts are discrete acts which can be pinpointed as to the date the promotion occurs. See, *National*

*Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002). A party must file a charge with the EEOC within 180 or 300 days of the date of the unlawful employment practice. Id. at 110. Claims filed in a federal lawsuit that are not timely filed at the administrative level must be dismissed in federal courts. Discrete acts such as a failure to promote are easy to identify and each incident constitutes a separate actionable employment practice. Id. at 114.

The general rule in the Sixth Circuit is that "the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Weigle v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 380 (6th Cir. 2002). It is the "facts alleged in the body of the EEOC charge, rather than merely the boxes that are marked on the charge, [that] are the major determinants of the scope of the charge." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (internal citations omitted). "[W]here facts related with respect to the charge claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Davis v. Sodexho, Cumberland College Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998).

The Sixth Circuit has remarked that the exhaustion requirement of Title VII "is not meant to be overly rigid." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006). Application of the exhaustion requirement should not result in the restriction of complaints based on "procedural technicalities" or where the charge does not contain "the exact wording which might be required in a judicial pleading." *Id.* (quoting *EEOC v. McCall Printing Co.*, 633 F.2d 1232, 1235 (6th Cir. 1980)). As a result, administrative charges should be "liberally construed" to encompass all claims reasonably expected to grow out of the charges of discrimination. *Id.*

The changing of the degree requirements as a means to allegedly exclude her from consideration was the basis for her May 10, 2016 Charge. While the requirement was determined to be met by her degree and she was, in fact, permitted to apply for the position, Plaintiff has complained about the promotion process.

The Ohio Civil Rights Commission investigated the promotion process, retaliation and the claims of a hostile work environment.

**Discrimination Claims**

Federal and Ohio courts use the same analysis in reviewing Title VII discrimination claims and Ohio Revised Code discrimination claims under § 4112. See *Plumbers & Steamfitters Commt.*, 66 Ohio St. 2d 192 (1981); *Little Forest Medical Ctr. v. Ohio Civ. Rights Comm*., 61 Ohio St. 3d 607 (1991).

Plaintiff asserts claims for sex and race discrimination against all Defendants. Sec. Am. Compl., ECF 23, PageID 247–48. In order to prove a claim of employment discrimination, Plaintiff must either present direct evidence of discrimination or prove a *prima facie* case under the *McDonnell Douglas* analysis. In a direct evidence case, the employee must present direct evidence that the employer acted with a discriminatory motive. *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 172 (6th Cir. 2004). In the instant case, there is no allegation of direct evidence of discrimination.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 428 (1981), allow a plaintiff who lacks direct evidence to survive a motion for summary judgment by establishing a *prima facie* case for her claim. Once the plaintiff meets this burden, the burden of production then shifts to the employer to articulate a legitimate,

nondiscriminatory reason for the adverse action. *Burdine*, 450 U.S. at 253. If the defendant meets its burden, the plaintiff must then demonstrate that the employer's proffered justification is merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. The plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Id*. at 1084.

To establish a *prima facie* case of sex discrimination by the indirect evidence method, a plaintiff must demonstrate that "(1) she was a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) other individuals outside of the protected class received more favorable treatment." *Ndene v. Columbus Acad*., No. 209-CV-892, 2011 WL 829189, at *6 (S.D. Ohio Mar. 3, 2011).

The City asserts Plaintiff cannot overcome the City's legitimate, non-discriminatory reasons for not promoting her. Selecting a more qualified candidate constitutes a legitimate, non-discriminatory reason. *Hawkins v. Memphis Light Gas and Water*, 520 Fed. Appx. 316, 319 (6th Cir. 2013). Here, while Plaintiff and the selected candidates had similar experience as Lieutenants, there is no question that the candidates chosen had better qualifications based upon performances on the assessment center exercise and in interviews. Hill Depo. Exhibit E.

Plaintiff has the burden of establishing that the stated reasons are pretext and can do so in three ways by showing that:(1) that the proffered reasons have no basis in fact; (2) they did not actually motivate the challenged conduct; or (3) were insufficient to warrant the challenged conduct. *Starks v. PNC Bank*, 2015 WL 9303195 at *7 (S.D. Ohio Dec. 22, 2015). A plaintiff cannot establish pretext by claiming that his qualifications were superior to the successful

candidate unless she proves that no reasonable decision maker could make a plausible case that the successful candidate was the better candidate. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 628 (6th Cir. 2006); *Starks v. PNC Bank*, 2015 WL 9303195 at *5 (S.D. Ohio Dec. 22, 2015).

An employer has even greater flexibility, where, as here, a management position is at issue. *Hawkins*, at 320. In conducting a comparison of the candidates' qualifications, courts do not substitute their judgment for that of management. Id. The Sixth Circuit has "granted 'great flexibility to employers when selecting management personnel…[and] has explicitly held that the law does not require employers to make perfect decisions, nor forbid them from making personnel decisions that others may disagree with. So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates." *Hawkins*, at 320. "A laxer standard would move this court from its proper role of preventing unlawful employment practices to the illegitimate role of acting as a 'super personnel department,' overseeing and second guessing employers' business decisions." *Benders v. Hecht's Dept. Stores*, 455 F.3d 612, 628 (6th Cir. 2006). Moreover, employers are not rigidly bound to the language of a job description and can consider factors external to the job description when selecting among qualified candidates. *Browning v. Department of Army*, 436 F.3d 692, 696 (6th Cir. 2006).

The June 13, 2016 results of the assessment center are not disputed. The top four candidates were: (1) Eric Henderson, (2) Wendy Stiver, (3) Joseph Wiseman and (4) Kimberly Hill. See Response Exhibit 12. Henderson and Stiver were promoted in August 2016 (See Response, Exhibit 27) for vacancies left by Mark Ecton and David Wolford. See Response Exhibit 2. Joseph Wiesman was promoted in June 2017 for a vacancy left by Christopher Williams. Id.

The skills assessment scores and rankings of the chosen candidates in oral and written communication exercises and during the oral interview process were factors considered by the City Manager in deciding who to promote. These are sufficient considerations for the decision of the City Manager. Eric Henderson and Wendy Stiver were top candidates with several years of experience as Lieutenants.

Plaintiff asserts that, prior to the positing of the major position, Chief Biehl had conducted private interviews of the candidates he wanted to promote. See Response, Exhibit 5. Lt. Hill, although next on the seniority list, was not one of the candidates Chief Biehl privately interviewed. This would be probative if the assessment center had ranked Hill higher, and the City had for some other reason decided not to hire her, but it does not overcome that the City outsourced the selection process to a disinterested third party.

In 2019, the City of Dayton created a new Major Position, position number 014430, and had another assessment center process to fill it. See ECF 25, Exhibits 2 and 4. This position was later filled by Christopher Malson, a white male, in March of 2019. See City of Dayton Police Department, West Patrol Operations, https://www.daytonohio.gov/655/West-Patrol-Operations (last visited May 24, 2019). Major Malson, although given a different position number, took over as the West Patrol Commander, the same position that was previously held by Matt Carper until he was promoted in August 2016. According to the results of the previous assessment by the center, then Lt. Hill would have been the next in line for the promotion in 2016 after Matt Carper was promoted. Instead, as the assessment was stale, the City created a new position. After another assessment of candidates, the position was filled with Christopher Matson.

Plaintiff cannot establish pretext by claiming she was better qualified unless she proves that no reasonable decision maker could say that Henderson and Stiver were better candidates. Independent objective evaluators and other interviewers besides the City Manager also thought they were the better candidates. Choosing those other candidates does not establish that her decision was a pretext for discrimination.

### PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM

To establish a claim for hostile work environment harassment based on the conduct of a coworker, Plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was subjected to unwelcome harassment related to her membership in the protected class, (3) the harassment was based on her membership in the protected class, (4) the harassment unreasonably interfered with plaintiff's work performance and created a hostile or offensive work environment that was severe or pervasive, and (5) the employer knew or should have known of the charged harassment and unreasonably failed to take prompt and appropriate corrective action. *Minnich v. Cooper Farms, Inc.,* 39 F. App'x 289, 293 (6th Cir. 2002). With regard to the third element, non-sexual conduct may only be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, she would not have been the object of harassment. *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999).

A hostile work environment only occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person

would find hostile or abusive and the victim must subjectively regard that environment as abusive. See id. at 21–22. Simple teasing, offhand comments, and isolated incidents, unless extremely serious, do not give rise to an actionable claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "The standards for judging hostility are sufficiently demanding in order to ensure that Title VII does not become a "general civility code." *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1988). This standard filters out complaints which attack "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Id. at 788. Conduct must be extreme to constitute a change in the terms and conditions of employment." Id.

When determining whether the alleged harassment is sufficiently severe or pervasive, the court must consider the totality of the circumstances. *Williams*, 187 F.3d at 562. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether taken together-the reported incidents make out such a case." Id. This determination is reached considering "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Here, the alleged hostile conduct was infrequent. In the course of almost seven years of employment, dating back to 2012, Plaintiff alleges several specific incidents of treatment. Most of these involve Plaintiff's own subordinates, who she had the authority to discipline. Hill is the "employer" in this situation. *Young v. City of Idabel*, No. CIV-14-465-RAW, 2016 WL 737917, at *3 (E.D. Okla. Feb. 23, 2016), aff'd, 721 F. App'x 789 (10th Cir. 2018) ("the cited incidents

were committed by plaintiff's own subordinates. So far as the record reflects, plaintiff as Fire Chief had authority over the firefighters working under him. … Plaintiff correctly notes that an employer is directly liable for a hostile work environment created by an employee if the employer knew or should have known about the employee's conduct and failed to end it. See *Debord v. Mercy Health Syst. of Kan., Inc*., 737 F.3d 642, 650 (10th Cir. 2013). In the case at bar, however, it appears plaintiff himself was the controlling supervisor.")

Here, Rike, Reboulet, Ecton, and other Command Staff would send emails and either leave Lt. Hill off the emails or send them to her simultaneously with emails sent to her subordinates. See Response Exhibit 15. Lt. Hill asked for this to stop on several occasions, but it persisted. Id. Rike and Reboulet would also slam the door just outside of Plaintiff's office, causing her additional stress. They continued to do this, even when asked to stop. See Reponses Exhibit 25. Apparently, Rike and Reboulet drove past Lt. Hill's house sometimes, just to see if she was home. This caused Lt. Hill to become fearful and stressed. See K. Hill depo, p. 165. Lt. Hill testified that she "cried every single day going to the office" and she only felt better when she was at home because she was not afraid. Id. This was not pervasive.

Neither was the conduct severe. The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. *Sublett v. Edgewood Universal Cabling Systems, Inc.*, 194 F. Supp. 2d 692, 703 (S.D. Ohio 2002). Here, the aggrieving actions constitute the ordinary tribulations of the work place and are insufficient to support a hostile work environment claim.

Moreover, the alleged conduct did not unreasonably interfere with work performance. While Plaintiff claims an inability to do her job, there is no evidence to suggest that any actions or

treatment by the City was so severe or pervasive, or gender or race motivated so as it could reasonably be expected to interfere with her work performance. There is no proof of a workplace so permeated with discriminatory intimidation, ridicule, and insult that it is sufficiently severe or pervasive to alter the conditions of Plaintiff's employment. See *McCoy v. Mv Residential Property Management, Inc*., S.D. Ohio, 2016 WL 1392483 at \*4.

**PLAINTIFF'S RETALIATION CLAIM**

A *prima facie* case of retaliation requires: (1) she engaged in protected activity; (2) defendants knew that he engaged in protected activity; (3) defendants subjected her to an adverse employment action and (4) the adverse employment action was causally connected to the protected activity. *Ladd v. Grant Trunk Western R.R., Inc*., 552 F.3d 495, 502 (6th Cir. 2009). In order to constitute protected activity for the purposes of Title VII or Ohio Revised Code Section 4112.02, an employee must specifically allege discriminatory conduct based upon membership in a protected class. *Balding-Margolis v. Cleveland Arcade*, 352 Fed. Appx. 3, 45 (6th Cir. 2009). Complaints about a supervisor or other general work-related issues that are not based upon membership in a protected class are insufficient to establish protected activity. Id.

Plaintiff engaged in a protected activity by complaining to her managers about her harassment due to race and gender, and filing her charges with the Ohio Civil Rights Commission. Lt. Hill complained to Chief Beihl and Lt. Colonel Mark Ecton on several occasions about the harassment she was experiencing at the hands of Rike and Reboulet. First, she complained informally to Ecton, then she followed up with more formal meetings and emails, including a text message sent in March 2016, followed by the conversations with Ecton the same day. Hill aff. She filed two charges of discrimination with the Ohio Civil Rights Commission in May 2016.

Plaintiff argues that after she complained of the discrimination issues, there were changes in the description and process for being selected as a major that resulted in Plaintiff not being promoted. That is, if the Department had promoted based strictly on seniority, instead of the assessment, she would have been promoted.

Here, the Plaintiff never complained of harassment or discrimination based upon race or gender until May 2016. She also has not suffered any adverse employment action as a result of engaging in a protected activity. She remains as a Lieutenant with the department with no reduction of pay, benefits, etc. As a result, Plaintiff cannot show any causal relationship between a protected activity and an adverse employment action. Therefore, Dayton is entitled to summary judgment on this claim as well.

**ATTORNEY'S FEES OR PUNITIVE DAMAGES**

Plaintiff's claims for attorney's fees and punitive damages against the City of Dayton are moot.

**Conclusion**

Because Plaintiff has no direct evidence of race or sex discrimination, and because Plaintiff cannot prove Defendant's stated non-discriminatory reason for not promoting her as pretextual, Plaintiff's summary judgment is awarded to Defendants on Plaintiffs' failure to promote claims. Because the harassment of which Plaintiff complains was not pervasive or severe and because it came largely from subordinates she could discipline, summary judgment is awarded to Defendants on Plaintiff's hostile work environment claim. Likewise, Plaintiff has no evidence of retaliation, and summary judgment is awarded on this claim as well. Plaintiff's claims for attorney fees and punitive damages are **MOOT**. Thus, Defendants' Motion for Summary Judgment, ECF 13, is

**GRANTED**, and the Clerk is **ORDERED** to enter judgment in favor of Defendants on all claims. The instant case is **TERMINATED** on the dockets of the United States District Court for the Southern District of Ohio, Western Division at Dayton.

      **DONE** and **ORDERED** in Dayton, Ohio, Wednesday, October 16, 2019.


                      s/Thomas M. Rose
                     _____
                       THOMAS M. ROSE
               UNITED STATES DISTRICT JUDGE